**Docket No. 24-165**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———— • ————

KELLY CAHILL, et al.,

*Plaintiffs-Appellees,*

v.

NON-PARTY MEDIAL ORGANIZATIONS INSIDER INC.
d/b/a BUSINESS INSIDER, et al.,

*Non-Party Media Orgs.-Appellees,*

NIKE, INC.,

*Defendant-Appellant.*

_____

*Appeal from a Decision of the United States District Court for the District of Oregon,*
*No. 3:18-cv-01477-JR · Honorable Marco A. Hernández*

## EXCERPTS OF RECORD
## Volume II of IV – Pages 12 to 309

DANIEL PRINCE, CA Bar No. 237112
FELICIA A. DAVIS, CA Bar No. 266523
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071-2228
Telephone: (213) 683-6000
Email: danielprince@paulhastings.com
Email: feliciadavis@paulhastings.com

*Attorneys for Defendant-Appellant*
*NIKE, INC.*

 COUNSEL PRESS · (213) 680-2300                     PRINTED ON RECYCLED PAPER 

| | |
|---|---|
| **From:** | info@ord.uscourts.gov |
| **Sent:** | Friday, January 5, 2024 2:53 PM |
| **To:** | nobody@ord.uscourts.gov |
| **Subject:** | [EXT] Activity in Case 3:18-cv-01477-JR Cahill et al v. Nike, Inc. Order |

**--- External Email ---**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 1/5/2024 at 2:52 PM PST and filed on 1/5/2024

**Case Name:**     Cahill et al v. Nike, Inc.

**Case Number:**   3:18-cv-01477-JR

**Filer:**

**Document Number:** 404(No document attached)

**Docket Text:**

**ORDER:** The Court finds Defendant has not established a likelihood of success on the merits of its Objections to the October 11, 2023, Findings and Recommendation or that Defendant will be irreparably harmed in the absence of a stay. The Court, therefore, DENIES that portion of Defendant's Motion to Stay, ECF 397.

The Court, however, GRANTS Defendant's alternative request for a temporary 7-day stay to allow time for Defendant to seek a stay from the Ninth Circuit directly. Accordingly, the Court's January 5, 2024 Order, ECF 403 is STAYED for a period of 7 days from the date of this Order. This temporary stay will expire automatically, without further order of the Court, 7 days from the date of this Order. Ordered by District Judge Marco A Hernandez. (jp)

**3:18-cv-01477-JR Notice has been electronically mailed to:**

ER-013

David B. Markowitz     davidmarkowitz@markowitzherbold.com, 6951279420@filings.docketbird.com, docket@markowitzherbold.com, sarahdubrule@markowitzherbold.com, sarapomerening@markowitzherbold.com, tamihall@markowitzherbold.com

Laura R. Salerno Owens     LauraSalerno@MarkowitzHerbold.com, 8359710420@filings.docketbird.com, AbigailAdams@MarkowitzHerbold.com, Docket@MarkowitzHerbold.com, sarahdubrule@markowitzherbold.com, sarapomerening@markowitzherbold.com

Laura E. Rosenbaum     laura.rosenbaum@stoel.com, docketclerk@stoel.com, marilyn.schoos@stoel.com

Felicia A. Davis     feliciadavis@paulhastings.com, arlenefigueroa@paulhastings.com, deisycastro@paulhastings.com, ecf-ord-6374354248433664@inbound.docketalarm.com, lindseyjackson@paulhastings.com

Harry B. Wilson     harrywilson@markowitzherbold.com, 2591600420@filings.docketbird.com, SarahDubrule@MarkowitzHerbold.com, docket@markowitzherbold.com, joannastalheim@markowitzherbold.com, sarapomerening@markowitzherbold.com

Kathryn P. Roberts     KathrynRoberts@MarkowitzHerbold.com, 9717759420@filings.docketbird.com, Docket@MarkowitzHerbold.com, JeniInirio@MarkowitzHerbold.com, SaraPomerening@MarkowitzHerbold.com, SarahDubrule@MarkowitzHerbold.com

Chad A. Naso     chadnaso@markowitzherbold.com, 2609173420@filings.docketbird.com, Docket@MarkowitzHerbold.com, SaraPomerening@MarkowitzHerbold.com, SarahDubrule@MarkowitzHerbold.com, joannastalheim@markowitzherbold.com

Katharine L. Fisher     kfisher@gbdhlegal.com

Laura L. Ho     lho@gbdhlegal.com, efile@gbdhlegal.com, sgrimes@gbdhlegal.com

Byron Goldstein     brgoldstein@gbdhlegal.com, efile@gbdhlegal.com

India Lin Bodien     india@indialinbodienlaw.com, jb@ackermanntilajef.com

Craig J. Ackermann     cja@ackermanntilajef.com, ak@ackermanntilajef.com, bd@ackermanntilajef.com, jb@ackermanntilajef.com

Daniel Prince     danielprince@paulhastings.com, alyssatapper@paulhastings.com, ecf-ord-6705547519524864@inbound.docketalarm.com, francinesheldon@paulhastings.com, lisavermeulen@paulhastings.com, maggiehall@paulhastings.com

Zachary P. Hutton     zachhutton@paulhastings.com

Barry Goldstein     bgoldstein@gbdhlegal.com

James P. Kan     jkan@gbdhlegal.com

Mengfei Sun     msun@gbdhlegal.com, dvaldez@gbdhlegal.com

Brian Walter Denlinger     brian.w.denlinger@gmail.com

Nicole Lueddeke      nicolelueddeke@paulhastings.com

**3:18-cv-01477-JR Notice will <u>not</u> be electronically mailed to:**

ER-015

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
|---|---|
| Plaintiffs, | |
| vs. | DEFENDANT NIKE, INC.'S MOTION FOR A STAY PENDING APPEAL RE: OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | **EXPEDITED HEARING REQUESTED** |
| | **ORAL ARGUMENT REQUESTED** |

ER-016

## TABLE OF CONTENTS

**Page**

I.      BACKGROUND ................................................................................................ 2

II.     LEGAL STANDARD...................................................................................... 3

III.    A STAY PENDING APPEAL IS NECESSARY HERE. .................................. 4

        A.      There Will be Irreparable Injury Without a Stay Pending Appeal. ...................... 4

        B.      NIKE Has Raised Serious Legal Questions on the Merits. .................................. 6

        C.      The Balance of Hardships Tips in Favor of NIKE and its Former Employees. .... 7

        D.      The Public Interest Favors a Stay Pending Appeal................................................ 7

IV.     CONCLUSION.............................................................................................. 8

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) ......................................................................................3, 4

*Align Tech., Inc. v. SmileDirectClub, LLC*,
    No. 23-CV-00023-EMC, 2023 WL 2347431 (N.D. Cal. Mar. 3, 2023)...............................4, 5

*Ball v. Skillz Inc.*,
    No. 220CV00888JADBNW, 2020 WL 10180904 (D. Nev. Nov. 16, 2020) .......................5, 8

*Benson v. Double Down Interactive, LLC*,
    Case No. 2:18-cv-00525-RBL, 2019 WL 972482 (W.D. Wash. Feb. 28, 2019)......................6

*Does I thru XXIII v. Advanced Textile Corp.*,
    214 F.3d 1058, 1069 (9th Cir. 2000) .......................................................................6

*Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*,
    179 F.R.D. 264 (C.D. Cal. 1998)...............................................................................8

*Flores v. Barr*,
    977 F.3d 742 (9th Cir. 2020) .................................................................................4

*Hernandez v. Cnty. of Monterey*,
    No. 13-CV-02354-BLF, 2023 WL 4849877 (N.D. Cal. July 28, 2023)...................................5

*Hooks v. Hood River Distillers, Inc.*,
    No. 3:21-CV-268-SI, 2021 WL 2142609 (D. Or. May 26, 2021) ............................................4

*Hunton v. Am. Zurich Ins. Co.*,
    No. CV-16-00539-PHX-DLR, 2019 WL 399708 (D. Ariz. Jan. 31, 2019).....................5, 7, 8

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ..............................................................................4, 6

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................................3, 5

*WOF SW GGP 1, LLC v. Quasar Energy Group, LLC*,
    No. 3:18-CV-01475-AC, 2020 WL 2758779 (D. Or. Jan. 7, 2020) ....................................6, 7

**Other Authorities**

Fed. R. App. P. 8(a)(1)..................................................................................................................3

Fed. R. App. P. 8(a)(2)(A)(ii) ..................................................................................................2, 8

LR 7-1(a).......................................................................................................................................1

LR 7-1(g) ......................................................................................................................................2

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Defendant NIKE, Inc. ("NIKE") conferred in good faith with counsel for the Non-Party Media Organizations, Insider Inc. *d/b/a BUSINESS INSIDER*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively the "Intervenors"), and counsel for Plaintiffs Kelly Cahill, Heather Hender, Sara Johnston, and Lindsay Elizabeth ("Plaintiffs"), regarding this motion and the matters contained herein.  NIKE understands that the motion is opposed.

## EMERGENCY MOTION FOR STAY PENDING APPEAL

NIKE filed objections to the Magistrate Judge's Findings and Recommendation (the "Findings") granting the Intervenors' Renewed Motion to unseal this Court's records (collectively, the "Records").[1]  NIKE files this protective motion for an emergency stay in the event the District Court overrules NIKE's objections.  The purpose of this motion is to avoid publication—during the pendency of any appeal—of the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents.  *See* ECF Nos. 343, 346.  Publication of the identities of the above-referenced individuals is likely to cause immediate and irreparable harm, and the subject matter of the appeal would be destroyed without a stay.  NIKE seeks an expedited hearing pursuant to LR 7-1(g).  **Assuming, *arguendo*, that the Court denies this motion, NIKE**

---

[1] Intervenors requested that unredacted versions of the following be publicly filed: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–6; Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–7; Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–8; Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–1; Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–2; Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 288; Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 290–4.  ECF No. 343 at 5.

**requests a brief stay be put in place for NIKE to request a stay directly from the Ninth Circuit. Fed. R. App. P. 8(a)(2)(A)(ii).**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      BACKGROUND

On November 13, 2022, the Court granted, in part, NIKE's motion to seal certain portions of documents filed in relation to Plaintiffs' motion for class certification, adopting the Magistrate's recommendations issued on September 30, 2022.  ECF Nos. 275.  The Court also granted the Intervenors' motion to intervene "for the limited purpose of challenging the stipulated redactions related to the briefing surrounding [P]laintiffs' Motion for Class Certification" and denied the Intervenors' request to unseal documents produced under the Protective Order in the case.  *Id.*  The Court denied Plaintiffs' motion for class certification on March 21, 2023 (ECF No. 335), and Intervenors filed their renewed motion on August 9, 2023, seeking to reveal the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents.

Many of the documents subject to the Intervenors' renewed motion already have been publicly filed and their substantive contents have been laid bare.  ***The only information that remains redacted are the names*** of individuals who:  (1) submitted complaints internally to NIKE, with the expectation that the issues raised would be investigated as confidentially as possible; (2) were the subjects of the internal complaints, some of which were not substantiated; or (3) alleged witnesses to purported events, many of whom were interviewed with the understanding that the investigation would remain as confidential as possible.  The Intervenors admitted that NIKE already unredacted extensive information pertaining to these purported complaints.  ECF No. 343, at 7–8.  The remaining redactions seek to avoid embarrassing the individuals named in the documents and to avoid discouraging confidential reporting of wrongdoing, an essential element in protecting workers

Page 2 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

going forward.  The individual employees implicated here are not parties to the litigation, and have no expectation that their identities are subject to exposure for the Intervenors' sole purpose of generating news content.  ***Furthermore, these individuals' identities have absolutely nothing to do with the claims or defenses raised in this case.***

On October 11, 2023, Magistrate Judge Russo recommended that this Court grant the Intervenors' renewed motion, ECF No. 364, and NIKE timely filed objections to the Magistrate Judge's Findings on October 25, 2023, ECF No. 376.  Both Plaintiffs and the Intervenors filed oppositions to NIKE's objections.  ECF Nos. 382–84.  NIKE's objections requested oral argument, and NIKE concurrently filed its renewed request for oral argument alongside this motion.  Within that renewal, NIKE requested a stay of proceedings in the event the District Court overrules NIKE's objections to avoid publication during the time this concurrently filed motion to stay remains under the Court's consideration.

## II.    <u>LEGAL STANDARD</u>

A party seeking a stay pending appeal must ordinarily move for a stay from the District Court before requesting a stay from the Ninth Circuit.  Fed. R. App. P. 8(a)(1).  Either level of review requires the consideration of four factors:

> "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Al Otro Lado v. Wolf*, 952 F.3d 999, 1006–07 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 434–435 (2009)).  "The first two factors ... are the most critical," while the last two are reached only "[o]nce an applicant satisfies the first two factors."  *Id*.  At core, "[a]n applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending."  *Id*.  However, the Ninth's Circuit's "sliding scale"

Page 3 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

approach—which balances the elements of the preliminary injunction test so that a stronger

showing of one element may offset a weaker showing of another—applies equally to a district

court's assessment of whether to stay an order pending appeal.  *Al Otro Lado*, 952 F.3d at 1007;

*Hooks v. Hood River Distillers, Inc.*, No. 3:21-CV-268-SI, 2021 WL 2142609, at *18 (D. Or.

May 26, 2021).  "If anything, a flexible approach is even more appropriate in the stay context."

*Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam).  Thus, a stay may be

granted despite serious questions going to the merits of success on appeal if the balance of

hardships tips in the moving party's favor.  *See Flores v. Barr*, 977 F.3d 742, 746 (9th Cir.

2020); *Align Tech., Inc. v. SmileDirectClub, LLC*, No. 23-CV-00023-EMC, 2023 WL 2347431,

at *1 (N.D. Cal. Mar. 3, 2023).

## III.    A STAY PENDING APPEAL IS NECESSARY HERE.

To the extent the District Court overrules NIKE's objections on the redaction issue, if there is

no immediate stay, Plaintiffs likely would file unredacted copies of the documents at issue publicly,

thereby enabling the Intervenors to publish non-party individuals' identities while NIKE's motion

for stay and appeal would be under review.  Publication of the records at issue would gut any

potential remedy available to NIKE or the impacted individuals.  Thus, if the Court denies NIKE's

instant motion, NIKE respectfully requests an emergency stay of proceedings to allow time for

NIKE to seek a stay directly from the Ninth Circuit pending appeal.

### A.      There Will be Irreparable Injury Without a Stay Pending Appeal.

Adoption of the Magistrate Judge's Findings presents a situation that could result in

irreparable injury to those currently protected by the Court's seal.  The Intervenors seek to

immediately publicize the documents at issue.  Thus, the risk that publication brings is not

merely that prying eyes will log into PACER and access documents behind the paywall; it is that

Page 4 –   NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

Plaintiffs would provide unredacted copies of the key documents to Intervenors, and that the Intervenors would publish the names contained therein.  This concern is not a mere possibility, but rather the fundamental reason why the Intervenors have joined this action seeking to unseal this information (and why Plaintiffs echoed the Intervenors' response to NIKE's objections). *See* ECF Nos. 343, 346.  Publication of this information is likely to bring embarrassment, emotional harm and reputational harm to individuals named in the redacted records.  And once the unredacted records are filed on the public docket, the information within them can never be fully clawed back.  *See Ball v. Skillz Inc.*, No. 220CV00888JADBNW, 2020 WL 10180904, at *2 (D. Nev. Nov. 16, 2020) (finding irreparable injury absent stay because of inability to claw back plaintiff's anonymity from public record); *see also Align Tech., Inc., LLC*, 2023 WL 2347431, at *1 ("'[When] the information is publicly filed, what once may have been [confidential] no longer will be'") (quoting *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3536800, at *1 (N.D. Cal. Aug. 15, 2012)).

If a stay is not put in place pending appeal of the Court's Order, nothing prevents the Intervenors or anyone else from accessing the Court's records and disclosing that information to the public during NIKE's appeal.  *See Hunton v. Am. Zurich Ins. Co.*, No. CV-16-00539-PHX-DLR, 2019 WL 399708, at *3 (D. Ariz. Jan. 31, 2019) (opposing counsel disclosed unsealed information to third party in absence of a stay pending appeal); Understanding that reality, a stay prevents harm to the individuals named in the applicable records, *see, e.g., Nken*, 556 U.S. at 434; *c.f. Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) (finding district court erred by failing to consider evidence of threatened retaliation to non-parties), while also preserving the merits of NIKE's appeal.  *Hernandez v. Cnty. of Monterey*, No. 13-CV-02354-BLF, 2023 WL 4849877, at *2 (N.D. Cal. July 28, 2023) ("Defendants

correctly point out that once the material in the reports is made public, Defendants would have no effective recourse even if they were to prevail on their appeal of the Sealing Order.").

### B.    NIKE Has Raised Serious and Important Legal Questions on the Merits.

The likelihood of NIKE's success on appeal also weighs in its favor.  At this stage, NIKE need only establish that success is a "reasonable probability," a "fair prospect," or that "serious legal questions are raised."  *Leiva–Perez*, 640 F.3d at 967-968; *WOF SW GGP 1, LLC v. Quasar Energy Group, LLC*, No. 3:18-CV-01475-AC, 2020 WL 2758779, at *1 (D. Or. Jan. 7, 2020).

Although the Ninth Circuit has not defined "serious legal questions," this Court and others within the Circuit have found that a question is serious "when it raises an issue of first impression within the Ninth Circuit or involves a split of legal authority."  *WOF SW GGP 1, LLC*, 2020 WL 2758779, at *1 (quoting *Vesta Corp. v. Amdocs Mgmt. Ltd.*, No. 3:14-cv-1142-HZ, 2016 WL 10843668, at *2 (D. Or. Nov. 7, 2016)); *Benson v. Double Down Interactive, LLC*, Case No. 2:18-cv-00525-RBL, 2019 WL 972482, at *6 (W.D. Wash. Feb. 28, 2019) (holding that "[e]ven though this Court stands by its prior decision ... there is no clear precedent by the Ninth Circuit or the Supreme Court squarely addressing the issue ... [and thus movant] meets the serious legal question standard").

There is a dearth of authority in the Ninth Circuit on motions to stay pending appeal when the underlying order concerns a motion to unseal the identities of non-party complainants, witnesses, and subjects of internal complaints.  That said, NIKE has presented a serious legal question with respect to whether the "good cause" standard (instead of the "compelling interest" standard) should be applied in the instant case.  This is especially true where, as here, the Court should weigh this factor as well as the other factors that militate in favor of NIKE.

Page 6 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

**C.      The Balance of Hardships Tips in Favor of NIKE and its Former Employees.**

There would be no injury to other interested parties as a result of a stay.  For one, all parties hereto have access to the applicable records without redaction.  Plaintiffs did not challenge the Court's June 17, 2019 Protective Order, and in fact, Plaintiffs agreed with NIKE to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at [NIKE] that have not already been made public[.]"  ECF No. 273 at 12. Of equal import, granting a stay would not impact the current stage of proceedings because the parties can continue the proceedings consistent with the Court's case management order.

The Intervenors likewise would be no worse off to wait until the appellate court can review the legal issues here before gaining access to and/or publishing the records at issue.  Any additional delay that may arise by virtue of any appellate proceedings is outweighed by the interest of justice for the individuals whose identities are currently redacted, and there would be no harm to the litigants themselves.  *See WOF SW GGP 1, LLC*, 2020 WL 2758779, at *2 ("[T]he timeframe for the appeal is not so arduously long that it creates an unnecessary burden on [p]laintiff.").

**D.      The Public Interest Favors a Stay Pending Appeal.**

Finally, public interest weighs in favor of NIKE's position.  If there is no stay and the Court is inclined to overrule NIKE's objections to the Magistrate Judge's Findings, any appeal to the Ninth Circuit likely would be moot—far in advance of the Ninth Circuit's review of the legal arguments.  *Hunton*, 2019 WL 399708, at *3 ("Although the Court could issue a stay that prevents Plaintiff from disclosing these documents to others going forward, it is not clear how the Court can undo the disclosures that already have occurred.").  Allowing parties to seek appellate review without mooting the subject of the inquiry is a significant public interest and

Page 7 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

finding otherwise would effectively create a "race to the courthouse," whereby Plaintiffs and/or

the Intervenors would attempt to publicize the records here before the Court has time to consider

NIKE's appeal. *C.f. Guthy-Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D.

264, 271 (C.D. Cal. 1998) ("[C]ourts seek to eliminate the race to the courthouse door in an

attempt to preempt a later suit in another forum.").  By contrast, minimal harm would befall the

public interest if proceedings are stayed pending appeal.  *See Ball*, 2020 WL 10180904, at *2

(finding slight delay in revealing contested information while an appeal is pursued has minimal

effect on public interest).

## IV.    <u>CONCLUSION</u>

Assuming, *arguendo*, that the Court overrules NIKE's objections to the Magistrate's

Findings & Recommendation, NIKE respectfully requests an immediate stay of proceedings to

protect the subject matter of any appeal that NIKE would file with the Ninth Circuit concerning the

redactions referenced in NIKE's objections to the Findings.  Assuming, *arguendo*, that the Court

denies this motion, NIKE requests a brief stay be put in place for NIKE to request a stay directly

from the Ninth Circuit. Fed. R. App. P. 8(a)(2)(A)(ii); s*ee Hunton*, 2019 WL 399708, at *3 (granting

party's alternative request for stay to allow time to seek relief directly from the Ninth Circuit).


Date: December 21, 2023              */S/ Daniel Prince*_____

                                     DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                     danielprince@paulhastings.com
                                     FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                     feliciadavis@paulhastings.com
                                     PAUL HASTINGS LLP
                                     515 South Flower Street, 25th Floor
                                     Los Angeles, CA 90071
                                     Telephone:  (213) 683-6000
                                     Facsimile:  (213) 627-0705


Page 8 –  NIKE, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.


UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S RENEWED REQUEST FOR ORAL ARGUMENT ON NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) PURSUANT TO FED R. CIV. P. 72 AND CONDITIONAL REQUEST FOR EMERGENCY STAY |
| vs. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |
| | **ORAL ARGUMENT REQUESTED** |

ER-029

**Renewed Request for Oral Argument and Request for Emergency Stay**

On October 25, 2023, NIKE filed its objections to the Magistrate Judge's Findings and Recommendation dated October 11, 2023 (the "Findings") granting the Non-Party Media Organizations' (the "Intervenors") Renewed Motion to Unseal Judicial Records (the "Renewed Motion"). NIKE requested oral argument because its objections raise serious and important legal questions. NIKE hereby renews that request. While NIKE continues to believe in its position, NIKE is concurrently filing a motion (on an expedited basis) seeking a stay pending appeal of the Court's decision in the event that the Court overrules NIKE's objections to ensure that Plaintiffs do not furnish records currently redacted to the Intervenors for publication while that appeal is pending.

That motion notwithstanding, at any oral argument, NIKE would seek an additional stay of proceedings if the Court overrules NIKE's objections to account for the period before the Court may consider and rule on NIKE's emergency motion for stay. Without a stay in place during this period, Plaintiffs could and likely would provide unredacted versions of documents that are now-redacted to the Intervenors, which, in turn, would publicize such information even though NIKE would seek an emergency stay and an appeal.[1] ***Thus, in the event NIKE does not have the opportunity to express this in oral argument, NIKE requests an immediate stay of the***

---

[1] Intervenors requested that unredacted versions of the following be publicly filed: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–6; Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–7; Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 284–8; Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–1; Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, ECF No. 285–2; Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 288; Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification, ECF No. 290–4. ECF No. 343 at 5.

Page 1 –  RENEWED REQUEST FOR ORAL ARGUMENT AND REQUEST FOR STAY

*Court's Order adopting the Magistrate Judge's findings while NIKE's emergency motion for stay is under consideration.*

As argued in that motion, a stay should be granted during this interim period for the same reasons why it is necessary pending appeal—because a stay avoids irreparable injury and protects the subject matter of any appeal.  The Plaintiffs likely would provide, and the Intervenors likely would seek to immediately publicize, unredacted documents containing the identities of complainants, witnesses, and subjects of internal complaints listed in certain, limited documents before the Court rules on NIKE's motion to stay.  *See* ECF Nos. 343, 346. Publication of this information is likely to cause emotional and reputational harm and other injury to the individuals named in the redacted records, and once the unredacted records are publicly filed, the information within them can never be fully clawed back.  *See Ball v. Skillz Inc.*, No. 220CV00888JADBNW, 2020 WL 10180904, at *2 (D. Nev. Nov. 16, 2020) (finding irreparable injury absent stay because of inability to claw back plaintiff's anonymity from public record); *see also Align Tech., Inc. v. SmileDirectClub, LLC*, No. 23-CV-00023-EMC, 2023 WL 2347431, at *1 ("'[When] the information is publicly filed, what once may have been [confidential] no longer will be'") (quoting *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3536800, at *1 (N.D. Cal. Aug. 15, 2012)).

A stay also is in the public interest, there would be little to no injury to the Intervenors if a stay is granted, and NIKE's objections raise serious and important legal questions related to individual's privacy interests on the merits.  Therefore, if NIKE's objections are overruled, NIKE requests an immediate stay during the Court's consideration of its motion to stay.

Date: December 21, 2023          */S/ Daniel Prince*
                                  DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                  danielprince@paulhastings.com

Page 2 –   RENEWED REQUEST FOR ORAL ARGUMENT AND REQUEST FOR STAY

FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PLAINTIFFS' OPPOSITION TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION**<br><br>**FILED WITH REDACTIONS** |

**Pɪs.' Opp'ɴ ᴛᴏ Nɪᴋᴇ's Oʙᴊᴇᴄᴛɪᴏɴs ᴛᴏ ᴛʜᴇ Mᴀɢɪsᴛʀᴀᴛᴇ Jᴜᴅɢᴇ's Fɪɴᴅɪɴɢs ᴀɴᴅ Rᴇᴄᴏᴍᴍᴇɴᴅᴀᴛɪᴏɴ**

## I.    INTRODUCTION AND SUMMARY

In its Objections to the Magistrate Judge's Findings and Recommendation ("F&R"), ECF No. 376 ("Objections"), Nike misrepresents the complaints[1] in question and their relevance to Plaintiffs' individual and class claims.  Plaintiffs present this Opposition to correct these errors, which, if uncorrected, could mislead the Court.  The complaints are relevant to all of Plaintiffs' claims, particularly the disparate treatment claims under Title VII and the Oregon Equality Act ("OEA"), which allege a pattern and practice of discrimination against women.  The information in this Opposition is critical to respond to Nike's factual distortions because the Media Intervenors do not have equivalent access to record evidence or familiarity with the underlying legal arguments as Plaintiffs.

Further, given that Plaintiffs will likely try their individual claims in the coming year and appeal the denial of class certification upon a final judgment, there is an ongoing need for public access to relevant and accurate information to evaluate both the merits of Plaintiffs' claims and the self-interested commentary issued by Nike.  Only when the names are unredacted will non-parties become aware that Nike Vice Presidents have been accused of gender-based discrimination and harassment.  For example, the spurious nature of Nike's claim that the

---

[1] Nike refers to the complaints as "unsubstantiated." Objs., ECF No. 376 at 6, 17.  But, Nike has never introduced evidence disputing the substance of the complaints. Moreover, after Nike received the complaints, Nike's CEO endorsed the validity of the complaints by, among other statements, admitting that "[HR] processes … underserved us in recent years [and Nike needs] to restore trust in places where it has eroded."  Sun Decl. Ex. 4, ECF No. 280-4 at 7. Furthermore, on the basis of attorney-client privilege, Nike has refused to produce documents related to its investigations of the complaints, any conclusions about the validity of the complaints, or any actions taken in response.  Nike should not be permitted to obtain the benefit of the privilege shield while, at the same time, making arguments about the validity of the complaints.  Finally, a corporate witness testifying pursuant to Federal Rule of Civil Procedure 30(b)(6) admitted that "some" employees were forced to "exit" as a result of the complaints but was directed by counsel not to identify those employees.  Sun Decl. Ex. 67, ECF No. 286-7 at 6-7.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 1

offending conduct was "consensual" between "colleagues" becomes clear when alleged harassers are revealed as executives with power and influence over their targets.

## II.    ARGUMENT

### A.    Nike Misrepresents the Substance of the Complaints.

To support its argument that the redactions should stand, Nike emphasizes the dissimilarity of the complaints and the subject matter of Plaintiffs' individual and class action claims.  But Nike's characterizations are inaccurate and misleading.

According to Nike, "none of the complaints at issue relate to pay disparities" and "[a] handful of claimed harassment complaints tell the Court nothing about whether Plaintiffs can prove a common policy or practice of pay or promotion decisions sufficient to certify a class." But, contrary to these assertions:[2]

- A complainant alleges "inequity in pay," stating that she has "asked twice to have [her] salary reviewed" and her "boss" while saying "that will happen" has "never follow[ed] through."  She "know[s]" that she is "underpaid."  Decl. of Mengfei Sun in Supp. of Pls.' Mot. for Class Certification ("Sun Decl.") Ex. 47, ECF No. 159-7 at 3 (unredacted) / ECF No. 284-7 at 3 (redacted). Ex. 47, ECF No. 159-7 at 3 (unredacted) / ECF No. 284-7 at 3 (redacted) at 10.

- A complaint, submitted by former Nike Vice President ████████████ describes discrimination in the promotion process.[3]  Decl. of Byron Goldstein in Supp. of Pls.' Mot. for Class Certification ("Goldstein Class Cert. Decl.") Ex. 9, ECF No. 290-4 at 19 (redacted) / Sun Decl. Ex. 50, ECF No. 159-10 (unredacted).  ████████ alleges that she proposed three female candidates for promotion but Senior VP[4] ████████ rejected her recommendation by telling her "you need a man in the role."  Sun Decl. Ex. 50, ECF No. 159-10 at 2 (unredacted) / Goldstein Decl. Ex. 9, ECF No. 290-4 at 20 (redacted).  After

---

[2] Plaintiffs only refer to the complaints that are the subject of the F&R.  For convenience of the Court, Plaintiffs cite to both the redacted and unredacted versions of these complaints.

[3] ████████ is a former Nike vice president.  Decl. of Byron Goldstein in Supp. of Pls.' Reply in Supp. of Mot. to Compel Produc. of Docs. ("Goldstein Reply MTC Decl.") Ex. 12, ECF No. 369-11 at 10.

[4] On a Nike organization chart, ████████ is listed as "████████████."  Sun Decl. Ex. 54, ECF No. 285-4 at 1. This is an example of the benefit of unredacting names.  By identifying ████ on an unredacted complaint, it becomes clear that a Nike executive, a VP, gave ████ explicit instructions to discriminate on the basis of gender.

**PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION**
**PAGE 2**

hearing this explicit discriminatory direction by a high-ranking Nike
executive, ███ had a "lack of faith in a fair & equitable promotion
process." *Id.*

- Another complainant, ███████████ alleged that, despite being a "top
  performer," she was not promoted; she reported the problem to HR but
  "nothing was done …."  Sun Decl. Ex. 46, ECF No. 159-6 at 2 (unredacted) /
  ECF No. 284-6 at 2 (redacted).

Nike also mischaracterizes the complaints of sexual harassment.  According to Nike,

"none of the [sex harassment] claims appear to assert allegations of non-consensual conduct."

Objs., ECF No. 376 at 6 n.4.  Nike further attempts to minimize the seriousness of the complaints

by referring to them as "allegations of philandering, consensual sex between colleagues, and

workplace bullying."  *Id.* at 9-10.  In reality, the complaints reveal hostile and unlawful sexual

harassment that cannot reasonably be described as "consensual."

- ███████████ alleged that her supervisor, ██████████, had a "[b]oys club
  attitude," "terrorized her," and "wouldn't stop."  Sun Decl. Ex. 46, ECF No.
  159-6 at 2 (unredacted) / ECF No. 284-6 at 2 (redacted).  ██████████ added
  that ████ knows that he "can get away with it," because "██████████ [a
  Nike VP]" turned a blind eye."  *Id.*

- Another complainant alleges "examples of sexual harassment" at Nike: "Men
  sloppy drunk putting their arms around … female coworkers while on work
  travel," "[m]en trying to sleep with women in their function at lower levels by
  luring them in through promise of a 'work dinner' to discuss their career," and
  "VP men sleeping with/getting BJs from women in the organization at much
  lower level."  Sun Decl. Ex. 47, ECF No. 159-7 at 3 (unredacted) / ECF No.
  284-7 at 3 (redacted).  The Complainant further describes that "ER [Employee
  Relations] and HR at this company are a joke" and that "██████████[6] [
  █████████████████████████████] was a well known sexual harasser
  …." *Id.*  Additionally, the complainant identifies several Nike executives

---

[5] The unredacted complaint identifies that ██████████, who was a Nike VP/GM, Goldstein
Reply MTC Decl. Ex. 7, ECF No. 369-6 at 1, "turned a blind eye" to the "[b]oys club" attitude
that "terrorized" the complainant, ██████████.  Without having access to the name, ██████
the public has no way to know that a company executive turned a "blind eye" to sexual
harassment.

[6] ██████████ was a former ██████████.  Goldstein Reply MTC Decl.
Ex. 9, ECF No. 369-8 at 1.  Without the unredacted complaint it is not possible to know that the
complainant charged that Nike's ██████████ was a "well known harasser."

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION
PAGE 3

including "███████ [and] ███████,[7]" who are identified in other complaints, as "known philanderers with lower level employees whom they exert influence and power over." *Id.*

- ███████, a former Nike VP,[8] identified "negative, manipulative and sexist behavior over the course of [her] career at Nike." Sun Decl. Ex. 48, ECF No. 159-8 at 3 (unredacted) / ECF No. 284-8 at 3 (redacted). ███ alleged that a senior Nike executive, ███████[9], engaged in "[d]isparaging, dishonest behavior" and "discredit[ed]" her "reputation" and damaged her career. *Id.* at 4. In doing so, ███ made sexist criticisms ("it's like neither your boyfriend nor your husband are happy with you.") *Id.*

- Two lower-level female complainants recounted severe harassing conduct by Nike VP ███████. One complainant alleged that "███ was late for his Personal Training session with me. I said, 'oh ███ you are so late today.' He responded, 'well maybe if you dressed sexier I would be on time.' He continued with 'take that baggy jacket off and show some skin.' I tried to laugh but I was humiliated. I finished the lesson and kept it to myself because of who he is at the company." She added, "[i]t made me feel bad. I was intimidated and felt degraded." Sun Decl. Ex. 51, ECF No. 160-1 at 2 (unredacted) / ECF No. 285-1 at 2 (redacted). A second complainant alleged that she "walked into the massage room at Nike Sports Center [and w]hen [she] opened the door" she saw a female trainer who was "performing oral sex on ███████." The episode "put a very bad taste in my mouth about leadership and how men … take advantage of women below them." Sun Decl. Ex. 52, ECF No. 160-2 at 2 (unredacted) / ECF No. 285-2 at 2 (redacted).

- Finally, a complainant details the problem with reporting sexual harassment to HR. She alleged how one woman was "not able to do anything about" being called a "bitch" by her manager because HR refused to act after a Nike vice-president, ███████,[10] "phoned in a favor" to protect his friend. Sun Decl. Ex. 49, ECF No. 159-9 at 2 (unredacted) / Goldstein Class Cert. Decl.

---

[7] ███████ is a Nike VP. Goldstein Reply MTC Decl. Ex. 9, ECF 369-8 at 1. Without the unredacted complaint it is not possible for the public to understand that that harassing conduct alleged was committed by a Nike executive and that this Nike executive, as described in other complaints, engaged in harassing conduct with Nike female employees in lower level positions.

[8] ███████ is a former Nike VP. Sun Decl. Ex. 74, ECF No. 162-4 at 8.

[9] ███████ is a former Nike VP/GM. Goldstein Reply MTC Decl. Ex. 3, ECF No. 369-2 at 1.

[10] The unredacted complaint identifies that ███████, who is a Nike VP, Goldstein Reply MTC Decl. Ex. 12, ECF No. 369-11 at 9, "phoned in a favor" that short-circuited any investigation of the harassment complaint. Only by knowing the name, ███████, would the public understand that a Nike VP interfered with an HR harassment investigation in order to protect a friend.

**PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION**
**PAGE 4**

Ex. 9, ECF No. 290-4 at 27 (redacted).

Nike's refusal to acknowledge the seriousness of these complaints is further evidence of a workplace culture imbued with gender-based discrimination.  Unredacting the names would enable the press and the public to investigate or challenge Nike's characterizations and mischaracterizations of the complaints.

**B.**    **Nike Ignores the Relevance of the Complaints.**

For Plaintiffs' disparate treatment claims under Title VII and the OEA, anecdotal evidence of sexual harassment, such as those in the complaints, helps "establish a general discriminatory pattern." *Obrey v. Johnson*, 400 F.3d 691, 698 (9th Cir. 2005).

**1.**    **Sexual Harassment by Superiors is Not Consensual.**

Nike's tone-deaf claim that the complaints do not allege "non-consensual" conduct and, instead, refer to "consensual sex between colleagues," Objections, ECF No. 376 at 6 n.4 and 10, ignores the status of the harassers as compared to the female victims.  For example, Nike cites two complaints involving sexual contact, referring to the participants as "individuals." *Id.* at 17. But Nike can only maintain the fiction of consent based on the underlined redacted complaints.  When the names are underlined unredacted, and the male harasser is identified as a Nike executive, VP ███ ███ and the victims are identified as female employees in the roles of personal trainer and a massage therapist, *see* section II.A, *supra*, the nature of the harassing conduct becomes evident.[11]

It is well established that conduct may constitute unlawful harassment because the harasser was a supervisor who exercised influence over a lower-level employee.  *See Zetwick v. County of Yolo*, 850 F. 3d 436, 445 (9th Cir. 2017) (concluding that a reasonable jury could find

---

[11] Similarly, Nike refers to "allegations of philandering," Objections, ECF No. 376 at 9-10, but omits that the complaint identifies "known philanderers," ███████ and ████████, as well as other Nike VPs, and that these Nike VPs focused upon "lower level employees whom they exert influence and power over." *See* section II.A, *supra*.

PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION
PAGE 5

that the alleged sexual harassment was actionable, in part, because of the harasser's status as a supervisor).  Courts further recognize the "potentially greater impact of harassment from a supervisor …." *Id.*  "Indeed, the Supreme Court has recognized that a 'supervisor's power and authority invests his or her harassing conduct with a particularly threatening character.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)); *see also Lanyon v. Interfor U.S. Inc.*, No. 1:16-cv-2058-MC, 2018 WL 1976023, at *7 (D. Or. Apr. 26, 2018) ("Hostile work environments created by supervisors deserve more scrutiny.").

The complaints describe just this type of abusive sexual harassment, such as "[m]en trying to sleep with women … at lower levels by luring them in through promise of a 'work dinner' to discuss their career" and one complainant reporting that she "was intimidated and felt degraded."  *See* section II.A, *supra*.  Nike takes the offensive and tone-deaf position of evaluating the complaints as if no power imbalance was at play; but this is key to analyzing unlawful harassment.  *See EEOC v. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the disparity in power between the harasser and the victim") (internal citation & quotation marks omitted); *EEOC v. R & R Ventures*, 244 F. 3d 334, 340 (4th Cir. 2001) (The objective severity of the harassment was compounded by the fact the harasser was an "adult male in a supervisory position over young women barely half his age.").  Nike's attempt to cast coercive sexual harassment as "consensual sex" or "philandering" is not only misguided, but it also ignores well-established and critical aspects of the legal framework that governs the very gender-based discrimination claims asserted by Plaintiffs.

### 2.    Evidence of gender-based hostility is relevant to discrimination claims.

In another misleading pronouncement, Nike categorically states that the complaints "have

<u>nothing</u> to do with the pay equity and promotion claims here," Objections, ECF No. 376 at 6 (emphasis in original and footnote omitted), and "tell … nothing about policy or practices of pay or promotion decisions …." *Id.* at 14. Nike again ignores a well-established principle, namely that, "[b]ecause hostility against women underlie decisions to discharge or hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based discrimination." *EEOC v. Farmers Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994). The Ninth Circuit has "long recognized that '[t]he sexual harassment of others, if shown to have occurred, is relevant and probative of [a defendant's] general attitude of disrespect toward his female employees and his sexual objectification of them.'" *Zetwick*, 850 F. 3d at 445 (quoting *Heyne v. Caruso*, 69 F.3d 1475, 1479-81 (9th Cir. 1995)); *see also McGinist v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) (If "hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff …."). Here, the pattern of gender-based hostility described in the complaints is relevant to Plaintiffs' claims which, at their core, are premised on the devaluation of female employees.

This is particularly true where, as here, the gender-based hostility is demonstrated by upper-level executives, as shown by the unredacted complaints, *see* section II.A, *supra*. In such an environment, evidence of sexual harassment can support class pattern or practice claims. *See*, *e.g.*, *Ellis v. Costco*, 285 F.R.D. 492, 520 (N.D. Cal. 2012) (evidence of a company culture that "fosters and reinforces stereotyped thinking" supports the claim that the company operates under a "common companywide promotion system"); *Chen-Oster v. Goldman Sachs & Co.*, 325 F.R.D. 55, 76-77 (S.D.N.Y. 2018) (pattern or practice discrimination class established by evidence including "sexualization" of female class members).

Not only do the complaints contain reports of discrimination in pay and promotions

supporting Plaintiffs' equal pay and disparate impact claims, they also evidence a pervasive

hostility to women at Nike and a workplace culture that turns a blind eye to bad behavior of

those with power, in support of Plaintiffs' disparate treatment claims.  Nike's claim that the

complaints lack relevance to the individual or class claims is simply wrong.

### III.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully oppose Nike's objections to the

F&R.

Dated:  November 8, 2023                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

_____
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)
MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854
ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel:  (310) 277-0614
Fax:  (310) 277-0635

**PLS.' OPP'N TO NIKE'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS AND
RECOMMENDATION
PAGE 8**

888091.10

INDIA LIN BODIEN, ATTORNEY AT LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 212-7913
Fax:  (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>RESPONSE OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S ORDER PURSUANT TO FED. R. CIV. P. 72(a) |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................... iii

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................2

    A.    The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal ..........................................................................................................2

    B.    The Magistrate's First Findings and Recommendation on Intervention and Unsealing..........................................................................................................3

    C.    Denial of Plaintiffs' Motion for Class Certification..........................................3

    D.    Remaining Stipulated Redactions .....................................................................4

    E.    Media Intervenors' Renewed Motion to Unseal and the Magistrate's Second Findings and Recommendation on Unsealing...................................................5

ARGUMENT........................................................................................................5

    A.    Standard of Review .............................................................................................5

    B.    The Magistrate Judge Correctly Found that "Compelling Reasons" Is the Proper Standard for Evaluating Requests to Seal Judicial Records Filed in Support of Class Certification ..........................................................................................6

    C.    Nike Continues to Improperly Seek to Shift its Burden to Media Intervenors ................9

    D.    Nike's Conclusory Claims of Potential Reputational and Privacy Harms Are Insufficient to Overcome the Burdens Under Both the "Compelling Reasons" and "Good Cause" Standards .........................................................................10

    E.    Nike Mischaracterizes Media Intervenors' Motives ......................................13

CONCLUSION ...................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Adtrader, Inc. v. Google LLC,*
  No. 17-CV-7082, 2020 WL 6391210 (N.D. Cal. Mar. 24, 2020)..........................................8, 11

*Bracken v. Fla. League of Cities,*
  No 1:19-CV-602, 2019 WL 1867921 (D. Or. Apr. 24, 2019) ...................................12

*CBS, Inc. v. Democratic Nat'l Comm.,*
  412 U.S. 94 (1973)..............................................................................................14

*Coates v. Farmers Grp., Inc.,*
  No. 15-CV-1913, 2016 WL 8223348 (N.D. Cal. Jan. 25, 2016)..................................7

*Ctr. for Auto Safety v. Chrysler Grp., LLC,*
  809 F.3d 1092 (9th Cir. 2016) ....................................................1, 7, 8, 10

*Fodera v. Equinox Holdings, Inc.,*
  341 F.R.D. 616 (N.D. Cal. 2022)..........................................................................8

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
  331 F.3d 1122 (9th Cir. 2003) ...............................................7, 9, 10, 11

*Hagestad v. Tragesser,*
  49 F.3d 1430 (9th Cir. 1995) ..................................................................6

*Heath v. Google LLC,*
  No. 15-CV-1824, 2018 WL 11465387 (N.D. Cal. June 22, 2018)............................7

*In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.,*
  101 F.R.D. 34 (C.D. Cal. 1984) .............................................................15

*In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.,*
  686 F.3d 1115 (9th Cir. 2012) .................................................................7

*Kamakana v. City & Cnty. of Honolulu,*
  447 F.3d 1172 (9th Cir. 2006) ...............................................7, 9, 10, 12

*Kautsman v. Carrington Mortg. Servs.,*
  2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017).................................7

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974)..............................................................................14

*Oliner v. Kontrabecki,*
  745 F.3d 1024 (9th Cir. 2014) ..................................................................12

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
   307 F.3d 1206 (9th Cir. 2002) ...................................................................6, 10

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
   No. 16-CV-300, 2017 WL 2806897 (C.D. Cal. Mar. 30, 2017)..................12

*Reynolds v. Saad*,
   No. 3:17-CV-67, 2018 WL 259386 (N.D. W. Va. Jan. 2, 2018)...................6

*Sessa v. Ancestry.com Operations Inc.*,
   No. 2:20-CV-2292, 2023 WL 1795856 (D. Nev. Feb. 6, 2023)...................7

*Stoba v. Saveology.com, LLC*,
   No. 13-CV-2925, 2016 WL 1257501 (S.D. Cal. Mar. 31, 2016) .................7

*Taylor v. Astrue*,
   32 F. Supp. 3d 253 (N.D.N.Y. 2012) ....................................................5, 6

**Other Authorities**

Fed. R. Civ. P. 26(c) ...................................................................................11

Fed. R. Civ. P. 72(a) .....................................................................................5

Fed. R. Civ. P. 72(b).....................................................................................5

Jeff Manning, *Courts Reject Nike's Effort to Keep Executives' Info Secret in
   Discrimination Suit*, The Oregonian (Nov. 18, 2020),
   https://perma.cc/WGC3-78W7 ...............................................................13

Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*,
   The Oregonian (July 7, 2018),
   https://perma.cc/9AJK-2BE4 ..................................................................13

Julie Creswell et al., *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*,
   N.Y. Times (Apr. 28, 2018),
   https://perma.cc/2PTE-23LZ ..................................................................13

Kevin Draper & Julie Creswell, *Nike's C.E.O. Vows Changes After Claims of Workplace
   Harassment and Bias*, N.Y. Times (May 5, 2018),
   https://perma.cc/V9YMGEAC ................................................................13

Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards Was Company's
   Highest Paid*, Portland Bus. J. (July 25, 2018),
   https://perma.cc/R3M4-63EE ..................................................................13

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER
- Page iv -**

Matthew Kish, *Nike Files Motion to Keep Sensitive Records in Sweeping Gender
    Discrimination Lawsuit Sealed*, Insider (Mar. 16, 2022),
    https://perma.cc/N7V4-GJ7D .................................................................................... 13

Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace
    'Behavior'*, The Oregonian (Mar. 16, 2018),
    https://perma.cc/2FTE-M3W2 .................................................................................... 13

Patrick Dorrian, *Nike Pay Equity Studies Privileged, Off Limits in Sex Bias Suit*,
    Bloomberg Law (Oct. 13, 2020),
    https://perma.cc/9EP6-SYML ...................................................................................... 13

Peter Blumberg, *Nike Women Clear First Hurdle in Lawsuit Over Gender Pay Gap*,
    Bloomberg (Feb. 27, 2019),
    https://perma.cc/V7M3-Q9EV ...................................................................................... 13

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page v -**

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully respond to Defendant Nike's objections to the Magistrate Judge's Findings & Recommendation dated October 11, 2023 (ECF No. 363) and request that the Court affirm the Magistrate's order pursuant to Federal Rule of Civil Procedure 72(a).

## INTRODUCTION

The Magistrate correctly granted Media Intervenors' renewed motion to unseal judicial records related to class certification because, as the proponent for sealing, Nike failed to show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness.  Nike's objections do not demonstrate that any of the Magistrate's findings are clearly erroneous or contrary to law and should be rejected for the following reasons.  ***First***, Nike continues to argue for application of the incorrect "good cause" standard to justify sealing judicial records related to a motion for class certification.  Instead, as the Magistrate found, Nike must meet the more stringent "compelling reasons" standard adopted by the Ninth Circuit for these matters in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016).  ***Second***, while the public interest in this proceeding, which will determine whether one of the country's most prominent public companies is properly handling claims of sexual harassment and misconduct, is undeniable, Nike continues to improperly seek to shift its burden to justify sealing to Media Intervenors; the Magistrate correctly imposed that burden on Nike.  ***Third***, in lieu of presenting concrete evidence of compelling reasons, or even good cause, to redact the names of all employees identified in workplace misconduct complaints, Nike reiterates vague privacy and reputational concerns that are too general to meet either standard and

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 1 -**

which have already been correctly rejected by the Magistrate Judge.  *Finally*, Nike improperly uses its objections to repeat its past *ad hominem* attacks on Media Intervenors' motives for seeking to unseal judicial records in this case, which are unwarranted and irrelevant.  In sum, Nike's objections fail to assert any legitimate arguments that would justify rejection or modification of the Magistrate Judge's findings.

## BACKGROUND

A.   **The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal**

On June 17, 2019, this Court entered a stipulated umbrella protective order, ECF No. 82 ("Protective Order"), modeled on the Court's Tier II template to govern the Parties' exchange of discovery materials.  Invoking the Protective Order, the Parties thereafter filed thousands of pages of documents under seal.  *See* ECF No. 205 Appendix A.  In March 2022, Media Intervenors notified the Parties of their intent to intervene for the limited purpose of moving to unseal those documents to vindicate the press and public's presumptive right of access to judicial records.  ECF No. 205 at 5–7.  Media Intervenors conferred with the Parties to reach a resolution, leading to the public filings of four docket entries previously submitted by Defendant under seal.  *Id.*  But Defendant ultimately declined to unseal most of the documents at issue, including its Response to the Class Motion, and instead moved to seal the documents the Parties had to that point filed under seal pursuant only to their Protective Order.  *Id.* at 7; ECF No. 171.  On April 8, 2022, Media Intervenors brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal.  ECF No. 205.

Defendant opposed Media Intervenors' Motion, contesting the public's presumptive right of access to the sealed judicial records and arguing that "[t]hose redactions w[ould] be addressed in due course" under the auspices of the Protective Order.  ECF No. 219 at 2.  Plaintiffs took no

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER - Page 2 -**

position on Media Intervenors' Motion, emphasizing that their lack of a position stemmed not from opposition to unsealing, but from a desire not to disturb the outcome of "months" of "negotiating in good faith with Nike about what documents should remain sealed." ECF No. 218 at 2.  Plaintiffs clarified that they "[were] not advocating that any documents should remain sealed," and were "cognizant of the presumption that documents filed with the Court should not be sealed."  *Id.*

### B.    The Magistrate's First Findings and Recommendation on Intervention and Unsealing

On September 30, 2022, Magistrate Judge Russo recommended granting the Motion to Intervene and the Court subsequently entered the Magistrate's Findings and Recommendation on intervention.  ECF Nos. 273, 275.  The Magistrate recognized that the Media Intervenors' interests were not represented with respect to stipulated redactions produced under the Parties' Protective Order.  ECF No. 273 at 11.  Because of the Parties' ongoing efforts to unseal and unredact existing filings, and the pendency of the Plaintiffs' class certification motion, Media Intervenors' request for further briefing and to unseal additional documents was denied.  *Id.* at 12–14.  However, the Magistrate further instructed that "following the final resolution of plaintiffs' Motion for Class Certification, the non-party media organizations may file a renewed motion for the purposes of opposing any remaining stipulated redactions."  *Id.* at 14.  Meanwhile, Magistrate Judge Russo continued to oversee the Parties' ongoing efforts to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."  *Id.* at 13.  This process led the Parties to refile redacted versions of all but one of the previously sealed documents identified in Appendix A of the Motion to Intervene.  *See* ECF No. 229 Updated Appendix A; ECF Nos. 276–309.

### C.    Denial of Plaintiffs' Motion for Class Certification

On November 22, 2022, Magistrate Judge Russo entered Findings and Recommendation concluding that Plaintiffs' motion for class certification should be denied.  ECF No. 310.  On

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 3 -**

March 21, 2023, the District Court adopted those Findings and Recommendation.  ECF No. 335. Plaintiffs petitioned the Ninth Circuit for leave to appeal their motion for class certification.  *See* ECF No. 337.  On June 1, 2023, the Ninth Circuit denied Plaintiffs' petition.  ECF No. 339.

### D.    Remaining Stipulated Redactions

Once the motion for class certification was resolved, Media Intervenors reviewed the remaining redacted judicial records related to Plaintiffs' motion for class certification and identified seven documents where continued redaction withholds key evidence presented in support of class certification:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification.  ECF No. 285-2.

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 290-4.

Although redactions limit Media Intervenors' ability to ascertain the full contents of these judicial records, they appear to contain information concerning allegations of harassment and abuse involving Nike executives.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
- Page 4 -

E. **Media Intervenors' Renewed Motion to Unseal and the Magistrate's Second Findings and Recommendation on Unsealing**

Pursuant to Local Rule 7-1(a), counsel for Media Intervenors conferred in good faith with counsel for Plaintiffs and Defendant regarding their intended renewed motion to unseal. Plaintiffs supported Media Intervenors' request to unseal the documents. ECF No. 343. Nike did not support Media Intervenors' request and, unable to resolve the dispute, on August 9, 2023, Media Intervenors filed a Renewed Motion to Unseal Judicial Records. *Id*. Nike opposed the Renewed Motion, ECF No. 345, and following full briefing, on October 11, 2023, the Magistrate entered Findings & Recommendation granting the renewed motion. ECF No. 363 (hereinafter "Magistrate's Findings"). Nike filed objections to the Magistrate's Findings and Recommendation on October 25, 2023. ECF No. 376 (hereinafter "Objections").

## ARGUMENT

A. **Standard of Review**

The Magistrate Judge's finding should be reviewed by the District Court *de novo*. Under Federal Rule of Civil Procedure 72(b), when reviewing a pretrial matter dispositive of the party's claim or defense "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Pursuant to Rule 72(a), the district judge must consider any timely objection and "modify or set aside any part of the order that is clearly erroneous or is contrary to law."

For the *de novo* standard to apply, a party's objections must be specific. If the objecting party "merely reiterates the same arguments made" in the original briefs submitted to the magistrate, then the court conducts only a clear error review. *See Taylor v. Astrue*, 32 F. Supp. 3d

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 5 -**

253, 260–61 (N.D.N.Y. 2012) (explaining that plaintiff's objections repeated the same arguments made in the brief in support of his motion for judgment on the pleadings and the Magistrate Judge's report-recommendation was free of clear error because he "employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts"); *Reynolds v. Saad*, No. 3:17-CV-67, 2018 WL 259386, at *2 (N.D. W. Va. Jan. 2, 2018) (finding that *de novo* review was not required because petitioner "presented no new material facts or arguments in his objections to the Magistrate Judge's R&R").

Here, Nike objects to the Magistrate Judge's finding that it must demonstrate "compelling reasons" to justify sealing court records filed in support of Plaintiffs' motion for certification. Objections at 7. This is a legal question and should be reviewed *de novo* by this Court. Nike's further objections are otherwise simply a recitation of the same general and conclusory privacy and reputational arguments that were presented to the Magistrate Judge. Whether the Magistrate's findings are reviewed *de novo* or for clear error, these claims lack adequate specificity to overcome the presumption of public access in this case.

### B. The Magistrate Judge Correctly Found that "Compelling Reasons" Is the Proper Standard for Evaluating Requests to Seal Judicial Records Filed in Support of Class Certification

Nike continues to misapply the standard for sealing judicial records filed in connection with a motion for class certification. The Ninth Circuit recognizes a strong presumption in favor of access to judicial records that stems from the "public interest in understanding the judicial process." *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002) (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995) (recognizing that when courts are determining if the common law right of access should be overridden, they must begin with a strong presumption in favor of access to information in civil cases)). To overcome this

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 6 -**

presumption, a party seeking redaction or sealing must show that there are compelling reasons for concealing the information from the public. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). This showing is particularized to ***each*** document or portion of a document the party seeks to seal. *Id.* at 1138–39.

The Ninth Circuit has sometimes applied a more lenient "good cause" standard to justify sealing documents filed in connection with non-dispositive motions. *See In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per curiam). The Court has made clear that the relevant standard "turn[s] on whether the motion is more than tangentially related to the merits of a case." Magistrate's Findings at 4 (quoting *Ctr. for Auto Safety*, 809 F.3d at 1101 (applying the compelling reasons standard to documents related to putative class action plaintiffs' motion for preliminary injunction)).[1] Proceedings demanding a higher threshold for sealing involve "the presentation of substantial evidence," "requir[ing] the court to address the merits of [the] case." *Ctr. for Auto Safety*, 809 F.3d at 1099. Thus, the terms "dispositive" and "nondispositive" are not meant to be "mechanical classifications." *Id.* at 1098. Instead, courts must look at how strongly a motion relates to the merits of the case. *Id.* (noting that even routine motions that would generally be considered nondispositive can be particularly relevant to the outcome of a case). Here, adjudication of Plaintiffs' motion for class certification, which required

---

[1]     Nike's reliance on *Sessa v. Ancestry.com Operations Inc.*, No. 2:20-CV-2292, 2023 WL 1795856 (D. Nev. Feb. 6, 2023), to argue that courts in the Ninth Circuit apply the "good cause standard" to seal class certification documents is misplaced. *See* Objections at 8. The *Sessa* court relied on *Kamakana v. City & County of Honolulu*, 447 F.3d 1172 (9th Cir. 2006) and overlooked the Ninth Circuit's clarification in *Center for Auto Safety* that "compelling reasons" is the applicable sealing standard for documents in the class certification context. *Sessa*, 2023 WL 1795856, at *1. All other cases Nike relies upon similarly ignore the Ninth Circuit's operative decision in *Center for Auto Safety*. *See* Objections at 8 (citing *Heath v. Google LLC*, No. 15-CV-1824, 2018 WL 11465387 (N.D. Cal. June 22, 2018); *Kautsman v. Carrington Mortg. Servs.*, 2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017); *Stoba v. Saveology.com, LLC*, No. 13-CV-2925, 2016 WL 1257501 (S.D. Cal. Mar. 31, 2016); *Coates v. Farmers Grp., Inc.*, No. 15-CV-1913, 2016 WL 8223348 (N.D. Cal. Jan. 25, 2016).

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 7 -**

assessments of voluminous evidentiary submissions and the merits of the case, unquestionably requires application of the "compelling reasons" standard to any requests to seal related judicial records.  *See* ECF No. 310 at 31–32; ECF Nos. 148–167, 185–187.

Accordingly, the Magistrate Judge correctly noted that Plaintiffs' reliance on internal Nike misconduct complaints, while not entirely determinative, "formed a crucial part of their motion," thus making the compelling reasons standard appropriate for evaluating the continued redaction of names found in those complaints.  Magistrate's Findings at 4.  Despite this, Nike continues to wrongfully assert that the Motion for Class Certification in this case is nondispositive and therefore subject to the "good cause" standard.  Objections at 2.  However, courts in the Ninth Circuit routinely apply the "compelling reasons" standard when ruling on motions to seal documents relating to class certification. *See Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 634–35 (N.D. Cal. 2022) (finding that the requesting party incorrectly applied the "good cause" standard in its motions to seal documents related to class certification and denying the motions for failing to present specific, compelling reasons for sealing); *see also Adtrader, Inc. v. Google LLC*, No. 17-CV-7082, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (following "numerous other district courts within the Ninth Circuit in concluding that the compelling reasons standard applies to motions to seal documents relating to class certification").

Plaintiffs' Motion for Class Certification was plainly "more than tangentially related to the merits of [this] case." *Ctr. for Auto Safety*, 809 F.3d at 1101.  As the Magistrate Judge's order correctly explained, "[t]he evidence sought to be unsealed . . . relates to commonality and for purposes of plaintiffs' disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision."  Magistrate's Findings at 4.  A court's decision whether to certify a class is critical to the litigation and it necessarily follows

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
- Page 8 -

that the public in general (including potential class members) should have access to filings relating to that certification decision. Accordingly, Nike must demonstrate "compelling reasons" to maintain under seal key information from judicial records Plaintiffs submitted in support of their class certification motion.

**C.    Nike Continues to Improperly Seek to Shift its Burden to Media Intervenors**

Nike maintains that the Magistrate Judge "erroneously focus[ed] on the relationship between the redacted documents and Plaintiffs' Motion for Class Certification." Objections at 9. In so arguing, Nike seeks to shift its burden to Media Intervenors to show the connection between the redacted documents and the substantive rights of the Parties. Nike also repeatedly downplays the public's interest in the redacted information given the purported "lack of relevance of such information to the pay equity and promotion claims asserted in this lawsuit." *Id.* at 12. Again, this line of argument incorrectly burdens Media Intervenors with the task of demonstrating "compelling reasons" to ***unseal***, when in fact, the burden rests with Nike to present compelling reasons to justify sealing the information from the public. *Foltz*, 331 F.3d at 1130–31.

At the start of this case, the Parties agreed to redact the names of Nike complainants, witnesses, and accused harassers, but that agreement has since ceased. Magistrate's Findings at 2 n.1. To date, Nike has provided no specific justifications for continued redaction of the names of the complainants, witnesses, and accused harassers. Further, the Plaintiffs in this case now support the motion to unseal. *Id.* To successfully argue for sealing under the "compelling reasons" standard, the party seeking sealing must demonstrate specific factual findings that outweigh the historic presumption and public interest in favor of access. *Kamakana*, 447 F.3d at 1178–79. Nike is, in effect, asking for a presumption in favor of closure and requiring Media Intervenors to show "compelling reasons" for unsealing this information from the public. Nike's position is

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 9 -**

inconsistent with clear Ninth Circuit holdings that the presumptive right of access "applies fully" to judicial records of this nature.  *Id.*; *Ctr. for Auto Safety*, 809 F.3d at 1101.  It is not the responsibility of Media Intervenors to affirmatively prove why the public deserves this information.

In any event, the public's interest in Nike's case is clear.  Nike is one of the largest and most prominent brands in the world, and its handling of workplace harassment and discrimination claims is of significant importance to American consumers and shareholders.  The Court reviewed the redacted identities of Nike complainants, witnesses, and employees who allegedly engaged in misconduct when ruling on the Plaintiffs' Motion for Class Certification.  To foster a greater understanding of the judicial process, the public has a right to know what evidence was relied on— and what evidence was rejected—in making decisions in this high-profile litigation.  *Phillips ex rel. Estates of Byrd*, 307 F.3d at 1213.

    **D.**    **Nike's Conclusory Claims of Potential Reputational and Privacy Harms Are Insufficient to Overcome the Burdens Under Both the "Compelling Reasons" and "Good Cause" Standards**

Applying the "compelling reasons" standard, the Magistrate Judge correctly found that Nike's privacy and reputational harm arguments rest on "generalized assertions" regarding the need to redact names and seal information that are insufficient to support continued sealing.  Magistrate's Findings at 5; *see also Foltz*, 331 F.3d at 1130–31.  Yet, when given the chance to object, Nike once again fails to provide any specific examples or an evidentiary showing of the potential harm that the complainants, witnesses, and subjects of the complaints would endure if their names were unredacted.  Nike's arguments thus fall far short of the showing necessary to meet its burden under Ninth Circuit law.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 10 -**

Nike alleges that the Findings and Recommendation ignore the privacy interests of the named individuals and cites the Federal Rules as evidence that such concerns are compelling enough to justify sealing.  Objections at 9.  But while Federal Rule of Civil Procedure 26(c)(1) allows for sealing to spare a person or party "annoyance, embarrassment, oppression, or undue burden or expense," this rule only applies to the application of the "good cause" standard in the discovery context.  As discussed, this is not the controlling standard in this case.  Where, as here, the "compelling reasons" standard applies, the proponent of sealing must present arguments "supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Foltz*, 331 F.3d at 1130–31 (citation omitted).  This showing must be made for ***each*** document or portion of a document that the party wishes to seal.  *Id.* at 1138–39.  Examples of specific harms that may satisfy this standard include situations where confidential business information could be used improperly by competitors or could be weaponized to gratify private spite.  *See, e.g.*, *Adtrader, Inc.*, 2020 WL 6391210, at *2 (finding that, in accordance with local rules, Google submitted a table of all documents they sought to have sealed and provided compelling reasons why each document listed should be redacted in order to "protect Google's sensitive, non-public, confidential, and propriet[ar]y business information").  Nike has made no specific allegation that such harm would result from unsealing any particular document at issue.

Indeed, Nike has still not provided specific reasoning or an evidentiary showing supporting sealing as to each document.  Objections at 12; *Foltz*, 331 F.3d at 1138–39.  Nike refers to only six of the seven exhibits at issue in its discussion of the supposed personal interests at stake.  Objections at 12.  And instead of pointing the Court to evidence such as affidavits describing specific potential harm, Nike resorts back to its same imprecise claims of "public scrutiny" and "reputational damage," *id.* at 11–13, that the Magistrate Judge correctly found were insufficient to

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 11 -**

outweigh the public's interest in disclosure.  Magistrate's Findings at 5 (citing *Bracken v. Fla. League of Cities*, No 1:19-CV-602, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019) (finding that "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records")).  Put simply, "assertions about possible harm" that are so vague "that there is no meaningful way to realistically gauge how"—or even whether—"disclosure would" actually be harmful are insufficient to seal court records.  *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. 16-CV-300, 2017 WL 2806897, at *6 (C.D. Cal. Mar. 30, 2017).

     Vague privacy and reputational interests do not rise to the level demanded by the "compelling reasons" standard.  Federal courts have consistently found that assertions that information might be embarrassing or damaging to an individual's reputation do not outweigh the public's right of access.  *Kamakana*, 447 F.3d at 1178–79 (holding that, under the compelling reasons standard, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records"); *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014) (holding that "avoid[ing] embarrassment or annoyance" is not a compelling enough reason to justify a request to seal an entire record of proceedings); *Bracken*, 2019 WL 1867921, at *4 (explaining that compelling reasons to justify sealing court records exist only when those records could be used for "improper purposes" and holding that "[t]he desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure" (citation omitted)).

     Nike also asserts concerns that "[u]nredacting complainants' names . . . would have a chilling effect on confidential reporting in the workplace," but Nike's claims that it "takes considerable precautions to protect the confidentiality of individuals" who make workplace

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER
- Page 12 -**

complaints or are subjects and witnesses in these matters are unproven and irrelevant. Objections at 12. Indeed, Nike offers no concrete evidence of the measures it has in place to maintain confidentiality. *Id.* Nike has not presented the Court with any confidentiality agreements signed by complainants or produced any documentation that would suggest third parties provided information under the promise of confidentiality. *Id.* Critically, whatever general privacy or reputational interests Nike asserts can be easily overcome by the public's right to information regarding the handling of sexual harassment and misconduct claims by the largest sportswear brand in the world.[2]

### E.  Nike Mischaracterizes Media Intervenors' Motives

While the Magistrate Judge correctly ignored Nike's baseless attacks on Media Intervenors' supposed motivations for seeking unsealing, Nike uses its objections to double-down on its unsubstantiated argument. Objections at 1. Nike accuses Media Intervenors of trying to "embarrass and shame" individuals by disclosing supposed confidential information, *id.*, and alleges, with no supporting evidence, that "[t]here can be no doubt that the sole purpose of the Media Intervenors' request is to shame and disparage third parties who will have no opportunity

---

[2]      *See, e.g.*, Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior'*, The Oregonian (Mar. 16, 2018), https://perma.cc/2FTE-M3W2; Julie Creswell et al., *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://perma.cc/2PTE-23LZ; Kevin Draper & Julie Creswell, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://perma.cc/V9YMGEAC; Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*, The Oregonian (July 7, 2018), https://perma.cc/9AJK-2BE4; Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards Was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://perma.cc/R3M4-63EE; Peter Blumberg, *Nike Women Clear First Hurdle in Lawsuit Over Gender Pay Gap*, Bloomberg (Feb. 27, 2019), https://perma.cc/V7M3-Q9EV; Jeff Manning, *Courts Reject Nike's Effort to Keep Executives' Info Secret in Discrimination Suit*, The Oregonian (Nov. 18, 2020), https://perma.cc/WGC3-78W7; Patrick Dorrian, *Nike Pay Equity Studies Privileged, Off Limits in Sex Bias Suit*, Bloomberg Law (Oct. 13, 2020), https://perma.cc/9EP6-SYML; Matthew Kish, *Nike Files Motion to Keep Sensitive Records in Sweeping Gender Discrimination Lawsuit Sealed*, Insider (Mar. 16, 2022), https://perma.cc/N7V4-GJ7D.

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 13 -**

to defend their reputation." *Id.* at 11.  This attack on Media Intervenors' motives is both untrue and irrelevant.

Nike largely mischaracterizes Media Intervenors' involvement in this case by suggesting that they initially requested private information including the redacted names of third parties mentioned in documents related to the class certification briefing.  Objections at 4.  In actuality, Media Intervenors first contacted the Parties to inquire about unsealing the docket generally to ensure the public could stay informed about this high-profile matter prior to the Parties' agreement to unseal certain documents with redactions.  *See* ECF No. 205 at 5.  The Media Intervenors' "sole purpose" thus could not have been to reveal the identities of complainants, witnesses, and accused harassers because the Parties' documents had been pervasively filed under seal and the presence of such information was unknown to non-parties.

Furthermore, Nike's attacks on Media Intervenors' motives do nothing to advance Nike's legal arguments.   Courts have historically chosen not to inquire into the press' editorial prerogatives.  *See CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124-25 (1973) ("For better or worse, editing is what editors are for; and editing is selection and choice of material."); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . constitute[s] the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press . . . .").  Consistent with the First Amendment and common law access principles set forth herein, the decision of how to report on the matters Nike seeks to withhold from the public must be made by editors, and not by courts (or Nike).

By failing to meet its burden to justify sealing, Nike once again reveals its true concern with unsealing—unfavorable press coverage.  Despite Nike's claims that the names of third parties

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER
- Page 14 -**

should be redacted to avoid "subject[ing] them to public scrutiny," Objections at 13, records

relating to matters of public concern cannot be sealed for this reason alone because "[i]t is not the

duty of federal courts to accommodate the public relations interests of litigants." *In re Coordinated

Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*, 101 F.R.D. 34, 40 (C.D. Cal. 1984).  Like

the Magistrate Judge's Recommendation, the Court should rest its decision on the factual showings

made—not general attacks on the media or attempts to mitigate a corporation's public relations

crisis.

## CONCLUSION

Media Intervenors respectfully request that this Court affirm the findings of the Magistrate

Judge and unseal the redacted information filed in connection with Plaintiffs' Motion for Class

Certification.  This important litigation is of interest to both the people of Oregon and the public

at large.  Thus, the presumptive right of access to the related judicial records outweighs any of

Defendant's asserted and unsupported justifications for continued secrecy.

Dated: November 8, 2023                    */s/ Lisa Zycherman*

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE'S ORDER**
**- Page 15 -**

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>        Defendant. | Case No.:  3:18-cv-01477-JR<br><br>DEFENDANT NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION DATED OCTOBER 11, 2023 (ECF NO. 363) PURSUANT TO FED. R. CIV. P. 72(a)<br><br>REQUEST FOR ORAL ARGUMENT |

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..................................................................... 1

II.     PROCEDURAL BACKGROUND.................................................................... 3

III.     ARGUMENT ................................................................................................. 5

       A.      Standard Of Review Under Rule 72(a). .......................................... 5

       B.      Pursuant To Rule 72(a), The Court Should Set The Findings & Recommendation Aside As Contrary To Law. ...................................... 7

             1.      The Findings & Recommendation Ignore That The "Good Cause" Standard Applies To Redaction Requests Accompanying Motions Tangentially-Related To The Merits Of The Case. ................................... 7

             2.      The Findings & Recommendation Ignore Case Law Finding Third-Parties' Privacy Is A Compelling Reason To Redact Names. ................... 9

             3.      The Findings & Recommendation Erroneously Rely On Inapposite Case Law............................................................................................ 14

             4.      The Findings & Recommendation Ignore The Reasonableness Of NIKE's Limited Redactions, Which Are Supported By Case Law. ........ 15

IV.     CONCLUSION........................................................................................... 16

Page i     -     DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-064

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Bakki v. Boeing Co.,*
2021 WL 962488 (W.D. Wash. Mar. 15, 2021) ......................................................13

*Bracken v. Fla. League of Cities,*
2019 WL 1867921 (D. Or. Apr. 24, 2019) .............................................................14

*Coates v. Farmers Grp., Inc.,*
2016 WL 8223348 (N.D. Cal. Jan. 25, 2016) .............................................................8

*Crispin v. Christian Audigier, Inc.,*
717 F. Supp. 2d 965 (C.D. Cal. 2010) .............................................................5, 6

*Ctr. for Auto Safety v. Chrysler Grp., LLC,*
809 F.3d 1092 (9th Cir. 2016) .........................................................................7, 10

*Delaittre v. Berryhill,*
2017 WL 6310483 (W.D. Wash. Dec. 11, 2017) ....................................................13

*Doe v. Va. Polytechnic Inst. & State Univ.,*
2022 WL 67324 (W.D. Va. Jan. 6, 2022) ..............................................................11

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
331 F.3d 1122 (9th Cir. 2003) .......................................................................10, 15

*Gnassi v. del Toro,*
2022 WL 3867376 (W.D. Wash. Aug. 30, 2022) ....................................................10

*Gregory v. City of Vallejo,*
2014 WL 4187365 (E.D. Cal. Aug. 21, 2014) .........................................................10

*Hanson v. Wells Fargo Home Mortg., Inc.,*
2013 WL 5674997 (W.D. Wash. Oct. 17, 2013) ......................................................7

*Heath v. Google LLC,*
2018 WL 11465387 (N.D. Cal. June 22, 2018) .........................................................8

*Hill v. Xerox Corp.,*
2014 WL 1356212 (W.D. Wash. Apr. 7, 2014) .........................................................8

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,*
2015 WL 984121 (N.D. Cal. Mar. 4,2015)..............................................................10

*Ingram v. Pac. Gas & Elec. Co.,*
2013 WL 6174487 (N.D. Cal. Nov. 22, 2013) ..........................................................6

*Kamakana v. City & Cnty. of Honolulu,*
447 F.3d 1172 (9th Cir. 2006) .......................................................................7, 11

*Kautsman v. Carrington Mortg. Servs.,*
2017 U.S. Dist. LEXIS 153550 (W.D. Wash. Sept. 19, 2017) .................................8

Page ii    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-065

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Mirlis v. Greer*,
  952 F.3d 51 (2d. Cir. 2020) ....................................................................................11

*Moussouris v. Microsoft Corp.*,
  2018 WL 1159251 (W.D. Wash. Feb. 16, 2018) ....................................................11

*Music Grp. Macao Com. Offshore Ltd. v. Foote*,
  2015 WL 3993147 (N.D. Cal. June 30, 2015) ........................................................10

*Myles v. County of San Diego*,
  2017 WL 274829 (S.D. Cal. Jan. 19, 2017) ............................................................10

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978) ................................................................................................11

*Philips v. Ford Motor Co.*,
  2016 WL 7374214 (N.D. Cal. Dec. 20, 2016) ..........................................................8

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
  307 F.3d 1206 (9th Cir. 2002) ..................................................................................9

*Price v. Equilon Enterprises LLC*,
  2012 WL 12846100 (W.D. Wash. Nov. 20, 2012) .............................................14, 15

*Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*,
  365 F. Supp. 3d 1129 (D. Or. 2019) .........................................................................6

*Rawcar Grp., LLC v. Grace Med., Inc.*,
  2014 WL 12496548 (S.D. Cal. Aug. 4, 2014) ...........................................................6

*Reflex Media, Inc. v. Doe No. 1*,
  2022 WL 2985938 (D. Nev. July 28, 2022) ...............................................................3

*Romero v. County of Santa Clara*,
  2014 WL 12641990 (N.D. Cal. June 17, 2014) .........................................................3

*SEC v. Ripple Labs, Inc.*,
  2023 WL 3477552 (S.D.N.Y. May 16, 2023) ......................................................11, 13

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
  2021 WL 794271 (S.D. Cal. Mar. 1, 2021), *aff'd*,
  2022 WL 706941 (9th Cir. Mar. 9, 2022) ..................................................................3

*Sessa v. Ancestry.com Operations Inc.*,
  2023 WL 1795856 (D. Nev. Feb. 6, 2023) .................................................................8

*Skurkis v. Montelongo*,
  2016 WL 4719271 (N.D. Cal. Sept. 9, 2016) ...........................................................11

*Spam Arrest, LLC v. Replacements, Ltd.*,
  2013 WL 4478645 (W.D. Wash. Aug. 20, 2013) ......................................................10

*Stoba v. Saveology.com, LLC*,
  2016 WL 1257501 (S.D. Cal. Mar. 31, 2016) ............................................................8

Page iii    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-066

## TABLE OF AUTHORITIES
(continued)

Page(s)

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  2019 WL 11743580 (N.D. Cal. Aug. 13, 2019) ......................................................7

*United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit
  514, S. of Billings, Mont.*,
  658 F.3d 1188 (9th Cir. 2011) ..............................................................................15

*United States v. Mayers*,
  2017 WL 2215805 (W.D. Wash. May 19, 2017)....................................................3

*United States v. McConney*,
  728 F.2d 1195 (9th Cir. 1984) (*en banc*), *overruled on other grounds by
  Estate of Merchant v. C.I.R.*,
  947 F.2d 1390 (9th Cir. 1991) ................................................................................6

*Weeks v. Union Pac. R.R. Co.*,
  2017 WL 1740123 (E.D. Cal. May 3, 2017) ......................................................5, 6

**STATUTES**

28 U.S.C. § 636(b)(1)(A)..............................................................................................5

28 U.S.C. § 2106..........................................................................................................5

**RULES**

FED. R. CIV. P. 23 .....................................................................................................2, 15

FED. R. CIV. P. 26(c)(1) ................................................................................................9

FED. R. CIV. P. 72(a) ..........................................................................................3, 5, 6, 7

**TREATISES**

12 Charles Alan Wright and Arthur R. Miller, *et al.*,
  *Federal Practice and Procedure: Civil* § 3069 (3d ed. 2018)...............................6

Page iv  -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-067

## I.    PRELIMINARY STATEMENT

These objections concern whether the privacy interests of complainants, third-party witnesses, and alleged persons of interest identified in unsubstantiated and uncorroborated complaint files outweigh the interests of the Media Intervenors to embarrass and shame individuals who did not consent to disclosure of their confidential information.[1]  The impact on privacy is particularly troubling where, as here, the complaints were often made anonymously, describe events that purportedly occurred many years before a small pamphlet of materials containing these complaints was provided to NIKE in or about December 2017,[2] and largely concern former employees whose personal and/or professional reputations ought not be damaged by unsubstantiated allegations to which they have no opportunity to respond.[3]

As the Court is aware, this is *not* a harassment case.  Yet, even though the unsubstantiated complaints alleging workplace (mis)conduct have *nothing* to do with the pay equity and promotion claims here,[4] it is undisputed that the allegations themselves—whether true or not—have been made available to Plaintiffs, the Media Intervenors, and exist in the public

---

[1] "Media Intervenors" refers to Non-Party Media Organizations Insider Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal*.

[2] Where possible, NIKE retained outside counsel to investigate the allegations.

[3] Specifically, the Media Intervenors seek to unseal the redacted content in Exhibits 46 (ECF No. 284-6), 47 (ECF No. 284-7), 48 (ECF No. 284-8), 51 (ECF No. 285-1), and 52 (ECF No. 285-2) of the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification ("Goldstein Decl.") (ECF No. 288), and Exhibit 9 to the Goldstein Decl. (ECF No. 290-4) (collectively, the "Documents").  Exhibit 9 to the Goldstein Decl. at pages 17, 18, 25, 31, and 32, includes redactions of the contents of complaints, rather than just the names of complainants, witnesses, and subjects of complaints.  NIKE maintains that the names of any individuals on these pages should be redacted, but does not otherwise oppose lifting the redactions.

[4] Further, none of the claims appear to assert allegations of non-consensual conduct.

Page 1    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

domain.[5]  In fact, such allegations have been repeated in court filings and news publications. *See, e.g.*, Edward Helmore, *Nike lawsuit records allege culture of sexism, bullying and fear of retaliation,* The Guardian, Dec. 22, 2022 (https://www.theguardian.com/business/2022/dec/20/nike-lawsuit-records-sexual-abuse-toxic-workplace-claim) (last visited October 25, 2023); *see also* ECF No. 146 at 37-39.  None of these shaming allegations—and certainly not the names of the complainants, witnesses, and alleged persons of interest—had any bearing on the Court's finding that Plaintiffs failed to meet their burden under Rule 23 to certify a class action.  Nor did the failure to disclose the identities of complainants, witnesses, and alleged persons of interest preclude the Ninth Circuit from denying Plaintiffs' petition for an immediate appeal.

The Findings & Recommendation (the "Findings"), however, assert that the privacy interests of the complainants, witnesses, and alleged persons of interest are not sufficiently specific here.  ECF No. 363 at 5-6.  But the Findings do not clarify the amount of proof or showing required to establish a specific privacy interest, whether under a "compelling reasons" or "good cause" standard.  As NIKE has argued, the identities of these individuals are completely unrelated to Plaintiffs' Motion for Class Certification, a non-dispositive motion that is only tangentially related to the causes of action.  As a result, the "good cause" standard applies to the narrowly-tailored redactions in this case.  Nevertheless, NIKE sufficiently demonstrated that, under either the "good cause" or the "compelling reasons" standard, the limited redactions

---

[5] Sun Declaration, Exhibits 46, 47, 51, and 52 relate, at least in part, to allegations of sexual harassment or observance of a consensual sexual act, rather than discrimination or pay equity and thus have no bearing on Plaintiffs' claims in this case.

Page 2    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

of the names of complainants, witnesses, and alleged persons of interest should be maintained to protect their privacy.[6]

Certainly, the law does not require that NIKE provide a third-party declaration stating, for example, that a third-party's personal or professional reputation would be harmed if uncorroborated allegations of his/her conduct (including details about his/her private life, relationship, or intimate partners) were revealed in the newspaper. Under the Findings, *even that* would be insufficient to outweigh the Media Intervenors' claimed right of access here. The law is not so rigid. Nor should it be construed to yield this result. Therefore, pursuant to Federal Rule of Civil Procedure 72(a), NIKE respectfully requests that the Findings are set aside as contrary to law. Nike further requests oral argument on its objections.

## II.   **PROCEDURAL BACKGROUND**

Plaintiffs and NIKE had previously agreed to redact select matters from the Parties' class certification briefing, principally the names of complainants, witnesses, and subjects of complaints (the "Third Parties") that were collected incident to the leafletting that occurred on NIKE's campus in late 2017. ECF No. 273 at 13 (the Parties had worked together to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."); *id* at 12 (the Parties agreed to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at Nike that have not already been made public[.]").

---

[6] *See e.g.*, *Reflex Media, Inc. v. Doe No. 1*, 2022 WL 2985938, at *2 (D. Nev. July 28, 2022) (sealing personal identifying information of victims of the alleged extortion business); *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021), *aff'd*, 2022 WL 706941 (9th Cir. Mar. 9, 2022) (sealing non-parties' names because it "runs a substantial risk of exposing those individuals to harassment"); *United States v. Mayers*, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017) ("sealing the identifying personal information of an unrelated party to this case is a compelling reason to keep that information sealed"); *Romero v. County of Santa Clara*, 2014 WL 12641990, at *3 (N.D. Cal. June 17, 2014) ("Discrete, sensitive identifying information regarding third parties may be redacted.").

Page 3    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

While the allegations contained in the complaints were made public, the Third Parties' names were redacted.  ECF No. 171 at 10.

On April 1, 2022, NIKE's counsel met and conferred with counsel for Plaintiffs and the Media Intervenors regarding the Media Intervenors' request for private information in support of the Parties' class certification briefing.  ECF No. 220, ¶ 3.  The Media Intervenors claimed that they should have the right to access "Confidential" and "AEO" filings to evaluate whether unsealing was justified.  ECF No. 205 at 13-15.

On April 8, 2022, the Media Intervenors brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal (the "Motion to Intervene").  ECF No. 205.  NIKE and the Media Intervenors fully briefed the motion, and on September 30, 2022, the Court issued a recommendation granting in part and denying in part the Motion to Intervene.  ECF No. 273.  While the Court allowed Media Intervenors to intervene for the limited purpose of unsealing judicial records, it denied their attempts to access or unseal the records in connection with Plaintiffs' Motion for Class Certification.  ECF No. 273 at 11.

On November 22, 2022, the Court entered its Findings and Recommendation, concluding that Plaintiffs' Motion for Class Certification should be denied.  ECF No. 310.  On March 21, 2023, the Court adopted the Findings and Recommendation in its Order denying class certification.  ECF No. 335.  Plaintiffs petitioned the Ninth Circuit for leave to immediately appeal the denial of their class certification motion.  ECF No. 337.  The Ninth Circuit denied their petition.  *Cahill v. Nike, Inc.*, No. 23-80027 (9th Cir. Ct. App. June 1, 2023) (Dkt. 9).

On August 9, 2023, the Media Intervenors filed a renewed motion to unredact the limited items remaining in certain "complaint" files, including, for example, allegations of philandering,

Page 4    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                 FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-071

consensual sex between colleagues, and workplace bullying.  ECF No. 343.  Recognizing the pre-certification stage of this case, and to protect the Third Parties' personal interest in maintaining privacy, NIKE had redacted the names of these third parties; but, the complaints themselves were unsealed.  Despite this wealth of information, the Media Intervenors claimed this was not enough and demanded the disclosure of the Third Parties' names.  On August 23, 2023, NIKE filed its opposition to the Media Intervenors' renewed motion.  ECF No. 345.  On September 6, 2023, the Media Intervenors replied.  ECF No. 346.  The Magistrate Judge issued her Findings & Recommendation on October 11, 2023.  ECF No. 363.  Therein, and as discussed below in more detail, the Findings recommend removal of the limited redactions remaining to mask the identities of complainants, witnesses, and alleged persons of interest.  These objections followed.

## III.    ARGUMENT

### A.    Standard Of Review Under Rule 72(a).

The District Court should review the Magistrate's Findings *de novo*.  Federal Rule of Civil Procedure 72(a) governs a district court's review of non-dispositive rulings by a magistrate judge.  Fed. R. Civ. P. 72(a).  The Rule provides that "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  *Id.*; 28 U.S.C. § 636(b)(1)(A).  As such, the district court, "[a]cting as an appellate court . . . has the power to 'affirm, modify, vacate, set aside or reverse' the magistrate judge's order and 'may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings . . . as may be just under the circumstances.'"  *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 971 (C.D. Cal. 2010) (quoting 28 U.S.C. § 2106).

Page 5    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-072

Under Rule 72(a), the "contrary to law" standard—which applies to a magistrate judge's finding of law—calls for "independent plenary review." *Weeks v. Union Pac. R.R. Co.*, 2017 WL 1740123, at *5 (E.D. Cal. May 3, 2017) (sustaining objections to a magistrate judge's order under Rule 72(a) after conducting an independent, plenary review); *see also Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*, 365 F. Supp. 3d 1129, 1141-42 (D. Or. 2019) (reversing magistrate judge's order as contrary to law under Rule 72(a) after conducting plenary review); *Rawcar Grp., LLC v. Grace Med., Inc.*, 2014 WL 12496548, at *4 (S.D. Cal. Aug. 4, 2014) ("In an objection under [Rule] 72(a), a magistrate judge's legal conclusions are subject to de novo review."); *Crispin*, 717 F. Supp. 2d at 991 (reversing in part and vacating in part a magistrate judge's decision under Rule 72(a) after conducting de novo review). As Judge Simon of this Court observed in undertaking plenary review of a nondispositive decision by a magistrate judge:

> [I]t is also important to avoid the conclusion that district judges are absolutely powerless to alter magistrate-judge resolution of nondispositive matters unless they fall into the clearly erroneous category. . . . Moreover, even for those courts that adhere to a strict application of the 'clearly erroneous' standard, it is limited to factual findings; even the Third Circuit recognized that the phrase 'contrary to law' indicates plenary review as to matters of law. . . . The latter is the situation that we have here.

*Quatama Park*, 365 F. Supp. 3d at 1141-42 (quoting 12 Charles Alan Wright and Arthur R. Miller, *et al., Federal Practice and Procedure: Civil* § 3069 (3d ed. 2018)) (quotation marks and citations omitted). Of note, for issues involving mixed questions of law and fact, *de novo* or plenary review still applies. *See, e.g., Ingram v. Pac. Gas & Elec. Co.*, 2013 WL 6174487, at *7 (N.D. Cal. Nov. 22, 2013) (observing that under Rule 72(a), "[m]ixed questions of fact and law are reviewed *de novo*") (citing *United States v. McConney*, 728 F.2d 1195, 1202-03 (9th Cir. 1984) (en banc), *overruled on other grounds by Estate of Merchant v. C.I.R.*, 947 F.2d 1390, 1392-93 (9th Cir. 1991)). Finally, an order is "contrary to law" when it "fails to apply or

Page 6    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-073

misapplies relevant statutes, case law, or rules of procedure." *Weeks*, 2017 WL 1740123, at *5 (quotation marks and citation omitted).

Here, NIKE's objections to the Findings concern two purely legal questions. First, whether the "good cause" or "compelling reasons" standard should apply to NIKE's request to maintain the limited redactions contained in the complaint files (*i.e.,* the names of complainants, witnesses, and alleged persons of interest). Second, regardless of which standard is applied, whether the privacy rights of Third Parties outweigh the presumption of public access in this case. Thus, the Findings are subject to *de novo* review by this Court.

### B. Pursuant To Rule 72(a), The Court Should Set The Findings & Recommendation Aside As Contrary To Law.

The Court should set aside the Findings under Rule 72(a) because, as discussed below, it fails to apply the "good cause" standard and, even under a "compelling reasons" standard, fails to find a particularized showing of harm to the Third Parties' privacy, in contravention of the holding in several cases in this Circuit.

### 1. The Findings & Recommendation Ignore That The "Good Cause" Standard Applies To Redaction Requests Accompanying Motions Tangentially-Related To The Merits Of The Case.

Courts employ two legal standards in motions to seal: the 'good cause' standard and the "compelling reasons" standard. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016). "The Ninth Circuit has not ruled [on the question of] whether a motion for class certification is a dispositive motion for the purposes of determining whether the compelling reasons standard applies to a sealing request." *True Health Chiropractic, Inc. v. McKesson Corp.*, 2019 WL 11743580, at *2 (N.D. Cal. Aug. 13, 2019) (citation omitted). In deciding which legal standard to apply, the Ninth Circuit has distinguished between requests that accompany dispositive and non-dispositive motions, with a focus on whether the motion is

Page 7    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-074

"more than tangentially related to the merits of a case." *Ctr. for Auto Safety*, 809 F.3d at 1101; *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); s*ee also Hanson v. Wells Fargo Home Mortg., Inc.*, 2013 WL 5674997, at *2 (W.D. Wash. Oct. 17, 2013); *Hill v. Xerox Corp.*, 2014 WL 1356212, at *1 (W.D. Wash. Apr. 7, 2014).

"[C]ourts generally hold that the standard for filing documents under seal in relation to a class certification motion is a showing of 'good cause.'" *Sessa v. Ancestry.com Operations Inc.*, 2023 WL 1795856, at *1 (D. Nev. Feb. 6, 2023) (citing cases; applying good cause standard) (citation omitted); *see, e.g.*, *Heath v. Google LLC*, 2018 WL 11465387, at *2 (N.D. Cal. June 22, 2018) (applying good cause standard to motion to decertify collective action); *Kautsman v. Carrington Mortg. Servs.*, 2017 U.S. Dist. LEXIS 153550, at *2-3 (W.D. Wash. Sept. 19, 2017) (finding good cause existed to seal documents filed to support the non-dispositive class certification motion); *Stoba v. Saveology.com, LLC*, 2016 WL 1257501, at *2 (S.D. Cal. Mar. 31, 2016) (applying good cause standard to motion to unseal documents related to motion for class certification); *Coates v. Farmers Grp., Inc.*, 2016 WL 8223348, at *2 (N.D. Cal. Jan. 25, 2016) (applying good cause standard to seal documents in connection with plaintiff's motion for conditional collective action certification because motion "does not address the merits of Plaintiff's underlying claims").

The "good cause" standard applies here because Plaintiffs' Motion for Class Certification is not more than tangentially related to the merits. Importantly, "[t]he Court need not decide whether, in general, motions for class certification are more than tangentially related to the underlying cause of action. . . . Instead, the Court merely decides that the instant motion for class certification meets this standard." *Philips v. Ford Motor Co.*, 2016 WL 7374214, at *2 (N.D. Cal. Dec. 20, 2016) (internal citation omitted). Here, it does not.

Page 8    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
            FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

However, instead of analyzing the extent to which the Motion for Class Certification is tangentially related to Plaintiffs' claims, the Findings erroneously focus on the relationship between the redacted documents and Plaintiffs' Motion for Class Certification.  For example, the Findings state, "complaints regarding pay disparities and harassment can be significant in an attempt to demonstrate class status" (ECF No. 363 at 4).  But, none of the complaints at issue relate to pay disparities, and Plaintiffs have not brought a harassment cause of action, nor have they attempted to certify a harassment class.  Furthermore, in the Findings and Recommendation denying class certification, the Magistrate Judge noted that these same documents are insignificant.  ECF No. 310 at 53 ("Plaintiffs present approximately 30 complaints from the Starfish Survey and no declarations from opt-in plaintiffs.  Given the size of the putative class, this is insufficient to demonstrate a standard operating procedure of discrimination.").  Indeed, the Findings and Recommendation on Plaintiffs' Motion for Class Certification do not analyze the complaints—for good reason.  A handful of claimed harassment complaints tell the Court nothing about whether Plaintiffs can prove a common policy or practice of pay or promotion decisions sufficient to certify a class.

Because Plaintiffs' Motion for Class Certification was only tangentially related to the underlying merits of the case, the good cause standard applies to this motion to seal.

## 2.    The Findings & Recommendation Ignore Case Law Finding Third-Parties' Privacy Is A Compelling Reason To Redact Names.

NIKE seeks to maintain the limited redactions of the documents at issue because they reveal the names of third-party (1) complainants alleging discrimination or harassment; (2) subjects of those complaints; and (3) witnesses to the alleged conduct.

Good cause exists where disclosure may subject "a party or person [to] annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c)(1); *see also*

Page 9    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) ("For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted.").  Under the "compelling reasons" standard, the court must "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Ctr. for Auto Safety*, 809 F.3d at 1097 (citation omitted).

While the "good cause" standard should apply, even under the "compelling reasons" standard, courts have recognized the privacy interests of third parties by sealing personnel and other identifying information from the public record.  *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003) ("third-party medical and personnel records" should be redacted "to protect third-party privacy interests"); *Gnassi v. del Toro*, 2022 WL 3867376, at *3 (W.D. Wash. Aug. 30, 2022) ("Courts may seal records containing identifying information of third parties to protect their privacy interests."); *Myles v. County of San Diego*, 2017 WL 274829, at *2 (S.D. Cal. Jan. 19, 2017) ("[I]nformation about third parties' personal identifying information should not be disclosed to the public."); *Music Grp. Macao Com. Offshore Ltd. v. Foote*, 2015 WL 3993147, at *2 (N.D. Cal. June 30, 2015) ("Disclosure of [identifying] information would infringe the privacy rights of [third party individuals], which constitutes a compelling reason for sealing."); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 2015 WL 984121, at *2 (N.D. Cal. Mar. 4 ,2015) ("invasion of third parties' privacy" constitutes a compelling reason to file under seal); *Gregory v. City of Vallejo*, 2014 WL 4187365, at *3 (E.D. Cal. Aug. 21, 2014) (identities of third parties should be sealed in internal investigation documents); *Spam Arrest, LLC v. Replacements, Ltd.*, 2013 WL 4478645, at *2 (W.D. Wash. Aug. 20, 2013) (finding compelling reasons justified redacting "email addresses [and] other

Page 10  -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
              FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-077

identifying information for Spam Arrest customers and . . . third parties").  "The privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation when deciding whether to seal certain materials." *SEC v. Ripple Labs, Inc.*, 2023 WL 3477552, at *6 (S.D.N.Y. May 16, 2023) (quoting *Mirlis v. Greer*, 952 F.3d 51, 61 (2d. Cir. 2020)).  That concern is particularly important here where the party seeking to unseal the files is not the Plaintiffs (who agreed the names should be sealed), but the Media Intervenors.  There can be no doubt that the sole purpose of the Media Intervenors' request is to shame and disparage third parties who will have no opportunity to defend their reputations.

Prevention of unfounded reputational damage is an overriding interest that supports redaction.  *See Kamakana*, 447 F.3d at 1178-79; *see also Skurkis v. Montelongo*, 2016 WL 4719271, at *6 (N.D. Cal. Sept. 9, 2016) (granting motion to file complaint under seal where it contained information about allegedly criminal acts of defendants' agents and non-parties).  "In general, 'compelling reasons' . . . exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."  *See Kamakana*, 447 F.3d at 1179 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)); s*ee also Doe v. Va. Polytechnic Inst. & State Univ.*, 2022 WL 67324, at *4 (W.D. Va. Jan. 6, 2022) (third parties "did not voluntarily disclose their identities . . .; there is a risk of harm to them as non-parties by being known as persons who asserted that they were victims of sexual violence . . .").  "The privacy interests of non-parties – most of whom raised allegations that they were discriminated against or harassed while employed by [NIKE] – outweighs the public's interest in knowing the identity of the non-parties.  Such information is private to the individuals involved, who have not sought to

Page 11    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                 FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-078

place that private information in the public sphere." *Moussouris v. Microsoft Corp.*, 2018 WL 1159251, at *6 (W.D. Wash. Feb. 16, 2018) (citation omitted).

Here, the unsubstantiated complaints about and by Third Parties implicate similar, significant privacy interests. For example, Sun Declaration Exhibit 47 accuses a NIKE employee of being a bully and others of being "philanderers." Sun Declaration Exhibit 51 alleges that an individual made inappropriate comments about the dress and body of the anonymous complainant. Sun Declaration Exhibit 52 identifies two individuals who allegedly engaged in a sex act on NIKE's campus. Further, Goldstein Declaration Exhibit 9 includes complaints with the names of women who allegedly complained about gender discrimination and the subjects of those complaints. Paragraph 16 of the Goldstein Declaration lists the subjects of these complaints.

Publication of this confidential information (including uncorroborated information about individuals and their claimed intimate partners) would violate the privacy of several current and former NIKE employees who are not parties to this lawsuit. These privacy interests outweigh the public's right of access to court records, particularly given the lack of relevance of such information to the pay equity and promotion claims asserted in this lawsuit. The individuals whose employment information is at stake here are ordinary citizens who lead private lives. For complainants and persons of interest, a complaint process is supposed to be a safe space for individuals to voice concerns, not for salacious rumor-spreading. Unredacting complainants' names necessarily risks their privacy, which likely would have a chilling effect on confidential reporting in the workplace. The net result is that complainants would be worse off. NIKE takes considerable precautions to protect the confidentiality of individuals who raise concerns, as well as the confidentiality of subjects and witnesses in these matters. Because publication of the

Page 12    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                 FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-079

Third Parties' names would subject them to public scrutiny while serving no countervailing public interest, there are compelling reasons to redact them.

Furthermore, courts have routinely found the protection of third party investigatory or disciplinary records to be a sufficiently compelling interest to justify withholding the information from the public. *See, e.g.*, *Bakki v. Boeing Co.*, 2021 WL 962488, at *6 (W.D. Wash. Mar. 15, 2021)* (finding, under compelling reasons standard, that the "third party disciplinary document implicates significant privacy interests" and its publication "would violate the employee's privacy and expose him to public scrutiny while serving no countervailing public interest in transparency") (citation omitted); *Delaittre v. Berryhill*, 2017 WL 6310483, at *3-4 (W.D. Wash. Dec. 11, 2017)* (granting motion to seal documents, including disciplinary histories of third party employees).

Moreover, Sun Declaration Exhibit 46 contains investigatory and disciplinary documents regarding a third party, specifically an executive summary of the complaint about the individual and the disciplinary letter the individual received as a result of the investigation. Thus, the names in Sun Declaration Exhibit 46 should remain redacted to avoid violating the employees' privacy interests and subjecting them to public scrutiny. The contents of the investigatory documents are already unsealed; there is no reason the public needs to know the individuals' names because their "identities have minimal relevance to the court's decision on the" class certification motion. *SEC*, 2023 WL 3477552, at *6*.

The Findings state, without explanation, that the aforementioned compelling reasons are not "concrete examples" but rather "broad conclusory allegations of harm." ECF No. 363 at 5. That is incorrect, and as detailed above, construing the law in this fashion would functionally mean that a third party's privacy may not be protected. Even if s/he submitted a declaration of

Page 13  -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-080

potential harm to reputation resulting from the public disclosure of intimate partners and the like, the declaration itself would be unsealed/unredacted under the Findings, and likewise would be considered to be speculative and not sufficiently specific.  This position is untenable.

### 3.    The Findings & Recommendation Erroneously Rely On Inapposite Case Law.

The Finding's reliance on *Bracken v. Fla. League of Cities*, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019) and *Price v. Equilon Enterprises LLC*, 2012 WL 12846100, at *1 (W.D. Wash. Nov. 20, 2012) is misplaced.  ECF No. 363 at 5-6.  In *Bracken*, the plaintiff requested to seal the case file, including the complaint, *in its entirety* "per reasons of privacy of all participants as the fruition of these matters set forth shall prevail."  *Bracken*, 2019 WL 1867921, at *4.  The *Bracken* court "reviewed the Complaint for personal information that may be inappropriate for public disclosure and found no such information."  *Id.*  Here, by contrast, NIKE explained the harm that disclosure of the Third Parties' names would have on each of them and cited to a plethora of case law finding the same.

The Findings point to *Price v. Equilon Enterprises LLC* as an example of a case where a court permitted unsealing a third party's name.  ECF No. 363 at 5-6.  But in *Price*, the court declined to redact just one third party's name because *his* behavior, as attested to in the relevant document, went directly to the plaintiff's claim that her employer maintained a hostile work environment.  *Price*, 2012 WL 12846100, at *1.  Indeed, the plaintiff specifically called out "experienc[ing] harassment and belittling comments" from that individual.  *Id.*  Notably, for the other third parties, the *Price* court found that simply redacting those individuals' names "is feasible."  *Id.*  Similarly, here NIKE only seeks to redact these individuals' *names* and none of these individuals is the focus of Plaintiffs' specific allegations in the operative complaint.

Page 14   -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-081

The Findings also state that the identities of the subjects of complaints "bear on [P]laintiffs' claims" and that the identities of complainants and witnesses go "to the merits and credibility of [P]laintiffs' claims."  ECF No. 363 at 5-6.  Untrue.  While the *substance* of the redacted documents may go to Plaintiffs' claims, the *names* of Third Parties in unverified complaints do not.  Furthermore, there is no showing that the names of Third Parties purportedly involved in harassment or discrimination (or who may have witnessed harassment or discrimination) were relevant to the Magistrate Judge's finding that Plaintiffs failed to meet their obligation under Rule 23.

**4.    The Findings & Recommendation Ignore The Reasonableness Of NIKE's Limited Redactions, Which Are Supported By Case Law.**

The Findings fail to address case law advocating for the use of limited redactions for privacy purposes as NIKE does here.  Indeed, one of the two cases upon which the Findings rely to explain the purported relevance of the Third Parties' identities to Plaintiffs' Motion for Class Certification actually supports NIKE's position.  *See Price*, 2012 WL 12846100, at *1. "[C]ourts have recognized several concerns that may call for redaction of the materials or withholding of disclosure outright[,]" including privacy interests.  *United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont.*, 658 F.3d 1188, 1195 n.5 (9th Cir. 2011).  "Simply redacting the identifying information of third parties (*e.g.*, their names . . .) from these records and disclosing the remaining information … would not injure the third parties[.]"  *Foltz*, 331 F.3d at 1137.[7]  This is exactly what NIKE has done.  It has provided the public with the information it needs to understand the Magistrate Judge's orders,

---

[7] The Findings also cite to this case in reliance on another proposition.

Page 15    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

while preventing the public scrutiny of Third Parties whose identities provide no added value to the issues in the Motion for Class Certification.

IV.    **CONCLUSION**

For the foregoing reasons, Nike respectfully asks the Court to set aside and reverse the Findings & Recommendation dated October 11, 2023 (ECF No 363).

Dated:  October 25, 2023          Respectfully submitted,

                                  /s/ Daniel Prince

                                  LAURA E. ROSENBAUM, OSB No. 110061
                                  laura.rosenbaum@stoel.com
                                  STOEL RIVES LLP
                                  760 SW Ninth Avenue, Suite 300
                                  Portland, OR  97205
                                  Telephone:  (503) 224-3380
                                  Facsimile:  (503) 220-2480

                                  DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                  danielprince@paulhastings.com
                                  FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                  feliciadavis@paulhastings.com
                                  PAUL HASTINGS LLP
                                  515 South Flower Street, 25th Floor
                                  Los Angeles, CA  90071
                                  Telephone:  (213) 683-6000
                                  Facsimile:  (213) 627-0705

                                  Attorneys for Defendant NIKE, INC.

Page 16    -    DEF. NIKE, INC.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S
                   FINDINGS & RECOMMENDATION PURSUANT TO FED. R. CIV. P. 72(a)

ER-083

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| | FINDINGS AND RECOMMENDATION |
| Plaintiffs, | |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

RUSSO, Magistrate Judge:

Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender brought this action seeking class action status alleging that defendant Nike systematically discriminates against them and other similarly situated women regarding salary and promotions. Several additional plaintiffs filed consents to join this action. During the pendency of plaintiffs' motion for class certification, defendant sought to seal certain portions of the documents filed in relation to the motion. At that time, a group of non-party media organizations, moved to intervene seeking access to sealed documents in the case. The Court granted the motion to seal in part. The Court also granted the motion to intervene for the limited purpose of challenging the parties'

Page 1 – FINDINGS AND RECOMMENDATION

stipulated redactions in regard to the briefing surrounding plaintiffs' motion for class certification. However, the Court denied intervenor's request for further briefing and to unseal or access documents produced under the protective order in place in the case. Nonetheless, the Court invited the media organizations to file a renewed motion for the purpose of opposing any remaining stipulated redactions following final resolution of the motion for class certification. The motion to certify has been denied and the media organizations now move to unredact the following documents:

• Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-6.

• Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-7.

• Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-8.

• Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-1.

• Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-2.

• Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. 288.

• Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. 290-4.[1]

---

[1] Defendant does not object to unredacting contents of the complaints in this document but maintains that redactions of the names of individuals listed as complainants, witnesses, and subjects of the complaints must remain. Plaintiffs support the motion to unseal.

Page 2 – FINDINGS AND RECOMMENDATION

For the reasons stated below, the motion is granted.

DISCUSSION

The redactions at issue involve the names of those making workplace complaints along with the names of the witnesses and subjects of and to the complaints.

The press and the public have a "general right to inspect and copy public records and documents, including judicial records." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). There is a strong presumption in favor of access to court records that "can be overridden given sufficiently compelling reasons for doing so." Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003). However, with respect to judicial records filed in relation to non-dispositive motions, a more lenient standard applies when seeking to seal records. In re Midland Nat'l Life Ins. Co. Annuity Sales Prac. Litig., 686 F.3d 1115, 1119 (9th Cir. 2012). In such situations, under Fed. R. Civ. P. 26(c), the party seeking to seal need only demonstrate "good cause." Id.

Thus, the applicable standard depends on the document's relationship to the merits of the plaintiff's claims. See Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1096-99 (9th Cir. 2016) (the focus is on whether the material "at issue is more than tangentially related to the underlying cause of action"). Under the "compelling reasons" standard, the party seeking to seal or redact a judicial record bears the burden of showing that compelling reasons supported by specific factual findings outweigh the presumption of access and the public policies favoring disclosure. Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178-79 (9th Cir. 2006). The "good cause" standard, in contrast, requires only a showing that "specific prejudice or harm will result." Phillips ex rel. Est. of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1210-11 (9th Cir. 2002).

Page 3 – FINDINGS AND RECOMMENDATION

The parties disagree over which standard applies with respect to the documents at issue. Defendant asserts the motion to certify is nondispositive and therefore the documents filed in support of the motion are merely subject to the good cause standard.  Certainly, the complaints regarding pay disparities and harassment can be significant in an attempt to demonstrate class status.  See, e.g., Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D. N.Y. 2018) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)) (Plaintiff's may demonstrate commonality in a disparate treatment claim via evidence of a "systemwide pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice." ).

Plaintiffs use of the complaints, while insufficient to demonstrate a company-wide policy rather than individualized hiring manager decisions, formed a crucial part of their motion.  Public access to filed motions and their attachments does not merely depend on whether the motion is technically "dispositive," rather, access turns on whether the motion is more than tangentially related to the merits of a case.  Ctr. for Auto Safety, 809 F.3d at 1101 (9th Cir. 2016).  Here, such evidence may also go to the merits of the disparate impact claim itself.  Generally, courts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification. See Adtrader, Inc. v. Google LLC, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).  The evidence sought to be unsealed, as noted, relates to commonality and for purposes of plaintiffs' disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision.  See, e.g., Cooper v. Fed. Rsrv. Bank of Richmond, 467 U.S. 867, 876 (1984).  Accordingly, defendant must show compelling reasons to continue redaction of the names of those making workplace complaints along with the names of the witnesses and subjects of and to the complaints.

Page 4 – FINDINGS AND RECOMMENDATION

Defendant asserts that the privacy interests of third parties in the complaints, especially those made by anonymous complainants rebuts any presumption of public access.  Defendant maintains unredacting the names would have a chilling effect on confidential reporting in the workplace and cause reputational damage to the subjects of the complaints especially if the complaints have been unsubstantiated.  In addition, defendant asserts revealing the names of witnesses identified in the complaints may expose those witnesses to unwanted attention or ridicule.  Finally, defendant asserts the public will reap no additional benefit from revealing the names beyond what they already may glean from the substance of the previously revealed documents.

Defendant largely relies on generalized assertions of purported compelling reasons to redact the names and only once specifically refers to a complaint in which the complainant is not identified.  However, the proponent of redactions must provide concrete examples rather than broad conclusory allegations of harm.  Foltz, 331 F.3d at 1130–31.

The names included in the documents involve Nike employees and actions that plaintiffs allege demonstrate gender discrimination and harassment by Nike itself.  The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records.  Kamakana, 447 F.3d at 1179. In addition, the desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure.  Bracken v. Fla. League of Cities, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019).

To the extent the individuals identified in the complaints are third parties, the public has an interest and right to access the documents that bear on plaintiffs' claims even if those documents identify non-parties to the litigation.  Price v. Equilon Enterprises LLC, 2012 WL 12846100, at *1

(W.D. Wash. Nov. 20, 2012). The identity of Nike employees engaged in the very behavior plaintiffs assert resulted in discrimination certainly bear on plaintiffs' claims. The identity of complainants and witnesses similarly relate to issues going to the merits and credibility of plaintiffs' claims. Accordingly, the intervenors' motion to unseal judicial records is granted.

<u>RECOMMENDATION</u>

The Media Intervenors' renewed motion to unseal judicial records (ECF <u>343</u>) should be granted and the following exhibits should be unredacted: Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>284-6</u>); Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>284-7</u>); Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. <u>284-8</u>); Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>285-1</u>); Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>285-2</u>); Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>288</u>); and Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification (ECF No. <u>290-4</u>).

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's

right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 11th day of October, 2023.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>REPLY IN SUPPORT OF RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page i -**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

I.   INTRODUCTION .......................................................................................................1

II.   ARGUMENT ..............................................................................................................2

    A.   Nike Must Demonstrate "Compelling Reasons" to Seal Judicial Records Filed in
         Support of Class Certification. ...........................................................................2

    B.   Nike Bears the Burden to Show Compelling Reasons to Justify Continued
         Sealing. .................................................................................................................3

    C.   Nike's Claims of Potential Embarrassment and Reputational Harm Are
         Insufficient to Justify Sealing Under Either the "Compelling Reasons" or "Good
         Cause" Standard. ................................................................................................6

    D.   Nike's Arguments About Media Intervenors' Purported Motives Are Irrelevant. ...........9

III.   CONCLUSION ........................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Adtrader, Inc. v. Google LLC*,
No. 17-CV-07082-BLF, 2020 WL 6391210 (N.D. Cal. Mar. 24, 2020) ....................................3

*Bracken v. Fla. League of Cities*,
No. 19-CV-00602-CL, 2019 WL 1867921 (D. Or. Apr. 24, 2019) .............................................7

*Buchanan v. Homeservices Lending LLC*,
No. 11-CV-0922, 2012 WL 5505775 (S.D. Cal. Nov. 13, 2012)................................................2

*CBS, Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973) ....................................................................................................................10

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
809 F.3d 1092 (9th Cir. 2016) .............................................................................................1, 2, 3

*Davis v. Soc. Serv. Coordinators, Inc.*,
No. 10-CV-02372-SKO, 2012 WL 2376217 (E.D. Cal. June 22, 2012)....................................2

*Delplanche v. Window Prods., Inc.*,
No. 16-CV-02319-AA, 2021 WL 1425320 (D. Or. Apr. 15, 2021),
*appeal dismissed*, No. 21-35361, 2021 WL 5237292 (9th Cir. July 19, 2021)..........................7

*Doe v. Pub. Citizen*,
749 F.3d 246 (4th Cir. 2014) .....................................................................................................10

*Dugan v. Lloyds TSB Bank, PLC*,
No. 12-CV-02549-WHA, 2013 WL 1435223 (N.D. Cal. Apr. 9, 2013).....................................2

*F.T.C. v. AbbVie Prods. LLC*,
713 F.3d 54 (11th Cir. 2013) .......................................................................................................4

*Fodera v. Equinox Holdings, Inc.*,
341 F.R.D. 616 (N.D. Cal. 2022) .................................................................................................3

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
331 F.3d 1122 (9th Cir. 2003) .................................................................................................4, 5

*In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*,
101 F.R.D. 34 (C.D. Cal. 1984)..................................................................................................10

*In re McClatchy Newspapers, Inc.*,
288 F.3d 369 (9th Cir. 2002) .....................................................................................................11

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page iii -**

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
  No. 09-CV-01967-CW, 2012 WL 5395039 (N.D. Cal. Nov. 5, 2012) ......................................2

*In re Roman Cath. Archbishop of Portland*,
  661 F.3d 417 (9th Cir. 2011) ...........................................................................................8

*In re High-Tech Emp. Antitrust Litig.*,
  No. 11-CV-02509-LHK, 2013 WL 163779 (N.D. Cal. Jan. 15, 2013) ...................................2

*Johnson v. Coos Cnty.*,
  No. 19-CV-01883-AA, 2023 WL 3994287 (D. Or. June 14, 2023) ......................................7

*Kamakana v. City & Cnty. of Honolulu*,
  447 F.3d 1172 (9th Cir. 2006) ............................................................................4, 5, 6, 7

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ...........................................................................................................10

*Oliner v. Kontrabecki*,
  745 F.3d 1024 (9th Cir. 2014) ............................................................................................7

*Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,
  307 F.3d 1206 (9th Cir. 2002) ............................................................................................4

*Polaris Innovations Ltd. v. Kingston Tech. Co.*,
  No. 16-CV-00300-CJC, 2017 WL 2806897 (C.D. Cal. Mar. 30, 2017) ..................................5

*Price v. Equilon Enters. LLC*,
  No. 11-CV-1553-JCC, 2012 WL 12846100 (W.D. Wash. Nov. 20, 2012) ..............................8

*Reflex Media, Inc. v. Doe No. 1*,
  No. 18-CV-02423-BNW, 2022 WL 2985938 (D. Nev. July 28, 2022) ...................................8

*Rich v. Hewlett-Packard Co.*,
  No. 06-CV-03361-JF, 2009 WL 2168688 (N.D. Cal. July 20, 2009) ......................................2

*Romero v. Cnty. of Santa Clara*,
  No. 11-CV-04812-WHO, 2014 WL 12641990 (N.D. Cal. June 17, 2014)...............................8

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
  No. 19-CV-1667-LAB, 2021 WL 794271 (S.D. Cal. Mar. 1, 2021) ......................................8

*Skky, LLC v. Facebook, Inc.*,
  191 F. Supp. 3d 977 (D. Minn. 2016) ...............................................................................5

*United States v. Amodeo*,
  71 F.3d 1044 (2d Cir. 1995) ...........................................................................................9, 10

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page iv -**

ER-094

*United States v. Mayers*,
   No. 16-CR-0258-JCC, 2017 WL 2215805 (W.D. Wash. May 19, 2017) .................................8

*Vietnam Veterans of Am. v. C.I.A.*,
   No. 09-CV-0037-CW, 2012 WL 1094360 (N.D. Cal. Mar. 29, 2012) ....................................2

*Waldrup v. Countrywide Fin. Corp.*,
   No. 13-CV-08833-CAS, 2018 WL 4586188 (C.D. Cal. Sept. 17, 2018)................................10

*Whitecryption Corp. v. Arxan Techs., Inc.*,
   No. 15-CV-00754-WHO, 2016 WL 7852471 (N.D. Cal. Mar. 9, 2016) ..................................5

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page v -**

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully submit this reply in support of their renewed motion seeking a court order requiring the parties to file unredacted versions of seven judicial records filed in support of Plaintiffs' Motion for Class Certification.

## I.    INTRODUCTION

Nike's opposition to Media Intervenors' Renewed Motion to Unseal seeks to invert the presumptive right of access and misapplies the applicable standard for sealing judicial records filed in connection with a motion for class certification in the Ninth Circuit.  Media Intervenors' Renewed Motion should be granted for the following reasons.  ***First***, Nike must meet the stringent "compelling reasons" standard to seal the records at issue.  All the cases cited by Nike in support of the less stringent "good cause" standard pre-date the Ninth Circuit's 2016 decision in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016), which clarified the sealing standard for class certification records.  ***Second***, while Nike would have this Court continue to redact the names of all employees identified in workplace misconduct complaints, concerns about potential embarrassment or reputational harm are insufficient to meet the "compelling reasons" standard, especially given the strong public interest in this proceeding, which will determine whether one of the country's most prominent public companies is properly handling claims of sexual harassment and misconduct.  ***Third***, Nike's generalized assertions and conclusory claims of potential harm fail to meet its burden to maintain secrecy.  ***Finally***, Nike's attacks on what it claims are Media Intervenors' motives for seeking to unseal judicial records in this case are improper and irrelevant; Nike's desire to control news media coverage of this matter is not determinative of the public's right of access and its arguments to that end must be rejected.

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 1 -**

## II.    ARGUMENT

### A. Nike Must Demonstrate "Compelling Reasons" to Seal Judicial Records Filed in Support of Class Certification.

After filing thousands of pages of judicial records under seal pursuant only to a stipulated protective order, Nike continues to resist meeting the Ninth Circuit's "compelling reasons" standard to justify sealing of judicial records submitted in support of class certification. Instead, Nike claims that it need only demonstrate "good cause"—a standard governing the exchange of materials in discovery, not the sealing of judicial records filed in connection with a dispositive motion. Opp'n 5. However, *every* case Nike cites in support of its position was issued *before* the Ninth Circuit's decision in *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092 (9th Cir. 2016), which clarified application of the "compelling reasons" standard in the class certification context. Consequently, Nike's survey of the caselaw, Opp'n 6–7,[1] elides the Ninth Circuit's unambiguous—and, here, dispositive—direction that where motions and accompanying materials are "more than tangentially related to the merits of a case"—including, specifically, at the class certification stage—a party must demonstrate "compelling reasons," rather than merely "good cause," to seal them from public view. *Ctr. for Auto Safety*, 809 F.3d at 1101 (reversing district court order applying "good cause" standard to deny motion to unseal records filed in connection with motion for preliminary injunction to require defendant vehicle manufacturer to

---

[1]    Citing *Dugan v. Lloyds TSB Bank, PLC*, No. 12-CV-02549-WHA, 2013 WL 1435223, at *1 (N.D. Cal. Apr. 9, 2013); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2013 WL 163779, at *2 n.1 (N.D. Cal. Jan. 15, 2013); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, No. 09-CV-01967-CW, 2012 WL 5395039, at *1–2 (N.D. Cal. Nov. 5, 2012); *Vietnam Veterans of Am. v. C.I.A.*, No. 09-CV-0037-CW, 2012 WL 1094360, at *1–2 (N.D. Cal. Mar. 29, 2012); *Buchanan v. Homeservices Lending LLC*, No. 11-CV-0922, 2012 WL 5505775, at *2 (S.D. Cal. Nov. 13, 2012); *Davis v. Soc. Serv. Coordinators, Inc.*, No. 10-CV-02372-SKO, 2012 WL 2376217, at *1 (E.D. Cal. June 22, 2012); *Rich v. Hewlett-Packard Co.*, No. 06-CV-03361-JF, 2009 WL 2168688, at *1 (N.D. Cal. July 20, 2009).

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 2 -**

notify proposed class of alleged risks presented by its vehicles); *id*. ("Consistent with our precedent, we make clear that public access to filed motions and their attachments does not merely depend on whether the motion is technically 'dispositive.'").  More recent decisions confirm that "[c]ourts within this circuit apply the compelling reasons standard to motions to seal documents relating to class certification." *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 634 (N.D. Cal. 2022); *see Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 6391210, at *2 (N.D. Cal. Mar. 24, 2020) (collecting cases).  Simply put, the law of this Circuit is clear: Nike must satisfy that more stringent standard.

Plaintiffs' Motion for Class Certification was plainly "more than tangentially related to the merits of [the] case." *Ctr. for Auto Safety*, 809 F.3d at 1101.  As noted in Media Intervenors' Renewed Motion, the Findings and Recommendation adopted by this Court on class certification specifically addressed the merits of Plaintiffs' underlying claim.  ECF No. 310 at 44–50 (analyzing Plaintiffs' disparate impact claims), 50–53 (analyzing Plaintiffs' disparate treatment claims), 53–54 (analyzing Plaintiffs' Oregon Equal Pay Act claim), 54–55 (analyzing the typicality and adequacy requirements of Rule 23).  This analysis was based on an assessment of voluminous evidence submitted by both parties.  The Court's decision whether to certify a class is critical to the litigation and it necessarily follows that the public in general (including potential class members) should have access to filings relating to that certification decision.  Accordingly, Nike must demonstrate "compelling reasons" to maintain under seal key information from judicial records Plaintiffs submitted in support of their class certification motion.

**B.  Nike Bears the Burden to Show Compelling Reasons to Justify Continued Sealing.**

Nike improperly attempts to shift its burden to Media Intervenors, Opp'n 11, but the burden to show compelling reasons that support sealing remains entirely with Nike.  In this case, other than an agreement of the parties—which has now ended—no specific justification was put forward

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 3 -**

by either party for redacting the names of Nike complainants, witnesses, and accused harassers.[2] And, now, absent that agreement, Nike offers no further justification to continue sealing those names other than the unsupported claim that one or more persons involved might be embarrassed by disclosure. However, as detailed below, embarrassment is not good cause—let alone a compelling reason—for entry of a sealing order or closure order of any kind. *See infra* Section II.C. And, fundamentally, Nike's arguments fall far short of the showing necessary to meet its burden under Ninth Circuit law.

To fulfill the demanding "compelling reasons" standard, a party seeking sealing must show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness. *Kamakana*, 447 F.3d at 1178–79. This showing is particularized to ***each*** document or portion of a document the party seeks to seal. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1138–39 (9th Cir. 2003). The burden remains on Nike even under the "good cause" standard, which requires the party seeking to shield documents (or portions of documents) to show that specific prejudice or harm will result from public disclosure. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 & n.1 (9th Cir. 2002). And, again, that burden must be met with respect to "each particular document [the party] seeks to protect." *Foltz*, 331 F.3d at 1130–31. This showing must be made through "specific

---

[2]     Nike argues that the redacted information in filings in support of Plaintiffs' Motion for Class Certification is not of sufficient importance because "these peoples' identities did not form the bases or explanations for the court's decision." Opp'n 12 (citation and internal quotation marks omitted). In essence, Nike argues for a presumptive right of ***closure*** until a court determines that information contained in court filings was critical or necessary to its ultimate decision. That is not the law. The Ninth Circuit has been explicit: the presumptive right of access "applies fully" to judicial records—not just those parts of a court record later deemed relevant to the issues before the court. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006); *see also F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 64 (11th Cir. 2013) ("This is a simple rule to apply and does not involve locating the [judicial record] on a continuum by determining the actual role the document played—by, for instance, counting the number of times the district court cited it[.]").

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 4 -**

demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Id.* (citation omitted).

Here, Nike has not identified any particularized harm, supported by any facts or evidence, that would result from the disclosure of the names of Nike employees involved in its internal workplace misconduct investigations. Moreover, even if Nike could identify some non-speculative, particularized harm (which it has not done), it would be outweighed by the substantial public interest in this case. Besides broad claims of potential embarrassment and reputational harm, Nike offers no factual support whatsoever for its contention that the court records at issue must continue to be redacted. To the contrary, Nike relies exclusively on broad generalizations about the value of confidentiality and unfounded speculation about the impact of disclosure, Opp'n 9–11. Indeed, it does not offer ***any*** evidence to show that unsealing any particular employee's name will cause any ***specific*** harm.

Nike's "generalized rationales" and vague speculation are not an adequate substitute for the factual demonstration of specific harm required to seal court records. *Whitecryption Corp. v. Arxan Techs., Inc.*, No. 15-CV-00754-WHO, 2016 WL 7852471, at *2 (N.D. Cal. Mar. 9, 2016). "[A]ssertions about possible harm" that are so vague "that there is no meaningful way to realistically gauge how"—or even whether—"disclosure would" actually be harmful are insufficient to seal court records. *Polaris Innovations Ltd. v. Kingston Tech. Co.*, No. 16-CV-00300-CJC, 2017 WL 2806897, at *6 (C.D. Cal. Mar. 30, 2017). And courts have repeatedly rejected attempts to seal court records based on such assertions. *See, e.g.*, *Skky, LLC v. Facebook, Inc.*, 191 F. Supp. 3d 977, 980–81 (D. Minn. 2016) ("If Defendants have a factual basis for requiring this information to be sealed, it is Defendants' duty to present that basis; the Court will not speculate based on broad, unsupported attorney advocacy."); *Kamakana*, 447 F.3d at 1182

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 5 -**

(refusing to seal court records based on "conclusory statements" that the documents "are confidential and that, in general, their production would . . . hinder [a police department's] future operations with other agencies, endanger informants' lives, and cast [police] officers in a false light").

### C. Nike's Claims of Potential Embarrassment and Reputational Harm Are Insufficient to Justify Sealing Under Either the "Compelling Reasons" or "Good Cause" Standard.

Nike's primary argument for continued sealing is that revealing the names of Nike employees who complained of, witnessed, or were accused of workplace misconduct would embarrass those unnamed individuals and potentially harm their reputations.   Opp'n 8. Specifically—and ignoring all other considerations, including the public's interest in access—Nike argues that there is good cause (and even compelling reason) to continue to redact the records at issue because unsealing would result in "embarrassing and shaming" people "solely to appeal to [Media Intervenors'] (or the public's) prurient interests." *Id*.  Nike's arguments must fail.

Whereas Federal Rule of Civil Procedure 26(c) authorizes courts to issue protective orders to shield "a party or person from annoyance, embarrassment, oppression, or undue burden or expense" in the discovery context, "[d]ifferent interests are at stake with the right of access [to court records] than with Rule 26(c)." *Kamakana*, 447 F.3d at 1180.  Indeed, even when a party has identified "compelling reasons," a court must then "conscientiously balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1179 (citations and internal quotation marks omitted).  In general, compelling reasons that could outweigh the public's interest in access and justify sealing court records are rare, found only when the information sought to be sealed could be used for some palpably improper purpose. *Id*.

Here, in contrast, Nike's conclusory argument casts a single, narrow factor in the good cause analysis—whether "specific prejudice or harm will result" if information is unsealed, Opp'n

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 6 -**

6—as a wholesale exception for anything that might be embarrassing or unfavorable. Nike's broad claims of potential embarrassment are insufficient under either the "compelling reasons" or the "good cause" standard. Federal courts consistently find assertions that information might be embarrassing, incriminating, or reputation-damaging insufficient to overcome the presumption of access. *Kamakana*, 447 F.3d at 1179 (applying compelling reasons standard and holding "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records"); *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014) (applying compelling reasons standard and holding "to avoid embarrassment or annoyance to [debtor] and to prevent an undue burden on his professional endeavors [] are not 'compelling'"); *Delplanche v. Window Prods., Inc.*, No. 16-CV-02319-AA, 2021 WL 1425320, at *2 (D. Or. Apr. 15, 2021), *appeal dismissed*, No. 21-35361, 2021 WL 5237292 (9th Cir. July 19, 2021) ("potential employers' knowledge of . . . lawsuit" which "has caused them to ask difficult questions during interviews and made it hard for [litigant] to find work does not meet the 'compelling reasons' standard"); *Bracken v. Fla. League of Cities*, No. 19-CV-00602-CL, 2019 WL 1867921, at *4 (D. Or. Apr. 24, 2019) ("The desire for privacy is not a compelling reason sufficient to outweigh the public's interest in disclosure."); *Johnson v. Coos Cnty.*, No. 19-CV-01883-AA, 2023 WL 3994287, at *3 (D. Or. June 14, 2023) (applying "good cause" standard and finding that while litigants had "a privacy interest at stake and the disclosure of the challenged exhibits may be embarrassing to them, these considerations are substantially outweighed by the remaining factors," including the public interest in disclosure).

Nike argues that some of the redacted witness names were provided in a confidential process (although no evidence has been proffered to support that claim) and that third parties should not be subjected to potential embarrassment or reputational harm, Opp'n 9. But the

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 7 -**

applicable standard applies equally to party litigants and non-parties. The Ninth Circuit has explicitly rejected the suggestion that it "develop a new rule governing the disclosure of discovery material containing confidential information about third parties." *In re Roman Cath. Archbishop of Portland*, 661 F.3d 417, 425–26 (9th Cir. 2011); *see also Price v. Equilon Enters. LLC*, No. 11-CV-1553-JCC, 2012 WL 12846100, at *1 (W.D. Wash. Nov. 20, 2012) (finding even under the good cause standard that the public has an interest and right to know the identity of the non-party whose actions go directly to plaintiffs' claims). Indeed, this discrimination lawsuit is against Nike, which acts through its employees, including those identified in the records at issue.[3]

In addition to offering only insufficient, conclusory arguments to support closure, Nike also radically underplays the public interest in the identities of key witnesses. Nike acknowledges "[t]he public's claimed interest in learning who may have been involved in purported wrongdoing," but argues that interest is "outweighed" by the "intrusion" on individuals' "privacy rights." Opp'n 3. The public interest here goes well beyond that. Despite Nike's inverted understanding of the presumption, the information it contends should remain sealed—*i.e.*, the identities of Nike employees who alleged serious misconduct occurred at the company or who were accused of serious misconduct—is relevant to the adjudication of the substantive rights of the parties. Here, the Court reviewed the redacted information to reach a determination on

---

[3]    None of the cases Nike cites is actually supportive of its argument for sealing individual names to avoid potential "harassment," Opp'n 10, as they either involved the incorrect sealing standard, *Reflex Media, Inc. v. Doe No. 1*, No. 18-CV-02423-BNW, 2022 WL 2985938, at *1 (D. Nev. July 28, 2022) (applying the "good cause" standard); criminal allegations or proceedings, *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, No. 19-CV-1667-LAB, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021) (the sealing of "non-parties' personal identifying information . . . [b]ecause that information connects the individuals to a criminal investigation of a high-profile issue"), *United States v. Mayers*, No. 16-CR-0258-JCC, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017); or the denial of a motion to seal, *Romero v. Cnty. of Santa Clara*, No. 11-CV-04812-WHO, 2014 WL 12641990, at *2–3 (N.D. Cal. June 17, 2014).

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS - Page 8 -**

Plaintiffs' Motion for Class Certification and the public is entitled to know the factual basis for this Court's legal determinations.  Specifically, the public is entitled to know what evidence the Court deemed credible, what evidence carried weight, and what evidence did not.

Media Intervenors seek access to the redacted information in furtherance of reporting on this important litigation.  This legitimate purpose does not promote public scandal, but instead fosters public understanding of these proceedings.  While Nike may prefer to litigate in private— as its extensive sealed filings before intervention make clear—the public interest in access to the sealed information is especially weighty here and more than enough to overcome any interest in secrecy.  On balance, Nike's claimed interest in precluding the public disclosure of Nike employees who claimed or were accused of misconduct does not overcome the public's right of access to the parties' class certification briefing in this case.

### D.  Nike's Arguments About Media Intervenors' Purported Motives Are Irrelevant.

Nike chastises Media Intervenors for supposedly "attempt[ing] to create a media circus," Opp'n 1, and seeking access only to "satisfy [their] (and Plaintiffs') 'morbid craving for that which is sensational and impure,'" *id*. at 3 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050–51 (2d Cir. 1995)).  In addition to being baseless, Nike's ad hominem attack on Media Intervenors' purported motives ignores the fact that, as even the decision Nike relies upon underscores, neither Media Intervenors' nor Plaintiffs' motives are relevant:

> Although the presumption of access is based on the need for the public monitoring of federal courts, those who seek access to particular information may want it for entirely different reasons. However, *we believe motive generally to be irrelevant to defining the weight accorded the presumption of access.* It is true that journalists may seek access to judicial documents for reasons unrelated to the monitoring of Article III functions. Nevertheless, *assessing the motives of journalists risks self-serving judicial decisions tipping in favor of secrecy.*  Where access is for the purpose of reporting news, moreover, those interested in

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page 9 -**

> monitoring the courts may well learn of, and use, the information
> whatever the motive of the reporting journalist.

*Amodeo*, 71 F.3d at 1050 (emphasis supplied); *see also Waldrup v. Countrywide Fin. Corp.*, No. 13-CV-08833-CAS, 2018 WL 4586188, at *3 (C.D. Cal. Sept. 17, 2018).

Courts have dismissed such motive-based arguments for good reason: it is not Nike's (or this Court's) role to impose its views as to the editorial prerogatives of press movants. *See CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 124–25 (1973) ("For better or worse, editing is what editors are for; and editing is selection and choice of material."); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper . . . and treatment of public issues . . . —whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."). Consistent with the First Amendment and common law access principles set forth in Media Intervenors' Renewed Motion to Unseal, the decision of how to report on the matters Nike seeks to withhold from the public must be made by editors, and not by courts (or Nike).

Nike's hyperbolic criticism of supposedly "'sensational and impure' headlines" it claims Media Intervenors "have used to grab attention for more than four years," Opp'n 8, reveals its real goal is to preserve the company's ability to "spin" future news coverage of this litigation. To the extent Nike is suggesting that court records may be sealed to avoid negative press coverage, it is wrong: "It is not the duty of federal courts to accommodate the public relations interests of litigants." *In re Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig.*, 101 F.R.D. 34, 40 (C.D. Cal. 1984); *see, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 269 (4th Cir. 2014) ("[T]he public and press enjoy a presumptive right of access to civil proceedings and documents filed therein, notwithstanding the negative publicity those documents may shower upon a

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page 10 -**

company."); *In re McClatchy Newspapers, Inc.*, 288 F.3d 369, 374 (9th Cir. 2002) (rejecting argument that court records could be sealed based on concerns that news media would publish accusations "without also publishing the skepticism of [the accuser's] credibility"). Needless to say, Nike's public relations concerns do not and cannot justify the continuing infringement of Media Intervenors' (and the public's) rights to access judicial records filed in this case.

## III.    CONCLUSION

Media Intervenors respectfully request that the redacted information filed in connection with Plaintiffs' Motion for Class Certification be made public. Access will promote public understanding of the events at issue in this important litigation, and the presumptive right of access to judicial records in this case outweighs any interest in secrecy.

/s/Lisa Zycherman

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**REPLY IN SUPPORT OF RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 11 -**

LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 294-9642
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.:  3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S OPPOSITION TO RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER INC. *d/b/a BUSINESS INSIDER,* ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
INTERVENORS' MOTION TO UNSEAL JUDICIAL RECORDS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................... 3

    A.    The Court Denied Media Intervenors' Unfettered Access To Sealed Records. ............................................................................... 3

    B.    The Court Denied The Plaintiffs' Motion For Class Certification. ...................... 4

    C.    Media Intervenors Seek To Unseal The Names Of Individuals Connected To Unsubstantiated Harassment Allegations. ......................................... 5

III.   ARGUMENT ...................................................................................... 5

    A.    The "Good Cause" Standard Applies Here. ........................................... 5

    B.    Even If A Higher Standard Is Applied, There Are "Compelling Reasons" To Redact The Names Of Complainants, Witnesses, And Subjects. ...................... 8

    C.    The Denial Of Class Certification Does Not Heighten The Public's Right To Access The Names Of Complainants, Witnesses, And Subjects. ................. 12

    D.    Plaintiffs' Position On Disclosure Is Legally Irrelevant. ...................................... 13

IV.  CONCLUSION................................................................................... 13

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Accenture LLP v. Sidhu,*
2011 WL 6057597 (N.D. Cal. Dec. 6, 2011) ............................................................9

*Apple Inc. v. Samsung Elecs. Co., Ltd.,*
727 F.3d 1214 (Fed. Cir. 2013) ...........................................................................11

*Buchanan v. Homeservices Lending LLC,*
2012 WL 5505775 (S.D. Cal. Nov. 13, 2012) .......................................................7

*Ctr. for Auto Safety v. Chrysler Grp., LLC,*
809 F.3d 1092 (9th Cir. 2016) ..........................................................................6, 11

*Davis v. Soc. Serv. Coordinators, Inc.,*
2012 WL 2376217 (E.D. Cal. June 22, 2012) .......................................................7

*Dugan v. Lloyds TSB Bank, PLC,*
2013 WL 1435223 (N.D. Cal. Apr. 9, 2013) .........................................................6

*Fodera v. Equinox Holdings, Inc.,*
341 F.R.D. 616 (N.D. Cal. 2022) .......................................................................12

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
331 F.3d 1125 (9th Cir. 2003) ...........................................................................5, 6

*Forbes Media LLC v. United States,*
61 F.4th 1072 (9th Cir. 2023) ............................................................................11

*Hounshel v. Battelle Energy All., LLC,*
2013 WL 5375833 (D. Idaho Sept. 24, 2013)......................................................8, 9

*In re: High-Tech Emp. Antitrust Litig.,*
2013 WL 163779 (N.D. Cal. Jan. 15, 2013) .........................................................6

*In Re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.,*
686 F.3d 1115 (9th Cir. 2012) ............................................................................6

*In re NCAA Student-Athlete Name and Likeness Licensing Litig.,*
2012 WL 5395039 (N.D. Cal. Nov. 5, 2012) .......................................................7

*Kamakana v. City & Cnty. of Honolulu,*
447 F.3d 1172 (9th Cir. 2006) ...................................................................5, 6, 9, 11

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
   998 F.2d 157 (3d Cir. 1993)...............................................................................................13

*Maldonado v. Apple, Inc.*,
   333 F.R.D. 175 (N.D. Cal. 2019)..............................................................................12, 13

*Nixon v. Warner Commc'ns, Inc.*,
   435 U.S. 589 (1978)...........................................................................................................6, 9

*Oliner v. Kontrabecki*,
   745 F.3d 1024 (9th Cir. 2014) ...........................................................................................12

*Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*,
   307 F.3d 1206 (9th Cir. 2002) .............................................................................................6

*Ramirez v. GEO Grp.*,
   2019 WL 6782920 (S.D. Cal. Dec. 11, 2019)...............................................................2, 7

*Reflex Media, Inc. v. Doe No. 1*,
   2022 WL 2985938 (D. Nev. July 28, 2022) ......................................................................10

*Rich v. Hewlett-Packard Co.*,
   2009 WL 2168688 (N.D. Cal. July 20, 2009) .....................................................................7

*Romero v. County of Santa Clara*,
   2014 WL 12641990 (N.D. Cal. June 17, 2014) .................................................................10

*Romero v. Drummond Co.*,
   480 F.3d 1234 (11th Cir. 2007) .........................................................................................13

*Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*,
   2021 WL 794271 (S.D. Cal. Mar. 1, 2021), *aff'd*,
   2022 WL 706941 (9th Cir. Mar. 9, 2022)..........................................................................10

*Skurkis v. Montelongo*,
   2016 WL 4719271 (N.D. Cal. Sept. 9, 2016) .....................................................................9

*United States v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995)............................................................................................3, 8

*United States v. Mayers*,
   2017 WL 2215805 (W.D. Wash. May 19, 2017)...............................................................10

*Vietnam Veterans of Am. v. C.I.A.*,
   2012 WL 1094360 (N.D. Cal. Mar. 29, 2012).....................................................................7

**STATUTES**

Oregon Equal Pay Act ...........................................................................................................4

Page iii    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                  INTERVENORS' MOTION TO UNSEAL JUDICIAL RECORDS

**RULES**

FED. R. CIV. P. 23 ................................................................................................ *passim*

FED. R. CIV. P. 26(c) ........................................................................................................7

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    <u>INTRODUCTION</u>

By their renewed motion, the Media Intervenors seek to reveal the identities of complainants, witnesses, and alleged victims of claimed wrongdoing based on the collection of unsubstantiated, uncorroborated, and unofficial "complaints" that were circulated to a small group of individuals on NIKE's campus in or about December 2017.[1]  The allegations made in these documents—whether true or not—have been published by various media outlets and documents filed in the class certification briefing.  The sole issue here is whether the privacy interests of the purported victims, witnesses, and alleged wrongdoers outweighs any purported right of the Media Intervenors to embarrass and shame these individuals.  None of this shaming detail had any bearing on the Court's finding that Plaintiffs failed to meet their burden under Rule 23 to certify a class action, or the Ninth Circuit's denial of Plaintiffs' petition seeking an immediate appeal of the denial of class certification.  Nor does the law support an attempt to create a media circus.  Indeed, the following shows why the Court should deny this request.

First, here's a realistic illustration that proves the point.  In the packet of "complaints" distributed and collected by Plaintiffs, an anonymous person stated that they saw Person 1 performing a sex act on Person 2 at some location on NIKE's 286-acre campus in Beaverton, Oregon, and that s/he told Random Person A about the event.  The fact of the allegation was laid bare in the documents produced by NIKE in this litigation.  The Media Intervenors now seek to unredact the identities of Persons 1 and 2, as well as Random Person A, notwithstanding:

---

[1] "Media Intervenors" refers to Non-Party Media Organizations Insider Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal*.

- The complainant here did not reveal her/himself, and there was no showing that this event ever took place. Nor are there any facts on the face of the complaint suggesting that this encounter, if it happened, was non-consensual even if inappropriate.

- Assuming *arguendo* that the event occurred, there is no bona fide reason to reveal the names of Persons 1 and 2—other than to embarrass them. But if the complaint was fabricated, identifying Persons 1 and 2 publicly likely would do violence to those individuals' personal and professional reputations, including their standing within the community, compromising (or destroying) personal and familial relationships, and endangering current employment or future employment prospects.

- Naming Random Person A also serves no legitimate purpose. That person is not a witness to the alleged event; his/her knowledge would be hearsay. In addition, publicly disclosing the identities of third parties (and witnesses) seems antithetical to the goal of encouraging confidential reporting of wrongdoing in a system that protects alleged victims. Media Intervenors—and Plaintiffs who joined this motion—should care about this objective. Their advocacy suggests otherwise.

Second, Media Intervenors are incorrect on the law. While they argue that a "compelling reasons" standard should apply in determining whether to unredact the names of purported victims, witnesses, and alleged wrongdoers, a majority of district courts in the Ninth Circuit hold that court records filed in connection with a motion for class certification are subject to a lower "good cause" standard because class certification motions are not dispositive. *See Ramirez v. GEO Grp.*, 2019 WL 6782920, at *3 (S.D. Cal. Dec. 11, 2019). The "good cause" standard

Page 2  -  DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

ER-113

applies in this case, particularly where, as here, the litigation continues even after this Court and the Ninth Circuit ruled in NIKE's favor.  In the above example, the risk of reputational and emotional harm to Persons 1 and 2 supports the limited redactions.

Third, the same result is obtained under a "compelling reasons" standard.  The public's claimed interest in learning who may have been involved in purported wrongdoing is outweighed by the intrusion into Persons 1 and 2's privacy rights.  Nor does the Media Intervenors' curiosity support a stifling of the complaint and investigation process as a whole, where the confidentiality of persons of interest is a key feature of a system that encourages victims to come forward so that allegations of wrongdoing may be fully investigated.  Courts routinely support the limited redactions at issue here, particularly where there is no showing that unredacting the individuals' names would assist the public in understanding Rule 23's requirements or any issue tied to the class certification briefing.  The sole objective of the renewed motion is to satisfy the Media Intervenors' (and Plaintiffs') "morbid craving for that which is sensational and impure." *United States v. Amodeo*, 71 F.3d 1044, 1050-51 (2d Cir. 1995) (citation omitted).

The Media Intervenors' renewed motion should be denied.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Court Denied Media Intervenors' Unfettered Access To Sealed Records.

Notwithstanding their recent change of heart, Plaintiffs and NIKE previously agreed to redact select matters from the parties' class certification briefing, principally the names of complainants, witnesses, and subjects of "complaints" that were collected incident to the leafletting that occurred on NIKE's campus in late 2017.  ECF No. 273 at 13 (the Parties had worked together to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."); *id* at 12 (the Parties agreed to keep redacted "the names of any individuals named in allegations of sexual harassment or gender discrimination at Nike that have

not already been made public[.]").  To be clear, this means that the allegations contained in the "complaints" would be made public; only the specific identities of witnesses and persons of interest would be redacted.

On April 1, 2022, NIKE's counsel met and conferred with counsel for Plaintiffs and Media Intervenors regarding the Media Intervenors' request to private information in support of the parties' filings in connection with the class certification briefing.  ECF No. 220 ¶ 3.  The Media Intervenors claimed that they should have the right to access "Confidential" and "AEO" filings to evaluate whether unsealing was justified.  ECF No. 273 at 13.

On April 8, 2022, Media Intervenors' brought their initial Motion to Intervene for the Limited Purpose of Moving to Unseal Judicial Records and to Oppose Defendant's Motion to Seal (the "Motion to Intervene").  ECF No. 205.  The parties fully briefed the motion, and on September 30, 2022, the Court issued a recommendation granting in part and denying in part the Motion to Intervene.  ECF No. 273.  While the Court allowed Media Intervenors to intervene for the limited purpose of unsealing judicial records, it denied their attempts to access or unseal the records in connection with Plaintiffs' Motion for Class Certification.  ECF No. 273 at 11.

### B.    The Court Denied The Plaintiffs' Motion For Class Certification.

On November 22, 2022, the Court entered its Findings and Recommendations, concluding that Plaintiffs' Motion for Class Certification should be denied.  ECF No. 310.  The Court found, *inter alia*, that Plaintiffs had failed to establish (1) a common practice regarding NIKE's alleged use of prior pay to set starting pay; (2) a common practice regarding bonus payments; (3) commonality regarding their Oregon Equal Pay Act claim; and (4) typicality, predominance, and superiority.  On March 21, 2023, the Court adopted those Findings and Recommendations in its Order denying class certification.  ECF No. 335.  Plaintiffs petitioned the Ninth Circuit for leave to immediately appeal the denial of their class certification motion.

ECF No. 337.  The Ninth Circuit denied their petition.  ECF No. 339.

### C.   Media Intervenors Seek To Unseal The Names Of Individuals Connected To Unsubstantiated Harassment Allegations.

Media Intervenors have filed a renewed motion to unredact the limited items remaining in certain "complaint" files.  Specifically, Media Intervenors seek to unseal the redacted content in Exhibits 46 (ECF No. 284-6), 47 (ECF No. 284-7), 48 (ECF No. 284-8), 51 (ECF No. 285-1), and 52 (ECF No. 285-2) of the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification, Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification ("Goldstein Decl.") (ECF No. 288), and Exhibit 9 to the Goldstein Decl. (ECF No. 290-4).[2]  As Media Intervenors admit, NIKE already unredacted extensive information in the documents identified.  ECF No. 343 at 7-8.  Generally speaking, the remaining redactions seek to protect the privacy interest of individuals who (1) submitted complaints so that the issues they raised could be investigated confidentially; (2) were alleged as persons of interest; or (3) alleged witnesses to purported events.

### III.   ARGUMENT

### A.   The "Good Cause" Standard Applies Here.

The Media Intervenors contend that there must be "compelling reasons" to override their claim of access to the names of complainants, witnesses, and subjects identified in the "complaint" files at issue.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) ("specific factual findings" of prejudice must "outweigh the general history of access and the public policies favoring disclosure") (citations omitted); *Foltz v. State Farm Mut.*

---

[2] Exhibit 9 to the Goldstein Decl. at pages 17, 18, 25, 31, and 32, includes redactions of the contents of complaints, rather than just the names of complainants, witnesses, and subjects of complaints.  Nike maintains that the names of any individuals on these pages should be redacted, but does not oppose lifting the redactions of anything besides that.

Page 5   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

*Auto. Ins. Co.*, 331 F.3d 1125, 1135 (9th Cir. 2003) (the right to access court records "is not absolute and can be overridden given sufficiently compelling reasons for doing so.").

However, there is an exception for sealed materials filed in relation to non-dispositive motions, which warrant a more lenient standard.  *See Kamakana*, 447 F.3d at 1178-79; *see also In Re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (same).  Under this exception, a party need only satisfy the less exacting "good cause" standard.  *See Foltz*, 331 F.3d at 1135.  The "good cause" standard requires the sealing party to show that "specific prejudice or harm will result" if information is unsealed.  *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).  As the Ninth Circuit has held, when materials are attached to a non-dispositive motion, "the private interests of litigants are the only weights on the scale," and public access may be denied for "good cause" alone.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016) (citation and quotation marks omitted).

Under both standards, courts continue to have a strong interest in preventing abuse of their processes; otherwise, judicial records would become a "vehicle for improper purposes," such as a tool to "gratify private spite," or "promote public scandal."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (citations omitted).

Numerous courts have held that the "good cause" standard applies to class certification motions.  *See e.g., Dugan v. Lloyds TSB Bank, PLC*, 2013 WL 1435223, at *1 (N.D. Cal. Apr. 9, 2013) ("Unless the denial of a motion for class certification would constitute the death knell of a case, the vast majority of courts within this circuit treat motions for class certification as non-dispositive motions to which the 'good cause' sealing standard applies.") (citation and quotation marks omitted); *In re:  High-Tech Emp. Antitrust Litig.*, 2013 WL 163779, at *2 at n.1 (N.D.

Page 6    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
             INTERVENORS' MOTION TO UNSEAL

Cal. Jan. 15, 2013) (in finding that the motion for class certification is non-dispositive, "the Court applies a 'good cause' standard here in accordance with the vast majority of other courts within this circuit"); *In re NCAA Student-Athlete Name and Likeness Licensing Litig.*, 2012 WL 5395039, at *1-2 (N.D. Cal. Nov. 5, 2012) (applying "good cause" standard to motion to seal class certification briefing); *Vietnam Veterans of Am. v. C.I.A.*, 2012 WL 1094360, at *1-2 (N.D. Cal. Mar. 29, 2012) (same); *Buchanan v. Homeservices Lending LLC,* 2012 WL 5505775, at *2 (S.D. Cal. Nov. 13, 2012) (same); *Davis v. Soc. Serv. Coordinators, Inc.*, 2012 WL 2376217, at *1 (E.D. Cal. June 22, 2012) ("the party seeking to seal a document related to a non-dispositive motion [exhibits attached to a declaration in support of a motion for conditional class certification] must meet the 'good cause' standard set forth by Federal Rule of Civil Procedure 26(c) that applies to protective orders."); *Rich v. Hewlett-Packard Co.*, 2009 WL 2168688, at *1 (N.D. Cal. July 20, 2009) (Because "[t]he contested issues in Plaintiffs' motion for class certification involve the procedural requirements of Fed. R. Civ. P. 23 and relate only tangentially to the underlying merits of Plaintiffs' claim[,] [t]he motion thus is not 'dispositive' . . . and a showing of good cause is sufficient to justify filing these documents under seal.").

There is no argument here that the denial of class certification would constitute the "death knell" of this case, particularly where Plaintiffs continue to litigate their claims and are in the midst of post-certification discovery concerning the same.  In *Ramirez*, 2019 WL 6782920, at *3, the court found a class certification motion to be non-dispositive and applied the "good cause" standard for documents attached to it to be filed under seal because the plaintiff "would presumably have financial incentive to pursue individual litigation even if he could not do so on behalf of a class."  There are no presumptions here—the named Plaintiffs are proceeding with their claims.

Page 7    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
INTERVENORS' MOTION TO UNSEAL

The "good cause" standard attaches in this case. NIKE has demonstrated specific harm to the personal and professional reputations of individuals who would be publicly associated with alleged wrongdoing (including consensual sex acts) during the course of their employment at NIKE. This harm would be amplified if the anonymous reports were false—that would cause harm which is impossible to compensate by money damages alone.

### B.   Even If A Higher Standard Is Applied, There Are "Compelling Reasons" To Redact The Names Of Complainants, Witnesses, And Subjects.

While the "good cause" standard is applicable here, even under the "compelling reasons" standard, the Court should deny the Media Intervenors' renewed motion. *See Amodeo*, 71 F.3d at 1050-51 (privacy interests of third parties rebut the presumption of public access, particularly where the request for public access hinges on "a morbid craving for that which is sensational and impure.") (citation omitted). All that the Media Intervenors (and Plaintiffs) seek in this case is a repetition of the same "sensational and impure" headlines that they have used to grab attention for more than four years, except this time, they do not believe that the allegations alone are sufficient. Media Intervenors and Plaintiffs seek to double down by embarrassing and shaming (perhaps innocent) people regardless of the reputational and professional costs, solely to appeal to their own (or the public's) prurient interests. There are "compelling reasons" to override their claim of public access in this case.

First, a significant number of the "complaints" collected here were anonymous, which presents critical questions relating to the veracity of the matters identified in those documents and the harm to individuals who may be publicly identified in connection with unverified, "sensational and impure" allegations. But as a general matter, individuals who submit complaints have no expectation that their own privacy might be compromised due to republication of their names in litigation (or the newspaper). *See Hounshel v. Battelle Energy*

*All., LLC*, 2013 WL 5375833, at *1 (D. Idaho Sept. 24, 2013) (party's "discovery requests raise significant privacy concerns for third-party employees who ha[d] no involvement in the case"). The complaint process is supposed to be a safe space for individuals to voice concerns, not for salacious rumor-spreading. Unredacting complainants' names necessarily risks the privacy of such third parties, which likely would have a chilling effect on confidential reporting in the workplace. The net result is that victims would be worse off.[3]

Second, there are "compelling reasons" to redact the names of subjects of the complaints in sexual harassment and/or gender discrimination matters, particularly where the allegations are unsubstantiated. Prevention of unfounded reputational damage is an overriding interest that supports sealing. *See* Kamakana, 447 F.3d at 1178-79; *see also* Skurkis v. Montelongo, 2016 WL 4719271, at *6 (N.D. Cal. Sept. 9, 2016) (granting motion to file complaint under seal where it contained information about allegedly criminal acts of defendants' agents and non-parties).

Here, NIKE only seeks to redact these individuals' names. "The inclusion of unfounded accusations unrelated to the claims brought by [Plaintiffs] suggests that" their names are being used "as a vehicle for character assassination." Accenture LLP v. Sidhu, 2011 WL 6057597, at *3 (N.D. Cal. Dec. 6, 2011) (holding that unfounded accusations should remain under seal because they could become the vehicle for improper purposes). Numerous "courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption." Nixon, 435 U.S. at 598 (citing cases). There is no showing that the names of those purportedly involved in harassment or discrimination here (or who may have witnessed harassment or discrimination) would have been relevant to the Court's finding that Plaintiffs failed to meet their obligation

---

[3] It is particularly unfortunate that Plaintiffs, who purport to represent the interests of Nike's women employees, have suddenly decided that they now "support un-redaction of the documents at issue." ECF No. 343 at 10.

Page 9   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

under Rule 23.  The only purpose served would be to harm the reputations and infringe upon the privacy rights of individuals who have not been found to have engaged in inappropriate conduct. This is improper.

Third, the names of witnesses (either third-party observers or victims of alleged harassment or discriminatory treatment by others) should be redacted.  Presumably, the Media Intervenors wish these names to be disclosed, along with those of complainants and persons of interest, for the purposes of writing salacious stories that potentially would expose such individuals to unwarranted attention or ridicule.

As provided above, the current record shows the potential for harm.  In Exhibit 52 of the Sun Declaration, there is an *anonymous* complaint that two individuals (Persons 1 and 2, whose names have been redacted) engaged in a sex act at some point while employed at NIKE.  ECF No. 285-2.  The complaint neither alleges nor suggests that the act was non-consensual.  Thus, revealing these individuals' names in a public filing serves no purpose other than to harass and shame.  Courts routinely prohibit this.  *See e.g.*, *Reflex Media, Inc. v. Doe No. 1*, 2022 WL 2985938, at *2 (D. Nev. July 28, 2022) (sealing personal identifying information of victims of the alleged extortion business); *Sentynl Therapeutics, Inc. v. U.S. Specialty Ins. Co.*, 2021 WL 794271, at *3 (S.D. Cal. Mar. 1, 2021), *aff'd*, 2022 WL 706941 (9th Cir. Mar. 9, 2022) (sealing non-parties' names because it "runs a substantial risk of exposing those individuals to harassment"); *United States v. Mayers*, 2017 WL 2215805, at *2 (W.D. Wash. May 19, 2017) ("sealing the identifying personal information of an unrelated party to this case is a compelling reason to keep that information sealed"); *Romero v. County of Santa Clara*, 2014 WL 12641990, at *3 (N.D. Cal. June 17, 2014) ("Discrete, sensitive identifying information regarding third parties may be redacted.").  The public already has access to the facts relevant to that

Page 10   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
             INTERVENORS' MOTION TO UNSEAL

"complaint," including the allegation that a sex act occurred on NIKE's 286-acre campus at some point in history.  There is no additional benefit to disclosing these individuals' names; but, dire personal and professional consequences could result if their identities are published (*e.g.,* there are likely impacts with respect to these individuals' personal relationships, relationships with family members, at their current employment, in the community or other professional circles, etc.).  These individuals' lives would be put under a spotlight for the sole purpose of the Media Intervenors' (and Plaintiffs') enjoyment.  The case law does not support the same.

Finally, the Media Intervenors' reliance on the "compelling reasons" standard falls flat because it misses the key point in the case law—the touchstone of the inquiry is whether removal of the redactions would assist the "public interest in ***understanding the judicial process***[.]" *Kamakana*, 447 F.3d at 1178-79 (emphasis added, citation omitted); *Forbes Media LLC v. United States*, 61 F.4th 1072, 1076 (9th Cir. 2023) ("[m]atters decided in the courts are often of considerable public interest," but the question is "not one of public interest but [of] public access.").  That interest "does not extend to mere curiosity about . . . confidential information where that information is not central to a decision on the merits." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 727 F.3d 1214, 1228 (Fed. Cir. 2013); *see also Ctr. for Auto Safety*, 809 F.3d at 1099 (the focus of the analysis is on whether the material "at issue is more than tangentially related to the underlying cause of action.").

There is no evidence—by the Media Intervenors or the Plaintiffs—that the names of the complainants, witnesses, and subjects referenced in the unverified "complaints" would assist the public in understanding the judicial process relating to the Court's ruling on class certification or the Ninth Circuit's denial of Plaintiffs' petition.  There is no logical argument as to why the identities of Persons 1 and 2, and Random Person A, might help anyone understand the

Page 11   -   DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA
                INTERVENORS' MOTION TO UNSEAL

requirements of Rule 23.  The Media Intervenors have not identified a single reference in *any* ruling by *any* court indicating that the court's legal or factual conclusions might rest upon the identities of a person of interest in the unverified "complaint" files.  The Media Intervenors' renewed motion should be denied.

### C.    The Denial Of Class Certification Does Not Heighten The Public's Right To Access The Names Of Complainants, Witnesses, And Subjects.

Media Intervenors argue that the Court's ruling on class certification increases the public interest in accessing documents that informed judicial decision-making.  They then cite an array of inapplicable cases that, in fact, cut against the Media Intervenors' arguments.

For example, Media Intervenors cite *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014), for the proposition that court records provide important bases for a court's decisions. But the case is inapposite.  In *Oliner*, the party sought to seal the *entire record* of the court proceedings, including the opinion itself.  By contrast, here, the opinion denying class certification and the great majority of the evidence supporting the opinion are publicly accessible.  In fact, the critical facts underlying the "complaints" are publicly available.  Only the individuals' names remain redacted and these peoples' identities did not form the "bases or explanations for [the] court's decision."  *Id*.

In *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D. 616, 635 (N.D. Cal. 2022), another case cited by Media Intervenors, the basis for the court's holding that sealing the records would make it difficult for the public to understand the facts underlying the motion for class certification was "the nature and volume of the sealing requests."  In *Fodera*, the parties sought to seal approximately 175 records.  Here, there are only seven documents at issue with a very limited redaction focus—protecting the privacy rights and interests of non-parties.

*Maldonado v. Apple, Inc.*, 333 F.R.D. 175 (N.D. Cal. 2019), is similarly unhelpful to the

Page 12    -    DEFENDANT NIKE, INC.'S OPPOSITION TO NON-PARTY MEDIA INTERVENORS' MOTION TO UNSEAL

Media Intervenors' position.  The *Maldonado* court merely held that the information that defendants sought to seal was too broad, albeit acknowledging that the categories were "likely to include sealable information."  *Id.* at 194.  The court confirmed that it would not seal information that is "***necessary*** to understand plaintiffs' theory of liability and hence this Order."  *Id.* (emphasis added).  Media Intervenors cannot earnestly argue that a third-party individual's name is necessary to understanding plaintiffs' claims or the Court's denial of class certification.[4]

### D. Plaintiffs' Position On Disclosure Is Legally Irrelevant.

Finally, Media Intervenors argue that because Plaintiffs now seemingly support the disclosure of the names of the individuals in these complaints, unsealing is appropriate.  Plaintiffs' position is legally irrelevant and immaterial.  It is interesting that Plaintiffs support disclosure of information (without consent) pertaining to the victims they claim to represent, but unlike any previous briefing on sealing, the sole question here is whether the law supports redaction of the names of complainants, witnesses, and subjects in "complaints" alleging sexual harassment and discrimination.[5]  The great weight of authority supports NIKE's position here.

### IV. CONCLUSION

For the foregoing reasons, Nike respectfully submits that Media Intervenors' Motion to Unseal should be denied in its entirety.

---

[4] Media Intervenors' out-of-circuit cases are similarly distinguishable.  In *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993), the Circuit Court vacated the district court's order that a party could not intervene, but did not hold that certain documents relevant to a motion should have been unsealed.  In *Romero v. Drummond Co.*, 480 F.3d 1234, 1245-46 (11th Cir. 2007), the court applied the "good cause" standard.  While the Eleventh Circuit found there was not good cause, it only did so because the party seeking to seal failed to articulate any good cause.  By contrast, Nike has explained in detail the harm that could come from unsealing these documents.
[5] In the previous round of sealing briefing, the Court unredacted the names of (former) NIKE employees referenced in the "complaints" because those specific references tracked information that had already been made public.  ECF No. 273 at 7-8.

Dated:  August 23, 2023          Respectfully submitted,

/s/ Daniel Prince
_____

Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9642
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>RENEWED MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO UNSEAL JUDICIAL RECORDS |

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page i -**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

LR 7-1(a) CERTIFICATION ............................................................................................. 1

RENEWED MOTION TO UNSEAL JUDICIAL RECORDS ................................................ 1

MEMORANDUM OF LAW IN SUPPORT ........................................................................ 2

    I.    INTRODUCTION ....................................................................................... 2

    II.   BACKGROUND AND SEALED DOCUMENTS AT ISSUE ......................... 2

         A.   The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal ..................................................................................................... 2

         B.   This Court's Findings and Recommendation on Intervention and Unsealing ............. 4

         C.   Denial of Plaintiffs' Motion for Class Certification .................................. 4

         D.   Remaining Stipulated Redactions ........................................................... 5

         E.   Media Intervenors' Renewed Outreach to the Parties ................................ 5

    III.  ARGUMENT ............................................................................................. 6

         A.   The Press and Public Enjoy a Presumptive Right to Access Judicial Records Submitted in Support of Class Certification Which Can Only Be Overcome By a Stringent "Compelling Reasons" Standard. ....................................... 6

         B.   Additional Factors Now Favor Access. .................................................... 9

            i.   Now that a final determination has been rendered on class certification, there is increased public interest in accessing documents that informed judicial decision-making. ................................................................... 9

            ii.  Plaintiffs have clarified their position in favor of disclosure. ............................ 11

    IV.  CONCLUSION ......................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) .................................................................... 7

*Ctr. for Auto Safety v. Chrysler Grp., LLC,*
  809 F.3d 1092 (9th Cir. 2016) ................................................. 7, 8, 9, 10

*Fodera v. Equinox Holdings, Inc.,*
  341 F.R.D. 616 (N.D. Cal. 2022) ........................................................ 8, 9

*Foltz v. State Farm Mut. Auto. Ins. Co.,*
  331 F.3d 1122 (9th Cir. 2003) ............................................................ 6, 9

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
  860 F.3d 1244 (9th Cir. 2017) ................................................................ 8

*In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.,*
  686 F.3d 1115 (9th Cir. 2012) ................................................................ 6

*In re Nat'l Sec. Agency Telecomms. Records Litig.,*
  No. 06-1791 VRW, 2007 WL 549854 (N.D. Cal. Feb. 20, 2007) ......... 11

*Kamakana v. City & Cnty. of Honolulu,*
  447 F.3d 1172 (9th Cir. 2006) ............................................................ 6, 8

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.,*
  998 F.2d 157 (3d Cir. 1993) ................................................................. 10

*Maldonado v. Apple, Inc.,*
  333 F.R.D. 175 (N.D. Cal. 2019) ...................................................... 8, 10

*Nixon v. Warner Commc'ns, Inc.,*
  435 U.S. 589 (1978) ................................................................................ 6

*Oliner v. Kontrabecki,*
  745 F.3d 1024 (9th Cir. 2014) ................................................................ 9

*Romero v. Drummond Co.,*
  480 F.3d 1234 (11th Cir. 2007) ............................................................ 10

*Schmidt v. I.R.S.,*
  533 F. Supp. 3d 952 (E.D. Cal. 2020) .................................................... 8

*Uniloc 2017 LLC v. Apple, Inc.,*
  964 F.3d 1351 (Fed. Cir. 2020) .......................................................... 8, 9

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page iii -**

*Vesta Corp. v. Amdocs Mgmt. Ltd.*,
   312 F. Supp. 3d 966 (D. Or. 2018) ............................................................................ 8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...................................................................................................... 7

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page iv -**

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Media Intervenors conferred in good faith with counsel for Plaintiffs Cahill, *et al.*, and Defendant Nike, Inc. regarding this motion, and the matters contained herein. Plaintiffs support Media Intervenors' request to unseal the documents referred to in this motion. Nike does not support Media Intervenors' request to fully unredact the documents addressed in this motion. As such, the Parties and Intervenors were unable to resolve the dispute.

## RENEWED MOTION TO UNSEAL JUDICIAL RECORDS

Non-party media organizations Insider, Inc. *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") respectfully move this Court to order the Parties to file unredacted versions of the following seven documents in this proceeding:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-2.

RENEWED MOTION TO UNSEAL JUDICIAL RECORDS
- Page 1 -

ER-130

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification.  ECF No. 290-4.

Pursuant to the Magistrate's September 30, 2022 Findings and Recommendation, Media Intervenors' renewed motion is now timely because the Court has issued its final disposition denying Plaintiffs' motion for class certification and, moreover, the Court of Appeals has denied Plaintiffs' motion for leave to appeal that ruling.

## MEMORANDUM OF LAW IN SUPPORT

## I.  INTRODUCTION

This case centers on allegations of discrimination and abuse involving one of the most well-known multinational corporations in the world.  Accordingly, this Court has granted the Media Intervenors' intervention to represent the significant public interest in accessing information about this important judicial proceeding.  ECF No. 273.  Media Intervenors respectfully renew their motion to challenge redactions to seven judicial records related to class certification.  There is a presumptive right of access to these records, which include newsworthy information of public concern.  The rationale underlying disclosure is most applicable where, as here, the judicial records are considered by a Court in ruling on a dispositive motion, like class certification.  Furthermore, the continued redaction of these records is no longer stipulated to by all Parties, with Plaintiffs clarifying their current position in favor of disclosure.

## II.  BACKGROUND AND SEALED DOCUMENTS AT ISSUE

### A.  The Parties' Protective Order and Intervenors' Initial Motion to Intervene and Unseal

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 2 -**

On June 17, 2019, this Court entered a stipulated umbrella protective order, ECF No. 82 ("Protective Order"), modeled on the Court's Tier II template to govern the Parties' exchange of discovery materials. Invoking the Protective Order, the Parties thereafter filed thousands of pages of documents under seal. *See* ECF No. 205 Appendix A. In March 2022, Media Intervenors notified the Parties of their intent to intervene for the limited purpose of moving to unseal those documents to vindicate the press and public's presumptive right of access to judicial records. ECF No. 205 at 5–7. Media Intervenors conferred with the Parties to reach a resolution, leading to the public filings of four docket entries previously submitted by Defendant under seal. *Id.* But Defendant ultimately declined to unseal most of the documents at issue, including its Response to the Class Motion, and instead filed a motion to seal the documents the parties had to that point filed under seal pursuant only to their Protective Order. *Id.* at 7; ECF No. 171. On April 8, 2022, Media Intervenors moved to intervene pursuant to Fed. R. Civ. P. Rule 24(b) to challenge the sealed filings in this case, and to oppose Defendant's then-pending motion to seal. ECF No. 205.

Defendant opposed Media Intervenors' Motion, contesting the public's presumptive right of access to the sealed judicial records and arguing that "[t]hose redactions w[ould] be addressed in due course" under the auspices of the Protective Order. ECF No. 219 at 2. Plaintiffs took no position on Media Intervenors' Motion, emphasizing that their lack of a position stemmed not from opposition to unsealing, but from a desire not to disturb the outcome of "months" of "negotiating in good faith with Nike about what documents should remain sealed." ECF No. 218 at 2. Plaintiffs clarified that they "[were] not advocating that any documents should remain sealed," and were "cognizant of the presumption that documents filed with the Court should not be sealed." *Id.* Indeed, in the weeks following Media Intervenors' Motion, the Parties would go on to unseal

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 3 -**

multiple judicial records, even before the Magistrate reached its Findings and Recommendation on the Motion to Intervene.  *See* ECF Nos. 224, 230, 247, 263, 270.

**B.  This Court's Findings and Recommendation on Intervention and Unsealing**

On September 30, 2022, Magistrate Judge Russo recommended granting the Motion to Intervene and the Court subsequently entered the Magistrate's Findings and Recommendation on intervention.  ECF Nos. 273, 275.  The Magistrate recognized that the Media Intervenors' interests were not represented with respect to stipulated redactions produced under the Parties' Protective Order.  ECF No. 273 at 11.  Because of the Parties' ongoing efforts to unseal and unredact existing filings, and the pendency of the Plaintiffs' class certification motion, Media Intervenors' request for further briefing and to unseal additional documents was denied.  *Id.* at 12–14.  However, in its Findings and Recommendation, the Magistrate made clear that "following the final resolution of plaintiffs' Motion for Class Certification, the non-party media organizations may file a renewed motion for the purposes of opposing any remaining stipulated redactions."  *Id.* at 14.  Meanwhile, Magistrate Judge Russo continued to oversee the Parties' ongoing efforts to "review previously sealed documents and re-lodge unsealed or redacted versions where appropriate."  *Id.* at 13.  This process led the Parties to refile redacted versions of all but one of the previously sealed documents identified in Appendix A of the Motion to Intervene.  *See* ECF No. 229 Updated Appendix A; ECF Nos. 276–309.

**C.  Denial of Plaintiffs' Motion for Class Certification**

On November 22, 2022, Magistrate Judge Russo entered her Findings and Recommendation concluding that Plaintiffs' motion for class certification should be denied.  On March 21, 2023, the District Court adopted those Findings and Recommendation.  ECF No. 335.  Plaintiffs petitioned the Ninth Circuit for leave to appeal their motion for class certification.  *See* ECF No. 337.  On June 1, 2023, the Ninth Circuit denied Plaintiffs' petition.  ECF No. 339.

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 4 -**

**D. Remaining Stipulated Redactions**

Media Intervenors have reviewed the remaining redacted judicial records related to Plaintiffs' motion for class certification and identified seven documents where continued redaction withholds key evidence presented in support of class certification:

- Exhibit 46 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-6.

- Exhibit 47 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-7.

- Exhibit 48 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 284-8.

- Exhibit 51 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-1.

- Exhibit 52 to the Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification. ECF No. 285-2.

- Paragraph 16 of the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. 288.

- Exhibit 9 to the Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification. ECF No. 290-4.

Although redactions limit Media Intervenors' ability to ascertain the full contents of these judicial records, they appear to contain information concerning allegations of harassment and abuse involving Nike executives.

**E. Media Intervenors' Renewed Outreach to the Parties**

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 5 -**

ER-134

On May 2, 2023, Media Intervenors notified the Parties of their intent to file a renewed motion to unseal, predicated on the public's presumptive right to access judicial records.  On May 15, 2023, counsel for Media Intervenors and the Parties conferred regarding the redacted documents at issue.  On May 23, 2023, Plaintiffs stated their position in support of Media Intervenors' renewed motion to unseal and Defendant provided its position against full un-redaction.  On August 4, 2023, counsel for Media Intervenors contacted Plaintiffs and Defendant to verify their stated positions.  Plaintiffs confirmed that they support un-redaction of the documents at issue.  Nike confirmed that it does not support Media Intervenors' request to fully unredact the documents addressed in this motion.  Unable to ascertain the exact contents of the redactions, and mindful of the now-heightened equities favoring disclosure, Intervenors now move this Court to unredact the documents at issue.

## III.    ARGUMENT

As Magistrate Judge Russo made clear, Media Intervenors enjoy "well-established common law and First Amendment rights to challenge the sealing of judicial records."  ECF No. 273 at 13.  The documents at issue are now post-decisional judicial materials, and the already-sufficient rationales for their disclosure apply with even greater force following the disposition of Plaintiffs' motion for class certification.  And Plaintiffs' position in favor of disclosure further bolsters the need for unsealing.

### A.  The Press and Public Enjoy a Presumptive Right to Access Judicial Records Submitted in Support of Class Certification Which Can Only Be Overcome By a Stringent "Compelling Reasons" Standard.

The press and public enjoy a strong, presumptive right of access to judicial records.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978).  Consequently, a party seeking to seal judicial records must meet a "compelling reasons" standard.  *Kamakana v. City & Cnty. of*

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 6 -**

*Honolulu*, 447 F.3d 1172 (9th Cir. 2006). To fulfill this demanding standard, a party seeking sealing must show compelling reasons supported by specific factual findings that outweigh the historic presumption and public interest in favor of openness. *Id.* at 1178–79. This showing is particularized to ***each*** document or portion of a document the party seeks to seal. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1138–39 (9th Cir. 2003).

The Ninth Circuit has sometimes applied a more lenient "good cause" standard to justify sealing documents filed in connection with non-dispositive motions. *See In re Midland Nat'l Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per curiam). In considering Defendant's motion to seal, Magistrate Judge Russo did not reach the question of which standard should apply because she found that "defendant's motion largely fail[ed] to present even 'good cause' for the proposed non-disclosures." ECF No. 273 at 5 n.3. The Ninth Circuit has made clear that the relevant standard "turn[s] on whether the motion is more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016) (applying the compelling reasons standard to documents related to putative class plaintiffs' motion for preliminary injunction). Proceedings demanding a higher threshold for sealing involve "the presentation of substantial evidence," "requir[ing] the court to address the merits of [the] case." *Id.* at 1099. Adjudication of Plaintiffs' motion for class certification, which required assessments of voluminous evidentiary submissions and the merits of the case, unquestionably requires application of the "compelling reasons" standard to any requests to seal related judicial records. *See* ECF No. 310 at 31–32; ECF Nos. 148–167, 185–187.

Motions for class certification are unquestionably "more than tangentially related to the merits of a case." *Ctr. for Auto Safety*, 809 F.3d at 1101. To adjudicate motions for class certification, courts' rigorous analysis "will entail some overlap with the merits of the plaintiff's

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 7 -**

underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  The Findings and

Recommendation adopted by this Court on class certification is no exception.  ECF No. 310 at 44–

50 (analyzing Plaintiffs' disparate impact claims), 50–53 (analyzing Plaintiffs' disparate treatment

claims), 53–54 (analyzing Plaintiffs' Oregon Equal Pay Act claim), 54–55 (analyzing the typicality

and adequacy requirements of Rule 23).  In addition, class certification proceedings typically

demand a higher threshold for sealing in the Ninth Circuit because courts take substantial evidence

into consideration before rendering a decision granting or denying certification.  *Blackie v.

Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  Here, Magistrate Judge Russo reviewed voluminous

evidence submitted by the Parties,[1] spanning thousands of pages, including the evidence contained

within the seven redacted documents Media Intervenors now seek to unseal.  ECF No. 310 at 19–

21.  Accordingly, Defendant must show compelling reasons, particularized to each redaction in

the seven identified documents, to maintain their non-disclosure.  *See Ctr. for Auto Safety*, 809

F.3d at 1099; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*,

 860 F.3d 1244, 1261 (9th Cir. 2017) (holding that a party seeking continued sealing had failed to

meet the compelling reasons standard where it only made vague claims of national security

interests); *Uniloc 2017 LLC v. Apple, Inc.*, 964 F.3d 1351, 1362 (Fed. Cir. 2020) ("[A]ll filings

[are] presumptively accessible . . . [and] the proponent of sealing bears the burden with respect to

sealing." (quoting *Kamakana*, 447 F.3d at 1182)); *Fodera v. Equinox Holdings, Inc.*, 341 F.R.D.

616, 635 (N.D. Cal. 2022) (applying compelling reasons standard to deny proposed sealing of

---

[1]        ECF No. 310 at 41 (citing Deposition of Shine Thomas at 215 (unsealed at ECF No. 287-9)); *id.* at 42–43 (referencing Plaintiffs' multiple regression analysis); *id.* at 44 (citing Rebuttal Expert Report of David Neumark at 4 (unsealed at ECF No. 278-2)); *id.* at 47 (citing ECF Nos. 148-1 and 149-2 (unsealed with redactions at ECF Nos. 277-1 and 278-2, respectively)); *id.* at 48 (citing ECF Nos. 149-2 and 159-1 (unsealed at ECF Nos. 278-2 and 284-1, respectively)); *id.* at 49 (citing ECF No. 159-2 (unsealed at ECF No. 284-2)); *id.* at 52 (citing ECF Nos. 149-1 and 182 (unsealed with redactions at ECF Nos. 278-1 and 293, respectively)).

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 8 -**

materials the court considered in granting plaintiffs' motion for class certification); *Maldonado v. Apple, Inc.*, 333 F.R.D. 175, 194 (N.D. Cal. 2019) (same); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 312 F. Supp. 3d 966, 969 (D. Or. 2018) (applying compelling reasons standard to deny proposed sealing involving alleged proprietary trade secret information); *Schmidt v. I.R.S.*, 533 F. Supp. 3d 952, 954 (E.D. Cal. 2020) (applying compelling reasons standard to deny proposed sealing involving alleged personal and confidential information tax information).

### B.  Additional Factors Now Favor Access.

> **i.    Now that a final determination has been rendered on class certification, there is increased public interest in accessing documents that informed judicial decision-making.**

Regardless of which standard this Court applies to the stipulated redactions, this Circuit recognizes a heightened public interest in accessing documents filed in connection with post-decisional matters.  The presumptive press and public right to judicial records flows from the rationale that the public is entitled to learn about the judicial process itself, including the bases behind judicial decisions that often exert far-reaching effects on society.  *Foltz*, 331 F.3d at 1135. Court documents filed in connection with post-decisional matters are crucial to this understanding because "court records often provide important, sometimes the only, bases or explanations for a court's decision."  *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) (citation omitted).

This rationale applies to the documents filed in connection with Plaintiffs' motion for class certification.  *See Fodera*, 341 F.R.D. at 635 ("[G]ranting [proponent's sealing requests] would make it difficult, if not impossible, for the public to understand the basic facts underlying the motion for class certification as well as [any] rationale for granting it.").  Plaintiffs' claims will have far-reaching implications, involving the application of Oregon's Equality Act and the federal and Oregon Equal Pay Act to one of the most well-known multinational corporations in the world. The denial of Plaintiffs' motion for class certification is a significant decision in the case, and the

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 9 -**

public has a compelling interest in accessing the underlying information that informed this Court's adjudication. *See Ctr. for Auto Safety*, 809 F.3d at 1102 ("Nothing in our precedent suggests that the right of access turns on any particular result."). This rationale applies irrespective of whether the specific documents at issue were mentioned in the Court's decision. *See Uniloc 2017 LLC*, 964 F.3d at 1362 ("The district court was not required to seal any information that was not 'directly relevant' to its ruling on [a dispositive motion]; instead, all filings were presumptively accessible, and it was [the sealing proponent's] duty to provide compelling reasons for shielding particular materials from public view.").

Furthermore, it is well-established that the heightened public interest in post-decisional judicial records applies to significant stages of litigation, even where additional discovery and determinations on the merits of a case remain. *See Maldonado*, 333 F.R.D. at 194 (denying a motion to seal even where the class action litigation involved further determinations on the merits, ruling "I will not seal information that is necessary to understand plaintiffs' theory of liability and hence this Order"); *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164 (3d Cir. 1993) ("[T]here is a presumptive right of public access to pretrial motions . . . whether preliminary or dispositive, and the material filed in connection therewith."); *Romero v. Drummond Co.*, 480 F.3d 1234, 1245–46 (11th Cir. 2007) (pretrial motions, even those unrelated to discovery, are subject to the presumptive right of access). To assess whether there is heightened public interest in accessing documents related to a judicial determination, the relevant inquiry is whether the judicial determination "is more than tangentially related to the merits," irrespective of whether additional questions on the merits remain. *Ctr. for Auto Safety*, 809 F.3d at 1101. It is therefore immaterial that the Parties have entered a schedule for additional discovery and hearings on Defendant's motion for summary judgment. *See* ECF No. 342. Following resolution of the motion

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 10 -**

for class certification, the heightened rationales underlying public access to judicial records have attached to the documents at issue and require their disclosure.

      ii.     **Plaintiffs have clarified their position in favor of disclosure.**

In the September 30, 2022 Findings and Recommendation, Magistrate Judge Russo opted to revisit the Parties' stipulated redactions, including the redactions challenged here, at a later point. ECF No. 273 at 12. And Judge Russo only upheld redactions that both Parties agreed upon, denying Defendant's unilateral motion to seal additional, unstipulated information. *Id.* at 7; *see also id*. at 13 (decision to leave stipulated redactions intact motivated in part by desire not to "disturb the existing compromise between the parties" (citing *In re Nat'l Sec. Agency Telecomms. Records Litig.*, No. 06-1791 VRW, 2007 WL 549854, *4 (N.D. Cal. Feb. 20, 2007))). Defendant's sealing motion sought to shield information referencing Nike employees identified in Project Starfish as alleged perpetrators of harassment and abuse: implicating the same purported privacy interests as the documents at issue here. *Id*. However, Magistrate Judge Russo found those privacy interests, advanced solely by Defendant, insufficient to justify sealing. *Id.* Accordingly, Media Intervenors' renewed motion concerns redactions that are no longer stipulated to by all Parties pertaining to the same alleged privacy interests Judge Russo has already found to be insufficient to justify sealing.

## IV.    CONCLUSION

For the foregoing reasons, Media Intervenors respectfully renew their motion to unseal and ask this Court to recommend the filing of unredacted versions of the seven identified documents.

                       /s/Lisa Zycherman_____

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 11 -**

ER-140

Timothy Volpert
OR Bar No. 814074
tim@timvolpertlaw.com
TIM VOLPERT, P.C.
3934 SE Hawthorne Blvd. Suite 343
Portland, OR 97214
(503) 703-9054

Lisa Zycherman*
lzycherman@rcfp.org
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
*Admitted *pro hac vice*

*Counsel for Media Intervenors*

**RENEWED MOTION TO UNSEAL JUDICIAL RECORDS**
**- Page 12 -**

ER-141

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 ǀ Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 ǀ Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>                                    Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>                                    Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PARTIES' JOINT STIPULATION AND [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE** |

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE**

ER-142

Plaintiffs Kelly Cahill, *et al.* ("Plaintiffs") and Nike, Inc. ("Nike" or "Defendant") (collectively, the "Parties"), through their respective counsel hereby present the following stipulated and agreed upon request for a short extension to file a Status Report and Proposed Case Management Schedule.

### The Parties Have a Good Faith Basis for Revising the Default Deadlines

On April 4, 2023, this Court issued an Order requiring, if Plaintiffs' Rule 23(f) Petition was denied, the Parties to "confer and file a formal Joint Status Report which includes proposed case management deadlines within 14 days of the Ninth Circuit Court's ruling." ECF No. 338. On June 1, 2023, the Ninth Circuit, in its discretion, denied the petition. The current deadline for the Parties is thus June 15, 2023.

Since the petition was denied, the Parties have been conferring but have not completed the process. The Parties believe they can complete the conferral process by June 29, 2023. In the absence of any other impacted litigation deadlines, the Parties stipulate to and respectfully request that the Court enter an order revising the due date for the Status Report to June 29, 2023.

### STIPULATED REVISED DEADLINES

The Parties hereby stipulate and agree and request the Court order that the Parties complete their conferral and file a Status Report with proposed case management deadlines by June 29, 2023.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD**.

Dated: June 14, 2023                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

*/s/Craig Ackermann*
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Byron Goldstein (admitted *pro hac vice*)

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE**
**PAGE 1**

Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

Attorneys for Plaintiffs and Opt-In Plaintiffs

Dated:  June 14, 2023          Respectfully submitted,

*/s/Daniel Prince*
Daniel Prince (pro hac vice)
danielprince@paulhastings.com
Felicia A. Davis (pro hac vice)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
Laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Nike, Inc.

**PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE PAGE 2**

**SIGNATURE ATTESTATION**

In accordance with Civil Local Rule 11(b)(2), I attest that concurrence in the filing of this document has been obtained from the signatories on this e-filed document.

Dated:  June 14, 2023                    Respectfully submitted,

                                         ACKERMANN & TILAJEF, P.C.

                                          _/s/Craig Ackermann_____
                                         Craig Ackermann (admitted *pro hac vice*)

PARTIES' JOINT STIP. & [PROPOSED] ORDER REQUESTING AN EXTENSION TO FILE A STATUS
REPORT AND PROPOSED CASE MANAGEMENT SCHEDULE
PAGE 3

ER-145

## **[PROPOSED] ORDER**

The Court has reviewed the Parties' Joint Stipulation Requesting An Extension To File A Status Report And Proposed Case Management Schedule and hereby enters the same. The Parties shall confer and file a formal Joint Status Report which includes proposed case management deadlines by June 29, 2023.

**IT IS SO ORDERED.**

Dated: _____

_____
JOLIE A. RUSSO
United States Magistrate Judge

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417
Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel for Plaintiffs, and Counsel for Defendant, listed
on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**JOINT STATUS REPORT AND REQUEST FOR STAY** |

**JOINT STATUS REPORT AND REQUEST FOR STAY**
**PAGE 1**

Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender ("Plaintiffs") and Defendant Nike, Inc. ("Nike") (collectively, the "Parties") by and through their respective counsel, submit the following Joint Status Report and Request for Stay pursuant to the Court's March 21, 2023 Order (Dkt. No. 336):

The Parties have conferred regarding the status of the immediate action. In light of the fact that Plaintiffs will file a Fed. R. Civ. P. 23(f) petition with the Ninth Circuit Court of Appeals on April 4, 2023 requesting permission to appeal this Court's denial of Plaintiffs' motion for class certification, the Parties agree that good cause exists for the Court to stay the litigation of this matter—and to withhold on setting further case management deadlines—until the resolution of Plaintiffs' forthcoming Rule 23(f) petition.

The Parties further agree that, within 14 days of the latter of (a) denial of Plaintiffs' forthcoming Rule 23(f) petition, or (b) resolution of Plaintiffs' Rule 23(f) appeal, if permitted, they will jointly submit an updated Joint Status Report to the Court and/or schedule a Case Management Conference.

Dated:  April 4, 2023                    Respectfully submitted,

                                        GOLDSTEIN, BORGEN, DARDARIAN & HO


                                         _/s/ James Kan_____
                                        Laura L. Ho (admitted *pro hac vice*)
                                        Barry Goldstein, Of Counsel (admitted *pro hac vice*)
                                        James Kan (admitted *pro hac vice*)
                                        Byron Goldstein (admitted *pro hac vice*)
                                        Katharine L. Fisher (admitted *pro hac vice*)
                                        Mengfei Sun (admitted *pro hac vice*)

                                        MARKOWITZ HERBOLD PC
                                        Laura Salerno Owens, OSB #076230
                                        David B. Markowitz, OSB #742046
                                        Harry B. Wilson, OSB #077214
                                        Kathryn P. Roberts, OSB #064854

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
Brian Denlinger (admitted *pro hac vice*)
INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)


Attorneys for Plaintiffs and Opt-In Plaintiffs


Dated:  April 4, 2023              Respectfully submitted,

                                   PAUL HASTINGS LLP


                                    */s/ Felicia A. Davis*
                                   Daniel Prince (admitted *pro hac vice*)
                                   Felicia A. Davis (admitted *pro hac vice*)

                                   STOEL RIVES LLP
                                   Laura E. Rosenbaum, OSB No. 110061


                                   Attorneys for Defendant Nike, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | No. 3:18-cv-01477-JR |
| Plaintiffs, | ORDER |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

HERNÁNDEZ, District Judge:

Magistrate Judge Jolie A. Russo issued a Findings and Recommendation on

November 22, 2022, in which she recommends that the Court deny Defendant's Motions to

Exclude the Opinions of Kathleen Lundquist and David Neumark, deny Plaintiffs' Motions to

Rule as Inadmissible Parts of the Expert Reports of Chester Hanvey and Ali Saad, and deny

1 – ORDER

ER-150

Plaintiffs' Motion to Certify the Class. F&R, ECF 310. The matter is now before the Court

pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

## I.    Portions of the Findings and Recommendation to which the parties do not object

The parties did not object to the portions of the Findings and Recommendation in which

Judge Russo recommended the Court deny Defendant's Motions to Exclude the Opinions of

Kathleen Lundquist and David Neumark and Plaintiffs' Motions to Rule as Inadmissible Parts of

the Expert Reports of Chester Hanvey and Ali Saad. The Court, therefore, is relieved of its

obligation to review those portions of the Findings and Recommendation *de novo*. *United States

v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(en banc); *see also United States v.

Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988)(*de novo* review required only for portions of

Magistrate Judge's report to which objections have been made). Having reviewed the legal

principles *de novo*, the Court finds no error as to those portions of the Findings and

Recommendation.

## II.    Portions of the Findings and Recommendation to which Plaintiffs object

Plaintiffs object to the portion of the Findings and Recommendation in which Judge

Russo recommends the Court deny Plaintiffs' Motion to Certify the Class. The Court, therefore,

must make a *de novo* determination of that portion of the Magistrate Judge's report. 28 U.S.C.

§ 636(b)(1); *Dawson v. Marshall*, 561 F.3d 930, 932 (9th Cir. 2009); *United States v. Reyna-

Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(en banc).

The Court has carefully considered Plaintiffs' objections and concludes there is no basis

to modify the Findings and Recommendation. The Court has also reviewed the pertinent portions

of the record *de novo* and finds no error in the Magistrate Judge's Findings and

Recommendation.

2 – ORDER

ER-151

## CONCLUSION

The Court adopts Magistrate Judge Russo's Findings and Recommendation [310].

Accordingly, Defendant's Motions to Exclude the Opinions of Kathleen Lundquist and David

Neumark [179, 181] are denied, Plaintiffs' Motions to Rule as Inadmissible Parts of the Expert

Reports of Chester Hanvey and Ali Saad [192, 221] are denied, and Plaintiffs' Motion to Certify

the Class [146] is denied.

IT IS SO ORDERED.


DATED: _____March 21, 2023_____


_____
MARCO A. HERNÁNDEZ
United States District Judge

3 – ORDER

ER-152

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KELLY CAHILL, SARA JOHNSTON,                    3:18-cv-1477-JR
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on behalf of others
similarly situated,                             FINDINGS & RECOMMENDATION

                          Plaintiffs,

            v.

NIKE, INC., an Oregon Corporation,

                          Defendant.
_____

RUSSO, Magistrate Judge:

        Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender bring

this putative class and collective action alleging that defendant Nike systematically discriminates

against them and other similarly situated women at Nike headquarters regarding salary and

promotions.   Plaintiffs move to certify this case as a class action.   Related to the motion to certify,

the parties raise challenges to each other's experts and evidentiary objections.   For the reasons

stated below, plaintiffs' motion to certify should be denied.

Page 1  - FINDINGS & RECOMMENDATION

<u>ALLEGATIONS</u>

Named plaintiffs bring this action on behalf of the following collective/class members:

All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from three years prior to opting-in through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President.

First Amended Complaint (ECF 42) at ¶ 165. Plaintiffs exclude Nike retail store employees, lawyers within Nike's legal department, and employees in Nike's finance and human resources departments. <u>Id.</u> at ¶ 166.

Plaintiffs allege defendant has engaged in systemic sex discrimination against the collective/class members by paying them less than male employees with substantially equal job duties requiring substantially similar skill, effort, and responsibility performed under similar working conditions. <u>Id.</u> at ¶ 167. Plaintiffs also allege defendant has contributed to, and perpetuated, sex-based pay disparities through common policies, patterns, or practices, including, but not limited to, those relating to starting salary and "band level," annual ratings, promotions, performance management policies or practices, centralized decision-making, and a work environment hostile to women. <u>Id.</u> at ¶ 168.

Plaintiffs assert defendant pays lower salaries and promotes women with less frequency than defendant's male employees. Plaintiffs allege those disparities occur because a small group of primarily male decision-makers implement the policies below, patterns, or practices which have an adverse impact on and otherwise discriminate against Class/Collective Members based on their sex:

First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation. Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate

Page 2 - FINDINGS & RECOMMENDATION

salary history . . . ." The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.

Second, as part of its annual performance evaluation process, Nike rates each of its corporate employees. The ratings are assigned according to a forced ranking system. Nike utilizes a curve that limits the number of employees at Nike headquarters who can receive ratings in the top two levels. This system causes Class/Collective Members to receive lower ratings than their male colleagues. Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions. Ratings also affect promotions. Lower ratings preclude promotions whereas higher ratings can lead to promotions.

Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts and otherwise discriminates against women. Each year, Nike creates a set pool of money for each of its organizations that is then used to provide annual salary increases and bonuses. A disproportionately low amount of these budgets is distributed towards women's annual salary increases and bonuses.

Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation.

Nike has neither validated nor established the job relatedness of its policies or practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment. Two of Nike's most-senior executives – Trevor Edwards (Nike Brand President and the second most senior executive after the CEO from July 2013 to August 2018) and David Ayre (Vice-President in charge of HR from 2007 through July 2017) – caused and reinforced a workplace that was, and continues to be, hostile towards women and that devalues women. The above-described policies or practices reflect Nike's discriminatory intent. In addition, since before the class and collective action periods, Nike has been aware that Class/Collective Members are paid and promoted less than male employees at Nike headquarters. Nike has known that the above-described policies or practices caused women to receive less pay and fewer promotions. Nike has likewise long known that Nike headquarters' workplace is hostile towards and devalues women. For years, women have reported hostility, sexual harassment, and inequality in pay and promotions to Nike's Employee

Page 3 - FINDINGS & RECOMMENDATION

Relations department, which is the department within Nike Human Resources that is primarily tasked with addressing workplace complaints, and to Nike's Human Resources department ("HR"). Instead of addressing these complaints, HR has reinforced and exacerbated the hostile work environment. Regardless of the evidence, HR has regularly found such complaints unsubstantiated, avoided taking any meaningful corrective or preventive actions, and otherwise failed to act to end either the inequality in pay and promotions or the hostility towards women in the workplace.

Id. at ¶¶ 4, 5-12 (footnotes and parentheticals omitted).

The named plaintiffs are as follows:

- Heather Hender, who had nearly 20 years of engineering experience and a B.S. in Manufacturing Engineering when she started working at Nike in April 2015. She was hired initially as a process engineer II until September 2018 when she was promoted to senior process engineer. Hender filed a sex discrimination charge with the EEOC on November 9, 2018, alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions, and received a right to sue notice on November 15, 2018.

- Sara Johnston, who had four years of experience in human resources and analytics along with an M.B.A. when she started working at Nike as a part-time employee in June 2008 in the employee services department. Johnston began working full-time in February 2010 when she was hired as a senior account service representative. In August 2012, Johnston became a junior business systems analyst and then promoted in 2014 to an intermediate business system analyst. In November 2017, Johnston resigned asserting she had fewer promotions than her male counterparts and due to a hostile work environment that defendant refused to cure.

- Kelly Cahill, who had nearly eight years of work experience in marketing, business

Page 4 - FINDINGS & RECOMMENDATION

development, and advertising, and a B.S. in Sports Marketing, when Nike hired her in November 2012 as an independent contractor in a senior producer position. Nike then hired Cahill as a full-time director in October 2013.   On July 26, 2017, Cahill resigned asserting Nike refused to address her complaints of a hostile work environment and discriminatory promotional practices.

- Lindsay Elizabeth, who had nearly four years of experience in product design and a B.F.A. in apparel design when Nike hired her as an independent contractor in March 2015 in a design position.   In January 2017, Nike hired Elizabeth as a full-time apparel designer.   On August 23, 2018, Elizabeth filed a sex discrimination charge against Nike with the EEOC alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions. Elizabeth received a right to sue notice on September 28, 2018.   Elizabeth left Nike's employment in October 2018.

Id. at ¶¶ 13-40.

Plaintiffs allege defendant has a disproportionately low number of women in higher level positions.   Specifically, plaintiffs allege 71% of Nike's vice presidents are men, 62% of its directors and senior directors are men, with significantly more men making up senior directors. Also, Nike's "band level" ranks influence employees' salaries and bonuses.   Plaintiffs assert that, as the band level increases, the percentage of women within that band level decreases.   Id. at ¶¶ 53-56.

Plaintiffs allege that despite many and long-standing complaints about male supervisors subjecting women to a hostile work environment and sexual harassment, defendant did not conduct

Page 5  - FINDINGS & RECOMMENDATION

sexual harassment training for its headquarter employees until March 2018.  Id. at ¶¶ 64-65. Plaintiffs relate their personal experiences with sexual harassment and hostile working conditions as well as their formal complaints, and assert the male perpetrators were promoted while they suffered retaliation.  Id. at ¶¶ 72-90.

Plaintiffs allege that defendant acknowledged in May 2018 that it has a policy or practice of setting employees' starting pay and band levels based on past compensation which disproportionately places women in lower pay and band levels.  Id. at ¶¶ 97-103.  Plaintiffs also allege employee ratings are decided by a majority of male managers based on criteria that are not job-related causing women to receive smaller salaries, bonuses, and fewer promotions.  Id. at ¶¶ 104-17.

Plaintiffs assert defendant has a pattern or practice of channeling women into positions that are less likely to lead to promotions by, for example, providing smaller budgets to teams with higher percentages of women.  Id. at ¶¶ 118-24.  Plaintiffs allege defendant acknowledges it has failed to implement changes in hiring and promotion decisions to eliminate discriminatory impact on women and that it needs to change its hiring, compensation, and promotion systems.  Id. at ¶¶ 126, 129.

Cahill alleges when she left defendant, she was replaced with a male who received a higher title and band level resulting in a higher salary and bonuses than she received despite having substantially the same job responsibilities.  Id. at ¶¶ 132-36.

Johnston alleges that two months after she was hired, defendant hired a male employee to perform substantially the same work in the same conditions, at a higher rate of pay even though Johnston had to train him, and he had a lower level of education and less experience.  Id. at ¶ 137.

Page 6 - FINDINGS & RECOMMENDATION

Johnston further alleges she received fewer and slower promotional opportunities than her less qualified or equally qualified male counterparts. Id. at ¶ 140-43. Johnston asserts that when she left, defendant hired two men to fill her position at higher pay. Id. at ¶ 144.

Elizabeth and Hender also allege they were paid and promoted less than their similarly situated male counterparts. Id. at ¶¶ 145-55.

Plaintiffs allege six claims for relief: (1) violation of the Equal Pay Act, 29 U.S.C. § 206(d); (2) violation of the Civil Rights Act via disparate impact, 42 U.S.C. §§ 2000e et seq; (3) violation of the Civil Rights Act via disparate treatment, 42 U.S.C. §§ 2000e et seq; (4) violation of the Oregon Equal Pay Act, Or. Rev. Stat. § 652.220; (5) violation of the Oregon Equality Act via disparate impact, Or. Rev. Stat. § 659A.030; and (6) violation of the Oregon Equality Act via intentional discrimination, Or. Rev. Stat. § 659A.030. Defendant moves to dismiss or strike the class and collective claims in the first, third, fourth, and sixth causes of action.

## BACKGROUND

The putative class includes at least 5,200 current and former female employees at Nike's World Headquarters (WHQ) in salaried corporate positions in Bands L, U, E, or S.[1] Report of Ali Saad at ¶ 43 (ECF 186-1 at p. 30). As result, the proposed class includes employees in 1249 different job codes. Id. at ¶ 44.[2]

Nike's WHQ consists of a broad array of employees including, but not limited to, shoe and apparel designers, manufacturing and software engineers, event planners, sports marketers,

---

[1] Nike places employees under the executive level in six bands known as VALUES. Declaration of Mengfei Sun at Ex. 27 at p. 6 (ECF 157-7 at p. 6). The L Band includes supervisors, intermediate professional, and entry professional. The U Band includes managers, lead professionals and senior professionals. The E Band includes directors and expert professionals. The S Band includes senior directors and professional consultants. Id.

[2] In addition, there are over 13,000 position titles for the putative class. Report of Chester Hanvey at ¶ 14, fn. 6 (ECF 185-1 at p. 9).

Page 7 - FINDINGS & RECOMMENDATION

information and technology security professionals, security professionals, supply chain experts, and airplane pilots and mechanics. See id. at Appx. D (ECF 186-1 at pp. 185-266). The WHQ jobs are organized within a uniform hierarchy according to "type of work" and "level of work." Declaration of Mengfei Sun at Ex. 27 (ECF 156-2 at p. 24) (defining job code via "type of work" such as finance and "level of work" such as intermediate professional). "Type of Work" includes job functions and job family. Job functions are broad categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills. Nike has identified about 20 job functions that categorizes the work it does. Job families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria. The number of job families varies with each job function. Id. at p. 25 (description from Nike "2019 Job Training Program").

"Level of work" provides a common framework used to determine the scope and complexity of various roles. "Level of work" consists of bands and job levels. Id. The combination of "level of work" and "type of work" results in a job code. Id. at p. 27.

A.      Starting Pay

The putative class's positions span 21 different job functions which are then divided across 109 different job families and 198 different job subfamilies. Report of Ali Saad at ¶¶ 44-45 (ECF 186-1 at p. 31). As noted, within this proposed class there over 1200 different job codes and each job code has its own pay range which managers use to place new hires and determine their compensation. ECF 187-3 at 41 (importance of job code and its relation to pay range); Deposition of Shane Walker at p. 60 (ECF 187-2 at p. 334) (managers are responsible for making pay decisions); p. 86 (ECF 187-2 at p. 336) (job codes tied to job titles and there is a position title

Page 8  - FINDINGS & RECOMMENDATION

which provides the generic description of job role); p. 411-12 (ECF 187-2 at pp. 355-56) (managers are responsible for making pay adjustments); ECF 187-3 at p. 47 (sections of pay range); Deposition of Jessica Elizabeth Stuckey at p. 67-68 (ECF 187-2 at pp. 270-71) (job code and title drives pay range and without link to job code, there is no driver for pay range).

Nike uses global jobs and global job descriptions "to level jobs across the organization, regardless of the location of the role, and facilitates career pathing, talent planning, and organizational design." ECF 160-8 at p. 1. The pay ranges are "developed from market pay data and used to guide pay decisions and provide a common span of pay for people in similarly valued jobs," but "[i]ndividual pay within that range can be influenced by performance/potential, experience, length of time in job, previous pay rate or strategic talent focus." ECF 155-2 at p. 10. Nike specifically denotes that, "[w]hile individual pay may vary, there should not be systematic differences based on gender or race." Id.

Despite the leveling of jobs across the organization, Nike's Senior Director of Global Retail Compensation confirms

> Nike's job codes are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working in the same job code do not necessarily perform similar work). Job codes that share the same Job Subfamily and Job Level may not be the same from a compensation survey or actual day-to-day perspective at Nike – it depends on the job. In fact, there are a number of job codes that share the same Job Subfamily and Job Level but are readily distinguishable, involving the application of differing skillsets.

Declaration of Jessica Stuckey at ¶ 4 (ECF 187-1 at pp. 270-71).

> Managers determine base salaries by considering the experience and sustained performance of the employee while also recognizing pay levels in the external market.

> Although employees' backgrounds vary widely, each should be paid within the portion of the market zone* that reflects their level of experience and performance.

Page 9 - FINDINGS & RECOMMENDATION

> Employees with less experience and lower performance will generally be lower in NIKE's relevant market zone for that job, while employees with more experience and/or higher sustained performance in that job will generally be paid higher (at or above the median**) in the market zone.

ECF 159-5 at p. 1.

When beginning a new job, whether new to Nike or moving into a new role at Nike, managers could consider these factors when offering base salary:

- External market zone for the job
- Internal peer base salaries
- Relevant work experience, education, and skills
- Total rewards package
- Historical salary progression
- Business financial conditions
- Past NIKE job performance (for internal employees changing jobs)

Id. Managers are also free to consider and weigh whatever factors they deem relevant to the position being hired. E.g., Declaration of Cynthia Peele (Service Delivery Manager) at ¶ 9 (ECF 187-1 at p 126):

> I have also been involved in the hiring process in my roles at Nike. No one has to approve my decision to post a job. I am typically posting jobs that existed on my team previously, but now are vacant. Accordingly, the band level and job title are pre-set and cannot change based on the candidate or any other factor. I also am involved in setting starting salary. To make this decision, I look at the candidate's experience, whether they have any certifications, and sometimes, what company they are coming from. For example, I know that candidates from Microsoft have a lot of technical experience, so I would likely give someone from Microsoft a higher salary than someone from a smaller, less technical company. Certifications are also very important for roles on my team because it shows whether candidates are keeping up with their technical skills. In IT and Tech Ops, it is easy to fall behind, so it is imperative that candidates actively seek to develop and refine their skills.[3]

---

[3] See also, e.g., Declaration of Alyssa Levison (Director Digital Design Operations) at ¶¶ 14-15 (ECF 187-1 at pp. 72-73) (have ultimate responsibility for setting starting pay, consult HR and Nike's salary range but then consider education, experience, room for growth, mastery of soft skills — may have to consult manager one level above to offer staring salary above pay range); Declaration of Mac Caputo (Former Recruiter-Global HR) at ¶¶ 9-11 (ECF 187-1 at pp. 187-88) ("Ultimately, while I typically do provide a recommendation to the hiring manger, the hiring manager is responsible for making the final decision on the starting salary" and they consider factors such as years of experience, related progressive experience to the job, education, complexity of the applicant's prior organization, level of prior influence and responsibility, and communication style, among many other possible factors).

Page 10 - FINDINGS & RECOMMENDATION

In May 2019, Nike internal documents indicate that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but that it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one." ECF 158-2 at p. 8.

In September 2019, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1. After that, Nike policy permitted asking a candidate about salary expectations. Id.

As noted above, Shane Walker, Senior Director of Global Compensation, indicates the hiring managers receive pay ranges for a job and are responsible for making the pay decision within that range. Deposition of Shane Walker at pp. 48-49, 60 (ECF 187-2 at pp. 332-33, 344):

> So for new hires, the guidance is to position someone between 85 percent to the maximum of the pay range. For promotions is to position 85 percent to 95 percent in the pay range. And for lateral moves it is generally no increase.
>
> But each individual situation needs to be reviewed and may call for an increase, and our guidance is that managers are responsible for making pay adjustments and that all newly hired or promoted employees should always be above the minimum of the pay range.

Id. at pp. 411-12 (ECF 187-2 at pp. 355-56).

According to Shine Thomas (Senior Director for Talent Acquisition, Innovation, Enterprise Data Science, and Analytics, Consumer Creation), decisions related to hiring, in some cases, should be approved by Talent Acquisition, but that hiring decisions are approved by multiple people. Deposition of Shine Thomas at pp. 49-50 (ECF 162-9 at pp. 9-10).[4] That said, "[t]he

---

[4] Thomas made this statement in the context of a situation in which a manager is asked to hire a relative of a friend for a summer internship whom they know is not qualified and whether that is considered a form of bribery. See ECF

Page 11 - FINDINGS & RECOMMENDATION

onus of the decision making for the offer rests on the hiring manager. The recruiter is involved in facilitating that process, but the decision is made by the hiring manager." Id. at p. 123 (ECF 187-2 at p. 299).

Thomas states that before September 2017:

> [P]rior salary was a data point that we looked at, but it was always, our guideline has always been that is a data point. The position and the range is also a data point. Every single offer is unique, and every single offer has different nuances associated with the candidate and their experiences and qualifications.

Id. at p. 220 (ECF 187-2 at p. 307).

B.      Pay Increases and Bonuses

From 2015 until 2019, lump-sum merit awards and pay increases were based on a percentage of employees' base pay.   Deposition of Shane Walker at p. 357 (ECF 162-11 at p. 32). In March 2019, Nike adjusted its annual salary increase policy (core pay) such that it is not purely percentage based and would account for an employee's position within Nike's pay range.   ECF 158-5 at pp. 34-35.   Even so, using the new competitive pay management (CPM) system still has a percent increase to base pay component.   ECF 156-6 at pp. 2-4.   The pay adjustment also includes consideration of the employee's current position in pay range, prior year performance, future potential, impact of loss, risk of loss, time in role and pay relative to peers.   Id. at pp. 3-4.

Nike's performance review process  - i.e., Coaching for Excellence (CFE) - assigns a rating of exceptional, highly successful, successful, inconsistent, or unsatisfactory.   ECF 187-3 at p. 85.   Prior to 2019, Nike assigned a minimum and maximum percentage for each rating and then managers used discretion to determine what increase the employee would receive, but whether that was within or outside the guideline depended on each manager.   Deposition of Shane Walker at

---

159-2 at p. 18.

Page 12  - FINDINGS & RECOMMENDATION

p. 360 (ECF 162-11 at p. 33). Beginning in 2019, managers select among four options (max invest, invest, market, and zero) which then presents a percent increase based on where the employee is in the pay range. ECF 158-5 at p. 35.

Nike does not have a forced CFE distribution. ECF 187-3 at p. 139. Individual CFE ratings seldom need to be approved by higher level managers. E.g., Declaration of Rebecca Edington (Vice President of Footwear Technical Development) at ¶ 13 (ECF 187-1 at p. 24) ("Lower-level managers are also the ones who made decisions on their direct reports' CFE ratings. While I do run calibration sessions to review the CFE ratings for the higher-level managers in my organization to ensure we are aligned and consistent in how we are rating employees, lower-level employees are reviewed through separate calibration sessions. I do not rate or review ratings for every single employee in my organization. I have never encountered a situation where I have over-ridden any manager's rating for his or her direct report."); Declaration of Kimberly Mack (Vice President for Men's Sport Performance Apparel) at ¶ 14 (ECF 187-1 at p. 97) ("During the annual pay and performance review cycles, I provide a performance rating for each of my direct reports. I then select a base pay increase for each direct report based on their performance rating. Each manager on my team rates and reviews each of their direct reports and selects a base pay increase accordingly. It is the manager's responsibility to select the employee's rating and base pay increase, not mine. If a manager cannot decide on a rating or base pay increase, that manager and I may have a conversation about ratings and pay, and I may provide input or guidance, but it ultimately is the direct manager's decision. In fact, I rarely question a manager's perspective on their direct report's performance or pay. I have never seen a base pay or ratings decision changed by anyone in a higher level."); but see ECF 158-6 at p. 13 (executive review does include using

Page 13 - FINDINGS & RECOMMENDATION

reporting to ensure pay outcomes align with talent perspective and ability to make any necessary changes); ECF 159-3 at p. 3 ("[S]ystem requires 'manger+1' approvals for merits and PSP awards.").

Despite the Nike guidelines, managers had discretion regarding pay increases and even employees with the same CFE ratings could receive different percent merit increases. E.g., Declaration of Ronni Worboys (Director of Retail Operations) at ¶ 12 (ECF 187-1 at p. 173) ("As a manager, I have the discretion to set base pay increases within this budget. I allocate this budget based on each employee's performance rating and each employee's compensation within a competitive salary range. I try to be as equitable as possible in providing base pay increases for each of the employees I supervise, but I do not always provide the same base pay increases to employees with the same ratings. For example, if two employees both received the same performance rating, but one employee's base pay is further from the midpoint of the salary range, I would give that employee a higher base pay increase. My goal is to try to increase pay so that all my employees are situated equitably within the same percentage of the pay range for the job."); see also ECF 187-3 at p. 141:

> Merit awards are discretionary and merit award guidelines vary within each performance rating category. When determining the size of increase, managers should consider a variety of factors:
>
> > o Performance: employee's performance for the entire fiscal year, and the most important factor in merit pay decisions.
> > o Position to Market: employee's pay relative to external market zone
> > o Internal Equity: employee's pay relative to peers in similar jobs within NIKE
> > o Employee's experience, skill levels, etc.
> > o Available Budget

The same is true after the 2019 introduction of the CPM system. See ECF 187-3 at p. 65

Page 14 - FINDINGS & RECOMMENDATION

(managers have the ability to further invest using a dropdown list); Deposition of Shane Walker at p. 365 (ECF 187-2 at p. 353) (The core pay investment table "is a data point that is available during that process, but how each individual manager, manager +1, uses that information will vary or if they use it at all.").

Nike uses a Performance Sharing Plan (PSP) to award annual cash bonuses to employees who receive a CFE rating above unsatisfactory. See, e.g., ECF 187-3 p. 78 (fiscal year 2017 CFE modifier guidelines: exceptional = 75-150%; highly successful = 50-125%; successful = 25-110%; inconsistent = 0-75%; and unsatisfactory = 0%). Prior to 2019, the award consisted of team and discretionary shares; the latter was determined by the manager based on the CFE rating. Id. Both shares consider an employee's job band and fiscal year earnings (i.e., base pay for salaried employees). Id.; Deposition of Shelli White at p. 122 (ECF 162-13 at p. 9). Starting in 2019, the performance modifier was set at 100% for all employees. ECF 158-5 at p. 11. The manager+1 approves the PSP award. Deposition of Shelli White at pp. 68-69 (ECF 187-2 at pp. 370-71).

C.      Promotions

At Nike, Talent Acquisition helps manage the process for competitive promotions or other job changes but does not manage the process independent of hiring managers. Deposition of Shine Thomas at pp. 28-29 (ECF 162-9 at pp. 6-7). Nike has a fill strategy which allows a job role to be posted internally, externally, or the hiring manager can promote someone within the company into a position. Deposition of Shine Thomas at pp. 80-81 (ECF 180-10 at pp. 2-3). Fill strategy and promotions do not require approval from Human Resources but may require a manager's direct supervisor (manager+1). See, e.g., Deposition of Treasure Heinle at pp. 62-63 (ECF 187-2 at pp. 144-45 (manager needs to get her direct manager's approval for noncompetitive

Page 15 - FINDINGS & RECOMMENDATION

job change); ECF 156-5 (noncompetitive job changes described as when an employee moves into a different role without formal interview process and requires approval of manager+1 or Human Resources partner).

Until 2018, employees in Bands L though S could receive a noncompetitive promotion, but it was really up to the manager.   Deposition of Treasure Heinle at pp. 211-12 (ECF 161-10 at pp. 25-26).   In December 2018, Nike required all E Band positions and below to be posted for a competitive hiring process.   ECF 156-10 at pp. 1-3.   Nike noted the changes in response to, among other things, recent employee surveys revealing that employees feel excluded from career opportunities due to perceived lack of transparency and visibility into open roles.   ECF 157-1 at p. 5.   Plaintiff's expert, Dr. David Neumark, found that, during the period from January 1, 2013, to September 1, 2019, promotions among entry level professionals to senior director consisted of 5,688 non-competitive promotions and 1,974 competitive promotions.   Expert Report of David Neumark, Ph.D. at p. 78 (ECF 149-1 at p. 79).

This case is distinguishable from Ellis v. Costco Wholesale Corp., 285 F.R.D. 492 (N.D. Cal. 2012) where the court acknowledged that (1) the derivative effects of a companywide policy could themselves present issues common to the class; and (2) a "common mode of exercising discretion that pervades the entire company" (recruiting internally and without necessarily making employees aware of openings) – coupled with evidence of working culture that reinforces stereotypes was enough to establish commonality regarding Title VII claims brought by woman surrounding the defendant's allegedly promotion practices. There, however, the class was much narrower (nationwide but concerning only two "closely related management-level" positions), and significantly, there were upper level managers that had direct oversight in the selection process.

Page 16 - FINDINGS & RECOMMENDATION

D.     Initial Job Assignments

As noted above, in the context of bribery and corruption practices by third parties seeking employment, all decisions related to hiring should be approved by Talent Acquisition.   ECF 159-2 at p. 18.   Talent Acquisition's role is to ensure compliance and provide guidance throughout the competitive hiring process, ensure a diverse slate when hiring for E-band+ open roles, and regularly communicate with hiring managers.   ECF 157-1 at p. 7.   Human Resources Business Partners associate with Talent Acquisition to ensure all E-band and below open roles are posted competitively.   Id.   Hiring managers attend regular manger training on the hiring process.   Id. In December 2018, Nike instituted these policy guidelines to prioritize inclusion, transparency, and equal opportunity throughout the hiring process.   Id. at p. 4.   To that end, Nike asked all employees, managers, and Talent Acquisition to follow consistent guidelines during each stage of the hiring process.   Id.

Maggie Baird, who has held positions ranging from Category Sales Director for Men's Training to Senior Director for Jordan North America, describes the initial hiring process she has used:

> We typically post an open position both internally and externally. There was one occasion that we posted the job internally only because we had an immediate business need for a position that managed a category, which comprised 65-70% of the business. We needed someone who understood the business to come in and pick up the work quickly. Prior to posting a job, I determine the band level based on what I think the scope of the work is in the current state and what I think the scope will be in the future. I also look at the work structure of my team, including each employee's band level, and figure out what our needs are. For example, when we hired the Retail Concepts Director, we knew that position would not have a team at the time of hiring, but we wanted a candidate that had leadership skills because we knew we would build out a team of direct reports into that role eventually.

Declaration of Maggie Baird at ¶¶ 4, 8, 13 (ECF 187-1 at pp. 7, 9, 11).

Page 17 - FINDINGS & RECOMMENDATION

ER-169

Although a hiring manager may partner with the Human Resources manager around the best approach for an open position, "the hiring manager will make the decision because it is their team and their business around what the open position should be." Deposition of Shine Thomas at p. 107 (ECF 187-2 at p. 295).

A hiring manager may work with Human Resources and their manager to set the level for the job posting. "The level is set for each role when the job is approved for headcount and cannot be changed once the job is approved." Declaration of Ronni Worboys at ¶ 15 (ECF 187-1 at p. 174); see also Declaration of Cynthia Peele at ¶ 9 (ECF 187-1 at p. 126) ("the band level and job title are pre-set and cannot change").

Recruiters may extend invitations to applicants for one job to apply for another open job. Deposition of Julian Miller at pp. 68-69 (ECF 187-2 at pp. 203-04) (a recruiter might extend an invitation to another job—they can invite candidates to apply to the specific requisition and it is up to the discretion of the recruiter). As for the guidelines provided recruiters:

> The guidelines are very specific. It has to be a job that meets the same band level. Right? It's the same seniority, the same job code. We're recruiting within those roles within a similar time frame, so it's still a valid application. And the screening criteria, as we mentioned, those pre-screening questions are the same amongst those requisitions. Those are -- Those are the guidelines that we educate them on. Right? So we can show in the system that -- that those roles use the same criteria, that recruiters screen candidates based on the same criteria based on -- across multiple requisitions.

Id. at p. 100 (ECF 187-2 at p. 205).

For example, Cahill notes that she planned to apply for a senior manager position, but the Vice President of Global Digital Brand wanted her to be at the higher level of Director instead. Deposition of Kelly Cahill at p. 106 (ECF 182 at p. 104). The record demonstrates that none of the named plaintiffs were channeled into a lower position than the one for which they had planned

Page 18 - FINDINGS & RECOMMENDATION

to apply.  See Defendant's Opposition (ECF 183) at p. 21, n. 25 (collecting transcript entries noting plaintiffs were hired into the positions for which they applied).

E.    Complaints of Harassment and Discrimination

In 2018, several Nike employees made complaints about discrimination and harassment referenced as the Starfish Survey.  See, e.g., Declaration of Mengfei Sun at Ex. 46 (ECF 159-6 at pp. 1-3)[5]; at Ex. 48 (ECF 159-8 at pp. 1-6)[6]; at Ex. 24 (ECF 157-4 at pp. 1-2);[7] at Ex. 50 (ECF 159-10 at pp. 1-4).[8]  Plaintiff identifies approximately 22 Nike executives who were alleged to have discriminated or condoned discrimination and approximately 30 complaints.[9]  Declaration of Byron Goldstein at ¶ 16 (ECF 163 at pp. 9-10).  Some complainants noted that Human Resources refused to act or apparently condoned the discriminatory and harassing behavior.  See,

---

[5] Gender bias and leadership complaint summarized as:
    • Was completely disrespected by []. No problems until he came on board. Almost left NIKE because of him. Terrorized her. He wouldn't stop. Boys club attitude. Knows he can get away with it. Sad to say, [] turned a blind eye.
• Gender bias. On team with other men. They had no issues. They didn't get demeaned. She was top performer but was not set up for career advancement. Her male colleague moved up, doesn't understand how. Biggest concern is that she already reported this situation to HR and nothing was done except she was moved to another role deeper in the organization, with no track for development. []
    • Fails or refuses to communicate with his team regarding key facts (e.g., new hires, project details and assignments, promotion of new boss); displays lack of interest in developing careers of his reports; in his current role, has never called a group meeting of his direct reports on any issues, including recent MOR-related events and []'s termination; indignantly refused team member request for huddle to discuss []'s promotion and impact on team.

[6] Describing a broken culture of pay inequities, diminished female talent, old-school lack of modern approach, male oriented supervision, disparaging behavior, "[b]oys club, biased selection process," and lack of HR action.

[7] Responses by Nike to the New York Times regarding complaints of harassment and discrimination.

[8] Female vice president alleges a more senior male denied her request for consideration of three females for a position and was told, "no, you need a man in that role."

[9] Plaintiff refers to the 2018 complaints as the Starfish survey.  While there is evidence in the record that refers to "Nike Project Starfish" (ECF 159-6 at p. 2), the record does not demonstrate who created the survey, how it was distributed, how recipients were selected, the sample size, or the response rate.  See Deposition of Kathleen Lundquist at pp. 275-80 (ECF 187-2 at pp. 184-89).  Nike's Human Resources Chief doesn't know who created the survey or who completed it but did receive a hard copy of the complaints.  Deposition of Monique Matheson at p. 93 (ECF 187-2 at p. 196).

Page 19 - FINDINGS & RECOMMENDATION

e.g., Declaration of Mengfei Sun at Ex. 49 (ECF 159-9 at p. 2) (unable to do anything about being called a "bitch" by a manger who "is protected by the European Boys Club" and nothing happened after reported to HR); at Ex. 47 (ECF 159-7 at p. 3) ("ER and HR at this company are a joke… [former Head of Human Resources] himself was a well-known sexual harasser").[10]

Nike's internal portals provide avenues to raise complaints (anonymously or otherwise). See, e.g., ECF 187-3 at pp. 83-84 (anti-harassment and antidiscrimination policy with definitions and directing: "Anyone who experiences, witnesses, or learns of harassment in the workplace must immediately report the incident by contacting their manager, HR Direct or Matter of Respect" and providing phone numbers, web links, and email address); id. at p. 86 (providing a link to provide feedback to HR); id. at pp. 87-90 (portal to "speak up," provided by an external issue reporting firm, to report concerns related to "harassment, retaliation, [and] discrimination" and if reporter chooses to remain anonymous, no identifying information is passed on to Nike); id. at pp. 92-99 (speak-up portal overview and instructions on reporting).

Monique Matheson, Nike's Chief Human Resources Officer since July 2017, notes that Nike shared the Starfish complaints with third-party counsel.  Deposition of Monique Matheson at pp. 86, 93 (ECF 187-2 at pp. 195-96).  Third-party counsel led an investigation and follow-up for the concerns raised.  Id. at pp. 86, 97-98 (ECF 187-2 at pp. 197-98).  Opt-in plaintiff Lauren Anderson states that after third-party counsel investigated her complaint of sexual harassment, the subject of the complaint was no longer with Nike and her complaint was taken seriously. Deposition of Lauren Anderson at pp. 220-21 (ECF 187-2 at pp. 40-41).

---

[10] This complainant reported "bullying" to HR which also included bullying by female managers but did not report sexual harassment because "it has not happened to me personally."  Declaration of Mengfei Sun at Ex. 47 (ECF 159-7 at p. 3).

Page  20  - FINDINGS & RECOMMENDATION

Near the conclusion of the investigation conducted in response to the Starfish complaints, Nike CEO Mark Parker stated:

> … the main set of complaints that gave rise to this process have been acted on ... and employee exits from this larger investigation will be behind us after this next week.
>
> It's also important to remember that not all employment action is visible. Just because someone didn't leave, does not necessarily mean that they've not had consequences. People have the potential to change and grow ... we have to believe in that as well.
>
> And as I said in my email, people leave and join Nike every day. With a workforce of 74,000 people, not everyone who leaves during this time is being exited.
>
> It's clear that people have raised broader concerns. Please remember that system changes, compensation reviews, and changes to organizations take time.
>
> There is no finish line here. We continue to review our HR processes from top to bottom so we can take our learnings from this experience.

ECF 155-4 at pp. 6-7.

Nike confirmed to the New York Times that, "[b]esides the resignations of Trevor Edwards and Jayme Martin, Nike has also confirmed the departures of Antoine Andrews; Vikrant Singh, a senior brand director for basketball; Daniel Tawiah, a VP for global brand innovation; and Greg Thompson, the VP for footwear."   ECF 157-3 at p. 2.   Nike also stated: "There was conduct where an insular group of high-level managers, in pockets of the organization, protected each other and looked the other way. This is something Nike will not tolerate."   Id. at p. 3.

DISCUSSION

A.    Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, Kathleen Lundquist, Ph.D.

Nike seeks to exclude the expert reports and testimony of Dr. Lundquist, an

Page 21  - FINDINGS & RECOMMENDATION

Industrial/Organizational (I/O) psychologist, pursuant to Fed. R. Evid. 702.

> Dr. Lundquist opines that:
>
> Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized. Nike uses this job architecture to apply a consistent set of policies and practices for employees within these groups for compensation, talent acquisition, talent management and performance management. Despite a common architecture for classifying jobs, Nike's policies and practices for compensation and promotion have not been substantiated as job related according to professional and legal guidelines.

ECF 148-1 at p. 48.

Nike asserts Dr. Lundquist's report is not based on any reliable methodology. Specifically, Nike contends she failed to describe any objective principles, standards, definitions, or other methodologies she applied to support her finding.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993). The court's task is to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Id. at 597.

Although Daubert listed specific factors for assessing scientific testimony, the test for

Page 22 - FINDINGS & RECOMMENDATION

reliability is a flexible one and not all factors[11] necessarily apply in every case.   Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010).

> When considering the applicability of Daubert criteria to the particular case before the court, the inquiry must be flexible. Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature. Lack of certainty is not, for a qualified expert, the same thing as guesswork. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline. [T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible.

Id. at 565 (internal citations omitted).

"Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).   This Court has broad latitude when it decides how to determine reliability.   Id.   In the end, an opinion is admissible if it is reliable and will assist the trier of fact in understanding the evidence at issue.

Certainly, Dr. Lundquist qualifies as an expert and her knowledge is connected to facts in issue, e.g., the relationship of Nike's Human Resources in developing and monitoring implementation of Nike's employment practices.   It is true that Dr. Lundquist provides scant analysis of, for example, whether certain job groupings actually perform similar work.   However, the Court is able to weigh the evidence adduced regarding Nike's Human Resources policies and determine what weight to give expert opinion, if any, for purposes of class certification.   See

---

[11] The Court listed criteria such as testability, publication, peer review, and general acceptance.

Page 23 - FINDINGS & RECOMMENDATION

Primiano 598 F.3d at 564–65 ("Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony.").[12]   When and if this action proceeds to a merits decision, the parties may wish to revisit the relevance of this opinion. Yet, as noted below, given the evidence regarding Nike's employment policies and discretion afforded individual managers, plaintiffs' experts provide little useful information for determining the core issue of whether commonality exits.[13]   Accordingly, the motion to exclude the opinions of Dr. Lundquist should be denied at this time.

B.      Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, David Neumark, Ph.D.

Nike also seeks to exclude the expert reports and testimony of statistical expert Dr. Neumark pursuant to Fed. R. Evid. 702.

Dr. Neumark opines that:

a. Women and men come to Nike with similar human capital (education, experience), and women get performance ratings as high or higher than men.
b. Women are hired at lower Job Levels than are men who come to Nike with similar human capital.
c. Once hired, women are promoted more slowly than men; this is driven by non-competitive promotions.
d. The lower Job Levels at hire, and the slower progress to higher Job Levels, creates a large pay shortfall for women in the class period.
  i. A simple estimate of this pay shortfall is $11,363 lower pay (in December 2019 dollars) per woman per year. [footnote omitted]
e. In addition, women doing substantially similar work to men, and with similar qualifications to men and similar performance to men, are paid less at hire. This

---

[12] For purposes of this motion, the Court itself has the discretion to determine whether a class should be certified and conducts a rigorous analysis to consider whether a claim meets Rule 23's requirements.   Thus, the Court, for certification purposes, decides how much weight to give the expert testimony.

[13] The core issue of commonality is generally capable of resolution without resort to expert analysis as the Court can review the evidence of whether Nike mandates an applicable policy that results in disparate treatment or impact. While a statistical analysis has some bearing on this issue, it becomes more useful in understanding an issue once the policy is or standard operating procedure is identified.   In addition, Dr. Lundquist's opinion regarding the job relatedness of Nike's policies becomes important once an actual company-wide policy has been identified.

Page  24  - FINDINGS & RECOMMENDATION

starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, subsequent pay increases for women and men with similar performance are based on the same percentage pay increase, perpetuating the starting pay gap.

> i. The pay gap within the same job creates a large pay shortfall for women in the class period. A simple estimate of this pay shortfall is $3,138 lower pay (in December 2019 dollars) per woman per year. Note that these amounts, while sizable, are smaller than the amounts in paragraph 8.d.i. above, because they do not reflect the female pay shortfall attributable to women being hired at lower Job Levels and being promoted more slowly.

ECF 149-1 at pp. 4-5

Dr. Neumark further opines:

In reaching these conclusions, my analysis uses an aggregated model that includes detailed controls for differences across women and men in the jobs they are in (or "Job Cells" defined by the interactions of Job Subfamilies and Levels), and their bona fide qualifications. This provides precise estimates of potential gender differences in pay and other outcomes. Dr. Saad insists, instead, that a disaggregated model must be used; this means that there has to be a separate model for each job (which he incorrectly insists should be based on Job Code rather than Job Cells). However, Dr. Saad's proposed disaggregation reduces statistical precision, which predictably often eliminates statistical significance, and masks common mechanisms that, as my evidence shows, cause discrimination.

ECF 149-2 at p. 5.

Nike asserts Dr. Neumark's opinions and/or analyses: (1) are based on the kind of aggregated analyses that the United States Supreme Court found were insufficient to establish whether pay discrimination claims can be proved on a class-wide basis; (2) do not show whether women are paid less than men for performing comparable or substantially equal work; (3) fail to consider the effect that different decision-makers have on the pay and promotion decisions challenged by plaintiffs; (4) incorporate data from outside the relevant claims periods, which leads to misleading and irrelevant results; (5) fail to account for fundamental variables and rely on unsubstantiated assumptions; (6) are based on a purported disparity that is not statistically

Page 25  - FINDINGS & RECOMMENDATION

significant or derives from the misapplication of his own models and standards; (7) are based on scientifically unsound and unreliable analyses of work experience and education background that fail to apply the facts here, and lack support within the scientific community; and (8) accepted the reliability of the opinions of Dr. Lundquist without question, despite admitting that he never analyzed her report.

Dr. Neumark, like Dr. Lundquist, is qualified and offers an opinion that is relevant to the facts at issue. However, as addressed below, the weight afforded this opinion is limited given the failure of the evidence to demonstrate a common policy or a standard operating procedure. Nonetheless, the motion should be denied at this time.

C.      Plaintiffs' Motion to Rule as Inadmissible Part of the Expert Report of Chester Hanvey, Ph.D.

Plaintiffs seek to exclude paragraphs 3, 5-8, 19-234, 247-48, and 251-52 of Dr. Hanvey, an I/O psychologist, pursuant to Fed. R. Evid. 702.

Dr. Hanvey opines that Nike employees are not sufficiently similar to be examined as a single group. ECF 185-1 at p. 5, ¶ 3. After analyzing the jobs performed by certain individuals in covered positions, Dr. Hanvey concluded:

> I designed and conducted an extensive job analysis involving over 200 hours of interviews with Nike employees to gather systematic data about the work performed by Nike employees and skill, effort, responsibility, and working conditions associated with that work. I selected two random samples of employee to evaluate the degree of variability across Job Codes and within Job Codes and conducted detailed interviews with each individual in the samples regarding various aspects of their work that relate to the factors specified in equal pay statutes and regulations.
>
> I found that employees in both samples varied substantially on factors that commonly impact pay, such as: work performed; KSAs required to perform that work; prior work experience; education; decision-making authority; supervisory

Page 26 - FINDINGS & RECOMMENDATION

ER-178

responsibility; level of stress in the job; work hours; travel; and exposure to physical hazards. Many of these differences are also present when I examined responses from multiple Nike employees with the same Job Code, Level, Function, Family, and Subfamily. I also found that certain factors that impact pay such as prior experience and education are not uniformly applicable to all Job Codes. In order to determine which roles do perform substantially equal or similar work, it would be necessary to conduct a full assessment of actual job content for each of the more than 1,400 Job Codes.

Finally, I found that rather than conducting a job analysis, Dr. Lundquist relied entirely on existing documents to reach her conclusions, which directly contradicts professional standards and her own statements in a prior case. She did not employ any scientific methods to support her conclusions about Nike employees and did not perform any analysis to determine whether employees are "substantially similar" for evaluating pay. As a result, there is no scientific basis to support her position that Nike employees in the same Subfamily/level are substantially similar.

ECF 185-1 at pp. 144-45, ¶¶ 251-53.

Plaintiffs assert they do not seek to establish that all jobs at Nike are comparable. They also argue Dr. Hanvey's conclusions are not based on sufficient facts, and he did not understand Nike's policies or plaintiffs' challenge to those policies. Plaintiffs also contend Dr. Hanvey did not use generally recognized methodologies and his sample sizes were too small to be reliable.

As with the other experts discussed above, Dr. Hanvey's qualifications are not in question. As for the merits of plaintiffs' claims, the opinion is relevant, and the weaknesses identified are more appropriately confined to the weight of the opinion, at least at this stage of the proceedings. As noted above, the Court can resolve the core issue of class certification without much resort to expert opinion. The parties disagree regarding how to demonstrate the important issue of whether there is a pay differential based on gender. Plaintiffs believe they can establish that difference by showing generally, regardless of job variability, that men as a whole earn more than women as a whole even when controlling for experiential differences. Nike, on the other hand, asserts the question must be answered by comparing similar work performed in a similar manner to determine

Page 27  - FINDINGS & RECOMMENDATION

whether any differences in pay exist. But at this stage, the Court is more concerned whether plaintiffs can point to any common company-wide policy or standard operating procedure that impacted the pay of all class members. It is unclear, at this stage, to what extent the various expert opinions may assist the trier of fact, but the Court can determine the existence of the policy or procedure by examining the underlying facts generally with or without the aid of the expert opinions. Accordingly, the motion should be denied at this time.

D.    Plaintiffs' Motion to Rule as Inadmissible Parts of the Expert Report of Ali Saad, Ph.D.

Plaintiffs seek to exclude portions of the opinion of statistical expert Dr. Saad pursuant to Fed. R. Evid. 702.

Dr. Saad reviewed Dr. Neumark's report and opined:

a. **Incumbent Pay**: There is no common pay shortfall for women across the Covered Positions. When I examine pay outcomes on a job-by-job basis, I find that for 97.1% of job codes, in which 92.4% of all women in the Covered Positions worked, there are no statistically significant adverse outcomes for women. Moreover, only 35 of the 1,204 job codes show a statistically significant adverse outcome for women, and those 35 job codes include just 7.6% of women in the Covered Positions. When I examine female pay outcomes by manager, I find that just 5.7% of managers have teams in which women earn statistically significantly less than men. The relatively small number of statistically significant disparities that the analyses do yield (for incumbent pay only) are sporadic and isolated, linked to a relatively small number of job codes and a small percentage of decision-makers, and do not appropriately account for legitimate, business-related factors that explain pay.

b. **Prior Pay**: There is no statistical evidence of sex-based disparities in prior pay because this data is not available to analyze. Nor is there any statistical evidence using the approach of Dr. Neumark that Nike consistently used prior pay to set starting pay at Nike, or that any such practice disparately impacted women.

c. **Starting Pay**: There is no consistent statistical evidence of sex-based disparities in starting pay when proper analysis groups are constructed. I estimated Dr. Neumark's starting pay model separately by Job Family in order to compare employees with prior education and work experience backgrounds one would expect to be similar. I find that 48% of Job Families analyzed show that female new hires are paid more than men on average (covering 39% of female new hires), even without suitable controls for prior experience and education. Only four Job Families

Page 28 - FINDINGS & RECOMMENDATION

show that women earn statistically significantly less than men. One Job Family shows that women earn statistically significantly more than men. Using Dr. Neumark's approach there is no common starting pay shortfall for women.

d. **Starting Level**: There is no statistical evidence of sex-based disparities in starting level once I correct Dr. Neumark's analysis to account for a critical variable — the job level a candidate applied to — which is essential for any analysis of whether "under-leveling" occurred.

e. **Prior Relevant Experience**: Dr. Neumark's methodology for measuring and comparing prior relevant experience among new hires is completely unscientific and full of obvious errors. Indeed, the clusters of purportedly similar prior jobs generated by Dr. Neumark's methodology are preposterous on their face. One cluster, for example, contains as supposedly similar prior jobs: Library Page; Deckhand; Spanish-English GED Tutor; Nanny; CEO; Handyman; Armory Chief; Journeymen; Bank Teller; Sign Painter; Penetration Tester; Tennis Captain; Model; Master Black Belt; and Caregiver.[footnote omitted] Dr. Neumark claims this is irrelevant because his alternative method of calculating prior experience returns the same results, but his alternative method omits 70% of the data used in the analysis. Neither method produces scientifically reliable results. Both should be disregarded.

f. **Relevant Education**: Dr. Neumark's attempts to control for education are equally deficient. Rather than control for college major, or degrees from schools that are valued by Nike, he controls for schools' rank based on three publicly-available "top 500"-type lists, which do not contain a single art or design school. Considering that Nike is a footwear and athletic apparel design company, the fact that not a single art or design school appears on those lists should have given Dr. Neumark pause as to their relevance for hiring at Nike (and his methodology as a whole).

g. **Merit Increases**: There is no statistical evidence of sex-based disparities in merit increases. In fact, Dr. Neumark finds that women actually receive larger merit increases than men. It is only by omitting job level – which is a key factor in determining the amount of merit pay awarded, regardless of gender – that Dr. Neumark manufacturers an issue where none exists.

h. **Promotions**: Finally, there is no statistical evidence of sex-based disparities in promotions. Again, Dr. Neumark's own analysis confirms this is true. And once again, only by contorting the data does Dr. Neumark manufacture an issue where there is none.

Not only is the analysis flawed, but the Neumark Corrected Report fails to address the legal claims at issue in this case. I understand that for claims under the federal Equal Pay Act ("federal EPA") and the Oregon Equal Pay Act ("Oregon EPA"), the jury must decide whether women are paid less than men for substantially equal or comparable work, respectively. [footnote omitted] In order to answer this question, the statistical analysis must present results at the level of the question presented – substantially equal or comparable work. Yet none of Dr. Neumark's analyses do so. Nowhere in Dr. Neumark's report can one find the answer to the

Page 29 - FINDINGS & RECOMMENDATION

question of whether women in job code A1046 (like named Plaintiff Cahill) are paid less than men in job code A1046. Nor does he answer the question whether women in job code A0692 (like named Plaintiff Johnston) are paid less than men in job code A0692. Instead, he combines all employees in the over 1,200 different Covered Positions [footnote omitted] in a single analysis, and presents one singular alleged female pay difference. In other words, he purports to find a 2.03% average shortfall across all of these disparate jobs (from his Table 2, column 4, panel C (which, when technical errors of timing and other mechanical issues are corrected, actually reveals itself to be 1.33%)). Yet even Dr. Neumark testified that this alleged shortfall does not apply to all of the Covered Positions, and is not likely to be the shortfall for any one Covered Position. In fact, I show that the overwhelming majority of within-job analyses show no statistically significant sex disparity in pay. Dr. Neumark's analysis, on the other hand, does not identify jobs in which women are paid more than men performing substantially equal or comparable work, jobs where women and men are paid the same, and jobs where women are paid less than men. Thus he cannot answer the question presented by the federal and Oregon EPAs: are women are paid less than men for substantially equal or comparable work? The alleged "average" provided by Dr. Neumark is not the correct metric to employ for a statistical analysis in an EPA setting.

Furthermore, to the extent that the Court must decide issues of commonality regarding Plaintiffs' disparate impact or treatment claims under Title VII or the Oregon Equality Act, Dr. Neumark presents no analyses at the level of decision-makers as I understand is required by Wal- Mart Stores, Inc. v. Dukes. [footnote omitted] In fact, Dr. Neumark never mentions decision-makers at all. Thus, none of Dr. Neumark's aggregated incumbent pay analyses speak to the issues in this case, or to the statistical issues relevant to class certification.

To summarize, Dr. Neumark conducts the wrong analysis to address Plaintiffs' federal and Oregon EPA claims, and he fails to show statistical commonality supporting certification of Plaintiffs' Title VII or Oregon Equality Act claims. His aggregated analyses of incumbent pay do not identify a single job in which men and women are paid differently. Using his model but correcting for flaws in timing and various technical errors demonstrates that the vast majority of the putative class did not experience a statistically significant pay shortfall. In addition, none of the various other employment outcomes studied by Dr. Neumark (for which he claims women share an adverse experience) are found to show any adverse outcomes, once errors are corrected.

ECF 186-1 at pp. 5-10.

Plaintiffs assert portions of the report are inadmissible because they contain legal

conclusions, Dr. Saad lacks a reliable basis in knowledge and experience in the relevant discipline,

Page 30 - FINDINGS & RECOMMENDATION

and portions of the report are not relevant.   Again, the Court should decline to grant the motion at this time as the report, while useful as to certain merits issues, is not entirely necessary to resolve a core issue regarding class certification. To the extent Dr. Saad offers his own legal analysis and conclusions on issues related to class certification,[14] the Court should not consider those opinions. See, e.g., Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (an expert witness cannot give an opinion as to their legal conclusion, i.e., an opinion on an ultimate issue of law).

E.       Evidentiary Objections

Nike argues the Declaration of Byron Goldstein improperly raises discovery disputes despite the close of pre-certification discovery.   Defendant also raises specific hearsay objections and objections to conclusions of law offered by a witness.

Plaintiffs object to: (1) the declaration of Jessica Stuckey as inadmissible lay testimony about scientific matters; (2) statements relying on privileged pay equity studies and investigation of Starfish complaints because Nike uses both as a shield and sword; and (3) evidence based on the Talent Acquisition playbook regarding "Match to Job" because Nike failed to produce the playbook.

In evaluating a motion for class certification, the Court may consider all material evidence submitted by the parties to determine whether the Rule 23 requirements are satisfied. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975). Strict adherence to the Federal Rules of Evidence is not required. Gonzalez v. Millard Mall Servs., Inc., 281 F.R.D. 455, 459 (S.D. Cal. 2012).   In considering the background facts applicable to class certification, the Court has endeavored to

---

[14] In addition to paragraphs   6 through 7 of the report quoted above, Dr. Saad concludes that Dr. Neumark's analysis provides no "glue" holding together plaintiffs' claims.   ECF 186-1 at p. 151.

Page  31  - FINDINGS & RECOMMENDATION

consider only evidence upon which both parties had access. To the extent that the Court discusses

any attorney-client privileged material, it is merely to provide historical background information

leading up this litigation.[15]

F.    Class Certification

Initially, plaintiffs filed their class certification motion seeking to certify a class of:

> All female current and former Nike employees at Nike Headquarters in Oregon,
> who were employed at any time from October 11, 2017 through the resolution of
> this action for claims under Title VII, and for the period from August 9, 2017
> through the resolution of this action for claims under ORS 652.220 and ORS
> 659A.030, in a salaried, corporate position in Bands L, U,
> E, or S2 ("Putative Class")

Motion For Class Certification (ECF 146) at p. 1.

Nike asserted this definition precluded Cahill's inclusion in the putative class given that

she resigned from Nike on July 26, 2017.  Thus, in their reply brief, plaintiffs modified their

proposed class as follows:

> All female current and former Nike employees at Nike Headquarters in Oregon,
> who were employed at any time from October 11, 2017 through the resolution of
> this action for claims under Title VII, for the period from July 25, 2017 through the
> resolution of this action for claims under ORS 659A.030, and for the period from
> August 9, 2017 through the resolution of this action for claims under ORS 652.220,
> in a salaried, corporate position in Bands L, U, E, or S ("Putative Class").

Reply (ECF 240) at p. 2.

The proposed change expands the claims under the Oregon Equality Act to begin 15 days

earlier.  Defendant objects contending the amendment to the class definition causes it to suffer

prejudice.

---

[15] The Court does consider Stuckey's declaration regarding job codes given her position as Senior Director of
Global Retail Compensation.   The declaration is based on her personal knowledge and qualifies as lay testimony.
See United States v. Flores, 536 F. App'x 709, 711 (9th Cir. 2013) (testimony rationally based on personal
knowledge offering observation that is common and requires limited expertise is admissible).

Page 32  - FINDINGS & RECOMMENDATION

Generally, the Court is bound by the class definitions provided in the complaint and, absent an amendment to the operative complaint, will not consider certification beyond that definition. See Berlowitz v. Nob Hill Masonic Mgmt., Inc., 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996) (rejecting plaintiff's attempt to certify a class different from that alleged in the complaint, because the "court is bound by the class definition provided in the complaint ... and will not consider certification of the class beyond the definition provided in the complaint unless plaintiffs choose to amend it"); see also Ortiz v. McNeil–PPC, Inc., 2009 WL 1322962, at *2 (S.D. Cal. May 8, 2009); Stuart v. Radioshack Corp., 2009 WL 281941, at *2 (N.D. Cal. Feb. 5, 2009).

Plaintiffs assert they are willing to amend if the Court prefers. Thus, in the Court is not prohibited from considering certification of a class as modified in a reply brief. See Garcia v. Schlumberger Lift Sols., 2021 WL 1259737, at *18 (E.D. Cal. Apr. 6), report and recommendation adopted, 2021 WL 5321669 (E.D. Cal. Nov. 16, 2021) ("As an initial matter, the Court may consider class definitions first raised in a plaintiff's reply brief."). As noted in Garcia, "the Court has the authority to redefine a class, and as such there is no reason the Court should not consider the amended definitions proposed." Id. Nonetheless, the modification should be permitted only if it is minor and non-prejudicial. Cancino Castellar v. Mayorkas, 2021 WL 4081559, at *8 (S.D. Cal. Sept. 8, 2021).

Defining the class is critical because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(b)(2) to the "best notice practicable" in a Rule 23(b)(3) action. Naylor Farms v. Anadarko OGC Co., 2009 WL 8572026, at *3 (W.D. Okla. Aug. 26, 2009). In this case, the parties engaged in a rancorous discovery process related to class certification over a nearly four-year period including extensive expert analysis based on the

Page 33 - FINDINGS & RECOMMENDATION

definition asserted in the First Amended Complaint which did not include dates but included all current and former female employees employed by Nike at any time from three years prior to opting-in through resolution of this action.  First Am. Compl. ¶ 165 (ECF 42).  The complaint alleged Cahill was a full-time employee from October 2013 to July 26, 2017. Cahill filed a BOLI complaint on July 25, 2018, which was withdrawn due to the filing of the initial complaint on August 9, 2018. Id. at ¶¶ 28, 32. Cahill filed the BOLI complaint on behalf of herself and all other similarly situated female Nike employees.  Id. at ¶ 33.  Further, Cahill filed her consent to be a party in the EPA collective action on August 9, 2018.  Id. at ¶ 31.  Accordingly, the First Amended Complaint made clear that the proposed class included claims up to one year before the filing of the BOLI charge which includes claims of former female employees, such as Cahill, as far back as July 25, 2017.  See Or. Rev. Stat. § 659A.875; Or. Admin. R. § 839-003-020(3).

The inclusion of modified specific dates within the time frame alluded to in the First Amended Complaint is a minor adjustment to the class definition.  Moreover, Nike does not demonstrate a need to conduct further discovery, only a potential need to have their expert re-run his analysis to reflect the 15-day change to the class definition.  However, pre-liability data is relevant and thus Nike already had incentive to conduct such analysis.  See, e.g., Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 528 (N.D. Cal. 2012) (pre-statute of limitations data is generally both relevant and frequently used in such matters as evidence of the alleged discriminatory practice, even when a plaintiff may not directly recover as to events occurring outside the applicable period).  In addition, Nike's primary dispute about expert analysis revolves around whether that analysis should be aggregated or disaggregated and the 15-day difference in the modified class does not impact this argument.  Accordingly, the Court should consider class

Page 34  - FINDINGS & RECOMMENDATION

certification based on the modified definition asserted in plaintiffs' reply brief.

Besides certifying the above modified class, plaintiffs also ask the Court to appoint the four named plaintiffs, Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender, as class representatives and appoint named plaintiffs' counsel as class counsel.

Plaintiffs challenge four purported class-wide polices that allegedly resulted in the putative class receiving lower pay than their male counterparts: (1) using prior pay or salary expectations when setting starting salary; (2) using a percentage of current salary when awarding annual merit increases and bonuses; (3) determining whether to fill promotions non-competitively or competitively; and (4) using hiring policies or practices that place women into lower job-levels based on initial job assignments.

Defendant asserts plaintiffs fail to provide sufficient evidence of a company policy or practice that both uniformly applies and harmed the entire putative class of 5,200 female employees. Defendant thus asserts plaintiffs fail to establish commonality, typicality, and predominance for purposes of Fed. R. Civ. P. 23. Defendant also argues certain putative class members themselves exercised discretion in their jobs and made the allegedly discriminatory decisions having a disparate impact, thus raising issues as to the adequacy of representation by the named plaintiffs. Defendant also contends plaintiffs lack standing for injunctive relieve on behalf of the class given that they are former employees. Finally, defendant argues plaintiffs fail to show a class action is superior to other methods of adjudication.

Rule 23 imbues "district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings." Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007). The party seeking certification bears the burden

Page 35 - FINDINGS & RECOMMENDATION

of showing the proposed class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b). See id. Although a court should accept the substantive allegations of the complaint as true, a court must also consider the nature and range of proof necessary to establish those allegations and conduct a "rigorous analysis" to determine whether the claim satisfies the Rule 23(a) requirements. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160-61 (1982); see also Zinser v. Accuflx Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001). Thus, this Court may look to supplemental information to "allow an informed judgment." Id. Although it may be necessary to inquire into the substance of a case to ascertain satisfaction of the Rule 23 requirements, the Court should not "advance a decision on the merits to the class certification stage." Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003).

To meet plaintiffs' burden, they must satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b). Rule 23(a) provides that plaintiffs may represent a class of similarly situated persons in a class action lawsuit only where:

(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs seek Rule 23 certification for three class claims: (1) disparate impact under Title VII, 42 U.S.C.§ 2000e et seq. and the Oregon Equality Act (OEA), Or. Rev. Stat. 659A.001 et seq.; (2) disparate treatment under Title VII and the OEA; and (3) pay discrimination under the Oregon Equal Pay Act (OEPA).

1. Numerosity

Page 36 - FINDINGS & RECOMMENDATION

There are at least 4,913 potential class members who were employed at Nike Headquarters in Oregon in a salaried, corporate position that was a lower-level position than Vice-President between October 11, 2017, and August 31, 2019.[16]   Rebuttal Expert Report of David Neumark at ¶ 27 (ECF 149-2 at p. 17).   Accordingly, this requirement for certification is met.   See Harrison v. Harry & David Operations, Inc., 2020 WL 8367533, at *6 (D. Or. Oct. 21, 2020), report and recommendation adopted, 2021 WL 1135022 (D. Or. Mar. 24, 2021) (numerosity is met when the proposed class size in excess of 2000 is so large that joinder would be impractical).

### 2.   Commonality

A class has sufficient commonality "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

The class members' claims "must depend on a common contention ... that is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Plaintiffs assert that all three of the of the claims upon which they seek certification are capable of class-wide resolution.   Plaintiffs contend the four challenged practices (using prior pay when setting starting salary, using a percentage of current salary when awarding annual merit increases and bonuses, filling promotions non-competitively, and placing women into lower job-

---

[16] As noted, discovery and expert reporting were completed before plaintiffs' modification of the class period.

Page 37 - FINDINGS & RECOMMENDATION

levels based on initial job assignments) result in disparate impact and disparate treatment. In other words, plaintiffs contend that resolution of whether these policies result in lower pay for women will decide a common question impacting the whole class. Plaintiffs also contend resolution of Nike's affirmative defense that any pay gap is due to a factor other than sex will resolve a common question related to the OEPA claim. At the core of this argument is whether the purported policies are in fact company-wide policies applied to all employees regardless of job or at least all employees within the 1200+ different jobs plaintiffs occupy.

### a. Disparate Impact Claims

To establish a prima facie case of disparate impact under Title VII, the plaintiffs must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact. Atonio v. Wards Cove Packing Co., Inc., 810 F.2d 1477, 1482 (9th Cir. 1987).[17] If plaintiffs establish a prima facie case, the burden shifts to the employer to show that its challenged practices are consistent with business necessity and that there was no less discriminatory alternative. Moussouris v. Microsoft Corp., 2018 WL 3328418, at *14 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019).

For purposes of plaintiff's disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision. See, e.g., Cooper v. Fed. Rsrv. Bank of Richmond, 467 U.S. 867, 876 (1984). Thus, in order to demonstrate commonality, it is not enough for plaintiffs to show they disproportionately are paid less than men, they must show that the reason behind that discrimination is the same for all class members.

---

[17] The parties agree that the OEA claims are analyzed similarly to the Title VII claims.

Page 38 - FINDINGS & RECOMMENDATION

ER-190

However, by using an aggregate statistical analysis as their primary evidence of disparate impact, plaintiffs put the cart before the horse and essentially argue the impact provides the common thread as to the reason for the discrimination. The four purported company-wide policies to which plaintiffs' point are the ostensive class-wide glue that binds their claims together permitting resolution at one fell swoop. The question thus becomes whether the policies are in essence mandatory principles upon which hiring managers must adhere together with whether those policies caused the disparate pay shown by the statistical analysis.

### 1.    Starting Pay

As noted above, before September 2017, Nike hiring managers were free to consider and weigh whatever factors they deemed relevant to the position being hired including historical salary progression. In September 2017, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1. After that, Nike policy permitted asking a candidate only about salary expectations. Id. Nike internal documents specifically indicated that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one." ECF 158-2 at p. 8.

Plaintiffs assert Nike had a class-wide policy of using prior pay when setting starting salaries and uniformly implemented this policy via active involvement of Human Resources including final decision-making by Human Resources and high-level executives. However, the evidence presented does not tip the scales in favor of a class-wide policy, rather it demonstrates that hiring managers possessed significant discretion.

Page 39 - FINDINGS & RECOMMENDATION

Hiring managers receive pay ranges for a posted job but then make an independent decision within that range. While hiring decisions may involve multiple people providing approval, the onus for the offer decision rests on the hiring manager. In that respect, the prior salary (before September 2017) was merely a data point the manager could consider. The record does not demonstrate a centralized decisionmaker(s) inserting themself into the hiring decision to adjust the offer to align with prior pay. Indeed, there appear to be many times a hiring manager did not inquire into prior pay. See e.g., Declaration of Kimberly Louder at ¶ 6 (ECF 187-2 at p. 84) ("After the hiring manager offered me the job, I asked for a higher starting salary, which she approved. Nobody at Nike asked me about my prior salary or salary expectations before making the offer."); Declaration of Amber Dockter at ¶ 10 (ECF 187-1 at p. 203) ("Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires."); Declaration of Adrienne Lore at ¶ 6 (ECF 187-1 at p. 77) ("I do not recall if anyone asked me about my current salary or salary expectations during the hiring process, but I would not have answered the question if asked."); Declaration of Julia Hansen at ¶ 6 (ECF 187-1 at p. 39) ("I do not believe anyone asked me about my prior salary or my salary expectations before I received an offer, nor did anyone communicate to me what my starting salary was based on."); Declaration of Taya Saxton at ¶ 5 (ECF 187-1 at p. 136) ("I do not recall being asked for my current salary during the interview or hiring process. I recall discussing salary generally and the hiring manager was open about the salary range for the position, so I knew the salary range during the interview process. My starting salary at Nike was higher than my salary at PGE at the time.").[18]

---

[18] There were candidates who did recall being asked about prior pay. See, e.g., Deposition of Kelly Cahill at p. 112 (ECF 241-1 at p. 30) ("I remember discussing salary and pay. They asked me what I had made prior or what I currently made as a Flex contractor."); Deposition of Samantha Phillips at p. 103-05 (ECF 241-1 at pp. 104-06) (candidate noted that the offer was lower than prior pay and was told it was because cost of living is lower in Portland).

Page 40 - FINDINGS & RECOMMENDATION

Plaintiffs assert Nike not only collected prior pay information from candidates, it also collected such information from employers and public records. See ECF 157-10 at p. 2 (in response to legislation prohibiting gathering compensation, Nike notes under new policy it may no longer search public records for compensation history); ECF 241-1 at p. 1 (HireRight background check seeking, from Hender, documentation verifying previous employment which may include W-2 forms, pay stubs and/or 1099 forms).[19]

The Senior Director for Talent Acquisition, Shine Thomas, specifically notes that she has:

> never asked an employer about someone's previous compensation history. … It's not a standard part of our recruiting process. We would ask, a follow-on change, we would ask a compensation history of a candidate. I can't think of a single scenario where the question went to their previous employer because of confidentiality. And currently we ask the candidate expectations, but we also do not contact the candidate's previous employer around compensation.

Deposition of Shine Thomas at p. 215 (ECF 162-9- at p. 21). Nike also asserts it is routine to confirm employment history. Moreover, there is insufficient evidence that Nike had a company-wide policy of collecting prior pay data from other sources. As with directly asking about prior pay either in the interview process or via public records search/background checks, some hiring managers inquired about it and some did not. The evidence does not demonstrate a centralized decision-making process that collected prior pay data used to make starting pay decisions.

Plaintiffs suggest the statistical analysis showing little variability among the class demonstrating women overall received lower pay than men at a statistically significant level is strong evidence of commonality. However, when using an aggregated statistical analysis, plaintiffs

---

[19] Plaintiffs similarly contend background checks sought prior pay information from plaintiffs Sara Johnston and Emily Tucker (ECF 241-1 at pp. 3-4, 7-8).

Page 41 - FINDINGS & RECOMMENDATION

must first demonstrate a class-wide policy that is the alleged cause of the pay gap. The evidence here more likely suggests an individual analysis of whether a particular hiring manager gathered prior pay history and used that information to set the starting pay with respect to individual hires.

In Wal-Mart Stores, Inc., 564 U.S. 338, the Supreme Court recognized the difficulty of maintaining a class action for disparate impact claims where hiring managers have discretion to make employment decisions such as setting starting pay. As noted above, while Nike permitted consideration of historical salary progression, mangers were free to consider and weigh whatever factors they deemed relevant to the position. While prior salary may have been a permissible data point, every offer was unique. In other words, hiring managers were given discretion to set starting pay, within a guideline range, using whatever factors they deemed relevant which may or may not include prior pay history. Use of such a discretionary system requires an individualized assessment as to whether the consideration of prior pay resulted in a disparate impact on the starting pay for women. As the Supreme Court noted:

> recognition that this type of Title VII claim "can" exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common. To the contrary, left to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact…. And still other managers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions.

Id. at 355–56.

Certainly, plaintiffs have shown that, in the aggregate, there is a statistically significant disparity among pay for women compared to pay for men at Nike. Plaintiffs have not, however,

Page 42 - FINDINGS & RECOMMENDATION

provided a statistical analysis demonstrating on a class-wide basis that starting pay is lower for women and higher for men where prior pay was a data point used by hiring managers in determining starting pay. Plaintiffs merely offer a broad analysis of starting pay at Nike headquarters showing a significant statistical disparity and assume the gathering of prior pay history is to blame without showing that the gathering of such information was common class-wide regardless of the job applied for, the department in which the job was located, or the educational, experiential, and other requirements for the job. Plaintiffs simply point to one document showing managers may consider historical salary progression (which is not defined in the document)[20] and assumed Nike did not permit managers to exercise discretion in implementing factors for setting starting pay. The evidence demonstrates otherwise. At best, plaintiffs demonstrate that some hiring managers considered prior pay. Nike similarly demonstrates that some hiring managers did not. The evidence squarely supports that an individualized inquiry will be necessary for each plaintiff to determine whether the imposition of the factor (or lack of imposition of that factor) had a disparate impact on pay.

Plaintiffs assert their multiple regression analysis demonstrates common impact. See Olean Wholesale Grocery Coop., 31 F.4th at 679 (finding well-developed expert testimony and regression modeling support common impact). The Court does not disagree that there is a

---

[20] The seven factors listed apply to "beginning a new job," but do not necessarily mean starting fresh with Nike. For example, one factor is past Nike job performance for internal employees changing jobs. Thus, it is not clear that historical salary progression applies to pay before coming to Nike. The evidence does, however, demonstrate that prior salary was a factor that may have been considered, but it does not demonstrate that it was a required factor class-wide. Plaintiffs argue that such an issue is itself a common question, but the Court must resolve the question of commonality at this stage of the litigation. See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 667 (9th Cir. 2022) ("A district court must also resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims. For instance … a district court [must] resolve factual disputes at certification regarding whether decisions regarding promotions were made at the local level or by upper management").

Page 43 - FINDINGS & RECOMMENDATION

statistically significant difference in pay even when controlling for factors such as education and experience.   However, the issue in this case is whether the common impact results from a common policy.

As noted above, Dr. Neumark opines that generally women came to Nike with similar or better education and/or experience than men but the starting pay for women was lower because of the purported company-wide policy of using prior pay as a factor in setting starting pay.  (ECF 149-2 at p. 4).   In reaching this conclusion, Dr. Neumark used an aggregate model controlling for differences in job families and subfamilies rather than for each job.   Dr. Neumark justifies this level of statistical analysis asserting the prior pay policy was common across all jobs at Nike.   Id. at p. 5.   While it is true that for a short period encompassed within the proposed class period prior salary was a permissible data point at Nike, the evidence does not establish hiring managers were required to or even did actually use such data uniformly across all jobs.   An aggregated statistical analysis is only appropriate in analyzing practices that are uniform across a company because it would conform to the level of decision for the challenged practice.   Ellis, 285 F.R.D. at 523.  "[I]n the absence of a common policy or procedure, mere statistics could not 'produce a common answer to the crucial question why was I disfavored.'"   Jones v. Nat'l Council of Young Men's Christian Assocs. of the U.S. of Am., 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014) (quoting Wal-Mart Stores, Inc., 564 U.S. at 352).[21]   The evidence supports a finding that hiring managers exercised discretion and determined what factors to apply in setting starting pay. The existence of a factor that may or may not be used is not "common direction" and there is no evidence that Nike

---

[21] Additionally, prior pay data for either men or women employed at Nike was unavailable for the analysis.   This reinforces that plaintiffs' experts presumed prior pay must be the reason behind the aggregated lower starting pay.

Page 44 - FINDINGS & RECOMMENDATION

executives directed their hiring managers to use that factor. Generalized statistics notwithstanding, "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." Wal-Mart Stores, Inc. 564 U.S. at 356. That an intervening change in the law required Nike to issue directives not to use the factor is not evidence of a prior directive requiring its use.[22]

In Olean, plaintiff sought class certification for price fixing where the common practice was already established via a conspiracy and thus the use of a common aggregated model to show class-wide impact was appropriate. See Olean Wholesale Grocery Coop., 31 F.4th at 661 (DOJ investigation uncovered a price-fixing scheme among tuna suppliers and Bumble Bee and StarKist, and three tuna industry executives pleaded guilty to the conspiracy); id. at 685 (statistical evidence capable of providing class-wide proof, sufficient to sustain a jury verdict on antitrust impact for the entire class).

While plaintiffs offer evidence of impact, they fail to establish a common mode of exercising discretion applied to virtually all hiring decisions made at Nike headquarters. Plaintiffs' theory is that use of prior pay or obtaining pay history resulted in women receiving disproportionately lower pay than men despite similar qualifications. However, because of the discretion afforded hiring managers, during the brief period in which such data could have been

---

[22] Plaintiffs assert they need not prove the existence of the challenged practice at this stage, merely that their evidence is capable of proving a key element on a class-wide basis. See Maney v. State, 2022 WL 986580, at *18 (D. Or. Apr. 1, 2022) ("based on Plaintiffs' theory of the case, they will be able to rely on the same evidence of centralized policies, practices, and decisions to attempt to prove that Defendants' alleged deliberate indifference and negligence caused the class members' injuries. Whether or not Plaintiffs can so prove is a merits question for trial, but these common questions predominate over individual questions for the purpose of class certification."). However, the Court must resolve factual disputes at the certification stage regarding whether starting pay decisions were at the hiring manager level or at the highest level of Nike management. Plaintiffs' theory is that differences in starting pay resulted in the disparate impact but resolving that question will require individualized inquiries as to whether each hiring manager utilized prior pay to set that pay. Plaintiffs would not just place the issue of determining the merits of its case to the jury but leave to the jury whether plaintiffs establish commonality. That is an issue the Court must decide before certifying the class.

Page 45 - FINDINGS & RECOMMENDATION

used, for each putative class member it will be necessary to determine did the applicant provide the salary data or did the hiring manager obtain it from another source and did the hiring manager use such data to set pay. The evidence already shows that some hiring managers did not use such data in the hiring process, while also showing some managers had the data. Accordingly, it is necessary to resolve not just whether the use of such data had a disparate impact (plaintiffs' theory) but whether each plaintiff was subject to such treatment. Simply resolving the issue of whether the data caused the disparate impact will not resolve a common question, it will instead turn on individualized inquiries. The resolution of those individualized inquires will then present the added complication of whether there is some other reason for the disparate pay, in the aggregate. Of course, offering a different reason for the pay differential (presumably one that is legitimate and nondiscriminatory) could itself present a common question. Nonetheless, in this case, it is first necessary to delve into each plaintiff's hiring process to determine what happened that may have caused any disparate impact. The failure to point to a common and required policy in the hiring process precludes a common analysis.

Plaintiffs attempt to certify a class of over 5,200 women in widely varying job positions with myriad qualifications from entry professionals to senior directors. There is insufficient evidence that starting pay was a required factor in making starting pay decisions throughout all these varied jobs. Plaintiffs fail to establish a common question of law or fact capable of class-wide resolution for starting pay and their disparate impact claims.

### 2. Pay Increases and Bonuses

Plaintiffs assert that Nike had a policy of calculating merit awards and pay increases based on a percentage of base pay and that this policy exacerbates the starting pay gap based on the

Page 46 - FINDINGS & RECOMMENDATION

purported policy of using prior pay to set starting pay.

The evidence again establishes considerable discretion on the part of managers and manager+1, with some managers providing a higher percentage increase to an employee with the same CFE rating as another employee if one of the employee's base pay is further from the midpoint.

Dr. Neumark opines:

This starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, merit pay increases and bonuses for women and men with similar performance are based on the same percentage pay increase relative to their base pay, which perpetuates the starting pay gap.

ECF 149-2 at p. 4.[23]

Dr. Lundquist opines:

In addition to the problem of setting starting pay based on prior pay, Nike awarded merit increases using a percentage increase approach based on performance ratings from 2015 to 2018 …. This approach is problematic because gender differences in starting salary tend to be perpetuated, and sometimes exacerbated, over time when increases are based on a percentage of base pay …. These differences can be exacerbated both within the current job and magnified in promotional increase decisions which typically also are based on a percentage of pay . . . The issues with percentage increases in merit decisions discussed above are also applicable to Nike's annual bonus plan, or PSP, which determined payouts based on percentage of base pay…. As with merit increases, a reward based on a percentage of the employee's base pay will continue to exacerbate existing gender differences in pay.

ECF 148-1 at pp. 33-35.

Plaintiffs point to a company-wide policy of using percentages of base pay for increases, but to the extent that this policy results in a disparate impact it requires Nike to also have a

---

[23] Dr. Neumark also opines that the purported policy of hiring women into lower job levels and promoting them more slowly further exacerbates the disparate impact of the use of a percentage of base pay to calculate increases and bonuses. ECF 149-2 at p. 5. The placement and fill strategy is addressed in the next sections.

Page 47 - FINDINGS & RECOMMENDATION

company-wide policy of using prior pay to set starting salaries. As noted above, the evidence fails to demonstrate that Nike had such a policy. Moreover, managers had considerable discretion and could adjust the pay percentage to accommodate different employees with lower base pay in the same CFE rating. They had discretion to account for lower base pay, and upper-level management involvement was generally limited to manager+1. As noted above, the absence of a common mode of exercising discretion that pervades throughout Nike headquarters prevents a finding of commonality. See, e.g., Moussouris v. Microsoft Corp., 2018 WL 3328418, at \*19-21 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019) (use of common criteria for pay determinations insufficient where the class was large involving myriad positions along with discretion of managers to make decisions within the framework).

### 3. Promotions

Until 2018, employees in Bands L through S could receive promotions noncompetitively. Dr. Neumark opines women at Nike experience a 6.26% lower rate of promotion, despite similar qualifications and performance ratings, when promotions are made noncompetitively. ECF 149-2 at pp. 36-38, ¶ 59 and Table R8.

However, the evidence again demonstrates managers exercise discretion in determining whether to promote noncompetitively. In addition, beyond a manager+1, upper-level Nike executives played no role in that decision.[24] When upper-level executives did get involved in response to employee surveys, it was to require all E Band and below jobs to be posted for a competitive hiring process. As with the other purported company-wide policies above, the

---

[24] Plaintiffs did present an instance in which Talent Acquisition posted competitively for a U Band position in 2016. ECF 159-1 at p. 1. However, the record does not support a broad HR policy enforced upon hiring managers to post non-competitive positions.

Page 48 - FINDINGS & RECOMMENDATION

discretion afforded managers with little upper management involvement is insufficient to present a common question that will resolve an issue relative to the entire class.

4.    Initial Job Assignments

Plaintiffs assert Nike has a policy of hiring women into lower job levels than men despite more education and work experience.   Expert Report of Dr. David Neumark at ¶ 102 (ECF 149-1 at p. 50).   Plaintiffs primarily assert the policy is company-wide based on a Nike document which stated: "All decisions related to hiring should be approved by Talent Acquisition."   ECF 159-2 at p. 18.   As noted previously, this statement is made in the very specific context of bribery and corruption.   The full context is as follows, which appears in a code of conduct document under the heading "BRIBERY AND CORRUPTION":

> The rule is simple:
> Don 't bribe anybody, anytime, for any reason.
>
> We do not offer, promise, give or accept money or anything of value to or from third parties to get an improper business advantage. Any of these actions constitutes a bribe.   Anti-bribery laws apply in every country where Nike does business. Criminal penalties to you and Nike for violating these laws are severe. There is no monetary threshold, so even a small or minor improper gift or donation could be construed as a bribe. Maintain accurate and transparent books and records, so all payments can be honestly described and documented.   We take particular care when working with or evaluating prospective third parties, including agents who may interact with government officials or business partners on behalf of Nike. We don't use them to do anything that is prohibited by law, our Code or Nike policies.
>
> WHAT I F. . .?
> I know someone who works in the Department of Customs. This person asked if I would be willing to hire their relative as an intern for the summer even though I know they aren't qualified. Would it be OK if I offer the relative a position or recommend them to another department for a position?
> **No. All decisions relating to hiring should be approved by Talent Acquisition.** Offering the official's relative a position or ensuring they receive special consideration in the hiring process could be considered a form of bribery. Please direct all requests for employment or internships to Talent Acquisition or reach out to Human Resources or the Ethics & Compliance Office for help.

Page 49  - FINDINGS & RECOMMENDATION

> We are in the middle of negotiating a big contract with a potential vendor. The vendor just gave me NBA courtside tickets. Is it OK to accept the tickets ? Probably not . Accepting anything of value - including event tickets, gifts, excessive meals or hospitality - from a vendor while negotiating a contract with them creates a potential conflict of interest and could also violate our policy on gifts, hospitality and other payments. Discuss with your manager to determine the best course of action to take.

ECF 159-2 at p. 18 (emphasis added).

This does not support a conclusion that all hiring decisions must be approved by Talent Acquisition. Indeed, the record supports a finding that, while hiring managers attend training sessions to understand guidelines, those managers make the decision on posting open positions. Even though a hiring manager may work with Human Resources to set the level for the posting, it cannot be changed once approved and the record does not support an effort to channel women into applying for postings at a lower level once an application is received. To the extent that hiring managers tend to deny applications from women for the higher-level jobs in favor of men, that is again a function of discretion that does not involve the application of any required company policy or upper management. The presence of centralized guidelines along with discretion is insufficient to present a common question — the resolution of which will apply to all putative class members. Whether any given candidate was channeled into a lower paying job requires an individualized assessment. See Moussouris, 2018 WL 3328418, at *19-21 (use of common criteria for pay determinations insufficient where managers exercise discretion within that framework).

Plaintiffs fail to establish the requirement of commonality for the disparate impact claims.

> b.     Disparate Treatment Claims

To demonstrate commonality in a disparate treatment claim, plaintiffs need not identify a specific company-wide employment practice, rather they must provide evidence of a "systemwide

Page 50 - FINDINGS & RECOMMENDATION

pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice." Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D. N.Y. 2018) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)). Plaintiffs may satisfy their burden of showing a pattern or practice of discrimination through statistics alone. Teamsters, 431 U.S. at 339–40.[25]   Still, plaintiffs must show discrimination was the company's standard operating procedure.   Wal-Mart Stores, Inc., 564 U.S. at 352 n.7.

As in the Wal-Mart case, Nike's announced policy forbids discrimination.   In addition, as in Wal-Mart, plaintiffs presented significant statistical evidence of disparities between men and women.   Nonetheless, Wal-Mart concluded:

> Even if they are taken at face value, these studies are insufficient to establish that respondents' theory can be proved on a classwide basis. In Falcon, we held that one named plaintiff's experience of discrimination was insufficient to infer that "discriminatory treatment is typical of [the employer's employment] practices." 457 U.S., at 158, 102 S.Ct. 2364. A similar failure of inference arises here. As Judge Ikuta observed in her dissent, "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 603 F.3d, at 637. A regional pay disparity, for example, may be attributable to only a small set of Wal–Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends.

> There is another, more fundamental, respect in which respondents' statistical proof fails. Even if it established (as it does not) a pay or promotion pattern that differs from the nationwide figures or the regional figures in all of Wal-Mart's 3,400

---

[25]  In a case involving discretion among many decisionmakers, use of statistics to demonstrate common answers to the question of whether discrimination occurred requires something more to show a pattern and practice of discrimination.   In Wal-Mart Stores, the Supreme Court found that, despite statistical evidence, plaintiffs could not establish commonality for purposes of their disparate treatment claims because the discretion afforded managers prevented finding a uniform corporate culture of bias against women.   Wal-Mart Stores, Inc., 564 U.S. at 345, 352 (resolving a Title VII claim focuses on the reason for a particular employment decision that must have a uniform answer to permit class action status); see also Stephanie S. Silk, More Decentralization, Less Liability: The Future of Systemic Disparate Treatment Claims in the Wake of Wal-Mart v. Dukes, 67 U. Miami L. Rev. 637, 656 (2013) (after the Supreme Court's rejection of this evidence in Dukes, it seems increasingly unlikely that plaintiffs asserting systemic employment discrimination claims will be able to meet the evidentiary threshold necessary to prove a pattern or practice of discrimination especially when dealing with large corporations).

Page 51 - FINDINGS & RECOMMENDATION

stores, that would still not demonstrate that commonality of issue exists. Some managers will claim that the availability of women, or qualified women, or interested women, in their stores' area does not mirror the national or regional statistics. And almost all of them will claim to have been applying some sex-neutral, performance-based criteria—whose nature and effects will differ from store to store. In the landmark case of ours which held that giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory, the plurality opinion conditioned that holding on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity is not enough. "The plaintiff must begin by identifying the specific employment practice that is challenged." … That is all the more necessary when a class of plaintiffs is sought to be certified. Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based disparity does not suffice.

Wal-Mart Stores, Inc., 564 U.S. at 356–57.

While this case does not involve 1.5 million putative class members, it does involve over 5200 women employed in a vast array of positions from apparel designers to pilots and mechanics in many separate departments at Nike's sprawling world headquarters.  And as noted above, Nike has delegated substantial authority for hiring and promotion within each of those departments. Plaintiffs' statistical analysis, while accounting for certain human capital, does not account for the differences from department to department and job to job.  Plaintiffs' experts merely pooled data across all 1,200 jobs and reported a single percentage in difference between men and women in all jobs combined.  See ECF 149-1 at p. 6.  The disparities might be attributable to only a small set of Nike managers, rather than a standard Nike operating procedure.  See Deposition of Deposition of David Neumark, Ph.D. at p. 297 (ECF 182 at p. 91) (it is possible that there are a couple or a handful of large job subfamily and level groupings that are driving the negative results).  As noted above, the aggregated data presume commonality, however, it does not present a common mode of proving it.

Page 52 - FINDINGS & RECOMMENDATION

Plaintiffs also allege a standard operating procedure exists at Nike based on anecdotal evidence. Plaintiffs present approximately 30 complaints from the Starfish Survey and no declarations from opt-in plaintiffs. Given the size of the putative class, this is insufficient to demonstrate a standard operating procedure of discrimination. Courts generally require a significant amount of anecdotal evidence to demonstrate commonality and even accepting the 30 complaints, that amount is insufficient. Compare Teamsters, 431 U.S. at 331, 338 (1 complaint per 8 class members), Brown. Nucor Corp., 785 F.3d 895, 913 (4th Cir. 2015) (1 for every 6.25 class members); Rollins v. Traylor Bros., 2016 WL 258523, at *5, 7-8 (W.D. Wash Jan. 21, 2016) (about 1 for every 4 class members). Here, by contrast, there is 1 complaint per 173 class members. Plaintiffs' assessment of Nike's response to the Starfish Survey otherwise fails to show Nike had a standard operating procedure of failing to address discrimination. Plaintiffs fail to establish commonality sufficient to maintain a class action with respect to their disparate treatment claims.

### c.       Oregon Equal Pay Act Claim

To establish a claim under OEPA, plaintiffs must show they were performing work comparable to that of men and were paid less than the male comparators. Smith v. Bull Run Sch. Dist. No. 45, 80 Or. App. 226, 229, 722 P.2d 27, 29 (1986). "Work of comparable character" means work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or title. Or. Rev. Stat. § 652.210(16).

Plaintiffs assert the expert opinions of Drs. Neumark and Lundquist demonstrate that, for a given set of job requirements men were paid more than women even with the same level of

Page 53 - FINDINGS & RECOMMENDATION

knowledge, experience, scope, effort, and responsibility. However, the reports do not adequately address job-to-job work and are too generalized to demonstrate work of comparable character. Nor do plaintiffs even identify specific job comparators for the named plaintiffs. And, as noted above, plaintiffs do not present a common thread as to the reason for the purported discrimination. Accordingly, plaintiffs fail to establish the requirement of commonality sufficient to support a class action with respect to their OEPA claim.

### 3. and 4.    Typicality and Adequacy of Representation

The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the Rule's permissive standards, representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. Hanlon, 150 F.3d at 1020.   In determining typicality, the court asks, "whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks omitted) (quoting Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992)). Individualized defenses applicable to class representatives do not preclude a finding of typicality unless there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it. Hanon, 976 F.2d at 508.

> To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them. See Hansberry v. Lee, 311 U.S. 32, 42-43, 85 L. Ed. 22, 61 S. Ct. 115 (1940). Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

Page 54  - FINDINGS & RECOMMENDATION

class? See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Hanlon, 150 F.3d at 1020.

Because the evidence establishes discretion on the part of hiring managers in setting pay, promoting, and granting pay increases and bonuses, the inquiry will be fact intensive and individualized for all putative plaintiffs. Commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.  Wal-Mart Stores, Inc.,564 U.S. at 338 n.5.  Accordingly, plaintiffs fail to meet these requirements sufficient to support a class action.

5.      Predominance and Superiority

A class action may be maintained only if one of three factors noted in Fed. R. Civ. P. 23(b) is present.  Plaintiffs rely primarily on Rule 23(b)(3) requiring that:

> questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> > (D) the likely difficulties in managing a class action.

Page 55  - FINDINGS & RECOMMENDATION

Fed. R. Civ. P. 23(b)(3).[26]

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).

> Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis. …[T]the examination must rest on legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.

Hanlon, 150 F.3d at 1022.

The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. Id. at 1023. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. Id.

The predominance standard is even more stringent than commonality. As noted above, common questions do not predominate and thus pursuit of individual claims is the better method to litigate claims of discrimination. Accordingly, plaintiffs' motion to certify the class should be denied.

<u>CONCLUSION</u>

---

[26] Plaintiffs also assert Rule 23(b)(2) is satisfied because they seek injunctive relief to halt the purported company-wide polices that result in discrimination. However, as noted, the evidence does not support a finding of common issues about the purported policies. Thus, plaintiffs would necessarily seek to enjoin individual hiring managers from engaging in the allegedly discriminatory conduct. Accordingly, plaintiffs fail to present a class action that may be maintained for injunctive relief.

Page 56 - FINDINGS & RECOMMENDATION

Plaintiffs' motion to certify the class (ECF 146) should be denied. Defendant's motions to exclude the opinions of Kathleen Lundquist and David Neumark (ECF 179, 181) should be denied. Plaintiffs' motions to rule as inadmissible parts of Chester Hanvey's and Ali Saad's expert reports (ECF 192, 221) should be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will waive a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 22nd day of November, 2022.


 /s/ Jolie A. Russo
JOLIE A. RUSSO
United States Magistrate Judge


Page 57 - FINDINGS & RECOMMENDATION



**G B D H**

**Goldstein, Borgen,
Dardarian & Ho**

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

May 7, 2020

<u>**Via E-Mail Only**</u>
Gary_Magnuson@ord.uscourts.gov

Hon. Jolie A. Russo
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third. Avenue
Portland, Oregon 97204

     Re:    *Kelly Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR
               Enforcement of the March 23, 2020 Discovery Order (ECF No. 99)

Dear Judge Russo:

     Plaintiffs request assistance enforcing this Court's March 23, 2020 Order (Ex. A, attached hereto, ECF No. 99, "Order"). Nike is violating the Order because the Order directs Nike to produce all "names and employee ID numbers of employees and witnesses in already produced . . . workplace complaint documents" and Nike refuses to produce all such names and ID numbers.[1] The Order's ruling also states: "Plaintiff's motion to compel (as stated in their letter to the Court dated March 4, 2020) is granted." *Id.* at 8.

     A month after the Order, on April 24, 2020, Nike made its revised production of documents concerning workplace complaints. Nike states it removed redactions of the names of complainants and witnesses.[2] Nike admits, though, that it intentionally kept redacted the names and ID numbers of the subjects of workplace complaints ("subjects"). *See e.g.,* Ex. B, attached hereto (examples of already produced documents concerning workplace complaints that still have redactions).[3] Plaintiffs have made several attempts to get Nike to comply with the Order, but Nike has repeatedly confirmed that it will not remove the redactions of subjects' names.

---

[1] On April 9, 2020, Nike filed Objections to the part of the Order regarding employment data but not to the part of the Order regarding documents concerning workplace complaints. ECF No. 101. Plaintiffs filed their Opposition to Nike's Objections on April 20, 2020 (ECF Nos. 102-3), and Nike filed a Reply in Support of its Objections on May 4, 2020 (ECF No. 104).

[2] Nike removed redactions of names of at least some non-subject complainants and witnesses, but Plaintiffs cannot confirm whether Nike has removed all such redactions because Nike did not provide a redaction log for these documents.

[3] Exhibit B contains documents Nike marked as "Confidential" and as "Highly Confidential – Attorneys' Eyes Only," but, pursuant to paragraphs 7(e) and 8 of the Protective Order (ECF No.

300 Lakeside Drive, Suite 1000, Oakland, CA  94612-3534    Tel 510. 763. 9800    Fax 510. 835. 1417    www.gbdhlegal.com

782532.5

Goldstein Decl. Ex. 9, Page 1 of 37

ER-210

-2-                                                                    May 7, 2020

Nike's refusal to identify the subjects of the complaints violates the Court's clear Order. Subjects are both employees and witnesses, and the Order directs Nike to "produce names and employee ID numbers of employees and witnesses in already produced . . . workplace complaint documents."  Order at 8.

Indeed, Nike fought against and lost this exact issue already.  In its opposition to Plaintiffs' March 4 letter to this Court, Nike recognized that Plaintiffs sought subjects' names: "Plaintiffs also assert that they need the names of non-party complainants, subjects, and third-party witnesses."  Nike's March 13, 2020 Letter to the Court at 7.  Nike's opposition letter argued against disclosing subjects' names.  *E.g., id.* (arguing that "Plaintiffs can obtain [anecdotal] evidence through the complaint files themselves; knowing … whom the complaints were about has no impact on this.").  After considering the letters and hearing argument, the Court ruled: "Plaintiff's motion to compel (as stated in their letter to the Court dated March 4, 2020) is *granted*."  Order at 8 (emphasis added).

In addition, Nike has not removed any redactions of any employee or witness names in several already produced documents concerning workplace complaints.  Plaintiffs provided Nike with examples of these documents, including Bates Numbers, on April 25 and May 1, 2020.  Although Plaintiffs repeatedly asked Nike to re-produce these documents without redactions, Nike has not said when or if it will remove redactions and re-produce these documents.  Moreover, Nike is more than thirty days past the deadline established by Local Rule 37-2, which states, "[u]nless otherwise directed by the Court, the party against whom an order to compel has been entered must comply within 14 days after the date of entry of the order."

Plaintiffs thus request an order: (a) finding Nike violated the Court's March 23, 2020 Order, and (b) directing Nike to complete its production in compliance with the Court's March 23, 2020 Order (ECF No. 99) within one week of entry of the order requested herein.

---

82), the Court and its staff can review the documents.  However, if the Court intends to put this document on the docket, please seal Exhibit B pursuant to paragraph 4 of the Protective Order.

-3-                                         May 7, 2020

Respectfully submitted,

/s/ Byron Goldstein
Byron Goldstein

Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
Chad A. Naso, OSB #150310
chadnaso@markowitzherbold.com
MARKOWITZ HERBOLD PC
Tel.: (503) 295-3085

Laura L. Ho (admitted pro hac vice)
Barry Goldstein, Of Counsel (admitted pro hac vice)
James Kan (admitted pro hac vice)
Byron Goldstein (admitted pro hac vice)
Katharine L. Fisher (admitted pro hac vice)
Mengfei Sun (admitted pro hac vice)
msun@gbdhlegal.com
Tel.: (510) 763-9800

Craig Ackerman (SBN 229832)
ACKERMANN & TILAJEF PC
Tel: (310) 277-0614

India Lin Bodien (SBN 44898)
INDIA LIN BODIEN LAW
Tel: (253) 503-1672

Attorneys for Plaintiffs

cc: Daniel Prince (danielprince@paulhastings.com)
    Zach P. Hutton (zachhutton@paulhastings.com)
    Felicia A. Davis (feliciadavis@paulhastings.com)
    Amy Joseph Pedersen (amy.joseph.pedersen@stoel.com)
    Kennon Scott (kennon.scott@stoel.com)

782532.5

# Exhibit A

Goldstein Decl. Ex. 9, Page 4 of 37

ER-213

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARAH JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | 3:18-cv-1477-JR |
| Plaintiffs, | ORDER |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

RUSSO, Magistrate Judge:

        Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender

bring this putative class and collective action alleging that defendant Nike systematically

discriminates against them and other similarly situated women at Nike headquarters regarding

salary and promotions.   Several additional plaintiffs have filed consents to join this action.   The

Court has previously denied Nike's motion to dismiss most of the class and collective claims.[1]

---

1 Nike did not seek dismissal of the class claims regarding the disparate impact claim.

Page  1  - ORDER

Goldstein Decl. Ex. 9, Page 5 of 37

ER-214

On March 4, 2020, plaintiffs submitted a letter to the court seeking an order to compel Nike to provide identifying information for employees in already produced employment data and workplace complaint documents.   On March 19, 2020, the Court heard argument on the request and for the reasons stated below, the request is granted.

At this stage, the Court has not certified a class action for any claims.

The proposed class includes:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from three years prior to opting-in through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President.

First Amended Complaint (FAC) (ECF #42) at ¶ 165.

Plaintiffs allege defendant has engaged in systemic sex discrimination against the collective/class members by paying them less than male employees with substantially equal job duties requiring substantially similar skill, effort, and responsibility performed under similar working conditions.   Id. at ¶ 167.   Plaintiffs further allege defendant has contributed to, and perpetuated sex-based pay disparities through common policies, patterns, or practices, including but not limited to those relating to starting salary and "band level," annual ratings, promotions, performance management policies or practices, centralized decision-making, and a work environment hostile to women.   Id. at ¶ 168.

The case is still in the pre-certification discovery phase.

Whether or not discovery will be permitted in a [class action] lies within the sound discretion of the trial court. See Berland v. Mack, 48 F.R.D, 121, 126 (S. D, N.Y. 1969). In determining whether to grant discovery [in connection with determining whether class-treatment is appropriate in a putative class action,] the court must consider its need, the time required, and the probability of discovery

Page 2 - ORDER

Goldstein Decl. Ex. 9, Page 6 of 37

ER-215

> resolving any factual issue necessary for the determination. The propriety of a
> class action cannot be determined in some cases without discovery, as, for
> example, where discovery is necessary to determine the existence of a class or set
> of subclasses. To deny discovery in a case of that nature would be an abuse of
> discretion. Where the necessary factual issues may be resolved without discovery,
> it is not required.

Kamm v. California City Development Co., 509 F.2d 205, 209-210 (9th Cir. 1975) (footnote

omitted).

Where discovery is necessary for the class-treatment determination, it is an abuse of

discretion to make the determination without permitting such discovery. See id. at 210. However,

while "in some cases a district court should allow discovery to aid the determination of whether a

class action is maintainable, the plaintiff bears the burden of advancing a prima facie showing

that the class action requirements of Fed. R. Civ. P. 23 are satisfied or that discovery is likely to

produce substantiation of the class allegations. Absent such a showing, a trial court's refusal to

allow class discovery is not an abuse of discretion." Mantolete v. Bolger, 767 F.2d 1416, 1424

(9th Cir. 1985), citing Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1313 (9th Cir.

1977).

"At the pre-class certification stage, discovery in a putative class action is generally

limited to certification issues: e.g., the number of class members, the existence of common

questions, the typicality of claims, and the representative's ability to represent the class." Dysthe

v. Basic Research, L.L.C., 273 F.R.D. 625 (C.D. Cal. 2011), citing Oppenheimer Fund, Inc. v.

Sanders, 437 U.S. 340, 359 (1978).

In October, the Court addressed plaintiffs' request to compel (1) documents related to

Page 3 - ORDER

Goldstein Decl. Ex. 9, Page 7 of 37

ER-216

Nike's public statements about sex discrimination allegations raised in this action; (2) complaints

of sex discrimination made by putative class members to Nike and Nike's responses, if any; (3)

three former high-level Nike executives who plaintiffs have specifically alleged contributed to or

participated in sex discrimination; and (4) applicable insurance policies.   The Court ordered as

follows:

> After considering the parties' comprehensive briefing and oral argument on October 30, 2019, plaintiffs' September 27, 2019 letter request to the Court to compel precertification discovery is Granted in Part and Denied in Part as follows: 1) With respect to Nike's Public Statements on Discrimination (RFPs 39-43 and 47), Nike shall produce the statements themselves and the motion is denied with respect to any further documentation regarding the public statements. However, to the extent not already produced, Nike shall produce any uniform policies it maintained during the relevant time periods regarding hiring, firing, pay, promotions, and compensation systems; 2) With respect to documents concerning sex discrimination, harassment, and hostile work environment complaints (RFPs 27, 29, and 45-46), the motion is granted regarding any such complaints made by any named plaintiff or those putative plaintiffs who have already consented to join and any other complainants to the extent such complaints involve compensation, promotion, or performance reviews and specific complaints that male colleagues received favorable treatment in those areas for the same work; 3) With respect to the personnel records of former Nike executives Trevor Edwards, Daniel Tawiah, and David Ayre (RFPs 34-38), the motion is granted to the extent the records contain complaints of sexual harassment/discrimination linked to policies of pay/promotions and job duties either by the named executives themselves or regarding actions these executives may have taken to condone pay/promotion and job duty discrimination decisions of lower level managers; and 4) With respect to insurance policies (RFP 51) the motion is denied. All production pursuant to this motion is subject to the Protective Order (82) entered in this case on June 17, 2019, as relevant and necessary.

Order (ECF #89).

In producing documents responsive to the Court's order, Nike removed or redacted

identifying information from employment data related to workplace complaints, etc.   Plaintiffs

move for an order compelling Nike to produce the Identifying Information.   Nike objects

Page 4 - ORDER

Goldstein Decl. Ex. 9, Page 8 of 37

ER-217

alleging the anonymization of its data is appropriate because (1) the data contains highly-sensitive and confidential compensation, performance, and personnel records for thousands of individuals who have not consented to join this action, and many more who are outside of the putative class and collective altogether; and (2) Nike's redaction of complainant, subject, and third-party witness names (none of whom are named or opt-in plaintiffs or the subject of plaintiffs' FAC allegations) are from sensitive internal complaint files. It appears that Nike wants to prevent plaintiffs from accessing a link between employee names/contact information and the data already provided rather than objecting to potential class member employees identifying information.

Nike states it has produced approximately 995,000 personnel records for nearly 13,400 current and former employees which include highly-sensitive personal and financial information detailing those 13,400 employees' compensation (including merit increases, bonuses, and equity awards), as well as dates of birth, performance review ratings, promotions, and dates of leave, retirement, and termination, including whether the termination was involuntary. Nike asserts that given the Court has yet to conditionally certify a class, it should not be required to provide identifying information including names and employee ID numbers regarding the employees (who have not opted in) to protect their privacy interests.

Nike contends that plaintiffs have the data they need to analyze whether there is statistical evidence to support their class and collective claims, and the use of anonymized identifiers has no impact on their ability to analyze that data. Plaintiffs assert they need the identifying information to help develop anecdotal evidence not captured in the raw data itself.

Page 5 - ORDER

Goldstein Decl. Ex. 9, Page 9 of 37

ER-218

Nike argues the relevant case law might allow compelled class member names, contact information, dates of employment, and work locations, but does not allow a link between those names to the complaints provided.   However, it does not appear that issue was discussed in most of the cases cited by Nike. [2]   Courts may not allow access to employee names/contact information solely to "solicit others to participate," but will allow it, for example, to investigate whether defendants made a common decision regarding classification.   Cedano v. Thrifty Payless, Inc., 2011 U.S. Dist. LEXIS 155956, at *33, 2011 WL 8609402 (D.Or. May 9, 2011).

Some courts have declined to require production of underlying identifying data due to privacy concerns pre-certification.   For example, in Barret v. Forest Labs, Inc., the court noted:

> There remains the question of the names of the employees whose employment data is to be produced. As defendants suggest, some of the data to be revealed is potentially quite sensitive. Although plaintiffs will undoubted have need for disclosure of the names of collective members if their forthcoming certification motion is granted, they fail to make a persuasive case for immediate disclosure of all names at this stage. They will be free to seek partial or full disclosure irrespective of whether their certification motion is granted, provided that they can demonstrate a specific need for some or all of those names. But they have not yet made that showing.

Barrett v. Forest Labs., Inc., 2015 U.S. Dist. LEXIS 51495 at *8 (S.D.N.Y. April 8, 2015).

However, Barret, as noted in the quote above, indicates that such a link between the data and employee identifying information may nevertheless be discoverable pre-certification.   In Wellens v. Daiichi Sankyo, Inc., the court identified what types of needs would justify disclosure of the names and linking information:

---

2 See, e.g., Babbitt v. Albertson's, Inc., 1992 U.S. Dist. LEXIS 19091 at *1617 (N.D.Cal. December 1, 1992) (in ordering names, addresses, telephone numbers and social security numbers of current and past employees produced, the court noted a protective order was sufficient to protect privacy interests and the information could lead to further relevant evidence).   The court did not address links to employment data or complaints, but other relevant evidence

Page 6  - ORDER

Goldstein Decl. Ex. 9, Page 10 of 37

ER-219

discovery from putative class members may lead to anecdotal evidence not captured in the pay and benefits data produced by Defendants, that such evidence is important to bring discrimination claims "convincingly to life," and as such may substantiate Plaintiffs' arguments for class certification. The court will therefore exercise its discretion to permit discovery of putative class members' contact information.

Wellens v. Daiichi Sankyo, Inc., 2014 U.S. Dist. LEXIS 29794 at *7 (N.D.Cal. March 5, 2014).[3]

Here, plaintiffs assert the identifying information will lead to anecdotal evidence relevant to certification of their disparate treatment claim.   Specially, plaintiffs contend the information sought will help develop evidence in support of class certification, including: (1) statistical evidence where disparate data files rely on identifying information for connection and analysis; (2) evidence of top management's involvement in discrimination; and (3) anecdotal evidence in support of class certification.   With respect to the October 31, 2019, Order, the Court already limited plaintiffs' discovery into the complaints to prevent a "fishing expedition."   Implicit in the Court's decision was a limitation on the invasion of privacy interests of employees who have yet to consent to join the lawsuit. Further, only those individuals with complaints similar to the named plaintiffs are appropriately discoverable.   The Court notes the existing Protective Order and find it sufficient to protect the privacy interests of the employees who filed the complaints. A link between the complaints and identifying information may better allow plaintiffs to bolster the issues related to certification especially with respect to the disparate treatment claim. Regarding documents demonstrating pay differentials, merit increases, bonuses, equity awards,

---

could include complaints made by the other employees of the type complained by the named plaintiffs as well as employee data relevant to certification.

3 Nike argues the Wellens Court only allowed discovery of contact information and not disclosure of the names applied to data.   However, the court left the door open to a link between the data and the names because the parties had not addressed the privacy concerns in their briefing and noted that the main issue was whether the protective order should include additional protections.   Id. at *11-12.

Goldstein Decl. Ex. 9, Page 11 of 37

and performance ratings, the identity of the employee regarding that data may help develop anecdotal evidence of disparate treatment as well.

The Court is mindful of the strong privacy interests of the employees who will be identified. The Protective Order (ECF #82) is sufficient to address that concern with the addition of one further restraint on the information provided: Should plaintiffs' counsel seek to contact a named employee in an effort to find anecdotal evidence that may be lacking in the files or complaints themselves, counsel shall first inform the employee of their right to refuse to talk.

<u>CONCLUSION</u>

Plaintiffs' motion to compel (as stated in their letter to the Court dated March 4, 2020) is granted. Defendant shall produce names and employee ID numbers of employees and witnesses in already produced employment data and workplace complaint documents. All production pursuant to this motion is subject to the Protective Order (ECF #82) entered in this case on June 17, 2019, with the additional requirement that any contacted employee shall first be informed of a right to refuse to talk at this stage of the proceedings.

DATED this 23rd day of March, 2020.

_____
/s/ Jolie A. Russo
JOLIE A. RUSSO
United States Magistrate Judge

Page 8 - ORDER

Goldstein Decl. Ex. 9, Page 12 of 37

ER-221

# Exhibit B

Goldstein Decl. Ex. 9, Page 13 of 37

ER-222

Confidential



Starfish



# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☒ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager, gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

NIKE_00019389

Goldstein Decl. Ex. 9, Page 14 of 37

ER-223

Confidential

## MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:
I experienced unfair treatment from a manager around pay, position and respect. (Preferential Treatment)

Date / location if you can remember:
WHQ 2016

Did you experience this situation first hand?
Yes.

Were there any witnesses?
Yes.

Do you have any hard evidence such as emails, photo's etc?
Just anecdotes around the situation, some 2x history.

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?
No.

If you reported it, was it resolved?

If you did not report it, why did you make that decision?
I make myself believe that I, indeed wasn't 'good enough' as the underqualified counterpart the manager showed preferential treatment. [to whom]

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)
Career progression. Emotional wear down. I fell into a depression for about a month thinking of low self-worth before I diverted action and energy towards finding another role (and boss...).

Please indicate if you would like to discuss and potentially elevate your experience:

NIKE_00019390

Goldstein Decl. Ex. 9, Page 15 of 37

ER-224

3/1/18

<u>March 1, 2018</u>
[Received by ▮▮▮▮▮▮▮▮▮ via email]

Please share brief outline of your experience:

- I confronted my Director and Senior Director about pay discrepancy. My female friend who is a global brand manager (I am NA brand manager) earns 25k more than me. 25k. Same job. I also have 5 years more work experience than her, including 3 different countries and 5 cities. My management told me (in my CFE) that there are no pay rises, and that people come into Nike at different pay levels and if I started lower than my friend then that's just how it is and I needed to negotiate harder when I came into Nike. I also asked for my pay to be internally benchmarked and HR gave me an external benchmark. I asked again, nothing has happened.
- My new Brand Director was a Comms Director for 4 months. He hated the role and hated living in Portland and threatened to quit. His behavior was 'rewarded' by him being promoted to Brand Director and moved to NYC. I was told I was too inexperienced for the role. I have 10 years of work experience in 3 countries, and have been a brand manager for 2 years. As such, I am now the only person on my team located in Portland. I am a Brand Manager and i am alone, with no management or team, no one to learn from or work with. I asked to move to LA to sit with EM, or to NYC to sit with my team and told that there is 'no way' I am moving and that they need 'ears on campus.' My reply was 'I am not your ears' which didn't go down well.
- I confronted the new Director about locations, and he admitted to me on a call that it would've made more sense for the Director to be in Portland and closer to global, and the Manager to be in market activating.

Date / if you can remember:
- During my CFE around Feb 5

Did you experience this situa first hand?
- Yes

Were there any witnesses?
- The director and senior director. I also have emails. I've also spoken to HR and they have been great listeners, but that's it. ▮▮▮▮▮▮▮ actually said to me "Do you think your Senior Director is trying to make you quit?"

Do you have any hard evidence such as emails, photo's etc?
- Yes

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)
- I want to leave my team/Nike. I'm alone, in Portland. No one moves to Portland alone with no friends to work at one of the biggest companies in the world and basically be remote. I barely even go to the office I just work from home and save the money on gas. It's taken a huge toll on me mentally and emotionally, I am so lonely, they basically left me behind and gave me an inexperienced Director who I am now teaching how to do the job. I had no Director for 4 months, I was doing the job of specialist manager and director and this is the reward I get.

Confidential

NIKE_00019420

Goldstein Decl. Ex. 9, Page 16 of 37

ER-225



Confidential

NIKE_00022566

Goldstein Decl. Ex. 9, Page 17 of 37

ER-226



I am given responsibilities but then questioned on my decisions and asked to provide timelines or explanations when my male counterparts are not asked to do the same.

I sit in large meetings and am commonly the only woman or minority. I do not see myself represented in the environment that I work in.

Nike sent out an email that women make 99% what men do and that it's essentially equal. It's not equal.

In general, I feel that sometimes myself and other women I work with are not heard, included, or respected and that our ideas and opinions are often met with immediate resistance.

I have not gone to HR about many of these issues not only because they were so unhelpful in the past but also because I honestly think a lot of it is systemic and subconscious. I believe that Nike should make an intentional effort to change the environment that we work in by hiring and promoting women and minorities at the same frequency and to the same levels of our Caucasian male counterparts. I see the word "Equality" on my screensaver but I do not see it being practiced.

Confidential



# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

**Please select one or more choices below.**

☒ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

Highly Confidential - Attorneys' Eyes Only

## MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)



Your (optional): ▮▮▮▮▮▮

Please share brief outline of your experience: BROUGHT INTO MY BOSS' OFFICE AND GIVEN A LIST OF 5 MALE NAMES FOR MY OPEN

Date / location if you can remember: S BAND GOAL WT ROLE. TOLD I WAS NOT TO WORK OUT UNTIL I PICKED ONE OF THOSE NAMES. I ASKED FOR 3 FEMALES TO BE PROPOSED FOR CONSIDERATION AND WAS TOLD "NO, YOU NEED A MAN IN THAT ROLE". THIS WAS AT 6:30 PM. WENT REINO

Did you experience this situation first hand? AND REINO ARGUING THE OPPOSITE (ALL MEN REPORTING INTO RVP)

Yes WAS CURRENT IN. ▮▮▮▮▮ ORG. WHY CAN WE NOT

Were there any witnesses? LOOK AT MOST QUALIFIED TALENT?

No

Do you have any hard evidence such as emails, photo's etc?

EMAIL

If not experienced first hand, then how was it brought to your attention?

Did you report this experience? YES. TO STEPHANIE STAPLES IN HR. I ALSO SHARED WITH 2 OTHER LEADERS FOR ADVICE.

If you reported it, was it resolved? WE ENDED UP LOSING ON A MORE COMPREHENSIVE CANDIDATE FOR & PROMOTED A FEMALE INTO THE ROLE.

If you did not report it, why did you make that decision?

What impact has this experience had on you? LACK OF FAITH IN A FAIR & EQUITABLE PROMOTION PROCESS FOR SENIOR

(For example; career progression, physical health, psychological health, other) LEADERSHIP POSITIONS. MASSIVE DISAPPOINTMENT THAT I HAD TO SPEND SO MUCH TIME GOING ROUND TO EFFECT

Please indicate if you would like to discuss and potentially elevate your experience: TO GET EQUAL REPRESENTATION OF FEMALES AND ULTIMATELY ADVOCATING FOR THE ONE WHO WAS MOST QUALIFIED.

NIKE_00022569
Goldstein Decl. Ex. 9, Page 20 of 37
ER-229

From: "Staples, Stephanie" ███████████████

Date: Wednesday, December 6, 2017 at 1:23 AM

To: Nike ████

Subject: Re: Follow Up Women's Apparel : Please keep this confidential!

Thanks for the update ████ Let me speak with Elizabeth and circle back.

Will you keep me posted regarding your conversations with ████████████████

Thank you,
Stephanie

Sent from my iPhone

On Dec 6, 2017, at 7:57 AM, ████████████████████ wrote:

Hi Stephanie,
Thank you so much for the time today. Sending over the pages I have been working on as it's a night update. Again please keep this attachment tight as much as possible as well as what I am about to share with you.

I am speaking to Reenie at 3 and Tyler at 4 tomorrow where I plan to address our conversation from today as well as another topic which came up in a meeting with ████ this evening- Tricia's backfill. ████ informed me that he, ████ and few other members from the GALT met Monday to discuss her role and decided we needed diversity when filling it. They came up with 5 names, all men from the org, none were on my radar when ████ and I spoke about it last week or when Reenie and I spoke about it the weeks prior. 2 of these men have been in their role for less than 5 months, 2 are in Jordan (1 has had serious performance issues from what I have been told by his manager), and one recently reported to me in men's NSW (he has been in his role less than 2 years and not a top performer). ████ asked me to select one. I have never had a talent conversation in this way. It's contrary to the OTP conversations we have had as an apparel leadership team where we identified HI PO HI PERF talent and it's contrary to earlier conversations I had with Reenie weeks ago where we discussed the RIGHT talent for the position.

Of course I want to have a diverse team which I am looking to put in the right way amongst the 46 roles reporting to me, but I also want the right talent for this critical GCAL role. I plan on being honest and clear with both Reenie and Tyler regarding this situation tomorrow. It is disappointing that I continue to be left out of critical conversations because of this divisional structure. I am disappointed that the first and only filter in considering a candidate pool was it had to be a man. It does not seem right that we would pass up women who are capable and ready for this role simply because there is a feeling that we have too many women on my team. Our work is about empowerment, progression, and the potential to change the world. Excluding women from that opportunity seems discriminatory to me. ████████ DVP of sport categories, has all men in his 7 leadership positions and I have to wonder if next time he has an open role he will be given a "forced diversity list" of women?

████ required me to select a name. Forced to choose, I said him I would support Neil Monroe in the role. Neil was promoted just 5 months ago as GCAL men's training. I don't know if he will go for this, or that it's a good move for him. But here I am having made my "pick" thinking this must be what it feels like to be in the twilight zone.

Amy is aware as I texted her about this tonight.

████

Highly Confidential - Attorneys' Eyes Only

From: Nike <█████
Date: Wednesday, December 6, 2017 at 10:06 AM
To: ████████████████
Subject: GCAL- training

H ██

After going home and processing last night what we discussed I wanted to ensure I heard you clearly.  I agree diversity is critical for us to have in the org and equally as important is having the best person for the job.  The 5  names you gave me (████████████████) being all men still is not computing as there is other talent in the org like ████████████████████████ who I believe are all high on the 9 box and would be interesting to consider as well.  I feel like I was forced to make a "pick" and feels it needs more thought and consideration.

Maybe we can get 5 mins after the bra conversation.

Thanks, ████

Highly Confidential - Attorneys' Eyes Only

Confidential

⑦

## IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☒ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
[Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

## IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

NIKE_00022572

Goldstein Decl. Ex. 9, Page 23 of 37

ER-232

Confidential

## MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:
I WAS TOLD "NO ONE GIVES A FUCK ABOUT FEMALE EMPOWERMENT," BY A MALE SUPERIOR.

Date / location if you can remember:
SUMMER 2017

Did you experience this situation first hand?
YES

Were there any witnesses?
YES

Do you have any hard evidence such as emails, photo's etc?
NO, IT WAS VERBAL.

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?
YES

If you reported it, was it resolved?
UNSURE

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)
IT HAS MADE ME QUESTION THE OVERALL CULTURE @ NIKE. I WORK IN A VERY MALE DOMINATED DEPT. AND HAVE ALSO BEEN IMPACTED FINANCIALLY — MALE CO-WORKERS IN LOWER POSITIONS

Please indicate if you would like to discuss and potentially elevate your experience:
MAKING THE SAME SALARY.

NIKE_00022573

Things I have experienced in my near 10-year career at Nike.

1. When I was promoted, the man that was hired to backfill by lower positioned was hired at the same salary that I was promoted to. We were at different band levels, I had more experience and I was in a higher position and he was making the same salary as me.

2. A male surperior told me in a meeting that "No one gives a fuck about female empowerment." It was in the context of a project and a new direction that the project needed to take, but he said it right to my face with no apology.

3. This is second-hand, but I have heard of certian male leaders not wanting women with children to work on their teams because they can't work late and they have other commitments outside of Nike.

4. There are very few female role models in my function that are married with children and excelling in their careers. It is extremely male dominated.

5. I have experienced countless times when I have been presenting to leadership (always men) and they won't make eye contact with me or engage in conversation. When one of my male counterparts gets up to present, their reaction is very different. I feel as though they aren't taking me seriously or respecting me or what I have to say.

Confidential

NIKE_00022574
Goldstein Decl. Ex. 9, Page 25 of 37
ER-234

Confidential



## IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☑ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

## IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

NIKE_00022575

Goldstein Decl. Ex. 9, Page 26 of 37

ER-235

Confidential

## MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:

Date / location if you can remember:

Did you experience this situation first hand?

Were there any witnesses?

Do you have any hard evidence such as emails, photo's etc?

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?

If you reported it, was it resolved?

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience:

There is a leader in our org that is trying to take care of a problem employee ▮▮▮▮ who is a poor performer and also called his employee a "Bitch" but she is not able to do anything about it because he is protected by the European Boys club. I know this was reported to ER. Why is nothing happening? Because he is friends with ▮▮▮▮▮▮ who phoned in a favor.

NIKE_00022576

Goldstein Decl. Ex. 9, Page 27 of 37

ER-236

Confidential

## MY EXPERIENCE
(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:

Date / location if you can remember:

Did you experience this situation first hand?

Were there any witnesses?

Do you have any hard evidence such as emails, photo's etc?

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?

If you reported it, was it resolved?

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience:

*Generally I have experienced that certain employees (mostly male) are "protected" because of who they are friends with, regardless of the fact that they are severe under-performers. We keep "finding homes" for these people and they take up valuable space in the company. I am in a situation where I do not feel empowered to manage with courage because of long standing relationships with Sr. leaders. (Sr. leaders who won't take on the problem themselves, by the way)*

NIKE_00022577

Goldstein Decl. Ex. 9, Page 28 of 37

ER-237

Confidential

Anonymous

③



# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

**Please select one or more choices below.**

☑ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

NIKE_00002578

Goldstein Decl. Ex. 9, Page 29 of 37

ER-238

Confidential

## MY EXPERIENCE
(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:

Date / location if you can remember:

Did you experience this situation first hand?

Were there any witnesses?

Do you have any hard evidence such as emails, photo's etc?

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?

If you reported it, was it resolved?

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience:

NIKE_00022579

Goldstein Decl. Ex. 9, Page 30 of 37

ER-239



- INEQUITY IN PAY: I have asked twice to have my salary reviewed in the past year and a half, my boss says that will happen but never follows through.  I know for a fact I am underpaid.



Confidential



Confidential

NIKE_00022581

Goldstein Decl. Ex. 9, Page 32 of 37

ER-241



My story is less of a specific incident, but a handful of occurances and an overarching theme.

When I received this questionnaire, I asked several of my female co workers what they thought of working at Nike. I asked how fairly they were treated based on performance vs gender. All unanimously talked about "the Boys Club" of Nike. A giant men's sports team, where favoritism prevails and females couldn't possibly play in the sandbox. Where I've received advice the reason I'm not advancing as I'd like, I'm not in the same social scene or sporting events as my co-workers. Or that as a woman males don't want to be so serious. Keep it light, keep it funny.

Over my years at Nike I have had a few occurances of discrimination or harrassment.

- Receiving an invitiation to ████████ (former employee) NFL launch party. All my male counterparts that actually worked on NFL, while I worked on Men's training did not receive the invite. I did. Come to find out several females including Nike store associates were invited to the party. I declined.
- Another time, I provided financials to a VP. When I stepped into the meeting to provide the financial facts to her, a single male VP in the audience asked me multiple times if I was going to stay for the meeting. A few of the other female co workers around me where uncomfortable. I could tell his inquisition was not work related. No employees below an S band were in the room. I was a U band.
- Since then I have had several incidents of my opinion being ignored or dismissed by a specific manager. When my male counterpart brings up the exact same opinions, the manager then decides to listen. This manager also yelled, screamed and banged his fists on the table at me, which was reported. He also came at another female employee, calling her a bitch. This was also reported. A third female manager has complained of receiving unfair treatment. My male counterparts did not complain of the same treatment. What is being done about it today, I am unclear.
- One thing we as a Global company need to recognize is people's experiences that frame their actions and behaviours. Meaning, the world is in various stages of acceptance from race, religion, gender, age etc. As we come together across the globe, some of us experienced rather progressive societies and others of us have not. How do we provide cultura training to bridge the gaps?

My biggest for Nike, as I talked with other femail co workers, was realizing how the "boys club" is a common theme. This is something I experience and tend to ignore, but why should I have to work 2X as hard as those around me? More importantly, how will we attract and retain top female talent? Women are the main spenders in households today. Why is our business so skewed toward men? How we will capture her attention? It starts from credibiilty within the organization. I hate to think of the talent we may be missing out on maximizing for the company, because she is being overlooked.

Appreciate the opportunity to speak.

Confidential

NIKE_00022582
Goldstein Decl. Ex. 9, Page 33 of 37
ER-242

## Scott Grimes

| | |
|---|---|
| **From:** | Davis, Felicia A. <feliciadavis@paulhastings.com> |
| **Sent:** | Thursday, May 7, 2020 3:29 PM |
| **To:** | Gary_Magnuson@ord.uscourts.gov |
| **Cc:** | Prince, Daniel; Hutton, Zachary; amy.joseph.pedersen@stoel.com; kennon.scott@stoel.com; Laura Ho; James Kan; Barry Goldstein; Byron Goldstein; Mengfei Sun; Laura Salerno Owens; David Markowitz; Harry Wilson; Anna Joyce; Chad A. Naso; cja@ackermanntilajef.com; india Bodien; Scott Grimes |
| **Subject:** | RE: Cahill, et al. v. Nike, Inc- Case No. 3:18-cv-01477-JR |

Deputy Magnuson,

We believe the issue can be resolved pursuant to Nike's request for clarification of the March 23, 2020 order submitted earlier today, but if the Court prefers additional briefing, please let us know, and we will prepare a formal written response to plaintiffs' letter brief.

Thank you very much,
Felicia Davis

---

**From:** Scott Grimes <sgrimes@gbdhlegal.com>
**Sent:** Thursday, May 7, 2020 2:24 PM
**To:** Gary_Magnuson@ord.uscourts.gov
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Hutton, Zachary <zachhutton@paulhastings.com>; Davis, Felicia A. <feliciadavis@paulhastings.com>; amy.joseph.pedersen@stoel.com; kennon.scott@stoel.com; Laura Ho <lho@gbdhlegal.com>; James Kan <jkan@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>; David Markowitz <davidmarkowitz@markowitzherbold.com>; Harry Wilson <harrywilson@markowitzherbold.com>; Anna Joyce <annajoyce@markowitzherbold.com>; Chad A. Naso <chadnaso@markowitzherbold.com>; cja@ackermanntilajef.com; india Bodien <india@indialinbodienlaw.com>
**Subject:** [EXT] Cahill, et al. v. Nike, Inc- Case No. 3:18-cv-01477-JR

Hon. Jolie A. Russo:

Attached please find Plaintiffs' Letter Regarding Enforcement of the March 23, 2020 Discovery Order in the matter *Cahill, et al. v. Nike, Inc.*, No. 3:18-cv-01477-JR.

**Scott G. Grimes ▪ Senior Paralegal ▪ Goldstein, Borgen, Dardarian & Ho** ▪ 300 Lakeside Drive, Suite 1000 ▪ Oakland, CA 94612 ▪ T: (510) 763-9800 ▪ F: (510) 835-1417 ▪ www.gbdhlegal.com



Please Note: The information in this E-mail message is legally privileged and confidential information intended only for the use of the addressee(s) named above. If you, the reader of this message, are not the intended recipient, you are hereby notified that you should not further disseminate, distribute, or forward this E-mail message. If you have received this E-mail in error, please notify the sender as soon as possible. In addition, please delete the erroneously received message from any device/media where the message is stored. Thank you.

1

*********************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

2

Goldstein Decl. Ex. 9, Page 35 of 37

ER-244

**Scott Grimes**

| | |
|---|---|
| **From:** | Gary Magnuson <gary_magnuson@ord.uscourts.gov> |
| **Sent:** | Friday, May 8, 2020 2:00 PM |
| **To:** | Davis, Felicia A. |
| **Cc:** | Prince, Daniel; Hutton, Zachary; amy.joseph.pedersen@stoel.com; kennon.scott@stoel.com; Laura Ho; James Kan; Barry Goldstein; Byron Goldstein; Mengfei Sun; Laura Salerno Owens; David Markowitz; Harry Wilson; Anna Joyce; Chad A. Naso; cja@ackermanntilajef.com; india Bodien; Scott Grimes |
| **Subject:** | RE:  Cahill, et al. v. Nike, Inc- Case No. 3:18-cv-01477-JR |

Counsel:

Judge Russo says she will await Judge Hernandez's ruling regarding her earlier order and will address this as necessary afterwards.

Best,

Gary Magnuson,
Courtroom Deputy,
U.S. District Court,
District of Oregon.
(503) 326-8055; fax (503) 326-8010
gary_magnuson@ord.uscourts.gov

---

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Thursday, May 7, 2020 3:29 PM
**To:** Gary Magnuson <gary_magnuson@ord.uscourts.gov>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Hutton, Zachary <zachhutton@paulhastings.com>; amy.joseph.pedersen@stoel.com; kennon.scott@stoel.com; Laura Ho <lho@gbdhlegal.com>; James Kan <jkan@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>; David Markowitz <davidmarkowitz@markowitzherbold.com>; Harry Wilson <harrywilson@markowitzherbold.com>; Anna Joyce <annajoyce@markowitzherbold.com>; Chad A. Naso <chadnaso@markowitzherbold.com>; cja@ackermanntilajef.com; india Bodien <india@indialinbodienlaw.com>; Scott Grimes <sgrimes@gbdhlegal.com>
**Subject:** RE: Cahill, et al. v. Nike, Inc- Case No. 3:18-cv-01477-JR

Deputy Magnuson,

We believe the issue can be resolved pursuant to Nike's request for clarification of the March 23, 2020 order submitted earlier today, but if the Court prefers additional briefing, please let us know, and we will prepare a formal written response to plaintiffs' letter brief.

Thank you very much,
Felicia Davis

---

**From:** Scott Grimes <sgrimes@gbdhlegal.com>
**Sent:** Thursday, May 7, 2020 2:24 PM
**To:** Gary_Magnuson@ord.uscourts.gov
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Hutton, Zachary <zachhutton@paulhastings.com>; Davis, Felicia A.

Goldstein Decl. Ex. 9, Page 36 of 37
ER-245

<feliciadavis@paulhastings.com>; amy.joseph.pedersen@stoel.com; kennon.scott@stoel.com; Laura Ho
<lho@gbdhlegal.com>; James Kan <jkan@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>; Byron
Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>; Laura Salerno Owens
<laurasalerno@markowitzherbold.com>; David Markowitz <davidmarkowitz@markowitzherbold.com>; Harry Wilson
<harrywilson@markowitzherbold.com>; Anna Joyce <annajoyce@markowitzherbold.com>; Chad A. Naso
<chadnaso@markowitzherbold.com>; cja@ackermanntilajef.com; india Bodien <india@indialinbodienlaw.com>
**Subject:** [EXT] Cahill, et al. v. Nike, Inc- Case No. 3:18-cv-01477-JR

Hon. Jolie A. Russo:

Attached please find Plaintiffs' Letter Regarding Enforcement of the March 23, 2020 Discovery Order
in the matter *Cahill, et al. v. Nike, Inc.*, No. 3:18-cv-01477-JR.

**Scott G. Grimes ▪ Senior Paralegal ▪ Goldstein, Borgen, Dardarian & Ho** ▪ 300 Lakeside Drive, Suite 1000 ▪ Oakland, CA
94612 ▪ T: (510) 763-9800 ▪ F: (510) 835-1417 ▪ www.gbdhlegal.com



Please Note: The information in this E-mail message is legally privileged and confidential information intended only for the use of the addressee(s)
named above. If you, the reader of this message, are not the intended recipient, you are hereby notified that you should not further disseminate,
distribute, or forward this E-mail message. If you have received this E-mail in error, please notify the sender as soon as possible. In addition, please
delete the erroneously received message from any device/media where the message is stored. Thank you.

*************************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name
and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy
and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

2

Goldstein Decl. Ex. 9, Page 37 of 37

ER-246

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Attorneys for Plaintiffs, Opt-In Plaintiffs, and Putative Class

[Additional Counsel of Record listed on the next page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**DECLARATION OF BYRON GOLDSTEIN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**FILED WITH REDACTIONS** |

**Craig Ackerman** (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (*admitted pro hac vice*)
bd@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

**India Lin Bodien** (admitted *pro hac vice*)
india@indialinbodienlaw.com
INDIA LIN BODIEN LAW
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

I, Byron Goldstein, declare as follows:

1.       I am a member in good standing of the Bar of the State of California and a partner at the law firm of Goldstein Borgen Dardarian & Ho in Oakland, California.  I am counsel for Plaintiffs, Opt-in Plaintiffs, and the putative class members, along with Markowitz Herbold, Ackerman & Tilajef, and India Lin Bodien Law.  I am providing this declaration in support of Plaintiffs' Motion for Class Certification.  I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them if called upon to do so.

2.       This declaration concerns discovery Plaintiffs sought concerning Plaintiffs' initial job assignment allegation (*see* ECF 42, ¶ 10).  Section I describes the relevant discovery requests as well as unproduced discovery related to Plaintiffs' initial job assignment allegation.  This declaration also concerns the authentication of the Parties' submissions to the Court requesting discovery orders, which is provided in Section II.

## I.       PLAINTIFFS' DISCOVERY REQUESTS TO NIKE SEEKING DISCOVERY ON PLAINTIFFS' INITIAL JOB ASSIGNMENT ALLEGATION.

3.       Plaintiffs served Requests for Production ("RFPs") seeking discovery concerning Nike's policies and practices related to initial job assignment.  *See* RFPs 1-4, 9, 11, and 32. These RFPs are contained in Plaintiffs' First Set of RFPs to Nike, which were served on March 22, 2019.  A true and correct copy of Plaintiffs' First Set of RFPs is attached hereto as Exhibit 1.

a.       These RFPs sought discovery concerning Nike's policies, practices, or procedures related to initial job assignment.  RFP 4 requested documents concerning policies or practices related to job offers for employees in Covered Positions, including band level or job assignments, related trainings, and documents identifying persons involved with disseminating, implementing, monitoring, and enforcing these policies and practices.  RFP 9 requested documents concerning policies, practices, or procedures related to the assignment of a new hire

to a Covered Position.  RFP 11 requested documents and communications related to any executive's involvement in the setting or review of any policies, practices, or procedures concerning the Covered Positions and job assignment, job applications, or decisions on job applications for new hires.

    b.    These RFPs also sought discovery concerning data related to initial job assignment and the availability of such data.  RFP 1 requested job application data for new hires. RFP 2 requested documents showing the systems Nike used to track, store, or access information or generate reports related to employees in the Covered Position for job applications and decisions on job applications for new hires.  RFP 3 requested documents that would help Plaintiffs understand those Nike systems related to RFPs 1-2.  RFP 32 requested discovery concerning Nike's policies or practices about retaining or deleting the requested discovery.

    4.    Nike did not produce documents in effect prior to November 2018 that show the steps, policies, procedures, or guidelines concerning how employees in Covered Positions were hired, including their initial job assignment.  This belief is based on: (1) the documents listed in the following subparagraphs, which are documents that other Nike documents and Nike testimony indicate existed and were not produced, and (2) Plaintiffs' counsel's thorough review and searches through all the documents Nike produced in all of Nike's productions.

    a.    Based on Plaintiffs' counsel's thorough review and searches through all the documents Nike produced in all of Nike's productions and the following, Nike did not produce any pre-December 13, 2018 version of its "Hiring Process" document.  Nike produced a version of this document that was in effect beginning December 13, 2018.  *See* Sun Decl. Ex. 11. Nike's "Hiring Process" document states it "is a quick guide to educate key players on their roles and responsibilities when looking to hire great talent at NIKE, inc.," and "[u]se this resource to

learn about your role – as well as when to rely on other stakeholders – throughout the hiring process." *Id.* at NIKE_00003185.  Nike changed its "Hiring Process" document on December 13, 2018 and there was at least one prior version in effect before December 2018 based on the following two Nike documents: (1) the "Hiring Process" document Nike produced states it was "Updated" on December 13, 2018 (*id.* at NIKE_00003186), and (2) Nike produced a document from October 2017 that was sent to all Nike Talent Acquisition employees that lists a "Hiring Process" document (*See* Exhibit 2, attached hereto, which is a true and correct copy of an email from Daniel Laboe, regarding "Commitment to Pay Equity," sent October 12, 2017 (NIKE_00024727), produced by Nike in this litigation, and entered as deposition exhibit 673 at the deposition of Shine Thomas, March 26, 2021).

        b.      Based on Plaintiffs' counsel's thorough review and searches through all the documents Nike produced in all of Nike's productions and the following, Nike did not produce any pre-December 10, 2018 version of its "Manager Playbook Hiring" document.  Nike produced a version of this document that was in effect beginning December 10, 2018.  Sun Decl. Ex. 14.  Nike's "Manager Playbook Hiring" lists the "role of manager" and "manager activities" in hiring.  *Id.*  Nike changed its "Manager Playbook Hiring" document on December 10, 2018 and there was at least one prior version in effect before December 2018 based on the following two Nike documents: (1) the "Manager Playbook Hiring" document Nike produced states it was "Updated" on December 10, 2018 (*id.*), and (2) Nike produced a document from October 2017 that was sent to all Nike Talent Acquisition employees that lists a "Manager Playbook Hiring" document that Nike had then (Ex 2).

        c.      Based on Plaintiffs' counsel's thorough review and searches through all the documents Nike produced in all of Nike's productions and the following, Nike did not

**DECL. OF BYRON GOLDSTEIN ISO PLS' MOT. FOR CLASS CERTIFICATION
PAGE 3**

produce complete versions of its "Talent Acquisition Playbook," which is also referred to as "TA Playbook." Nike documents and testimony from its Rule 30(b)(6) witness state that Talent Acquisition manages the hiring process from the time a job is posted until a candidate is selected. *See* Plaintiffs' Motion In Support of Class Certification at 27. The "Talent Acquisition Playbook," according to a Nike witness' testimony, is the main source of policies and guidelines for members of the Talent Acquisition organization. *Id.* Another Nike witness testified that the "TA playbook was created, I think, sometime in 2016," and that Nike puts "new material" and "new policy changes" into the TA Playbook. *See* Exhibit 3, attached hereto, which is a true and correct copy of excerpts from the deposition of Julian Miller, taken June 3, 2021, ("Miller Dep.") 101:18-102:12. Nike produced a document from October 2017 that was sent to all Nike Talent Acquisition employees directing them to "Review the resources on the "TA Playbook," which indicates that Nike has had a "TA Playbook" since at least October 2017. Ex. 2 at NIKE_00024727.

5.    Nike did not produce any data from its Avature system, including data related to Nike's sourcing of external candidates who were hired into Covered Positions and had not applied to the open job being sourced. A Nike witness testified Avature is "a tool …. primarily used for proactive sourcing of prospects." *See* Exhibit 4, attached hereto, which is a true and correct copy of excerpts from the deposition of Shine Thomas, taken on March 26, 2021, ("Thomas Dep.") 42:20-43:7. According to this Nike witness, proactive sourcing of prospects involved Nike identifying potential candidates for positions that had not yet been officially posted and contacting them to gather their interest in potential positions at Nike. *Id*. at 44:17-45:21. Another Nike witness testified, "Avature is a tool by which recruiters can log information, as this says, for passive candidates… These are candidates that have not applied to

an open job…." Ex. 3, Miller Dep. 74:13-75:7. This Nike witness also testified that Avature contains information "regarding … qualifications … [and] experiences" of candidates that is not in Taleo, and "[t]here'd be no information in Taleo that [candidates] were sourced from Avature;" Taleo would just say "that a candidate has applied." *Id.* 76:4-77:7.

6.      Nike did not produce complete data from its Taleo system, including data related to Nike's matching of candidates to job requisitions. Taleo "has all the history of all the candidates who've applied to our open roles." Ex. 4, Thomas Dep. 237:7-14. Another Nike witness testified that there are hundreds of different Taleo fields related to posting and filling jobs that were not produced. Ex. 3, Miller Dep. 127:3-128:19. This witness testified that these missing data fields include entries related to Nike's "matched to job" practice, which is where Nike applied on behalf of existing candidates to other job postings, and records related to communications made by Nike recruiters that encouraged applicants to apply for open positions. *Id.* at 113:6-21

7.      Plaintiffs served a Notice of a Rule 30(b)(6) Deposition on Nike that sought testimony concerning initial job assignment. A true and correct copy of this deposition notice, introduced as deposition exhibit 501 at the deposition of Shane Walker, December 17, 2021, is attached here as Exhibit 5. Topic 7 sought testimony on, inter alia, hiring for covered positions. Topic 11 sought testimony on, inter alia, systems Nike used regarding job assignments. Topic 33 sought testimony on, inter alia, data Nike had not produced concerning job assignment of covered employees, job postings, and job applications.

8.      Nike failed to designate a Rule 30(b)(6) witness on Topics 7, 11, and 33 with respect to the parts of those topics related to initial job assignment. *See* Exhibit 6, attached hereto (true and correct copies of deposition exhibits 502 (introduced at the deposition of Shane

Walker, December 17, 2021), 566 (introduced at the deposition of Alison Daugherty, January 8,

2021), 597 (introduced at the deposition of Shelli White, January 29, 2021), 629 (introduced at

the deposition of Kendra Pryce, February 11, 2021), 635 (introduced at the deposition of

Treasure Heinle, March 16, 2021), 652 (introduced at the deposition of Cory Gillespie, March

25, 2021), 665 (introduced at the deposition of Shine Thomas, March 26, 2021), 698 (introduced

at the deposition of Elizabeth Vales, May 27, 2021), 728 (introduced at the deposition of Julian

Miller, June 3, 2021)) (Nike's statements about the limits of Rule 30(b)(6) testimony that it said

it would provide).

## II.  THE PARTIES' SUBMISSIONS TO THE COURT REQUESTING DISCOVERY ORDERS.

9.      Attached hereto as Exhibit 7 is a true and correct copy of the briefing for

Plaintiffs' First Letter Brief to the Court, submitted September 27, 2019, Nike's opposition

submitted October 4, 2019, and Plaintiffs' reply submitted October 9, 2019.  In response to the

Parties' briefing on this request, the Court issued an Order on October 31, 2019.  ECF No. 89.

10.      Attached hereto as Exhibit 8 is a true and correct copy of the briefing for

Plaintiffs' Second Letter Brief to the Court, submitted March 4, 2020, Nike's opposition

submitted March 13, 2020, and Plaintiffs' reply submitted March 18, 2020.  In response to the

Parties' briefing on this request, the Court issued an Order on March 23, 2020 (ECF No. 99),

which was affirmed by Judge Hernandez on November 17, 2020 (ECF No. 128).

11.      Attached hereto as Exhibit 9 is a true and correct copy of Plaintiffs' Letter to the

Court requesting enforcement of the Court's March 23, 2020 Order, submitted May 7, 2020,

Nike's Email Response submitted May 7, 2020, and the Court's response sent on May 8, 2020.

12.      Attached hereto as Exhibit 10 is a true and correct copy of the briefing for

Plaintiffs' Third Letter Brief to the Court and the Declaration of James Kan in support, submitted

DECL. OF BYRON GOLDSTEIN ISO PLS' MOT. FOR CLASS CERTIFICATION
PAGE 6

June 5, 2020, Nike's opposition submitted June 22, 2020, and Plaintiffs' Reply submitted June 29, 2020. In response to the Parties' briefing on this request, the Court issued an Order on July 2, 2020. ECF No. 108.

13. Attached hereto as Exhibit 11 is a true and correct copy of the briefing for Plaintiffs' Fourth Letter Brief to the Court and the Declaration of Byron Goldstein in support, submitted June 30, 2020, Nike's opposition submitted July 17, 2020, and Plaintiffs' reply submitted July 22, 2020. In response to the Parties' briefing on this request, the Court issued an Order on August 10, 2020. ECF No. 111.

14. Attached hereto as Exhibit 12 is a true and correct copy of the briefing for Plaintiffs' Fifth Letter Brief to the Court, submitted August 7, 2020, Nike's opposition and declarations submitted September 8, 2020, Plaintiffs' reply and the Declaration of Byron Goldstein in support submitted September 15, 2020, and Nike's Sur-Reply and declaration submitted September 22, 2020. In response to the Parties' briefing on this request, the Court issued an Order on October 9, 2020. ECF No. 117.

15. Attached hereto as Exhibit 13 is a true and correct copy of the briefing for Plaintiffs' Letter to the Court requesting unredacted names in the Starfish Survey, submitted October 15, 2020, and Nike's opposition submitted October 16, 2020. In response to the Parties' briefing on this request, the Court issued an Order on November 23, 2020. ECF No. 130.

16. After the Court compelled Nike to produce an unredacted copy of the "Starfish Survey" or the packet of complaints provided to Nike's CEO in March 2018, ECF No. 130, the documents included the names of at least 22 Nike executives listed in the Survey who Nike had previously redacted and who were alleged to have discriminated or condoned discrimination. The people identified in the Survey who have been Nike executives are ███████████████

███████████████████████

███████████████████████████

███████████████████████████

██████████

17.    Attached hereto as Exhibit 14 is a true and correct copy of the briefing on Nike's Request for a Protective Order, submitted November 11, 2020, Plaintiffs' opposition submitted November 25, 2020, and Nike's reply submitted December 14, 2020.  In response to the Parties' submissions, the Court issued an Order on December 17, 2020.  ECF No. 131.  The declarations in support of the briefing are omitted from this exhibit for brevity.

18.    Attached hereto as Exhibit 15 is a true and correct copy of Plaintiffs' Sixth Letter Brief to the Court, submitted March 1, 2021, Nike's opposition and declaration submitted March 15, 2021, Plaintiffs' reply submitted March 17, 2021, and Nike's Sur-Reply submitted March 19, 2021.  Plaintiffs' March 1, 2021 submission requested an order to compel discovery concerning, inter alia, Nike's organizational structure based on "[r]ecent deposition testimony of Nike's Rule 30(b)(6) designees have confirmed the existence of several documents whose production is either already ordered by this Court (for some subject to two separate orders) or is required by long ago served document requests."

a.    In response to the Parties' briefing on this request, the Court issued an Order on March 30, 2021, compelling Nike to produce, inter alia, "Organizational Charts granted to the extent they already exist."  ECF No. 135.  After this March 30, 2021 Order, Nike's productions made clear that Nike possessed many thousands of organizational charts because, as Nike stated in its June 2, 2021 letter to Plaintiffs, "we have produced more than 5,000 organizational charts …."  The organizational charts Nike produced included, at least, many

DECL. OF BYRON GOLDSTEIN ISO PLS' MOT. FOR CLASS CERTIFICATION
PAGE 8

hundreds created prior to March 30, 2021, including numerous organizational charts created each year between 2014 through 2020.

19.    Attached hereto as Exhibit 16 is a true and correct copy of Plaintiffs' Request for a Discovery Conference, submitted March 12, 2021, and Nike's response submitted March 12, 2021.

20.    Attached hereto as Exhibit 17 is a true and correct copy of Plaintiffs' Seventh Letter Brief to the Court, submitted March 23, 2021, and Nike's opposition submitted March 30, 2021.  In response to the Parties' briefing on this request, the Court issued an Order on April 1, 2021.  ECF No. 136.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that this Declaration was executed this 10th day of January, 2022 in Oakland, California.

_/s/ Byron Goldstein_ _____
Byron Goldstein

**DECL. OF BYRON GOLDSTEIN ISO PLS' MOT. FOR CLASS CERTIFICATION PAGE 9**



**EXHIBIT 621**
Alison Daugherty
2/5/2021

# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☐ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☑ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

Highly Confidential - Attorneys' Eyes Only

NIKE_00033366

Sun Decl. Ex. 52, Page 1 of 2

ER-258

## MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional): Anonymous please

Please share brief outline of your experience: I walked into the massage room at Nike Sports Center. The room was empty I thought and I was going to take a nap since my morning client cancelled. When I opened

Date / location if you can remember: NSC    the door ████████ performing oral sex on
7:00 am    She was a trainer at the time working also ████ with the

Did you experience this situation first hand? Yes    Innovation Kitchen. I closed the door quickly. He saw me but
I saw it.    she did not.

Were there any witnesses? NO

Do you have any hard evidence such as emails, photo's etc? NO

If not experienced first hand, then how was it brought to your attention?

Did you report this experience? I told ████████

If you reported it, was it resolved? I doubt anything was done to address this behavior. Its ████ ████
→ and I don't want to lose my job.

If you did not report it, why did you make that decision?

What impact has this experience had on you? It put a very bad taste in my mouth about the leadership and how men think and take
(For example: career progression, physical health, psychological health, other) advantage of the women below them.

Please indicate if you would like to discuss and potentially elevate your experience: No, he is too high up.

Highly Confidential - Attorneys' Eyes Only

NIKE_00033367

Sun Decl. Ex. 52, Page 2 of 2

ER-259



**EXHIBIT 620**
Alison Daugherty
2/5/2021
Aleshia Macon - CSR, CCR

# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☐ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition. Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager, gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☑ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature. Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)

Highly Confidential - Attorneys' Eyes Only

NIKE_00033364

Sun Decl. Ex. 51, Page 1 of 2

ER-260

# MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience: ████ was late for his Personal Training lesson with me. I said, "OH ████ you are so late today." He responded, "Well maybe if you dressed sexier I would be on time." He continued with "take that baggy jacket off and show some skin." I tried to laugh but I was humiliated. I finished the lesson and kept it to myself because of who he is at the company.

Date / location if you can remember: NSC 2008

Did you experience this situation first hand? Yes

Were there any witnesses? NO

Do you have any hard evidence such as emails, photo's etc? NO

If not experienced first hand, then how was it brought to your attention?

Did you report this experience? NO

If you reported it, was it resolved?

If you did not report it, why did you make that decision? Because I was afraid and intimidated.

What impact has this experience had on you? It made me feel bad. I was intimidated and felt degraded.
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience: NO

Highly Confidential - Attorneys' Eyes Only

NIKE_00033365

Sun Decl. Ex. 51, Page 2 of 2

ER-261



# IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

**Please select one or more choices below.**

☑ **Discrimination or other harassment**
(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition. Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager, gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**
(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature. Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

# IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)



Highly Confidential - Attorneys' Eyes Only

# MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:

Date / location if you can remember:

Did you experience this situation first hand?

Were there any witnesses?

Do you have any hard evidence such as emails, photo's etc?

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?

If you reported it, was it resolved?

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience:

Highly Confidential - Attorneys' Eyes Only

I am speaking out as I believe that I have normalized negative, manipulative and sexist behavior over the course of my career at Nike.

I am speaking out for the younger generation of female leaders.

I am speaking out because I have two daughters and want them to have equality no matter what or where they decide to invest their time and energy.

I am speaking out because I wonder if Executive or Senior level Management would want their daughter – or wife - to work at Nike.

Our culture is broken and I am becoming more sensitive to the plight of women at Nike.

When people ask me if I have ever felt discriminated against as a female at Nike, I have always responded no.

My dad brought me up to believe that I could do ANYTHING that I set my heart and mind to achieving. Growing up with two older brothers and in sports, I have always been competitive and philosophically have always believed that if I do the right thing, act with integrity, honesty and kindness, put the team above myself, good things will happen.

And good things have happened; I have a husband of 24 years who I love dearly, I have three stable and confident kids and work that I am passionate about. We have lived around the world and have experienced many amazing things as a result of our affiliation with Nike. It's only when I take a deeper look, really dig into "normal" Nike behavior, that I start to question what is really normal versus what is Nike Normal.

For a company that prides itself on innovation, inclusion and equality, I fear that we are missing the mark. Nike can change and lead in this space.

Here are some situations.

**Discrimination**

**Pay Inequities**
- E6 vs E7: I am "tied" for 4th paid salary on my direct team
- David Ayre email on pay was real setback, it was tone deaf

**Function: Sales**
- Sales is consistently diminished, talent (esp female) moved to other pipelines (GM, Merchandising)
- Sales perceived as "old school", aging, lacking modern + innovative approach
- Nike Direct priority vs wholesale dynamic

**Global Category Marketplace Team**

Highly Confidential - Attorneys' Eyes Only

NIKE_00033340

Sun Decl. Ex. 48, Page 3 of 6

ER-264

- 41 (13 women/28 men) direct reports + 16 (10 women/5 men/1 open HC) dotted line
- All E7 and S band direct reports (9) are male, 2 POC
- 'male team makeup but you're the boss'
- Career panels = troubling optics for innovative and diverse approach

██████████

- Disparaging, dishonest behavior, discredit my reputation
- Senior leaders told me that ██ would completely discredit me, question my ability and integrity in HR sessions
- ██ said to me: 'it's like neither your boyfriend nor your husband are happy with you', referring to ████████ as I was the WE GM Jordan and Nike Basketball and ██ questioned (and said that ███ questioned it on the Jordan side but ███ never mentioned it / appeared to support me) whether I was spending the appropriate time on Nike Basketball. I told him that I over-indexed my time on Nike Basketball relative to the size of business and that I was offended by the accusation, asked for proof. Never received anything.
- He had completely unrealistic expectations of level of work. I would push back to protect the team but would eventually have to deliver (example, Quarterly business reviews in-between QBR's, Basketball LT WE trip: 5 key city tour at the same time for marketplace, experiences, inspiration which almost killed my small team but we delivered beyond expectations)
- He was manipulative and I was concerned for my career
- I felt completely exposed and unprotected after building my Nike career for 18 years
  - If you were on ██ s good list, you were protected by him
  - He once told his Staff Meeting attendees: 'it's really important to know who's at the table and know who has your back and who doesn't'
- I confided in ██████ about my concerns: 'don't fight that battle, you won't win'
- ████████ escalated discrimination and behavior to HR & ER, eventually left the company
  - I was interviewed as a result of ████ 's escalation and cited above specific examples but nothing happened for many months (maybe a year or more?)

## Question self, value

- 'everybody wears the green jacket' and then you lose it
- NLT evenings where you are tapped to go out. Or not.
- Secret areas for VIP, expectations on entertainment
- Boys club, biased selection process, protection
- 'Don't nag, guys don't want to feel like they're with their wives'
- 'You're cool, you're one of the boys'
- My introvert, quiet leadership style vs. extrovert culture (I have overcome this but it took time)
  - 'People don't know you because you don't put yourself out there'

Highly Confidential - Attorneys' Eyes Only

o  'do you have ambition? Do you want to grow because you don't show it" -- BUT I
   DELIVER EVERY DAY AND AM VERY COMPETITIVE

Women tend to be placed in Women's, Young Athletes, Analysts, Merchandising roles

Highly Confidential - Attorneys' Eyes Only

Monday, March 5, 2018 at 1:38:20 PM Pacific Standard Time

**Subject:** Equal Pay Day: Nike has Pay Equity
**Date:** Tuesday, April 4, 2017 at 12:20:00 PM Pacific Daylight Time
**From:** DAyre
**To:** Lst-Nike.Global



Team,

Today, on Equal Pay Day, we are pleased to share that NIKE, Inc. has pay equity globally across all team members in all brands, inclusive of our wholesale and retail employees. This means that women, men and all races/ethnicities who undertake the same work at the same level, experience and performance are equitably compensated.

You may recall that several months ago Mark Parker communicated our commitment to pay equity as part of the White House Equal Pay Pledge. At that time, we shared that we would review pay practices across the company. In keeping with industry best practices, we worked in partnership with outside experts to complete a comprehensive study of all aspects of our pay across all jobs and all levels globally.

At Nike, for every $1 earned by men, women employees globally earn 99.6 cents. Racial and ethnic minorities (combined) in the U.S., where we track this information, earn 99.7 cents for every $1 earned by white employees. This confirms that there are essentially no differences in pay and that we have pay equity, highlighting the strengths of our Total Rewards programs and our continued focus on market competitiveness and pay for performance.

As Mark stated, "we are proud of our leadership and efforts to create a level playing field where all team members can perform at their best." We'll continue to focus on maintaining and reporting on pay equity across Nike. However, to truly unleash our full potential, we recognize that we must increase our efforts to create an inclusive culture where all of our diverse employees thrive, with supporting policies and practices, and — most importantly — where diverse individuals are represented at every level of leadership.

Regards,

**David Ayre**
EVP, Human Resources

Page 1 of 2

Highly Confidential - Attorneys' Eyes Only

NIKE_00033343
Sun Decl. Ex. 48, Page 6 of 6
ER-267

Case 3:18-cv-01477-JR    Document 284-7    Filed 11/16/22    Page 1 of 4



## IF IT'S HAPPENED TO YOU WE WANT TO KNOW.

Please select one or more choices below.

☑ **Discrimination or other harassment**

(Generally, Discrimination or Harassment can include threats, insults, jokes, unwelcome verbal comments or email, derogatory pictures or gestures or unwelcome physical conduct, bullying, retaliation, discrimination or disrespect based on race, age, sexual orientation, disability, ethnic group or any protected class status, intimidation, micro-aggressions, exclusionary behavior and actions including 'cliques' or 'clubs', preferential treatment, the feeling of having to 'prove' yourself versus colleagues, pay or performance recognition.  Could include purposely ambiguous CFE feedback whether verbal or written, lack of a clear and supported growth plan from manager,  gender or diversity bias relating to hiring, promoting, pay or performance rewards. Discrimination or harassment at work can happen inside or outside of the work-place.)

☐ **Sexual harassment**

(Generally, Sexual Harassment can include unwelcome sexual advances, requests for sexual favors, other verbal or physical conduct of a sexual nature.  Sexual harassment at work can happen inside or outside of the work-place and can include co-workers including athletes, managers, vendors and visitors.)

## IF YOU WOULD LIKE TO SHARE MORE DETAILS, PLEASE DO SO OVER THE PAGE.

(If you are a Nike employee, Nike's harassment and anti-discrimination policy can be found here: https://nikehr.nike.com/node/15978)



EXHIBIT
570
Alison Daugherty
1/8/2021

Highly Confidential - Attorneys' Eyes Only

NIKE_00033334

Sun Decl. Ex. 47, Page 1 of 4

ER-268

# MY EXPERIENCE

(If you need more space, please photocopy this page or include additional attachments as needed)

Name (optional):

Please share brief outline of your experience:

Date / location if you can remember:

Did you experience this situation first hand?

Were there any witnesses?

Do you have any hard evidence such as emails, photo's etc?

If not experienced first hand, then how was it brought to your attention?

Did you report this experience?

If you reported it, was it resolved?

If you did not report it, why did you make that decision?

What impact has this experience had on you?
(For example; career progression, physical health, psychological health, other)

Please indicate if you would like to discuss and potentially elevate your experience:

Highly Confidential - Attorneys' Eyes Only

I wish to remain anonymous and will share examples of discrimination and harassment at Nike I have witnessed and/ or been on the receiving end of:

- AGGRESSIVE BEHAVIOR: I witnessed a VP pound fists and scream to the point spit was coming out of his mouth in 2016 in front of a group of 10 employees.
- BULLYING: Everyone is scared to death of ███, Don't say anything contrary to what he says is the unspoken rule. Unless you are one of his "boys". And if you are not in the inner circle, you are out. ███ is most certainly close if not already in this camp. She puts people down and make comments that absolutely diminish in front of others then stands up on stage and pretends she is an advocate for women. ███ is one of the worst leaders and a bully. She will yell and threaten others because somebody on their team does not agree with her. It's been witnessed by HR time and time again and nothing is done. Speaks under her breath, lies, and makes inappropriate comments. If you dare try to share a different POV to hers it will escalate so everyone knows to shut their mouth for fear of the consequence.
- INEQUITY IN PAY: I have asked twice to have my salary reviewed in the past year and a half, my boss says that will happen but never follows through. I know for a fact I am underpaid.
- INAPPROPRIATE LANGUAGE: Male S band and VP in apparel who call people you work with RETARDED, calling a woman BITCH to her face, calling women HONEY and GIRLS.
- GENDER BIAS IN HIRING: Bringing only men into consideration or a panel because "the leader (male) knows these guys" or "he goes way back with so and so" or "they need more men on that team".
- RETALIATION: ███ took down ███ year end rating from HS to S to send a message that his decision to side with apparel on a topic was "not ok". Everyone in merch knows he earned an HS, his boss even put it down but ███ wouldn't have it. ███ quit a month or two later. ███ bullied him and retaliated against an amazing merchant and now he is gone.

I have twice reported bullying by a senior VP and HR said they would "take care of it", "we are coaching them". I saved copies of my emails to HR and made notations through my personal computer at home in case I ever need to go back to these. It's the first to do. I have friends who have reported bullying. No action was ever taken except a "we will talk to them".

A few examples of sexual harassment at Nike:

- Men sloppy drunk putting their arms around a waitress and/ or female co-workers while on work travel.
- Men trying to sleep with women in their function at lower levels by luring them in through the promise of a "work dinner" to discuss their career or some project they were working on that these women might want to be a part of.
- VP men sleeping with/ getting BJ's from women in the organization at much lower band
- A good friend of mine is an aesthetician at a medical spa in Portland and recently told me one of her clients (she would not tell me his name because of patient confidentiality) is a VP at Nike and bragged to her about sleeping with a female employee in a closet at Nike. AT WORK! DURING WORK HOURS!

I have never reported any of this because it has not happened to me personally but I have seen and heard enough about it and honestly would not even know where to turn because it's just so common it's accepted as normal. That in itself is the problem.

ER and HR at this company are a joke. These groups have proven over and over that they are unreliable. There is zero transparency which goes perfectly with zero accountability. It's a disgrace. ███ was a well known sexual harasser. ███ and others were and are still well known philanderers with lower level employees whom they exert influence and power over. Who is going to go up against these guys? Why would we report something when our company has a systemic and repeated practice of not addressing appropriately? Only reason ███ is gone is because his wife emailed dozens of nike employees his texts to ███, His wife basically got him fired.

Highly Confidential - Attorneys' Eyes Only

NIKE_00033336
Sun Decl. Ex. 47, Page 3 of 4
ER-270

Matt Lauer was removed from his position in less than 72 hours after the reports came through of his harassment. LuLu Lemon took out their own CEO who had a multitude of lapses in judgment and was perpetuating the "boys club culture" including cocaine use and dating an employee while she received "financial benefit" because of the relationship. MarketWatch published an article Feb 19, 2018 about what the 30 companies that make up the Dow Industrials are doing to address sexual-harassment claims. Commitments have been issued around transparency, re-issuing code of ethics, annual trainings, and zero-tolerance policies from many of the companies. Sadly Nike has yet to respond. I bet our board doesn't have a clue about how bad it is inside and outside the berm. I have to imagine nobody is being transparent with them. It's time for a change and for people to be held accountable at the highest levels. **We need to visibly see action is being taken or the culture will carry on as it has.** No amount of trainings or video's or emails from our CEO about culture and leadership will change this.

Nike is a boys club. Somebody recently posted on glassdoor.com regarding Nike "cons: boys club, with frat-boy type behavior that is ignored by mgmt." That is the truth. The network of men hold unwritten rules that define insider vs outsiders. They get to decide who is successful and who is not. Females at this company have felt very little power to change a culture and environment that has been and continues to be disrespectful to women. Even women are disrespectful to women without consequence. This company must lay a new foundation and it must start at the highest level of the organization. We need Nike to stand up for what is preaches "EQUALITY" and start treating men and women the same. The METOO movement has given women an opportunity to step out of the shadows and it has given them a massive dose of courage. Somebody is going to go public. It's just a matter of time. Get your act together Nike. We have had enough.

Highly Confidential - Attorneys' Eyes Only



**Subject**

**\*\*MORHL OC: MOR -** ████████

Question Reference # 180614-001904

Assigned: Carla Lowe
Date Created: 06/14/2018 02:52 PM
Date Last Updated: 08/30/2019 03:24 PM
Status: Resolved

Note By (Brenna Cordoba) (10/11/2018 02:03 PM)
Sr. HRBP: Hoogers
HRBP: Brouwer
ER:
Follow Up: Coaching document
Follow Up Date: 8-14-2018
Action Delivered By: Iris Yen, Michael Spillane, Rolien Hoogers

Customer By (Carla Lowe) (06/14/2018 02:52 PM)
From MOR Hotline & Transitioned From Outside Counsel
HRLT: Hoogers
HRBP: Brouwer
Person of Interest: ████████
Complainant: ████████
Reference Case(s): N/A

**EXHIBIT
5**
I n  a  her
1/8/2021
es  is Ma   - CSR CCR

Highly Confidential - Attorneys' Eyes Only

## NIKE PROJECT STARFISH
## EXECUTIVE SUMMARY

| Name: | Reports to: |
|---|---|
| ▬▬▬▬▬ | ▬▬▬▬▬ |

**Describe Investigation To Date**

Reviewed documentation; interviewed Starfish complainant, two current female direct reports, and current HRBP who handled Complainant's initial HR complaint.

**Spoke to Subject?**

No.  Complainant did not want ▬▬▬ to be interviewed due to strong fear of retaliation.

**Summary of Select Allegations:**

### Gender Bias

- Was completely disrespected by ▬▬▬▬ in ▬▬▬▬ group.  No problems until he came on board.  Almost left NIKE because of him.  Terrorized her.  He wouldn't stop.  Boys club attitude.  Knows he can get away with it.  Sad to say, ▬▬▬▬ turned a blind eye.

- Gender bias.  On team with other men.  They had no issues.  They didn't get demeaned.  She was top performer but was not set up for career advancement.  Her male colleague moved up, doesn't understand how.  Biggest concern is that she already reported this situation to HR and nothing was done except she was moved to a another role deeper in the organization, with no track for development.

### Ineffective Leadership

- Fails or refuses to communicate with his team regarding key facts (e.g., new hires, project details and assignments, promotion of new boss); displays lack of interest in developing careers of his reports; in his current role, has never called a group meeting of his direct reports on any issues, including recent MOR-related events and ▬▬▬▬ termination; indignantly refused team member request for huddle to discuss Montagne's promotion and impact on team.



Highly Confidential - Attorneys' Eyes Only

NIKE_00032844

Sun Decl. Ex. 46, Page 2 of 3

ER-273

Re:    Coaching – Matter of Respect                                    Beaverton, July 20 2018

█████

This e-mail confirms our discussion on July 11 2018. At that time, we shared with you that we received concerns that you engaged in behavior inconsistent with Nike's Matter of Respect policy.

In general, we received concerns that you engaged in behavior that was perceived as perpetuating the "in crowd vs. the out crowd", prioritizing work content over team dynamics and employee development and not delegating appropriately.

As you know, we take all concerns seriously and our Matter of Respect team investigated. That investigation concluded that you engaged in some conduct inconsistent with our policy and that the conduct and employees' perceptions about your conduct were serious enough to warrant follow-up and coaching.  As we discussed, going forward, you will focus on the following;

• Promote Inclusion. Remain focused on creating an environment where all employees feel valued and included, whether in meetings, lunch outings or social events.
• Value Diverse Viewpoints. Actively value the contributions of other employees,  invest in the development of team members
• Model Teamwork. Collaborate openly and often with team members, and avoid forming cliques or subgroups.

In addition, our commitments and investments to support you with the above are ;
  •   Ongoing and regular feedback
  •   A formal 360 degree feedback in August 2018
  •   Partnership with a leadership coach
  •   Another formal 360 degree feedback early 2019.

█████we are confident you understand the seriousness of this situation and the importance of creating a culture of inclusion and respect. We expect that you will work to address the concerns above and to model Nike values and leadership expectations.

Also, please remember that the Matter of Respect policy prohibits retaliating against an individual because they raised concerns or complaints and/or participated in an investigation. Behavior that can be considered retaliation can be direct (taking a negative employment action against someone) or subtle (ignoring, isolating or freezing out persons suspected of participating in a complaint or investigation). Anyone found to have engaged in retaliatory behavior will be subject to corrective action, up to and including termination.

We understand that this process is difficult for all involved, and we thank you for your professionalism and commitment to move forward. As part of that commitment, we ask that you refrain from communicating about the investigation or its findings with others. If you have concerns or you wish to discuss this further, I urge you to contact me or Rolien Hoogers.

This summary of our conversation will be retained by Employee Relations as confirmation of our discussion and your commitment to make improvements.

Regards,

█████

███████████████

Page 1 of 1

Highly Confidential - Attorneys' Eyes Only                                    NIKE_00032845

Sun Decl. Ex. 46, Page 3 of 3

ER-274

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | No. 3:18-cv-01477-JR<br><br>ORDER |

                    Plaintiffs,

     v.

NIKE, INC., an Oregon Corporation,

                   Defendant.

HERNÁNDEZ, District Judge:

     Magistrate Judge Jolie A. Russo issued a Findings and Recommendation on September

30, 2022, in which she recommends that the Court grant in part and deny in part Defendant's

Motion to Seal [171] as set out in the Findings and Recommendation and grant the non-party

media organizations' Motion to Intervene [205] to the extent they request intervention for the

limited purpose of challenging the parties' stipulated redactions in regard to the briefing

1 – ORDER

surrounding plaintiffs' Motion for Class Certification and denied in all other respects with leave to renew. F&R, ECF 273. The matter is now before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b).

Because no objections to the Magistrate Judge's Findings and Recommendation were timely filed, the Court is relieved of its obligation to review the record *de novo*. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc); *see also United States v. Bernhardt*, 840 F.2d 1441, 1444 (9th Cir. 1988) (*de novo* review required only for portions of Magistrate Judge's report to which objections have been made). Having reviewed the legal principles *de novo*, the Court finds no error.

## CONCLUSION

The Court adopts Magistrate Judge Russo's Findings and Recommendation [273]. Accordingly, Defendant's Motion to Seal [171] is granted in part and denied in part and the non-party media organizations' Motion to Intervene [205] are granted to the extent that they requested intervention for the limited purpose of challenging the parties' stipulated redactions in regard to the briefing surrounding plaintiffs' Motion for Class Certification and denied in all other respects with leave to renew.

IT IS SO ORDERED.

DATED: _____November 13, 2022_____.

_____
MARCO A. HERNÁNDEZ
United States District Judge

2 – ORDER

ER-276

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CAHILL, SARA JOHNSTON,                          Case No. 3:18-cv-01477-JR
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on behalf of                      FINDINGS AND
others similarly situated,                                RECOMMENDATION

                    Plaintiffs,

        v.

NIKE, INC., an Oregon Corporation,

                    Defendant.
_____

RUSSO, Magistrate Judge:

        Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender bring

this putative class and collective action alleging that defendant Nike systematically discriminates

against them and other similarly situated women regarding salary and promotions. Several

additional plaintiffs filed consents to join this action. Defendant now moves to redact certain

portions of the documents surrounding plaintiffs' Motion for Class Certification. Certain non-party

media organizations subsequently moved to intervene. For the reasons stated below, defendant's

motion should be granted in part and denied in part, and the non-party media organizations' motion

should be granted in part and denied in part.

Page 1 – FINDINGS AND RECOMMENDATION

ER-277

## DISCUSSION

On June 17, 2019, this Court entered a stipulated Protective Order to govern the parties' exchange of discovery materials. The Protective Order details procedures allowing the parties to provisionally file documents containing privileged or confidential information under seal, as well as procedures for those designations to be challenged. In particular,

> [i]f a non-designating party is filing a document that another party has designated as "Confidential" or "Attorneys' Eyes Only," then the non-designating party shall file the document under seal. If the non-designating party makes a request in writing to have the document unsealed and designating party does not file, within twenty (20) calendar days, a motion that shows good cause to maintain the document under seal, then the Court shall unseal the document.

Protective Order 4 (doc. 82).

On March 15, 2022, defendant filed the present motion to redact certain portions of plaintiffs' Motion for Class Certification, and supporting documents, in lieu of sealing those documents in their entirety. Briefing was completed in regard to that motion on April 6, 2022. On April 8, 2022, the non-party media organizations moved to intervene for the limited purpose of further opposing defendant's motion and challenging the parties' stipulated redactions.

## I.    Motion to Seal

The press and the public have a "general right to inspect and copy public records and documents, including judicial records." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). As a result, a strong presumption in favor of access to court records exists that "can be overridden given sufficiently compelling reasons for doing so." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). However, an exception exists in regard to judicial records filed in relation to non-dispositive motions, which warrant a more lenient standard. *In re Midland Nat'l Life Ins. Co. Annuity Sales Prac. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (per

curiam). In such situations, the party seeking to seal need only demonstrate "good cause" under Fed. R. Civ. P. 26(c). *Id.*

Thus, the applicable standard depends on the document's relationship to the merits of the plaintiff's claims. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-99 (9th Cir. 2016) (the focus is on whether the material "at issue is more than tangentially related to the underlying cause of action"). Under the "compelling reasons" standard, the party seeking to seal or redact a judicial record bears the burden of showing that compelling reasons supported by specific factual findings outweigh the general history of access and the public policies favoring disclosure. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). The "good cause" standard, in contrast, requires only a showing that "specific prejudice or harm will result." *Phillips ex rel. Est. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).

Defendant seeks to redact the following categories of information:

(1) the names of any individuals (complainants, subjects and witnesses) named in the context of allegations regarding sexual harassment or gender discrimination at Nike;[1] (2) briefing and declarations filed in relation to Plaintiffs' motion to compel Nike's privileged pay equity, promotion and compensation analyses that reflect confidential legal strategy; and (3) Nike's confidential and proprietary compensation information, including Nike's compensation structure as well as pay shortfall conclusions derived from Attorneys' Eyes Only ("AEO") compensation data of current and former Nike employees who are not parties to the litigation.

Def.'s Mot. Seal 1 (doc. 171).

Defendant, however, does not delineate which particular objection relates to each document (or, for that matter, page) and, at times, the parties' designations are seemingly inconsistent. Moreover, defendant erroneously designated certain redactions in its initial filing,

---

[1] As defendant denotes, "[t]he parties have reached an agreement on this topic except with regard to three former employees who were the subjects of complaints and allegations regarding sexual harassment and gender discrimination," and who are expressly named in the First Amended Complaint. Def.'s Mot. Seal 5 (doc. 171).

Page 3 – FINDINGS AND RECOMMENDATION

resulting in the scope of disputed documents being submitted three times by defendant, with its final submission encompassing approximately 500 additional, or 1635 total, pages. These practices resulted in a tremendous expenditure of time by the Court requiring it to review and track hundreds of documents, tactics which defendant has been specifically cautioned against in the past. *See, e.g.*, Order 2 (Apr. 1, 2021) (doc. 136); *see also Foltz*, 331 F.3d at 1130 (the moving party bears the burden of proof "for each particular" nondisclosure).

In any event, in addition to the ones previously agreed upon, plaintiffs concede that at least some of the proposed redactions are appropriate – specifically, portions of "page 19 and the chart of Panel A and Panels B-C on the bottom of page [55] of Dr. Neumark's report," as well as certain inadvertent inclusions and references to third parties in Exhibit 11 and legal advice in Exhibit 12, respectively, to Byron Goldstein's declaration. Pls.' Resp. to Mot. Seal 11 (doc. 175); Kan Decl. Ex. A, at 89, 125, 536, 594-99, 601-02, 611-12, 616-24, 627-28, 631-33, 643-46, 649-50, 653-55, 657-62, 666, 678, 680, 784-87, 794-96 (doc. 176-1); *see generally* Kan Decl. Ex. B (doc. 176-2). Defendant, in turn, appears to withdraw some of the redactions articulated in its initial motion, especially relating to third parties and purportedly confidential business information.[2] *See generally* Prince Decl. Ex. A (doc. 201-1); *compare* Def.'s Mot. Seal 2 (doc. 171), *with* Prince Decl. ¶ 4 (doc. 201). The Court's analysis is therefore limited to the proposed redactions that remain in dispute following the completion of briefing, as detailed below.

---

[2] Defendant's revised submissions, however, fail to incorporate many of plaintiffs' newly recognized redactions, creating the appearance of dispute in certain circumstances where none exists. *Compare generally* Kan Decl. Exs. A-B (doc. 176), *with* Prince Decl. A (doc. 201-1). Similarly, defendant includes Exhibit 14 of the Goldstein Declaration in its list of documents needing a ruling, yet the only proposed redactions therein appear to be stipulated. Prince Decl. ¶ 4 (doc. 201); *but see* Prince Decl. A, at 1096-1171 (doc. 201-1).

Page 4 – FINDINGS AND RECOMMENDATION

A.      **Exhibits A-B to the Neumark Declaration**

Defendant seeks to redact portions of Dr. Neumark's expert and rebuttal reports that include pay shortfall conclusions (both the dollar amount and percentage representations, but not the standard deviations), which were undisputedly culled from defendant's AEO designations. In particular, defendant argues that, because Dr. Neumark's conclusions were "derived from various analyses of Nike's confidential and proprietary compensation information of current and former employees," they impermissibly disclose "sensitive personal financial information of a non-party." Def.'s Mot. Seal 8 (doc. 171). Defendant further contends that the "aggregate of confidential and proprietary information . . . also warrant[s] protection" because the revelation of such information would "help Nike's competitors and hurt Nike's competitive standing." *Id.* at 8-11.

Initially, the Court finds that defendant has proffered little more than broad assertions of harm. Significantly, defendant does not meaningfully address how the information set forth in Dr. Neumark's expert report implicates any personal or proprietary information. *See generally id.*; Def.'s Reply to Mot. Seal (doc. 200). This shortcoming is especially problematic given that the "compelling reasons" standard[3] applies to the disputed information in Exhibits A and B to the Neumark Declaration, as these statistics are integral to plaintiffs' disparate impact and treatment claims. *See J.N. v. Or. Dep't of Educ.*, 2020 WL 589534, *2 (D. Or. Feb. 5, 2020) (applying the "compelling reasons" standard to an expert report filed in relation to the plaintiffs' motion for class

---

[3] Defendant acknowledges the "compelling reasons" standard but nonetheless argues that the "good case" standard applies to certain categories of information. *See, e.g.*, Def.'s Reply to Mot. Seal 10 (doc. 200). In contrast, the non-party media organizations advocate for the wholesale application of the "compelling reasons" standard. Neither the parties nor the non-party media organizations furnish any briefing concerning whether the motion itself determines the applicable standard, or a document-by-document analysis is required. The Court need not resolve this issue because defendant's motion largely fails to present even "good cause" for the proposed non-disclosures.

Page 5 – FINDINGS AND RECOMMENDATION

certification because it was "more than tangentially related to the underlying cause of action"); *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 312 F.Supp.3d 966, 972 (D. Or. 2018) (generalized assertions that "information is proprietary and confidential" fail to meet the "compelling reasons" standard); *see also Buchanan v. Tata Consulting Servs. Ltd.*, 2017 WL 6611653, *12 (N.D. Cal. Dec. 27, 2017) ("gross statistical disparities in the treatment of members of a protected class alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination") (citations and internal quotations omitted; emphasis in original).

Stated differently, the Court finds that Nike's proffered reasons to seal are neither compelling nor, on balance, outweigh the public interest in disclosure. Notably, the personal financial information of non-parties is not implicated by the aggregated shortfall dollars and percentages at issue here. Except in one isolated instance, Dr. Neumark's aggregated results – while derived from protected compensation data – do not reveal the financial information of any individual, specific subfamily, or job level, or overarching pay practice.[4] Prince Decl. A, at 71-272 (doc. 201-1). Rather, these statistics merely provide representative data or comparator information between male and female employees.

As a result, defendant does not (and presumably cannot) explain how these shortfall calculations divulge proprietary information about Nike's business practices or compensation structure that would be valuable to competitors. Defendant's alleged refusal to pay female employees fairly is a matter of public import and the subject matter of this litigation. Accordingly,

---

[4] The one exception being on page 75 of Dr. Neumark's report, which includes information about defendant's starting salaries. Prince Decl. A, at 146 (doc. 201-1); *cf. Kenny v. Pac. Inv. Mgmt. Co. LLC*, 2018 WL 3328224, *2 (W.D. Wash. July 6, 2018) (granting a motion to seal compensation information, noting the aptness of the defendant's argument that the disclosure compensation amounts "would be a boon to competitors who could use such information to recruit [the defendant's] personnel or otherwise compete with [the defendant] for talent").

Page 6 – FINDINGS AND RECOMMENDATION

ER-282

there is no apparent public scandal or confidential information associated with the proposed redactions, and "the mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179; *see also Moussouris v. Microsoft Corp.*, 2018 WL 1159251, *12 (W.D. Wash. Feb. 16), *adopted by* 2018 WL 1157997 (W.D. Wash. Mar. 1, 2018) (denying a motion to seal in a putative class action surrounding gender-based employment discrimination where the defendant's true concern surrounding the disclosure of "raw diversity data" was not "competitive harm [but rather that it] would have a negative effect on its reputation"). Defendant's motion should be granted as to the salary information displayed on page 75 of Dr. Neumark's expert report and denied in all other respects.

### B.    Exhibits 11-12 to the Goldstein Declaration; Exhibit 74 to the Sun Declaration

Defendant asserts references to the names of three former Nike employees whose actions are challenged via the First Amended Complaint should be redacted because they concern "sensitive personal information" and surround "inflammatory allegations" that have not yet been proven. Def.'s Mot. Seal 5-6 (doc. 171). Defendant also contends references to "confidential legal strategy, legal advice provided to Nike Legal, and requests for legal advice regarding these analyses" are privileged and should not be disclosed. *Id.* at 7.

Exhibit 11 of the Goldstein Declaration contains three disputed redactions to the former Nike employees at issue – i.e., on pages 28, 61, and 86.[5] Prince Decl. A, at 732, 765, 790 (doc. 201-1). The Court has thoroughly reviewed these portions of the record and finds that, with the

---

[5] This exhibit also includes an allegedly disputed redaction on page 81. Prince Decl. A, at 785 (doc. 201-1). Plaintiff clarifies that this "[w]as not intended as a redaction" and instead was originally highlighted "to call to the Court's attention [certain] text." Kan Decl. Ex. B, at 17 (doc. 176-2).

Page 7 – FINDINGS AND RECOMMENDATION

exception of the latter two references in ¶ 30 on page 28,[6] they directly track the information that has already been made public (and mainly concern the fact that plaintiffs have sought discovery regarding the allegations surrounding these individuals). *Compare id.*, *with* First Am. Compl. ¶¶ 12, 66-71, 81-84, 128, 182 (doc. 42) *and* Order (Oct. 31, 2019) (doc. 89); *see also Williams v. Apple, Inc.*, 2021 WL 2476916, *3 (N.D. Cal. June 17, 2021) (declining to seal an email that largely discussed information already made public via the docket and the press).

Turning to the second category of challenged information, as addressed above, plaintiff concedes that references to the content of legal advice sought or obtained by defendant should be redacted. Defendant appears to have removed certain redactions in these exhibits as well. As such, the only remaining dispute surrounds foundational facts regarding defendant's 2018 pay equity promotional analysis that occur on page 88 of Exhibit 12 of the Goldstein Declaration, and on pages 23-25 of Exhibit 74 of the Sun Declaration. Prince Decl. A, at 886, 1534-36 (doc. 201-1).

Defendant acknowledges that the public announcement of this promotional study should not be sealed. Additionally, defendant does not seek to redact a reference on page 24 of plaintiff's Motion for Class Certification to the "halt[ing] [of] the promotion analysis before it could be completed." *Id.* at 34. In any event, while the reasons behind defendant's cessation of this study may be privileged, the mere fact that the study was stopped is not. Nor does this fact, in and of itself, touch upon any confidential business strategy or information. Defendant's mere desire to keep this information confidential is inadequate in this context, nor does it outweigh the public's interest in disclosure, especially in light of defendant's initial and widely-disseminated statements

---

[6] These facts are not clearly alleged in the First Amended Complaint and are consistent with the range of redactions plaintiffs have stipulated to. *See, e.g.*, Prince Decl. A, at 730 (doc. 201-1).

Page 8 – FINDINGS AND RECOMMENDATION

concerning the study. Defendant's motion should be granted as to the latter two references in ¶ 30 on page 28 of Exhibit 11 of the Goldstein Declaration and denied in all other respects.

### C.    Plaintiffs' Motion for Class Certification

Finally, defendant seeks to redact portions of plaintiffs' Motion for Class Certification that reference Dr. Neumark's pay shortfall conclusions or the fact that Nike stopped its promotion impact study in 2018. Prince Decl. Ex. A, at 2-70 (doc. 201-1). As addressed above, defendant has not shown a sufficient reason to prevent public disclosure of this information. Defendant's motion should be denied in this regard.

## II.    Motion to Intervene

As noted above, there is a strong presumption in favor of public access to court records, but "access . . . is not absolute." *Kamakana*, 447 F.3d at 1178. Likewise, Rule 26 allows a court to issue a protective order – for "good cause" – that specifies the terms of discovery or limits its public disclosure. Fed. R. Civ. P. 26(c)(1); *but see San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir. 1999) (blanket protective orders are "inherently subject to challenge and modification").

"Nonparties seeking access to a judicial record in a civil case may do so by seeking permissive intervention under Rule 24(b)(2)." *San Jose Mercury News*, 187 F.3d at 1100. "A motion for permissive intervention pursuant to Rule 24(b) is directed to the sound discretion of the district court." *Id.* Where, as here, intervention is sought for the limited purpose of seeking access to documents, the moving party must show "a timely motion" and "a common question of law and fact between the movant's claim or defense and the main action." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992). "Even if an applicant satisfies those threshold requirements, the district court has discretion to deny permissive intervention," taking into account, among other

factors, "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights," "whether the intervenors' interests are adequately represented by other parties," and "whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998); *Perry v. Schwarzenegger*, 630 F.3d 898, 905 (9th Cir. 2011) (citing *Spangler v. Pasadena Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

The non-party media organizations seek to intervene "to provide further briefing to the Court regarding the insufficiency of the parties' justification for agreed-upon redactions as well as [their] objections to the categories of information Defendant alleges should be subject to redaction or sealing." Non-Party's Mot. Intervene 8 (doc. 205). Concerning the former, the non-party media organizations request "unredacted copies of all documents filed in this case since January 10, 2022," including information designated under the Protective Order as "Confidential" or "AEO," to independently assess the propriety of parties' stipulations. Non-Party's Reply to Mot. Intervene 2 (doc. 229). Alternatively, "if the Court allows intervention but denies further briefing, [the non-party media organizations] ask that the parties be directed to re-file unsealed or redacted documents relating them to their previously sealed ECF Nos. and with any requested sealings or redactions permitted only upon a finding by the Court that compelling reasons exist to seal such information from the public." Non-Party's Mot. Intervene 3 (doc. 205).

Here, there is no meaningful dispute surrounding the threshold requirements for intervention. While defendant asserts the Motion to Intervene is "procedurally untimely," there is simply no basis for the Court to conclude the non-party media organizations have sat on their rights. Def.'s Resp. to Mot. Intervene 14-15 (doc. 219). Indeed, it is undisputed that the parties

Page 10 – FINDINGS AND RECOMMENDATION

have been conferring with the non-party media organizations about this issue since March 2022, and the Motion to Intervene was filed two days after defendant's Reply to its Motion to Seal. *See San Jose Mercury News*, 187 F.3d at 1101 ("delays measured in years have been tolerated where an intervenor is pressing the public's right of access to judicial records") (collecting cases). Courts have also recognized a common question of law and fact where the sole issue is the confidentiality of sealed documents. *See, e.g.*, *Jessup v. Luther*, 227 F.3d 993, 998-99 (7th Cir. 2000).

Although defendant opposes intervention on additional grounds (namely, that the parties adequately represent their interests and intervention would "make an end-run on the Protective Order"), the Court disagrees. Def.'s Resp. to Mot. Intervene 1 (doc. 219). Courts routinely permit the press to intervene for the purpose of unsealing judicial records and, in regard to the stipulated redactions, the non-party media organizations' point of view is not necessarily represented in the litigation. Accordingly, the Court finds that the non-party media organizations satisfy the requirements set forth in Fed. R. Civ. P. Rule 24(b)(2).

Regardless, allowing additional briefing or unfettered access to documents underlying plaintiff's Motion for Class Certification is not warranted, at least at this stage in the proceedings. As to the disputed redactions, intervention will not advance or contribute to the development of the underlying issues. The non-party media organizations have adequately stated their position on the record, which the Court has thoroughly reviewed in resolving defendant's motion. To the extent the non-party media organizations may wish to devote additional time and effort opposing the Motion to Seal, the Court finds that their interests are adequately represented by plaintiffs. *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996) ("[w]here an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises") (citation and internal quotations omitted). Moreover, defendant's motion

Page 11 – FINDINGS AND RECOMMENDATION

has been fully briefed for nearly six months; allowing additional, and likely duplicative, briefing would unnecessarily prolong this litigation.

As to the redactions that have been stipulated-to pursuant to the Protective Order, the Court may revisit this issue at a later point in the litigation.[7] There have been nearly 300 court filings in this case, the vast majority of which have been filed publicly and are available for consumption by the press or other members of the public. While the parties have not sought to individually address each of the stipulated non-disclosures underlying plaintiffs' Motion for Class Certification, they concern, at least in part: (1) the names of any individuals named in allegations of sexual harassment or gender discrimination at Nike that have not already been made public; (2) proprietary information that either qualifies as a trade secret or presents competitors with an unfair business advantage; (3) information that is outside the scope of this case; or (4) privileged information.[8] The Protective Order provides a process for downgrading confidential designations or for the Court

---

[7] As both case law and the non-party media organizations acknowledge, it is not uncommon for the press to seek to unseal documents subject to a protective order after the merits have been adjudicated. *See, e.g.*, Non-Party's Mot. Intervene 11 (doc. 205); *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 340 F.Supp.2d 1118, 1121 (D. Or. 2003). Furthermore, defendant represents that the non-party media organizations "requested to postpone a decision on their motion until the Court resolves the Parties' sealing issues," suggesting that there is no imminent need for accessing sealed portions of the docket. Prince Decl. ¶ 4 (doc. 220); *see also* Def.'s Resp to Mot. Intervene 5 (doc. 219) (if the non-party media organizations "have access to confidential information on a real-time basis like the Parties, then it would be impossible to later 'unring the bell'. . . the Court's ruling(s) on redaction matters in the cure here").

[8] In light of the Protective Order, and with the exception of the disputed redactions discussed herein, the Court has never been asked to formally analyze whether a particular document should be sealed. As the non-party media organizations accurately observe, defendant "fail[ed] to present this Court with any briefing addressing the parties' agreed-to categories of information for sealing." Non-Party' Reply to Mot. Intervene (doc. 229); *see also* Pls.' Resp. to Mot. Intervene 2 (doc. 218) (while "plaintiffs have spent the months since filing its motion for class certification negotiating in good faith with Nike about what documents should remain sealed," they, in fact, are "not advocating that any documents should remain sealed . . . sunlight is the best disinfectant"). As such, the aforementioned categories of redactions are simply those that are readily inferred.

Page 12 – FINDINGS AND RECOMMENDATION

to resolve disputes concerning the same, which the parties have been successfully utilizing. That is, the parties have been actively working to review previously sealed documents and re-lodge unsealed or redacted versions where appropriate. *See, e.g.*, Order (Apr. 5, 2022) (doc. 195); Order (Apr. 12, 2022) (doc. 208); Order (June 27, 2022) (doc. 264); Order (July 28, 2022) (doc. 272).

Under these circumstances, allowing the non-party media organization to access filings under seal so that they may evaluate and, if necessary, move to unseal them eviscerates the safeguards built into the Protective Order for "Confidential" and/or "AEO" information, and has the potential to erode the privacy rights of third-parties and/or disturb the existing compromise between the parties.[9] *See In re Nat'l Sec. Agency Telecomm'ns Records Litig.*, 2007 WL 549854, *4 (N.D. Cal. Feb. 20, 2007) (granting the media's motions to intervene for the purpose of unsealing judicial records but denying "their motions to unseal documents at the present time" where "the parties already released redacted versions of the documents at issue"); *see also Velasco v. Chrysler Grp. LLC*, 2017 WL 445241, *5 (C.D. Cal. Jan. 30, 2017), *aff'd*, 747 Fed.Appx 463 (9th Cir. 2018) ("courts routinely decide motions to unseal brought by intervenors without first unsealing the documents at issue").

The Court finds that the aforementioned considerations counsel against allowing unbridled access to filings emanating on or after January 10, 2022, at this juncture. The Court nevertheless recognizes the distinct perspective the non-party media organizations offer to this litigation, along with their well-established common law and First Amendment rights to challenge the sealing of judicial records. Therefore, the Court finds the most prudent and efficient course of action is to grant the non-party media organizations' motion to intervene but deny their request for further

---

[9] As the docket in this case reflects, the parties have engaged in protracted litigation surrounding the scope of plaintiffs' allegations and pre-certification discovery, which has resulted in the utilization of a significant amount of judicial time and resources.

Page 13 – FINDINGS AND RECOMMENDATION

briefing and to unseal or access documents produced under the Protective Order. However, following the final resolution of plaintiffs' Motion for Class Certification, the non-party media organizations may file a renewed motion for the purposes of opposing any remaining stipulated redactions. At that point the parties shall identify all exhibits admitted into evidence they contend should remain sealed and include explanations supporting their contentions.

## RECOMMENDATION

Defendant's Motion to Seal (doc. 171) should be granted in part and denied in part as stated herein. The non-party media organizations' Motion to Intervene (doc. 205) should be granted to the extent they request intervention for the limited purpose of challenging the parties' stipulated redactions in regard to the briefing surrounding plaintiffs' Motion for Class Certification and denied in all other respects with leave to renew.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right

to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 30th day of September, 2022.

_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge

Ellen Osoinach, OSB#02498
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
6605 SE Lake Road
Portland, OR 97221
(503) 213-3949
eosoinach@rcfp.org
*Counsel of Record for Proposed Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>MOTION OF NON-PARTY MEDIA ORGANIZATIONS INSIDER, INC. *d/b/a BUSINESS INSIDER*, ADVANCE LOCAL MEDIA LLC *d/b/a OREGONIAN MEDIA GROUP*, AND AMERICAN CITY BUSINESS JOURNALS, INC. *d/b/a PORTLAND BUSINESS JOURNAL* TO INTERVENE FOR THE LIMITED PURPOSE OF MOVING TO UNSEAL JUDICIAL RECORDS AND TO OPPOSE DEFENDANT'S MOTION TO SEAL |

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 1**

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Media Intervenors conferred in good faith with counsel for Plaintiffs Cahill, *et al.*, and Defendant Nike, Inc. regarding this motion, and the matters contained herein.  Plaintiffs and Defendant take no position with respect to the instant motion.  As such, the parties were unable to resolve the dispute.

## MOTION

Pursuant to Fed. R. Civ. P. 24(a) and (b) and Local Rule 7, non-party media organizations Insider Inc., *d/b/a Business Insider*, Advance Local Media LLC *d/b/a Oregonian Media Group*, and American City Business Journals, Inc. *d/b/a Portland Business Journal* (collectively, the "Media Intervenors") hereby move for leave to intervene in the above-captioned proceeding for the limited purpose of vindicating the right of the press and the public to access judicial records in this matter.  In particular, Media Intervenors seek to unseal judicial records filed entirely under seal by the parties pursuant to a protective order[1] and to oppose Defendant's pending motion to seal (ECF No. 171 )[2].

## MEMORANDUM OF LAW IN SUPPORT

### I.    INTRODUCTION

The parties have arrived at a pivotal moment in this high-profile litigation: class certification.  The Court's decision about whether to certify a class will "determine not only the stakes involved, but also . . . the structure of trial and methods of proof, and the length and cost of the litigation." Manual for Complex Litigation (Fourth) § 21.11 (2004). Thousands of current

---

[1]    S*ee* Appendix A.

[2]    If the Court grants Media Intervenors' motion to intervene and allows them further briefing on the pending motion to seal, Media Intervenors' opposition to sealing will take differing positions than Plaintiffs' in their motion opposing sealing (ECF No. 177).  For that reason, Media Intervenors take no position on Plaintiffs' motion opposing sealing.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 2**

and former Nike employees and their families will be impacted by the Court's decision. As one of the most well-known multinational corporations in the world, Nike's employment practices— which are directly at issue in this matter—are closely watched by the public.

Despite the significant public interest in this case[3], the parties have filed numerous documents relating to class certification entirely under seal or with significant redaction, leaving the press and the public with scant access to the underlying facts or arguments and limited vantage to understand the details of this important judicial proceeding. Media Intervenors seek to enforce the public's common law and First Amendment access rights to these sealed documents, which can only be vindicated through intervention, and to brief the Court on why public access to unsealed and unredacted documents is required. In the alternative, if the Court allows intervention but denies further briefing, Media Intervenors ask that the parties be directed to re-file unsealed or redacted documents relating them to their previously sealed ECF Nos. and with any requested sealings or redactions permitted only upon a finding by the Court that compelling reasons exist to seal such information from the public.

---

[3]      *See, e.g.*, Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior'*, The Oregonian (Mar. 16, 2018), https://perma.cc/2FTE-M3W2; Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://perma.cc/2PTE-23LZ; Kevin Draper & Julie Creswell, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://perma.cc/V9YM-GEAC; Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*, The Oregonian (July 7, 2018), https://perma.cc/9AJK-2BE4; Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards Was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://perma.cc/R3M4-63EE; Peter Blumberg, *Nike Women Clear First Hurdle in Lawsuit Over Gender Pay Gap*, Bloomberg (Feb. 27, 2019), https://perma.cc/V7M3-Q9EV; Jeff Manning, *Courts Reject Nike's Effort to Keep Executives' Info Secret in Discrimination Suit*, The Oregonian (Nov. 18, 2020), https://perma.cc/WGC3-78W7; Patrick Dorrian, *Nike Pay Equity Studies Privileged, Off Limits in Sex Bias Suit*, Bloomberg Law (Oct. 13, 2020), https://perma.cc/9EP6-SYML; Matthew Kish, *Nike Files Motion to Keep Sensitive Records in Sweeping Gender Discrimination Lawsuit Sealed*, Insider (Mar. 16, 2022), https://perma.cc/N7V4-GJ7D.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE Page 3**

## II.    BACKGROUND AND SEALED DOCUMENTS AT ISSUE

### a.  The Parties' Protective Order

On June 17, 2019, this Court entered a stipulated umbrella protective order, ECF No. 82, ("Protective Order") modeled on the Court's Tier II template to govern the parties' exchange of discovery materials.  Such umbrella orders avoid burdening the court with "document-by-document adjudication" of information or documents subject to discovery that a party considers sensitive by providing that "all assertedly confidential material disclosed . . . is presumptively protected unless challenged."  Manual for Complex Litigation (Fourth) § 11.432 (2004).

The Protective Order details procedures for the parties to provisionally file documents containing privileged or confidential information under seal, as well as procedures for those designations to be challenged via motion practice applying a "good cause" standard.  *Id.*  See Protective Order ¶¶ 4, 11.

### b.  The Parties' Sealed Class Certification Filings

As the parties entered the class certification phase of litigation, they invoked the Protective Order to file thousands of pages of documents under seal.  Attached to this motion as Appendix A is a chart listing the relevant docket numbers and their current status.

On January 10, 2022, Plaintiffs filed under seal a Motion for Class Certification ("Class Motion").  ECF No. 146.  Plaintiffs also filed under seal most of the documents supporting the Class Motion.[4]  Thereafter, on March 23, 2022, Plaintiffs and Defendant agreed to Plaintiffs re-filing a redacted version of its Class Motion, ECF No. 178, Ex. A.  But the parties did not agree to unseal the three attachments to the attached to the Class Motion (ECF No.146, Ex. 1-3), nor

---

[4]    *See* ECF Nos. 148–149, 154–167.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 4**

any of the declarations or further exhibits supporting Plaintiffs' motion. ECF Nos. 148–149, 154–167[5].

On March 25, 2022, Defendant Nike filed under seal the entirety of its Response in Opposition to Plaintiffs' Class Motion ("Response to Class Motion"), including all supporting documents. ECF Nos. 183–187. Then, on April 1, 2022, Defendant publicly re-filed three previously sealed declarations along with their exhibits in support of its Response to Class Motion,[6] but did not publicly re-file the Response nor the declaration and supporting exhibits of Felicia Davis. ECF No. 187 ("Davis Declaration"). And on April 4, 2022 Defendant filed an unopposed motion to unseal three docket entries—Response to Class Motion, ECF No. 183, Motion to Exclude the Opinions of Plaintiff's Expert, ECF No. 181, and Objections to Evidence Filed In Support of Plaintiff's Class Motion, ECF No. 184—which the court granted on April 5, 2022. ECF No. 195. The Davis Declaration, however, remains entirely under seal.

Also on April 1, 2022, Plaintiffs filed entirely under seal a motion and supporting documents seeking to declare the opinion of Defendant's expert inadmissible. ECF Nos. 192–193.

### c. Media Intervenors' Outreach to the Parties and Motion to Seal

On March 11, 2022, counsel for Media Intervenors notified the parties of their intent to file an appropriate motion, predicated on the public's common law and First Amendment rights to inspect judicial records, to unseal the Class Motion, Response to Class Motion, and supporting documents.

---

[5]    *See also* Appendix A.

[6]    *See* ECF Nos. 189, 190, 191 corresponding to prior sealed ECF Nos. 182, 185, 186.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 5**

On March 14, 2022, counsel for Plaintiffs and Defendant jointly responded that if their meet and confer efforts failed to resolve the parties' disputes regarding the extent to which their sealed filings should be made publicly available, Nike would file an application to "seal limited portions of the documents by March 15."

On March 15, 2022, Defendant publicly filed a Motion to Seal the Class Motion and its supporting documents ECF No. 171 ("Sealing Motion").  In support, Defendant also filed under seal a declaration, ECF No. 172 ("Sealing Declaration"), wherein Defendant purportedly identified proposed redactions to previously sealed documents to which both parties agreed and identified proposed redactions to previously sealed documents opposed by Plaintiffs.  Sealing Mot. at 2, fn 1.  Notably, the Sealing Motion only addressed the proposed redactions which Plaintiffs opposed.  *Ibid*.  On March 16, 2022, this Court set the Sealing Motion on the under-advisement calendar of April 18, 2022.  ECF No. 173.

On March 23, 2022, Plaintiffs publicly filed a Response in Opposition to the Sealing Motion asserting that Plaintiffs "agreed to the majority of redactions proposed by [Defendant] Nike."  ECF No. 177 ("Public Opposition to Sealing").  Plaintiffs also filed under seal a second Response in Opposition to the Sealing Motion and supporting affidavit in which Plaintiffs identified proposed redactions to which the parties did not agree.  ECF Nos. 175–176 ("Sealed Opposition to Sealing").

After reviewing the parties' public briefing regarding sealing, as well as the redacted Class Motion—and seeing that Defendant filed its Response to Class Motion and supporting documents entirely under seal—counsel for Media Intervenors notified the parties on March 30, 2022, of their renewed intent to file a limited motion to intervene to unseal judicial records. Thereafter, on April 1, 2022 the parties and Media Intervenors jointly conferred regarding Media

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 6**

Intervenors' proposed intervention. On the same day, and as discussed during the meet and

confer, Defendant publicly re-filed three of the four docket entries supporting its Response to

Class Motion[7] but did not unseal the Response itself nor the Davis Declaration.

On April 6, 2022 Defendant filed entirely under seal a Reply to Motion to Seal and a

supporting declaration. ECF Nos. 200-201 ("Sealing Reply").

## III.    ARGUMENT

As news organizations that write and disseminate information to the public about the

judiciary's work, Media Intervenors have standing to vindicate the public interest in access to

this proceeding. The parties must demonstrate compelling reasons to prevent the public from

accessing sealed and redacted judicial records.[8] According to its Sealing Motion, Defendant

seeks to seal "(1) the names of any individuals (complainants, subjects and witnesses) named in

the context of allegations regarding sexual harassment or gender discrimination at Nike; (2)

briefing and declarations filed in relation to Plaintiffs' motion to compel Nike's privileged pay

equity, promotion and compensation analyses that reflect confidential legal strategy; and (3)

Nike's confidential and proprietary compensation information, including Nike's compensation

structure as well as pay shortfall conclusions derived from Attorneys' Eyes Only ("AEO")

---

[7]     See ECF Nos. 189-191.
[8]     Because Media Intervenors agree with the parties that they and the Court should apply a
compelling reasons standard to justify the sealing or redaction of these judicial records, this
motion does not address whether class certification motions are "dispositive" or "non-
dispositive" for the purpose of determining the applicable standard for sealing judicial records.
We note, however, that the Sixth Circuit as well as many district courts in the Fourth and Ninth
Circuits apply a compelling reasons standard to the sealing of materials related to class
certification. *See, e.g.*, *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305
(6th Cir. 2016); *Moussouris v. Microsoft Corp.*, No. 15-CV-1483 (JLR), 2018 WL 1159251, at
*4 (W.D. Wash. Feb. 16, 2018); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-CV-
04000 (EMC), 2016 WL 8253802, at *1 (N.D. Cal. Mar. 14, 2016); *In re Google Inc. Gmail
Litig.*, No. 13-MD-02430 (LHK), 2014 WL 10537440, at *3 (N.D. Cal. Aug. 6, 2014); *Soutter v.
Equifax Info. Servs. LLC*, 299 F.R.D. 126, 130 (E.D. Va. 2014).

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 7**

compensation data of current and former Nike employees who are not parties to the litigation"). Sealing Motion at 1, ECF No.171. To aid in the Court's analysis of the application of the "compelling reasons" standard to the records at issue in this proceeding, Media Intervenors seek the opportunity to provide further briefing to the Court regarding the insufficiency of the parties' justification for agreed-upon redactions as well as Intervenors' objections to the categories of information Defendant alleges should be subject to redaction or sealing.

> **a. Media Intervenors Should Be Permitted to Intervene for the Limited Purpose of Vindicating the Public's Right of Access.**
>
> > **i. Media Intervenors have a presumptive right of access and intervention is the appropriate procedural mechanism to assert that right.**

The Media Intervenors have a presumptive First Amendment and common law right of access to court proceedings and judicial records in this matter. *See Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8 (1986) (holding that the First Amendment right of access attaches to judicial proceedings and documents where "the place and process have historically been open to the press and general public," and where "public access plays a significant positive role in the functioning of the particular process in question"); *Oregonian Publ'g Co. v. U.S. District Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) ("Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents."); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (common law guarantees as similar right of access). As the Ninth Circuit recognized in *Foltz*, "we start with a strong presumption in favor of access to court records" in civil cases, which may be overcome only where the proponent of secrecy meets its burden of establishing "***compelling reasons***" that justify sealing records, *Foltz*, 331 F.3d at 1135 (emphasis added), and the court articulates in ***specific, on-the-record findings***

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 8**

why the sealing order "is essential to preserve higher values and is narrowly tailored to serve that interest," *Press-Enter. Co.*, 478 U.S. at 2 (citation omitted) (emphasis added).

The press has standing to challenge the sealing of judicial records and to assert the public's—and its own—right of access to those records. *See, e.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 609 n.25 (1982). Time and again, courts have held that non-parties, like Media Intervenors here, may intervene to challenge limitations on the right of access. *See, e.g.*, *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992). Not surprisingly, most of the Ninth Circuit's leading access decisions involve news organizations' efforts to open court proceedings and to unseal court records. *See, e.g.*, *Oregonian Publ'g Co.*, 920 F.2d at 1466; *Associated Press v. U.S. District Court*, 705 F.2d 1143, 1147 (9th Cir. 1983); *Phoenix Newspapers, Inc. v. U.S. District Court*, 156 F.3d 940, 949 (9th Cir. 1998); *CBS, Inc. v. U.S. District Court*, 765 F.2d 823, 825 (9th Cir. 1985); *see also California ex rel. Lockyer v. Safeway, Inc.*, 355 F. Supp. 2d 1111, 1112 n.1 (C.D. Cal. 2005) (granting newspaper leave to intervene to move to unseal court records in civil action).

Intervention under Federal Rule of Civil Procedure 24(b) ("Rule 24(b)") is the appropriate procedural mechanism in a civil case for a third party, including members of the press or public, to assert rights of access to judicial records, to challenge protective orders, and to contest the closure of judicial proceedings. *See San Jose Mercury News, Inc. v. U.S. District Court*, 187 F.3d 1096, 1100 (9th Cir. 1999) (holding that "[n]onparties seeking access to a judicial record in a civil case may do so by seeking permissive intervention under Rule 24(b)(2)"); *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (collecting cases).

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 9**

The Ninth Circuit has instructed that Rule 24 should be construed liberally "in favor of applicants for intervention." *Wash. State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982). The Court should permit Media Intervenors to intervene in this case for the limited purpose of moving to unseal these judicial records.

> ### ii. Pursuant to Rule 24(b), Media Intervenors' motion is timely and shares a question of law in common with the main action.

Ordinarily, a party seeking permissive intervention must demonstrate: "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *San Jose Mercury News*, 187 F.3d at 1100 (citation omitted). Where, as here, intervenors "do not seek to litigate a claim on the merits" but rather intervene for the limited purpose of seeking access to documents, "an independent jurisdictional basis is not required." *Beckman Indus.*, 966 F.2d at 473; *see also San Jose Mercury News*, 187 F.3d at 1100. Thus, Media Intervenors need only show that their motion is timely and that they share a common question of law or fact with the main action.

Media Intervenors' motion is timely because there has been no delay in seeking intervention. Defendant's Sealing Motion and Sealing Declaration were filed on March 15, 2022; Plaintiffs' Public and Sealed Opposition to Sealing were filed on March 23, 2022; and Defendant's Sealing Reply was filed on April 6, 2022. Unfortunately, the parties did not move to unseal or otherwise re-file the Sealed Declaration, Sealed Opposition to Sealing, or Sealing Reply which means the parties' agreed-upon redactions remain under seal. Media Intervenors have made good faith efforts to address their concerns regarding the parties' broad sealing efforts, and the parties have re-filed some documents publicly.[9] But as of the date of the instant

---

[9]      *See* ECF Nos. 178, Ex. A; 189, 190, 191 (corresponding to prior sealed ECF Nos. 182, 185, 186); and 195 (unsealing ECF Nos. 181, 183, and 184).

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 10**

motion, many documents still remain entirely under seal and since conferral the parties have filed several additional documents under the Protective Order giving rise to a need for further unsealing[10] Furthermore, it has been less than a week since Defendant publicly re-filed three previously sealed declarations and supporting exhibits in support of its Response to Class Motion[11], and Plaintiffs have not yet filed their reply in support of the Class Motion.  Regarding the Sealing Motion, it been less than three days since Defendant filed its Sealing Reply. "[D]elays measured in years have been tolerated where an intervenor is pressing the public's right of access to judicial records."  *San Jose Mercury News*, 187 F.3d at 1101; *see also S.E.C. v. AOB Commerce, Inc.*, No. 07-CV-4507 (CAS), 2013 WL 5405697, at *1 (C.D. Cal. Sept. 23, 2013) (permitting intervention for the purpose of unsealing documents "five years after th[e] case was settled").  Here, Media Intervenors have moved to intervene within a few weeks of the parties' initial efforts to seal the judicial records, entering the proceeding at precisely the stage in which the Court is determining the extent to which the parties' proposed redactions and sealings are warranted.  Accordingly, Media Intervenors' motion is timely and will provide the Court with a complete assessment of the parties' efforts to seal from the public categories of information, motion briefing, and supporting documents.

Several courts have held that the question of whether documents should be sealed is itself a question of law in common with the main action sufficient to support intervention.  *See, e.g.*, *Jessup v. Luther*, 227 F.3d 993, 998–99 (7th Cir. 2000) ("Although the Parties take a very different view [than the intervenor] of the matter of confidentiality, nevertheless, that

---

[10]    *See* Appendix A.
[11]    *See* ECF Nos. 189, 190, 191 corresponding to prior sealed ECF Nos. 182, 185, 186. Notably, Defendant did not publicly re-file the Response itself nor the other supporting documents in ECF Nos. 183, 184, or 187.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE Page 11**

confidentiality is—in the language of Rule 24(b)(2)—a 'question of law . . . in common'

between the Parties and the [intervenor]."  The Ninth Circuit and Oregon District Courts have

repeatedly upheld the intervention of nonparties for the purposes of unsealing in cases where

there was no common question except the propriety of the sealing.  *See Kamakana v. City & Cty.*

*of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006); *San Jose Mercury News*, 187 F.3d at 1100;

*Confederated Tribes of Siletz Indians of Oregon v Weyerhaeuser Co.*, 340 F. Supp. 2d 1118,

1121 (D. Or. 2003) (noting that a party's filing of an exhibit under seal pursuant to a protective

order is of little weight in the court's sealing analysis, because blanket protective orders are

'inherently subject to challenge and modification'.)  The Ninth Circuit has characterized its own

caselaw as "holding that . . . [a] strong nexus of fact or law [is] not required where [an]

intervenor merely seeks to challenge a protective order."  *San Jose Mercury News*, 187 F.3d at

1100 (citing *Beckman*, 966 F.2d at 473–74).  Accordingly, Media Intervenors' interest in

challenging the parties' efforts to seal judicial records from the public is sufficient to support

their motion for intervention.

> **b.  The Extensive Sealing in this Case Violates the Public's Common Law and First Amendment Right of Access to Judicial Records.**

Courts in the Ninth Circuit have made it clear that the mere fact that a document was

subject to a blanket protective order does not relieve the parties or a court of the obligation to

comply with the Ninth Circuit's otherwise applicable sealing regimen.  *See, e.g.*, *Kamakana*,

447 F.3d at 1179 ("The 'compelling reasons' standard is invoked even if the dispositive motion,

or its attachments, were previously filed under seal or protective order."); *Edwards Vacuum, LLC*

*v. Hoffman Instrumentation Supply, Inc.*, No. 20-CV-1681 (MHS), 2021 WL 186932, at *2 (D.

Or. Jan. 19, 2021) ("[T]he fact that the parties may have stipulated to a protective order is not

itself a basis for sealing or otherwise restricting access to any specific discovery material.");

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 12**

*Muhaymin v. City of Phoenix*, No. 17-CV-04565 (DLR), 2021 WL 5173767, at *4 (D. Ariz. Nov. 3, 2021) ("Once a party decides to use a document to support a filing with the Court, the party asserting confidentiality must show either good cause or compelling reasons (depending on the nature of the filing) for sealing the record and cannot merely rely on the fact that the party subjectively believes the document is confidential and has chosen to designate it as such."). Indeed, "'once the [sealed discovery] documents are made part of a dispositive motion . . . they lose their status of being raw fruits of discovery,' and no longer enjoy protected status" unless the court or the party seeking sealing identifies "some overriding interests in favor of keeping the discovery documents under seal." *Foltz*, 331 F.3d at 1136 (citation omitted). Therefore, the Protective Order in this proceeding provides no sanctuary for the parties' efforts to seal or redact information related to briefing on the Class Motion, briefing on the Sealing Motion, or future filings which may rely on materials or information shared in discovery pursuant to the Protective Order.

To be clear, Media Intervenors seek to intervene in this matter for the purpose of providing the Court with additional briefing regarding the specific sealings and redactions proposed in Defendant's Sealing Motion, Sealing Declaration, Plaintiffs' responses (both public and non-public) thereto, and Defendant's Sealing Reply. While the parties' purported justifications for concealing judicial records are, for the most part apparently set forth in sealed documents, based on the parties' public filings, it is Media Intervenors' position that neither party has met, or can meet, the "compelling reasons" standard necessary to maintain secrecy of their filings. *See* ECF Nos. 171, 177, 200, 201. At present, the docket contains approximately one-hundred individual documents which no party has publicly moved to unseal,[12] and twelve

---

[12]    *See* Appendix A.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE Page 13**

documents to which the parties propose both agreed-upon and disputed redactions.[13]  In the

absence of a publicly filed written request to unseal as contemplated by paragraph four of the

Protective Order, it is impossible for Media Intervenors to identify which, if any, of the one-

hundred sealed entries the Plaintiffs wish to unseal.  Similarly, since Plaintiffs and Defendant

both filed their agreed-upon redactions under seal, Media Intervenors cannot determine if any of

the one-hundred sealed entries fall within the parties' apparent agreement to redact and unseal.[14]

*See* ECF. No 171 ("proposed redactions highlighted in green are those which both parties have

agreed upon"); ECF No. 177 ("redactions that are included in Nike's Motion to Seal and that

Plaintiffs agree to [are] in Exhibit A to the Kan Declaration . . . [and] redactions that are omitted

from Nike's filing that Plaintiffs do not oppose . . . are listed in Exhibit C to the Kan

Declaration").

        The extensive sealing and redaction of court records in this case withholds valuable

information from the press and public about pending litigation and functions as a form of closure

of court proceedings and records.  The public interest in class certification motions is particularly

strong because class certifications can determine the legal rights of persons not currently before

---

13      *Id.*
14      The practice of filing entirely under seal documents that contain any information
arguably falling under the Protective Order and then filing redacted copies of those previously
sealed documents without reference to the original sealed entry has led to considerable confusion
in the public docket.  For example, though Plaintiffs and Defendant agreed to publicly file a
redacted copy of Plaintiffs' Class Motion, Plaintiffs filed it as an exhibit to their Sealing
Opposition (*see* ECF No. 178, Ex. A) rather than re-filing it as a redacted copy of the Class
Motion and referencing ECF No. 146.  For this reason, Media Intervenors request that the parties
be directed to publicly re-file documents with agreed-upon redactions and relate them to the
previously sealed ECF Nos. as Defendant did with its re-filing on April 1, 2022, and as the Court
did when it granted Defendant's unsealing on April 6, 2022.

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE
Page 14**

the Court.  Thus, the public has an interest in knowing the legal basis of the Class Motion and Response to Class Motion, as well as the facts and arguments applicable to each.

## IV.    CONCLUSION

As newspaper publishers, Media Intervenors have a compelling interest in public access to information on pending judicial proceedings regarding the application of Oregon's Equality Act and the Federal and Oregon Equal Pay Act to one of the most well-known multinational corporations in the world.  The Media Intervenors therefore respectfully request that this Court permit them to intervene for the limited purpose of vindicating the press and the public's right to access court records in this matter.  The Media Intervenors further request that this Court convene a scheduling conference to establish a briefing schedule for their motion to unseal, an opportunity for Media Intervenors to brief a response to Defendant's Sealing Motion, Sealing Declaration, and Plaintiffs' responses (both public and non-public) thereto, and that the Court otherwise permit Media Intervenors' counsel to participate in any upcoming scheduling conferences or hearings in this matter related to sealing.

In the alternative, if the Court allows intervention but denies further briefing, Media Intervenors ask that the parties be directed to re-file unsealed or redacted documents by relating them to their previously sealed ECF Nos. and with any requested sealings or redactions permitted only upon a finding by the Court that compelling reasons exist to seal such information from the public.

Dated: April 8, 2022

Respectfully submitted,

/s/ *Ellen Osoinach*
_____
Ellen Osoinach
THE REPORTERS COMMITTEE FOR FREEDOM OF
THE PRESS

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 15**

ER-306

6605 SE Lake Road
Portland, OR 97221
eosoinach@rcfp.org
*Counsel for Media Intervenors*

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 16**

## APPENDIX A

| ECF | Description | Status |
|---|---|---|
| 146 | Plaintiffs' Motion to Certify the Class | Memorandum redacted; Exs. 1–3 sealed |
| 148 | Declaration of Kathleen Lunquist in Support of Plaintiffs' Motion for Class Certification | Sealed in its entirety |
| 149 | Declaration of David Neumark in Support of Plaintiffs' Motion for Class Certification | Declaration sealed; Exs. A and B proposed redacted |
| 154 | Declaration of Mengfei Sun in Support of Plaintiffs' Motion for Class Certification | Sealed in its entirety |
| 155 | Exhibits 1–10 to Declaration of Mengfei Sun | Sealed in their entirety |
| 156 | Exhibits 11–20 to Declaration of Mengfei Sun | Sealed in their entirety |
| 157 | Exhibits 21–30 to Declaration of Mengfei Sun | Sealed in their entirety |
| 158 | Exhibits 31–40 to Declaration of Mengfei Sun | Sealed in their entirety |
| 159 | Exhibits 41–50 to Declaration of Mengfei Sun | Sealed in their entirety |
| 160 | Exhibits 51–60 to Declaration of Mengfei Sun | Sealed in their entirety |
| 161 | Exhibits 61–70 to Declaration of Mengfei Sun | Sealed in their entirety |
| 162 | Exhibits 71–83 to Declaration of Mengfei Sun | Redaction suggested for Exs. 74 & 81; remainder sealed |
| 163 | Declaration of Byron Goldstein in Support of Plaintiffs' Motion for Class Certification | Sealed in its entirety |
| 164 | Exhibits 1–5 to Declaration of Byron Goldstein | Sealed in their entirety |
| 165 | Exhibits 6–10 to Declaration of Byron Goldstein | Redaction suggested for Exs. 6, 7, 9; Exs. 8, 10 sealed |
| 166 | Exhibits 11–15 to Declaration of Byron Goldstein | Redaction suggested for Exs. 11–12, 14–15; Ex. 13 sealed |
| 167 | Exhibits 16–17 to Declaration of Byron Goldstein | Redaction suggested for Ex. 17; Ex. 16 sealed |
| 172 | Declaration of Daniel Prince in Support of Defendant's Motion to Seal | Redaction suggested |
| 175 | Plaintiffs' Response in Opposition to Motion to Seal | Sealed in its entirety |
| 176 | Affidavit of James Kan in Opposition to Motion to Seal | Sealed in its entirety |

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 17**

| ECF | Description | Status |
|:---:|:---:|:---:|
| 187 | Declaration of Felicia Davis Filed in Support of Defendant's Opposition to Plaintiffs' Motion for Class Certification | Sealed in its entirety |
| 200 | Defendant's Reply to Motion to Seal | Sealed in its entirety |
| 201 | Declaration of Daniel Prince Filed in Support of Nike's Reply to Motion to Seal | Sealed in its entirety |

**MOTION OF NON-PARTY MEDIA ORGANIZATIONS TO INTERVENE**
**Page 18**